**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IN RE: DOMESTIC DRYWALL ANTITRUST LITIGATION** | **MDL No. 2437 13-MD-2437** |
| **THIS DOCUMENT RELATES TO:** **All Direct Purchaser Actions** | |

### DIRECT PURCHASERS' CONSOLIDATED AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

This action is brought on behalf of Plaintiffs and all others similarly situated, to recover treble damages and other appropriate relief based on Defendants' unlawful conspiracy, from at least September 2011 to the present, to fix, raise, maintain and stabilize the price of gypsum wallboard ("wallboard") and to help effectuate this price-fixing conspiracy by abolishing the industry's long-standing practice of limiting price increases for the duration of a construction project through the use of "job quotes." The Defendants in this action, CertainTeed Corporation ("CertainTeed"), USG Corporation and United States Gypsum Company (collectively "USG"), New NGC, Inc. ("National Gypsum"), Lafarge North America Inc. ("Lafarge"), Eagle Materials Inc. ("Eagle Materials"), American Gypsum Company LLC ("American Gypsum"), TIN Inc. d/b/a Temple-Inland Inc. ("Temple-Inland"), and PABCO Building Products, LLC ("PABCO"), manufacture and sell the vast majority of wallboard sold in the United States.[1] As set forth below, Defendants' conspiracy violates the federal antitrust laws and, in particular, Section 1 of the Sherman Act, 15 U.S.C. § 1 ("Sherman Act").

---

[1] Plaintiffs and Georgia Pacific LLC ("GP") have entered a tolling agreement and GP is not included as a defendant herein.

## INTRODUCTION AND OVERVIEW

1.      Wallboard – also known as drywall, sheetrock or plasterboard – is used in over 90 percent of all new residential and commercial construction projects in the United States.  On average, a new home built in the United States contains more than 7.31 metric tons of gypsum, wallboard's primary component.  Because of its ease of installation and finishing, and sound-dampening, fire-retarding and/or moisture-control qualities, wallboard has no reasonably functional or economic substitutes, thus enabling the manufacturers of wallboard to control the market price without fear that purchasers might turn to an alternate product.

2.      The major manufacturers of wallboard have aggregate, annual, domestic sales of more than $3 billion.

3.      From at least September 2011 through the present, Defendants, manufacturers of wallboard, and potentially others unnamed herein, combined and conspired to fix and raise the prices at which they sold wallboard in the United States, beginning with large and coordinated price increases that all became effective on or about January 1 or 2, 2012.  In advance of these coordinated increases, each Defendant informed customers that it was imposing enormous price increases, that those price increases would go into effect on or about January 1, 2012, and that those increases would remain in place throughout 2012. For example:

- On September 20, 2011, Defendant American Gypsum told customers nationwide that "Effective January 1, 2012, we will implement a 35% price increase on all gypsum wallboard products.  This increased price (up 35%) will be your price for the entire year 2012.  This increase applies to all segments of the business."

- On September 28, 2011, Defendant USG told customers nationwide that "USG will establish new pricing which will be effective on all wallboard purchases beginning January 1, 2012."  USG stated that this price increase would be in effect "for all of 2012."  USG subsequently imposed substantially the same price increase as its co-conspirators effective January 1, 2012.

2

- On September 30, 2011, Defendant National Gypsum told customers nationwide that "National Gypsum Company will implement a price increase of 35% on all wallboard products, to be effective on January 1, 2012. It is our intention that the resultant price (up 35%) will apply for all 2012."

- On October 3, 2011, Defendant CertainTeed wrote to inform its customers that they would receive a new price schedule on November 15 for "all wallboard products." CertainTeed subsequently told customers that "our price increase, intended to be in effect for the calendar 2012 year, will range between 35% and 37% for all gypsum wallboard products."

- On October 4, 2011, Defendant Lafarge informed its customers nationwide that "on Monday, January 2nd 2012 we will implement a 35% increase on all our wallboard products."

- On October 12, 2011, Defendant PABCO told customers nationwide that "Effective January 1, 2012, PABCO Gypsum will implement a 35% price increase across all product lines. This increase will establish pricing for the calendar year 2012."

- At about the same time, Defendant Temple-Inland communicated to customers that it was imposing substantial price increases, that those price increases would become effective on or about January 1, 2012, and that those price increases would remain in effect throughout 2012. Defendant Temple-Inland then imposed price increases that were substantially the same as those imposed by its co-conspirators, went into effect at the same time and were imposed for the same time period.

4. The 2011 price increase announcements were led by Defendant American Gypsum, which had a small market share relative to industry leaders like Defendants USG and National Gypsum. Absent assurances and agreement that its "competitors" would follow, such "leadership" by a small player would have been contrary to American Gypsum's self-interest. Indeed, given the prevailing market conditions and the previous inability of individual companies to impose smaller price increases in the absence of collusion, the initiation of such a huge price increase by American Gypsum (and other actions described below) would—in the absence of a conspiracy—have failed in the marketplace and had negative business consequences for American Gypsum, including, *e.g.*, loss of customers, erosion of market share and loss of

3

valuable good-will in the marketplace.  That is to say, absent collusion, American Gypsum's actions, and those of the other Defendants, would not have made economic sense.

5.      Contrary to prior history in the industry, Defendants not only announced these coordinated price increases, despite an anticipated soft market, they then successfully maintained much higher prices throughout 2012.  Defendants were able to impose and maintain these substantially higher prices in the face of significant industry overcapacity.  This would not have been possible in the absence of collusion.  Indeed, wallboard manufacturing executives have indicated that neither increased costs, increased demand, nor a reduction of wallboard production capacity or supply explained or drove the 35 percent price increase announced by the Defendants.

6.      In the same letters announcing their price increases, each Defendant also abruptly abolished its use of a decades-old competitive pricing practice known as "job quotes."  Job quotes permitted customers to lock in the price of wallboard (sometimes with specified escalators) for the entire course of a construction project.  Notwithstanding the pivotal role this industry practice had historically played for four decades, each Defendant abruptly eliminated the practice in late 2011, at the same time that Defendants put in place the industry-wide price increases described above.

7.      This longstanding industry practice had provided a mechanism for price competition between manufacturers.  But the collusive change in the industry pricing model shifted the risk of future price increases squarely to customers and was expressly designed to allow Defendants to profit from the January 2012 price increase, as well as any future price increases.  A research analyst who follows the industry stated succinctly: "the elimination of job quotes paves the way for a meaningful price increase.  That, in a nutshell, is the story."

8.      The elimination of competitive job quotes facilitated collusion by enhancing Defendants' ability to monitor and detect cheating from the conspiracy.  Prior to the elimination of job quotes, a significant portion of wallboard was sold pursuant to a job quote.[2]  If job quotes had remained in place, a Defendant's failure to implement collusive price increases could simply be regarded as pricing consistent with the job quote practice.  With the practice eliminated, however, any failure to impose price increases would be more readily recognized by co-conspirators as cheating.    Thus, by eliminating the job quote policy, Defendants ensured more immediate and consistent implementation of their conspiratorial 2012 price increase, and facilitated the monitoring of their conspiracy.

9.      Job quotes had been a well-ingrained industry practice for over four decades and customers received this price protection for a substantial portion of wallboard purchases.  Accordingly, any one Defendant seeking to eliminate these competitive price terms by itself would have been met with opposition and likely defections from customers.  Only through collusion, therefore, was the reversal and restraint of this long-standing practice possible.  The conspiracy allowed Defendants to effectuate this historically unprecedented change in price structure.

10.      Both the changes described above and the manner in which they were implemented departed from longstanding industry practices in numerous respects.  First, the industry-wide announcements of across-the-board 35 percent price increases were the largest increases in at least a decade.  Further, Defendants issued these unprecedentedly large price increase announcements shortly after individual wallboard manufacturers had tried and failed to impose smaller increases earlier in the year, and even though there had been no material change

---

[2] Although precise figures are not available to Plaintiffs, Defendants may have had as much as 40 percent of their sales subject to job quotes prior to their actions to curtail this practice.

in market conditions that provided any reason to believe much larger increases would have been viable absent collusion.  Second, in contrast to longstanding industry practice in which price increases were ordinarily announced approximately thirty days in advance (which allowed a company to anticipate market conditions when the prices would become effective), the announcement of these increases commenced more than three months before they were to become effective.  Third, each Defendant announced that its much higher prices would remain in effect for the entire year (regardless of any changes in market conditions).  This was, again, a striking departure from Defendants' longstanding practices.  Fourth, as noted above, each Defendant departed from its historical practice by announcing the immediate elimination of job quotes.

11.    Long-time industry participants recognized that these changes, implemented at virtually the same time and in virtually identical manners by each Defendant, were a radical departure from long-established practices.  A distributor described the policy and pricing changes as "drastic."  Furthermore, a manufacturing executive with decades of experience in the wallboard industry indicated that these changes and the manner in which they were imposed were unprecedented and troubling from an antitrust perspective.  The executive was aware of no legitimate business reasons for the actions taken through Defendants' price increase announcement letters, nor could he see how those actions could be consistent with the unilateral interest of any wallboard manufacturer in a competitive marketplace.

12.    At or about the same time, Defendants also implemented supply restrictions to facilitate their ability to impose and maintain industry-wide price increases.  These supply restrictions were put in place even though there was substantial overcapacity in the industry. In fact, the industry was operating at barely over fifty percent of its actual capacity.  It would have

been contrary to the unilateral interests of any Defendant to restrict its supply of wallboard to customers during a period of substantial overcapacity in the absence of a conspiracy because of the risk that customers could have turned to competing suppliers to meet their needs.  Similarly, because of limited demand for wallboard and substantial overcapacity, no manufacturer could have imposed and maintained such large price increases or eliminated the longstanding competitive job quotes practice in the absence of a conspiracy.

13.     Defendants had ample opportunity to collude.  For example, they participate in multiple trade association meetings, including a mid-September 2011 Association of Walls & Ceiling Industry Executives' Conference and a mid-October 2011 meeting of the Gypsum Association.  There are also close connections between certain Defendants' executives and sales personnel.  For example, the President of American Gypsum (the first company to announce the price increase and elimination of job quotes on September 20, 2011) was formerly a senior executive at USG (which announced almost immediately thereafter that it would be increasing prices on the same effective date, for the same time period and eliminating all job quotes).

14.     Since these changes were implemented on or about January 1, 2012, no Defendant has retracted the announced price increases or reinstituted a job quote policy to gain market share.  Departing from prior practice, Defendants have substantially increased wallboard prices and curtailed their customers' ability to get bids for jobs from a variety of manufacturers and play one off of the other.

15.     Not only did Defendants maintain supra-competitive prices in 2012, late in that year they announced substantial additional price increases effective January 1, 2013, with the intention of maintaining those increased prices throughout 2013.  For example:

- On August 22, 2012, Defendant American Gypsum told its customers that it would impose a 25% price increase on all wallboard products on

7

January 1, 2013 and that price increase would apply to all work performed in 2013.

- On September 6, 2012, Defendant National Gypsum told its customers that it "will increase prices on its entire Gypsum Wallboard product line … by **30%** across the board.  It is once again, our intention that this increase will be good for the entire calendar year of 2013.  In addition, our elimination of the practice of providing job quotes remains in effect and is strictly enforced."  (Emphasis in original).

- On September 13, 2012, Defendant CertainTeed told customers that it "will increase price effective with shipments on January 2, 2013 by 30%.  This increase amount will apply to all wallboard products and is intended to be in effect for the entire year."  CertainTeed also stated that it was continuing "our policy of not providing job quotes to customers for specific projects."

- On October 15, 2012, Defendant Lafarge told its customers that effective January 1, 2013, it would increase the price of all wallboard products by 30% and "[t]his price increase applies to all our wallboard products and is intended to be in effect for all of 2013."

- On October 24, 2012, Defendant PABCO told its customers that "[e]ffective January 1, 2013, PABCO Gypsum will implement a **30%** price increase across all product lines.  This increase will establish pricing for the calendar year 2013."

- Defendant USG also informed customers in November 2012 that it would impose increased prices on all USG wallboard products effective January 1, 2013, that these price increases would remain in effect for all of 2013, and that USG would not provide job quote or price protection for any wallboard products.  Like the other Defendants, USG has then imposed price increases of approximately 30%.

- Similarly, Temple-Inland informed customers in November 2012 that it was "increasing the prices **30%** on all gypsum wallboard products effective with shipments after December 30, 2012."  Temple-Inland's policy of eliminating job quotes has also remained in place.

16.    As a result of Defendants' collusion, Plaintiffs and all other direct purchasers of wallboard have paid artificially inflated prices.  This action is brought by Plaintiffs and a proposed class of direct purchasers (defined below) to recover overcharges they paid as a result of Defendants' unlawful conspiracy in violation of the Sherman Act.

## CLASS ALLEGATIONS

17.    Plaintiffs bring this action pursuant to Rules 23(a) and 23(b)(3) of the Federal

Rules of Civil Procedure on behalf of a class (the "Class") consisting of:

> All persons or entities that purchased wallboard in the United
> States directly from any of the Defendants or their co-conspirators,
> their subsidiaries, affiliates or joint-ventures from January 1, 2012
> through the present (the "Class Period"). Excluded from the Class
> are Defendants, their parent companies, subsidiaries and
> affiliates, any co-conspirators, federal governmental entities and
> instrumentalities of the federal government.

18.    The Class is so numerous that joinder of all members is impracticable. Many

hundreds, if not thousands, of individuals and entities purchased wallboard directly from

Defendants during the Class Period.

19.    Plaintiffs' claims are typical of the claims of the members of the Class because

they were all damaged by the actions of Defendants which caused them to pay artificially

inflated prices for wallboard.

20.    Plaintiffs will fairly and adequately represent and protect the interests of the

Class.  Plaintiffs' interests coincide with, and are not antagonistic to, those of the other Class

members.

21.    Plaintiffs are represented by counsel who are experienced and respected in the

prosecution of class action and antitrust litigation.

22.    This case presents many common questions of law and fact that will predominate

over any questions that may affect individual members of the Class, such as:

- Whether Defendants engaged in a conspiracy to raise, fix, and maintain
  prices of wallboard sold in the United States;

- Whether Defendants conspired to eliminate or otherwise restrain the
  practice of providing job quotes in order to effectuate their price-fixing
  conspiracy;

- Whether Defendants conspired to restrict the supply of wallboard;

- The duration and extent of the conspiracy;

- Whether each Defendant was a participant in any such conspiracy;

- Whether Defendants' actions in so conspiring violated Section 1 of the Sherman Act;

- Whether the conspiracy had the effect of artificially inflating the price of wallboard sold in the United States during the Class Period;

- Whether Defendants' conduct caused injury to Class members; and

- The measure and amount of damages incurred by the Class.

23.    Adjudicating the claims of Class members as a class action is superior to the alternative, because it allows for the fair and efficient adjudication of the controversy alleged in this Complaint, while avoiding the risk that the prosecution of separate actions by individual members of the Class would create inconsistent adjudications, establishing incompatible standards of conduct for Defendants. This action presents no difficulties in management that would preclude its maintenance as a class action.

## JURISDICTION AND VENUE

24.    Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries that Plaintiffs and the other Class members have suffered from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

25.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

26.    Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C § 1391(b), (c) and (d) because, during the Class Period, Defendants resided, transacted

business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District.

27.    This Court has personal jurisdiction over each Defendant, because each Defendant – throughout the United States and including in the Eastern District of Pennsylvania – transacted business, sold wallboard, maintained substantial contacts, and/or committed overt acts in furtherance of their illegal scheme and price-fixing conspiracy.  The conspiracy was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in the Eastern District of Pennsylvania.

## PARTIES

28.    Plaintiff Sierra Drywall Systems, Inc. is a corporation with its principal place of business in Arizona.  Sierra Drywall purchased wallboard at supra-competitive prices directly from a wholly-owned and controlled subsidiary of USG Corporation during the Class Period.

29.    Plaintiff Janicki Drywall, Inc. is a Pennsylvania corporation with its principal place of business in Erie, PA.  Janicki purchased wallboard at supra-competitive prices directly from a wholly-owned and controlled subsidiary of USG Corporation during the Class Period.

30.    Plaintiff New Deal Lumber & Millwork Co. is a Pennsylvania corporation with its principal place of business in Philadelphia, PA.  New Deal purchased wallboard at supra-competitive prices directly from Defendants USG, Lafarge and National Gypsum during the Class Period.

31.    Plaintiff Grubb Lumber Co., Inc. is a Delaware corporation with its principal place of business in Wilmington, DE.  Grubb purchased wallboard at supra-competitive prices directly from a wholly-owned and controlled subsidiary of USG Corporation during the Class Period.

32.     Defendant CertainTeed Corporation ("CertainTeed") is a corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Valley Forge, PA.  During the Class Period, CertainTeed manufactured and sold wallboard to purchasers in the United States, including to members of the Class.  In 2011, CertainTeed had approximately 13% of sales of wallboard in the United States.

33.     Defendant USG Corporation (referred to collectively with United States Gypsum Company as "USG") is a public corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Chicago, IL. USG Corporation, through its wholly-owned subsidiaries United States Gypsum Company and L&W Supply Corporation ("L&W"), is a leading manufacturer and distributor of wallboard.  Defendant United States Gypsum Company is a wholly-owned subsidiary of USG Corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Chicago, IL. During the Class Period, USG manufactured and sold wallboard to purchasers in the United States, including to members of the Class.  USG has had the largest market share of any manufacturer prior to and during the Class Period.  Specifically, in 2011, USG had approximately 25% of the U.S. sales of wallboard.

34.     Defendant New NGC, Inc. ("National Gypsum"), commonly known as National Gypsum Company, is a privately-held corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Charlotte, NC.  During the Class Period, National Gypsum manufactured and sold wallboard to purchasers in the United States, including to members of the Class.  In 2011, National Gypsum had approximately 23% of sales of wallboard in the United States.

12

35.     Defendant Lafarge North America Inc. ("Lafarge") is a corporation organized, existing, and doing business under the laws of the State of Maryland, with its headquarters in Reston, VA.  During the Class Period, Lafarge manufactured and sold wallboard to purchasers in the United States, including to members of the Class.  In 2011, Lafarge had approximately 8% of sales of wallboard in the United States.

36.     Defendant Eagle Materials Inc. ("Eagle Materials") is a public corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Dallas, TX.  Eagle Materials, through its wholly-owned subsidiary American Gypsum Company LLC, is a manufacturer of wallboard.  Defendant American Gypsum Company LLC is a wholly-owned and controlled subsidiary of Eagle Materials organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in the same location in Dallas, TX.  Eagle Materials controls American Gypsum's operations. Eagle Materials vice presidents occupy all of the top executive positions at American Gypsum, including its president, and therefore direct all of American Gypsum's operations.  During the Class Period, Eagle Materials and American Gypsum (referred to collectively as "American Gypsum") manufactured and sold wallboard to purchasers in the United States, including to members of the Class.  In 2011, American Gypsum had approximately 10% of sales of wallboard in the United States.

37.     Defendant TIN Inc. d/b/a Temple-Inland Inc. ("Temple-Inland") is a corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Austin, TX.  During the Class Period, Temple-Inland manufactured and sold wallboard to purchasers in the United States, including to members of the Class.  In 2011, Temple-Inland had approximately 7% of sales of wallboard in the United States.

13

38.     Defendant PABCO Building Products, LLC ("PABCO") is a corporation organized, existing, and doing business under the laws of the State of California, with its headquarters in Rancho Cordova, CA.  During the Class Period, PABCO manufactured and sold wallboard to purchasers in the United States, including to members of the Class.   In 2011, PABCO had approximately 4% of sales of wallboard in the United States.

39.     Defendants' acts, as alleged herein, were authorized, ordered and condoned by their respective parent companies and authorized, ordered and performed by their officers, directors, agents, employees, representatives or subsidiaries while engaged in the management, direction, control or transaction of their business affairs.

40.     Various other persons, corporations, or firms not named as Defendants herein participated in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

## INTERSTATE TRADE AND COMMERCE

41.     Defendants' conduct, as described in this Complaint, was within the flow of, was intended to, and did have a substantial effect on, the interstate commerce of the United States, including in this District.

42.     During the Class Period, Defendants manufactured, sold and shipped wallboard in a continuous and uninterrupted flow of interstate commerce.   Defendants' price-fixing conspiracy had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## FACTUAL ALLEGATIONS

A.    **Wallboard Background**

43.    Wallboard consists primarily of a solid, flat core of gypsum rock sandwiched in between two sheets of linerboard paper.  It is commonly referred to as drywall, sheetrock, wallboard or plasterboard.

44.    Gypsum is one of the most widely used minerals in the world.  Although there are two types of gypsum – natural and synthetic – they are chemically identical ($CaSO_4\,2H_2O$).

45.    Natural gypsum is a mineral mined in 17 states and many parts of the world.

46.    Gypsum is extracted through mining or quarrying veins of ore that occur close to the surface of the earth.  Gypsum deposits lie in flat beds of typically about six to eight feet in thickness, but sometimes of twenty to thirty feet.  They are often inter-layered with limestone or shale.

47.    One hundred pounds of gypsum contains approximately 21 pounds of chemically combined water.  To drive off the majority of this water and turn the raw product into usable gypsum, it is first crushed into a powder and heated to 350 degrees Fahrenheit.  This process is called "calcining."  In 2010, the states where the most gypsum was calcined were Nevada, Iowa and California.

48.    The powder is made into wallboard by mixing it with water and other additives and feeding the resulting slurry between layers of paper on a board machine.  The paper edges of the board are machine-wrapped as the face and back paper become chemically and mechanically bonded to the gypsum core.

49.    The calcium sulfate then re-crystallizes, and the board is cut to length and conveyed through dryers to remove any of the remaining moisture.  After the board is dried, it is

15

inspected and trimmed again.  Individual boards are bound together in pairs in a two-sheet stack called a "book."

50.     Wallboard is used in new residential and new commercial construction as well as in the repair and remodeling of both residential and commercial buildings.  Wallboard is used in nearly all of the new homes constructed in the United States, and an average new home in the United States contains more than 7.31 metric tons of gypsum or, in other terms, more than 6,144 square feet (571 square meters) of gypsum wallboard.   In 2011, wallboard sales were apportioned approximately as follows: 34 percent new residential uses, 54 percent residential repair and remodel and 12 percent for commercial uses.   In 2012, wallboard sales were apportioned approximately as follows: 35 percent new residential uses, 55 percent residential repair and remodel and 11 percent for commercial uses.

51.     Wallboard is sold in standardized widths, lengths and thicknesses.  1/2 inch, and 5/8 inch are the most common thicknesses, and 12 feet by 4 feet is the most commonly produced size.

52.     Wallboard differs from products like plywood, hardboard and fiberboard because of the non-combustible core, primarily comprised of fire-resistant gypsum.  It also differs from glass-faced sheathing materials.

**B.**     **Market Characteristics Conducive to Collusion**

**1.**     **Sales Of Wallboard In The United States Are Conducive To Collusion Because They Are Controlled By A Limited Number Of Manufacturers.**

53.     Defendants collectively account for approximately ninety percent of the wallboard sold in the United States and Canada as of 2011.  The four largest Defendants account for approximately 71% of U.S. wallboard sales. *See Figure 1.*

| Defendant Manufacturer | Market Share 2011 |
|---|:---:|
| USG | 25% |
| National Gypsum | 23% |
| CertainTeed/Saint-Gobain/BPB | 13% |
| American Gypsum | 10% |
| Lafarge | 8% |
| Temple-Inland | 7% |
| PABCO | 4% |

*Figure 1*

54.     The current level of concentration is relatively recent.  In the early 1990s, there were also several smaller manufacturers with only one or two plants and a regional focus.  Prior to 2002, investor filings discussed the competition that Defendants experienced from "smaller, regional competitors," but Defendants stopped referring to such competitors after 2002.

55.     Empirical scholarship on cartels has primarily focused on a concentration measure called the CR4 (i.e., the four-firm concentration ratio – the share of product sales accounted for by the four largest firms) as a diagnostic in analyzing what levels of concentration facilitate multi-firm collusion.  For example, a published study of U.S. Department of Justice price-fixing investigations found that 76% of these cartels occurred in sectors with CR4s of 50 percent or greater, which was about double the average CR4 for manufacturing.  Fully a quarter of these cartels, therefore, were organized in markets with a less than 50 percent share held by the four

largest firms.   As indicated above, the CR4 in the wallboard industry is 71%, a level of concentration highly conducive to cartelization.

56.    This increased market concentration facilitated the conspiracy because a potential cartel would need only to conspire with, and police, a limited number of companies to be successful.  This concentration facilitated not only the fixing of prices but also the coordination of pricing terms (including the elimination of job quote pricing).  Moreover, because Defendants own and control approximately ninety percent of the wallboard manufacturing capacity in the United States, they collectively have the market power to impose and sustain the large price increases described herein.

### 2.    Wallboard is a Commodity Product, which Facilitates and Encourages Collusion.

57.    Defendants' wallboard is a commodity product and is functionally interchangeable, *i.e.*, one Defendant's wallboard does not differ significantly in quality, appearance or use from that produced by another Defendant.

58.    When products are interchangeable, the primary way companies can win business is by competing on price.  The avoidance of price-based competition is the primary motivation for forming a cartel.  Thus, cartels are more likely when the participants sell interchangeable products.

59.    Wallboard is produced and sold in standard dimensions.

60.    To be competitive, wallboard manufacturers must adhere to standards set by the ASTM (American Society for Testing Materials) and UL (Underwriters' Laboratories) to be compliant with applicable building codes for construction products.  Compliance with these standards commoditizes wallboard since the standards effectively dictate the quality and

composition of the vast majority of wallboard sold in the United States, including that sold by Defendants.

61.     The Gypsum Association itself describes wallboard as "a family of panel-type products consisting of a noncombustible core, primarily of gypsum, with a paper surfacing on the face, back, and long edges." Defendants and/or their parent corporations have acknowledged that wallboard is a commodity in that competition is based largely on price, which Defendants recognize is the principal driver of competition.

62.     Where a product like wallboard is a commodity, economics suggests that cartel behavior is facilitated because, *inter alia*, cartel members can more easily monitor and detect defections from a price-fixing agreement.

### 3.    High Barriers To Entry In The Wallboard Market Make The Industry Susceptible To Collusion.

63.     A collusive arrangement that raises product prices above competitive levels would, under normal circumstances, attract new entrants to the market. Where there are significant barriers to entry, however, new entrants are less likely.  High barriers to entry have prevented new entrants into the wallboard market in the United States, despite the coordinated inflation of prices and elimination of job pricing.

64.     Entry into the wallboard market involves significant start-up capital expenditures. A new entrant would have to incur tens, if not hundreds, of millions of dollars in costs, including capital expenditures on plants and equipment, regulatory approvals, transportation, electricity, infrastructure for distribution, and labor. The equipment needed to manufacture wallboard is custom-built and would take at least 18 months, but more likely several years, before it could become operational.  Moreover, because wallboard manufacturers are vertically integrated, to compete effectively in the market a new entrant would not only have to acquire the means to

produce wallboard, such as access to a limited number of gypsum mines, but would also need to acquire the means to produce finished wallboard, and to place the product into the marketplace. Further, some of the major manufacturers already maintain distribution networks which not only make products available, but provide information about the products and new product developments to customers. As an example of the cost of entering into the market, the purchase of one gypsum line and wallboard plant in Nashville, Arkansas cost $97 million dollars in 1997. And, in 2000, Celotex Corporation sold its gypsum wallboard business for $345 million to purchaser BPB P.L.C., a company owned by Saint-Gobain, which also owns Defendant CertainTeed. In April 2005, American Gypsum announced that its new wallboard manufacturing facility in Georgetown, South Carolina would cost $125 million to build. In 2007, National Gypsum built a $125 million wallboard manufacturing plant in Mt. Holly, North Carolina.

65.     Moreover, imports do not provide a reasonably interchangeable substitute for domestic wallboard. Because of safety and quality concerns associated with foreign wallboard, and with Chinese wallboard in particular, as well as transportation costs associated with imports, purchasers have no meaningful alternative to domestic wallboard. Imports account for *de minimis* sales of domestic wallboard.

66.     These high barriers to entry helped facilitate Defendants' conspiracy, as they severely restrict the ability of new competitors to enter the market and capitalize on the conspiracy's supra-competitive pricing.

### 4.     Price Inelasticity For Wallboard Makes The Industry Susceptible To Collusion.

67.     When a seller of goods or services can increase prices without suffering a substantial reduction in demand, pricing is considered inelastic. Price inelasticity facilitates collusion, allowing producers to raise their prices collectively without triggering sufficient

customer substitution to alternative products that could make the conspiratorial prices unprofitable.

68.    Pricing for wallboard is highly inelastic in large part because there are no adequate economic substitutes.  Wallboard is used in virtually all new residential construction and renovation projects, and many commercial projects as well, throughout the United States.  There are no close substitutes for wallboard that builders can use as a replacement, because wallboard differs from other construction materials in its composition, functional characteristics, customary uses, and lower cost.  It is also different from other construction materials such as plaster or lumber because of ease of application, smooth finish and fire-resistant and moisture-controlling qualities.

69.    Because there are no reasonably interchangeable or economic substitutes for wallboard, a significant increase in the price of wallboard by a cartel would not cause (and has not caused) a significant number of purchasers to utilize other materials in lieu of wallboard.

70.    Because the price for wallboard is highly inelastic, Defendants were able to collectively raise prices to supra-competitive levels without losing revenues.

### 5.    The Defendants Had Many Opportunities To Collude.

71.    The wallboard industry provides ample opportunities for Defendants to collude through trade association meetings, other contacts between the conspirators' executives and sales personnel, movement of executives from one co-conspirator to another, and analyst phone calls.

72.    The Gypsum Association was founded in 1930.  Defendants USG, National Gypsum, American Gypsum, PABCO, Temple-Inland, Lafarge and CertainTeed are among its members.   In addition to publishing a number of promotional, educational, and technical materials concerning the gypsum industry, it hosts meetings in the spring, summer and fall and a

yearly conference, at which Defendants are regular attendees.  Numerous Defendant employees, including their CEOs and high-ranking executives, attend these multi-day meetings.  In addition to formal meetings, the Gypsum Association events also include social activities and dinners attended by Defendants.

73.    The Gypsum Association's board of directors for the 2011-2012 term included, for example, Stephen Raley from Defendant Temple-Inland, John K. Donaldson from Defendant CertainTeed, Joseph Holmes from Defendant USG and Craig Robertson from Defendant National Gypsum.  The Gypsum Association's board of directors for the current 2012-2013 term includes, for example, Joseph Holmes from Defendant USG, Craig Robertson from Defendant National Gypsum, and Treasurer Ryan Lucchetti from Defendant PABCO.

74.    Each Defendant is also a member of the Association of the Wall & Ceiling Industry ("AWCI"), which is a trade association that holds multi-day conferences and meetings in the spring and fall.  These events are attended by Defendants' senior officials and sales executives.  The attendees at these meetings typically stay at the same hotel.

75.    At least four Defendants (USG, National Gypsum, CertainTeed and Lafarge) are members of the Drywall Finishing Council ("DWFC").  The DWFC holds at least two annual events—its annual convention each Fall, and a "Spring Mixer."  Some Defendants are also members of the Drywall & Interior System Contractors Association.

76.    Trade associations and meetings provided numerous opportunities for Defendants to collude as alleged herein.  For example, Defendants attended the annual AWCI Industry Executives' Conference & Committee Meeting over a four-day period from September 13-16, 2011 in Coeur d'Alene, Idaho.  Defendant USG sponsored the entire event while Defendant National Gypsum sponsored the golf tournament.  On September 15, 2011, a "Supplier and

Manufacturers Committee" meeting was conducted.   On September 16, 2011, the Wallboard Committee met.   During the Conference, attendees discussed topics such as how "effective control systems are critical to maintaining margins;" "the way suppliers and distributors stock inventory;" and "the reason for the changes to quoting policies."   Shortly thereafter, Defendants met again on October 17-18, 2011 at the Global Gypsum Conference in Las Vegas, Nevada.   As set forth above, in the one-month window between these two major industry meetings, Defendants announced unprecedented, huge price increases and the elimination of the decades-old practice of providing job quotes.

77.    Also, at the Global Gypsum Conference in Las Vegas in October 2011, Mr. Bob Bruce, owner of Innogyps, Inc., the leading gypsum market consulting entity in North America, acknowledged that the industry faced continued difficult economic conditions and explicitly warned that economic conditions did not support (non-collusive) price increases.   Mr. Bruce stated: "The industry needs to achieve in the region of 85% capacity utilization to be able to push through price rises, rather than the 55% level that we are at right now."   Similarly, Eagle Materials, the parent corporation of Defendant American Gypsum, estimated that capacity utilization needed to be approximately 90% in order for U.S. wallboard manufacturers to exercise pricing power unilaterally.   Defendants understood that any efforts by individual manufacturers to impose substantial price increases in this competitive environment would have been doomed to failure.

78.    The trade association meetings and other industry events and contacts provided opportunities to meet and confer regarding the price of wallboard, elimination of competitive job quotes, and implementation of the conspiracy described herein.

79.    There are close connections between Defendants' executives and sales personnel. For example, David Powers, President of American Gypsum, was formerly a senior executive at USG.  Keith Metcalfe, the Vice President of Marketing Sales and Distribution of American Gypsum (and Vice President of Gypsum Sales of Eagle Materials) is a former USG employee. Mr. Metcalfe signed American Gypsum's September 20, 2011 and August 22, 2012 letters informing customers that prices were being increased and job quotes were being eliminated. Charles Olson is National Account Manager at American Gypsum, the same position he previously held at USG.  David Bates was District Sales Manager at USG from 1994 to 2003, and then became Director of Sales at American Gypsum from 2003 to the present.  As set forth above, in September 2011, American Gypsum and USG were the first companies to announce price increases, at virtually the same time, making them effective at the same time, imposing them (contrary to longstanding industry practice) for an entire year, and eliminating job quotes.

### 6.    The Wallboard Industry's History of Collusive Behavior.

80.    Defendants have a history of engaging in anticompetitive behavior.  In 2002, the European Union fined four gypsum companies $455 million dollars for engaging in a price-fixing scheme for wallboard and other products between 1992 and 1998.  Two of these companies – Lafarge and BPB PLC (which merged with CertainTeed in the United States) – sell wallboard in the United States and are Defendants in this action.

81.    The wallboard industry has also run afoul of U.S. antitrust laws in the past.  In *U.S. Gypsum Co. v. National Gypsum Co.*, 333 U.S. 364 (1948), the Supreme Court reversed the dismissal of a Sherman Act complaint against manufacturers of gypsum wallboard, including defendant US Gypsum, finding that there was sufficient evidence to support a finding that the defendants had violated Section 1 and 2 of the Act by engaging in a conspiracy to restrain and

monopolize interstate trade in gypsum products.  Likewise, in *Wall Products Co. v. National Gypsum Co.*, 326 F. Supp. 295 (N.D. Cal. 1971), US Gypsum and National Gypsum, among others, were found to have violated the Sherman Act by combining and conspiring among themselves to stabilize and maintain the price level of gypsum wallboard.

82.    Similarly, after a nineteen week trial in the 1970's, six gypsum manufacturers, including defendants US Gypsum and National Gypsum, were convicted of criminal antitrust violations in a nationwide conspiracy to fix the price of wallboard.  *See United States v. Gypsum Co.*, 438 U.S. 422 (1978).  While their convictions were overturned due to faulty jury instructions, on remand from the Supreme Court, the Third Circuit denied the manufacturers' motion for a judgment of acquittal, finding there was sufficient evidence from which a jury could have concluded the conspiracy violated the Sherman Act.  *See United States v. United States Gypsum Co.*, 600 F.2d 414, 419-20 (3d Cir. 1979).

### C.    The Conspiracy

83.    Starting in or before September 2011, Defendants engaged in a conspiracy to raise, fix, maintain and/or stabilize the price of wallboard and eliminate the long-standing "job quotes" pricing practice.

### 1.    Defendants' Price Increases Effective January 1, 2012

84.    The wallboard price increase that Defendants announced in the fall of 2011 was the largest in more than a decade.  During the same year, there had been failed attempts by individual manufacturers to increase prices.  In January, April and July of 2011, individual wallboard manufacturers had attempted to impose smaller price increases, but those proposed increases were rejected by customers and thus could not be maintained.

25

85.    Prior to the fall 2011 collusive price increase announcements, wallboard prices had been in a three-month period of decline, falling 0.6% in July 2011, 1.7% in August 2011, and 1.7% in September 2011.  Indeed, prices had generally been flat or declining throughout the 2008-2011 time period as a result of insufficient demand and industry overcapacity.

86.    Given the widespread and repeated rejection of efforts by individual manufacturers to implement much smaller price increases, there was no sound reason for any manufacturer to believe that a 35-percent increase could be imposed with even a remote chance of success in the absence of a collusive arrangement with other manufacturers.

87.    To the contrary, the foreseeable result of trying to impose such a drastic price increase on a unilateral basis would have been a failed price increase, a loss of substantial business to rivals intent on using the announcement as an opportunity to gain market share, a loss of good will with customers, and a loss of the manufacturer's credibility in connection with any future attempted price increases.

88.    There are significant potential costs in price announcements that have no realistic prospect for success (absent collusion).  For example, if a manufacturer loses (or fails to compete effectively for) customers because of unrealistic pricing, its ability to gain (or regain) that business in the future may be impeded by volume discounting.  This is because competing manufacturers use volume rebate programs, frequently on an annual or quarterly basis, to incentivize customers to refrain from switching to competitors absent significantly lower pricing by the competitor.  As a result, if a manufacturer loses business because of excessive pricing, it may be unable to gain or regain that business for a significant period of time because the customer is incentivized to remain with a competing supplier and maximize its volume discounts.

89.    Historically, each Defendant had typically issued price increase announcements approximately thirty days before their effective date.  The proximity of the announcement to its implementation helped ensure that the increase reflected market conditions at the time it was actually implemented.  Moreover, Defendants also had typically refrained from specifying that the higher price would be imposed for an extended period of time.  This meant that the level of the price increase could be adjusted based on changes in cost, demand, capacity or competitive conditions after it became effective.  Each Defendant departed from these historical practices in the fall of 2011 (and again, as described below, in the fall of 2012) by informing its customers that it was not only imposing much higher prices effective January 1, 2012, but also that these much higher prices would remain in effect throughout the entire year.  While none of the Defendants had engaged in this practice during the preceding decade, they all imposed these restrictions on price competition at virtually the same time effective January 1, 2012.  In the view of senior officials with substantial experience in the wallboard industry, the timing, form, and substance of Defendants' fall 2011 price increase announcements constituted a departure from longstanding practices in the wallboard industry.  These officials were aware of no legitimate business considerations for these actions, nor how they could be consistent with the unilateral interests of individual wallboard manufacturers in a competitive marketplace.

90.    To announce these material changes in price and industry practices, the Defendants issued price increase letters or otherwise communicated with their customers in late 2011.  These letters were remarkably similar.  For instance, the effective date for the price increases was virtually identical, and the stated duration of the price increases was the same.  Moreover, two Defendants even included the same mistake; Defendant CertainTeed's October 3, 2011 letter was mistakenly dated "October 3, 2012" and Defendant Lafarge sent a letter with the

27

same price increase, same effective date, same duration, and same elimination of job quotes the following day, yet was also mistakenly dated "October 4, 2012."

91.    Defendants' price increase announcement letters were described by one distributor to its customers in December 2011 as follows:  "As you are probably now aware, all the drywall manufacturers have revised their pricing strategies beginning in 2012. … The manufacturer letters that have been published vary slightly from manufacturer to manufacturer but it amounts to approximately 35% across the gypsum wallboard category."

92.    Defendants' price increase announcements were not in response to – or in expectation of – an increase in demand for wallboard.  To the contrary, Defendants had anticipated flat demand, warning investors in 2012 that "demand for drywall would be no better this year than last." Defendant National Gypsum stated that wallboard demand "has been essentially flat and at historically low levels" and projected that the "outlook for the next 12 to 18 months might at best be described as a slow 'climb out.'"  Defendant CertainTeed projected in October 2011 that "[t]he housing market is still anemic with little expectation of real improvement in the coming year."  Similarly, in October 2011, USG believed that the market was "going to be flat next year."  Defendant Eagle Materials indicated that low volumes and low capacity utilization "continues to negatively impact gypsum wallboard pricing and profitability. We do not anticipate wallboard demand to improve significantly during the remainder of Fiscal Year 2012."  Similarly, analysts at the time believed that wallboard market "[c]onditions are expected to remain weak in the near term."

93.    Faced with an anticipated weak market with no immediate prospect of rebound, Defendants nevertheless each communicated to their customers that they were imposing a large

increase in the price of wallboard.  This increase was not supported by market conditions and thus could not have been sustained absent Defendants' agreement to raise prices.

94.    Defendants' price announcements and subsequent implementation of price increases announced in the fall of 2011 had their intended effect of raising wallboard prices to the Plaintiffs and other direct purchasers to supra-competitive levels throughout 2012.

95.    The Defendants also subsequently proposed large price increases in the fall of 2012 that became effective on or about January 1, 2013.  Similarly, these price increases were not the result of higher wallboard costs.  In fact, the costs of the major wallboard inputs were stable or even falling during the 2011-2012 time period.  Moreover, most Defendants are vertically integrated companies, and thus are able to control to a certain extent the biggest cost inputs of wallboard – gypsum and paper – because they mine or produce these materials themselves.

96.    Absent collusion, if input costs remain stable or fall, and demand is flat, prices would be expected to remain flat or fall as well.  That all Defendants' prices rose substantially in 2012, despite competitive conditions dictating stable or falling prices, is indicative of collusion.  Here, through their alleged conspiracy, Defendants were able to increase wallboard prices even in the face of stable input costs and anticipated flat demand without fear that their customers could turn to competitors selling at a lower price.

97.    Moreover, the January 2012 price increases were imposed during a time of substantial overcapacity in the industry.  In October 2011, US Gypsum reported that "[c]urrently, there is significant excess wallboard production capacity industry wide in the United States.  Industry capacity in the United States was approximately 32.9 billion square feet.  We estimate that the industry capacity utilization rate was approximately 52% during the first nine months of

29

2010.  We project that the industry capacity utilization will remain at approximately that level for the balance of 2011."  Another wallboard manufacturer reported internally that "[o]ver 2006-11, industry operating rates (production over running capacity) fell from the high 90%s to the mid 50%s."  The industry's overcapacity during the period 2007-2011, and other factors such as declining demand, created substantial downward pressure on pricing.

98.    Industry analysts have recognized the downward pressure that overcapacity creates on pricing, noting, for example, that wallboard prices have tended to weaken historically when the industry's rate of capacity utilization has declined below 90%.  As one analyst explained, "[w]hen industry utilization drops below 85-90%, prices start to drop and continue to do so until the supply-demand curve comes back into balance.  Normally the price will drop and force capacity closures until the plant utilization rate approaches 85-90%."  The same market constraint on pricing was recognized by wallboard manufacturers.  For example, internal records of one wallboard manufacturer reported that "[s]ignificant industry excess capacity will persist into the near-term keeping downward pressure on operating rates …, sales prices and profits."  Similarly, USG has acknowledged that the industry's low level of capacity utilization puts downward pressure on wallboard selling prices.

99.    Because of these market fundamentals, other industry participants – unaware of the conspiracy – had a high level of certainty that these price increases, like earlier efforts in 2011, had no chance of succeeding.  As one distributor explained at the time, "[t]he whole thing will … slowly but surely collapse."  Another distributor explained that "[i]t's pretty basic economics; demand is simply too low … to allow for an increase and policy change this drastic."

100.    These forecasts incorrectly assumed, however, that normal competitive forces were at work.  The reality was quite different.  As a result of their concerted actions, Defendants

successfully and substantially increased wallboard prices and then maintained them at supra-competitive levels. Although the grandfathering of job quotes that were in place before the conspirators discontinued job quotes overall, may have delayed full implementation of some price increases on certain jobs, the conspiracy has been highly successful at raising wallboard prices in the United States.

101. Thus, in 2012, analysts reported that the price increase imposed in January 2012 "continues to hold nearly in full." An industry participant explained that in terms of the price increases, the wallboard manufacturers were "sticking to their guns."

102. Without the conspiracy's implementation of significant price increases, each Defendant's respective self-interest would have dictated price cutting, or at least price moderation, to undercut its rivals' price increases. Absent the conspiracy, efforts by one Defendant to increase prices significantly, and commit to sticking to such increases, in the existing soft market, would have resulted in lost sales, customers and market share to competitors who did not raise prices. No one Defendant would have had the leverage to increase wallboard prices profitably to the degree collectively imposed by Defendants absent collusion.

103. For example, American Gypsum's leadership in announcing a 35 percent price increase for all customers, its commitment to maintain those higher prices throughout 2012 and its elimination of job quotes, were all actions decidedly against its unilateral self-interest in the absence of a conspiracy. Given the marketplace's widespread rejection of at least three smaller price increase efforts in the preceding months – and no intervening change in market conditions – there was no plausible reason to believe that a price increase (let alone a 35 percent price increase) could be imposed with any success in the fall of 2011, particularly by a company with only a 10% market share. Instead, absent a conspiracy, a smaller market player announcing a 35

percent price increase and the immediate elimination of job quotes would have risked a significant and immediate loss of business, a loss of good will with customers and lost credibility in connection with any future attempted price increases. No firm, let alone a relatively small market participant like American Gypsum, would have rationally taken such steps absent an agreement in advance that the other Defendants would follow.

### 2.    Defendants' Elimination of Job Quotes

104.    Concurrent with the fall 2011 price increase announcements, Defendants also announced the elimination of the industry's longstanding practice of providing job quotes. Job quotes – also called price protection – had been a competitive pricing practice in the wallboard industry for more than four decades. Job quotes allowed customers to lock in a price for wallboard (sometimes with specified price increases) supplied throughout the entire course of a construction project. The abrupt elimination of job quotes, which Defendants each announced in the fall of 2011, represented a fundamental change in this longstanding competitive price practice for the wallboard industry.

105.    Until 2011, it was a standard competitive industry practice to allow purchasers of wallboard to negotiate job quotes with the Defendants. Prior to Defendants' conspiracy, a significant portion of Defendants' wallboard sales were made pursuant to job quotes. One distributor described this price protection practice as ingrained in the industry.

106.    Defendants' agreement to eliminate this form of price competition facilitated their tracking and monitoring of cartel members' prices, and thus the enforcement of the conspiracy. The use of job quotes made competitor pricing in the industry relatively opaque, *i.e.*, it would be harder for one cartel member to determine whether a low price given to a particular customer by another cartel member was pursuant to a job quote or was instead a defection from the cartel

32

price.  Without job quotes, Defendants would be much better able to monitor and discipline other cartel members in furtherance of their overall price-fixing conspiracy.  Thus, the elimination of job quotes facilitated the coordinated price hikes and the policing of the conspiracy.

107.    Defendants' elimination of job quotes also made it more difficult for customers to avoid Defendants' huge price increases by "locking in" fall 2011 prices for long-term projects by soliciting and receiving competitive job quotes prior to the price increases' effective date.

108.    Thus, Defendants' agreement to increase prices, coupled with their elimination of job quotes, effectively and substantially increased wallboard prices and then maintained those higher prices.  Reports have confirmed that the elimination of job quotes coupled with the announcement of higher prices to remain in place for the entire year resulted in a sharp rise in wallboard prices in 2012 and recently again in 2013.

109.    This dramatic change in a long-standing competitive pricing practice used by each Defendant was implemented, for example, in the following communications:

- On September 20, 2011, Defendant American Gypsum told its customers that "Effective immediately, we will no longer be providing job quotes."

- On September 28, 2011, Defendant USG told its customers that "USG will no longer offer job quotes and/or price protection on wallboard, effective immediately."

- On September 30, 2011, Defendant National Gypsum told its customers that "effective immediately, we will discontinue for all product lines the policy of providing job quotes."

- On October 3, 2011, Defendant CertainTeed (Saint-Gobain) told its customers that it was going to "cease all job quotes immediately." (Emphasis in original).

- On October 4, 2011, Defendant Lafarge told its customers that "effective immediately, we will cease all job quotations."

33

- On October 12, 2011, Defendant PABCO told its customers nationwide that "Effective immediately, PABCO Gypsum will discontinue the policy of providing job quotes.

- Similarly, Defendant Temple-Inland also informed its customers that it was eliminating its policy of providing job quotes.

110.   As discussed above, Defendants implemented this significant change in their business practices at virtually the same time and in virtually the same manner.  For example, Defendant USG indicated that it would "honor any job quotes that have been committed to USG with a purchase order by October 15, 2011."  Defendant CertainTeed told customers that "we will require all existing projects be confirmed with a firm purchase order or written notice of intent by October 14, 2011.  This policy will be strictly enforced."  Defendant National Gypsum revoked a policy it had described to customers only a few months earlier, stating that "effective immediately, we will discontinue for all product lines the policy of providing job quotes" and also established an "October 14, 2011" deadline for honoring job quotes that had already been provided.  Defendant PABCO's elimination of job quotes became "[e]ffective immediately" on October 12, 2011.   Defendant Lafarge's October 4, 2011 letter provided that "effective immediately, we will cease all job quotations," and it would only honor outstanding job quotes that had been validated "not later than October 14, 2011.  This policy will be strictly enforced."

111.   This change – implemented at almost the same time in virtually identical terms by each Defendant – was a drastic departure from practices that had prevailed in the industry for at least four decades.

112.   It would have been against the self-interest of any one Defendant to eliminate the job quote pricing practice unilaterally because, absent collusion, any Defendant who was unwilling to offer this competitive pricing term would have risked losing market share to other competitors offering job quotes.  No one Defendant would have had the leverage to eliminate

34

this form of competition by itself; only by conspiring could Defendants have virtually eliminated this practice. Gypsum industry executives also believe that the elimination of job quotes unilaterally by one competitor carried great risks in terms of loss of volume from customers if the competitor did not know the industry would eliminate them.

113.    Defendants' imposition of a 35 percent across-the-board price increase along with a promise to continue to charge these inflated prices throughout 2012 is not a form of "price protection" analogous to job quotes.   Telling customers, across the board, that dramatically higher prices are going to be imposed – and that those increases will remain in place regardless of competitive conditions or market forces – is not protection from a price increase because it *is* a price increase.  Moreover, unlike job quotes – which were a form of price competition for large projects – Defendants' *carte blanche* announcement of much higher prices and commitment to maintain those higher prices for the next year regardless of market conditions was designed to, and had the effect of, restraining price competition.

114.    Defendants have adhered to their announced policy of discontinuing job quotes. For example, on September 6, 2012, Defendant National Gypsum told customers that "our elimination of the practice of providing job quotes remains in effect and is strictly enforced."  On September 13, 2012, Defendant CertainTeed told customers that it "continues our policy of not providing price quotes to customers for specific projects."  The other Defendants have, in like manner, continued to restrain the availability of job quotes in the marketplace consistent with Defendants' agreement.

### 3.    Defendants' Supply Restrictions

115.    In conjunction with the price increases described herein, Defendants have also imposed restrictions on the supply of wallboard made available to distributors and other

customers.  For example, Defendants refused to sell wallboard to many customers in late 2011 and 2012 to prevent them from "pre-buying" supplies of wallboard at prevailing market prices before the collusive price increases went into effect.  These supply restrictions facilitated Defendants' ability to impose and maintain the price increases described herein.

116.    To help enforce supply restrictions, Defendants notified and/or monitored distributors and other customers to ensure that they did not build up surplus inventory to circumvent price increases.  For example, pursuant to the conspiracy, Defendants alerted co-conspirators when a particular distributor appeared to be accumulating excess supply and notified the distributor that its purchases were being monitored and reported by another conspirator.

117.    One analyst, when discussing the 2013 price increase, noted that when planning for that increase, "most distributors were reminded of their limited ability to procure product ahead of last year's price increase, which was driven in large part by controlled distribution and manufacturers rather uniformly taking down their plants for maintenance in mid to late December, which severely limited distributors' ability to procure product at that time."  That same analyst confirmed that, as of mid-September 2012, "manufacturers implemented a national allocation program," limiting distributors' ability to place new orders based on the average size of purchases placed during the preceding 3-6 month period.

118.    These supply restrictions have been imposed despite substantial overcapacity in the wallboard industry.  As set forth above, and as acknowledged by Defendant USG in 2012, the industry's capacity utilization is still at "historically low" levels.

119.    Because of this underutilized capacity, it would have been contrary to the interests of any individual Defendant to restrict the supply of wallboard to its purchasers.  Absent the

conspiracy, a manufacturer restricting supply to a customer unilaterally would risk not only loss of that specific business, but could also jeopardize the customer relationship by encouraging the customer to do business with its competitors.

### 4.    Defendants' January 1, 2013 Price Increases

120.    Although demand has improved only modestly, Defendants continue to impose price increases that are significantly out of proportion to changes in demand.   Defendants informed customers of, and then imposed another round of large price increases effective on or about the same date – January 1, 2013 – to again remain in place for the same duration – throughout 2013.  For example:

- On August 22, 2012, Defendant American Gypsum told its customers that it would impose a 25% price increase on all wallboard products on January 1, 2013 and that price increase would apply to all work performed in 2013.

- On September 6, 2012, Defendant National Gypsum told its customers that it "will increase prices on its entire Gypsum Wallboard product line … by **30%** across the board.  It is once again, our intention that this increase will be good for the entire calendar year of 2013.  In addition, our elimination of the practice of providing job quotes remains in effect and is strictly enforced."  (Emphasis in original).

- On September 13, 2012, Defendant CertainTeed told customers that it "will increase price effective with shipments on January 2, 2013 by 30%.  This increase amount will apply to all wallboard products and is intended to be in effect for the entire year."  CertainTeed also stated that it was continuing "our policy of not providing job quotes to customers for specific projects."

- On October 15, 2012, Defendant Lafarge told its customers that effective January 1, 2013, it would increase the price of all wallboard products by 30% and "[t]his price increase applies to all our wallboard products and it intended to be in effect for all of 2013."

- On October 24, 2012, Defendant PABCO told its customers that "[e]ffective January 1, 2013, PABCO Gypsum will implement a **30%**

price increase across all product lines.  This increase will establish pricing for the calendar year 2013." (Emphasis in original).

- On November 16, 2012, Defendant USG told its customers that its wallboard prices would increase effective January 1, 2013; that the higher "price will be in effect for all of 2013"; and that "USG will not provide job quotes or price protection for any wallboard products."  Effective January 1, 2013, USG imposed price increases of approximately 30% on customers for 2013.

- On November 26, 2012, Defendant Temple-Inland told customers that it "will be increasing the price **30%** on all gypsum wallboard products" effective December 30, 2012.  (Emphasis in original).

121.   Defendants' actions have again led to substantial and supra-competitive price increases for their customers in 2013.  Industry analysts have surveyed retailers and distributor customers of Defendants and concluded that the price increases for 2013 have been successful.

122.   Defendants imposed these price increases even though there continues to be substantial overcapacity in the industry.  Absent the conspiracy, it would have been contrary to the interests of any one Defendant to impose such large increases in a market with significant overcapacity.  As Defendant USG again acknowledged in April 2012, "there is significant excess wallboard production capacity industry-wide in the United States.  Industry capacity in the United States was approximately 31.9 billion square feet as of January 1, 2012.  We estimate that the industry capacity utilization was approximately 54% during the first quarter of 2012 compared to 51% during the first quarter of 2011 and 56% during the fourth quarter of 2011.  We project that the industry capacity utilization rate will remain at approximately the current level for the balance of 2012."  Defendant USG recognized that "such a low level of capacity utilization" puts "pressure on gypsum wallboard selling prices and gross margins."  Capacity utilization in the industry has, in fact, remained very low.  For example, Defendant USG

estimates that industry capacity utilization was 52% in the first quarter of 2013 and has projected that the utilization rate will increase only "slightly" in 2013.

123.    Defendants again maintained supply restrictions to facilitate another round of coordinated, large price increases effective January 1, 2013.  For example, Defendants have communicated to their customers and imposed supply restrictions limiting the ability of distributors to purchase larger amounts in late 2012.  Defendant USG indicated that on or about September 18, 2012, it "put in a controlled distribution policy for our customers" and, as a result, customers "know there's a ceiling on what they can purchase."

124.    During the same time period, Defendants have imposed these supply restraints even though they are substantially underutilizing their capacity.  Absent the conspiracy, it would not be in the independent interest of any one Defendant to impose such a supply restraint unilaterally, because of the risk that substantial business would be lost to its competitors.

## VIOLATIONS OF THE ANTITRUST LAWS

125.    Beginning by at least September 2011 and continuing through the present, Defendants engaged in a continuing agreement, understanding and conspiracy in restraint of trade to artificially raise, fix, maintain, or stabilize wallboard prices in the United States.

126.    Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially raise, fix, maintain, or stabilize wallboard prices in the United States.  These activities included:

(a)    participation in meetings, conversations, and communications to discuss, and fix, raise, maintain, or stabilize the price and pricing terms for the sale of wallboard in the United States;

(b)    agreement during those meetings, conversations, and communications to charge prices at specified levels and otherwise to fix, raise, maintain, or stabilize prices of wallboard sold in the United States;

39

(c)     agreement during those meetings, conversations, and communications to discontinue the industry practice of providing job quotes, in furtherance of their conspiracy to fix, raise, maintain, or stabilize the prices of wallboard sold in the United States;

(d)     agreement during those meetings, conversations, and communications to restrict the supply of wallboard to their customers; and

(e)     taking numerous steps, as set forth above, to implement and maintain the conspiracy.

127.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreement described in this Complaint.

128.    Throughout the Class Period, Plaintiffs and the other Class members purchased wallboard directly from Defendants (or their wholly owned and controlled subsidiaries) at prices that were artificially inflated due to the conspiracy.

129.    Defendants' contract, combination or conspiracy constitutes an unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## ANTI-COMPETITIVE EFFECTS

130.    As a result of Defendants' unlawful conduct, Plaintiffs and the other Class members have been injured in their business and property because they have paid more for wallboard than they would have paid absent collusion.

131.    Defendants' unlawful contract, combination or conspiracy has had at least the following effects:

(a)     price competition in the market for wallboard has been artificially restrained;

(b)     prices for wallboard sold by Defendants have been raised, fixed, maintained and/or stabilized at supra-competitive levels; and

(c)    purchasers of wallboard from Defendants have been deprived of the benefit of free and open competition in the market for wallboard.

## <u>CAUSE OF ACTION – VIOLATIONS OF SHERMAN ACT § 1</u>

132.    Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

133.    Beginning in at least September 2011, and continuing thereafter to the present, Defendants and their co-conspirators, by and through their officers, directors, employees, agents, or other representatives, engaged in anticompetitive activities, the purpose and effect of which were to artificially raise, fix, maintain, or stabilize the price of wallboard sold in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

134.    Defendants entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially raise, fix, maintain, or stabilize prices for wallboard in the United States.

135.    Defendants entered into a continuing agreement, understanding and conspiracy in restraint of trade to eliminate job quotes in furtherance of their conspiracy to fix, raise, maintain, or stabilize the price of wallboard.

136.    Plaintiffs and the other Class members have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiffs and Class members paid more for wallboard than they otherwise would have paid in the absence of Defendants' conduct.  This injury is of the type the federal antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

137.    Accordingly, Plaintiffs and Class members seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including reasonable attorneys' fees.

## DEMAND FOR JURY TRIAL

138.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand

a jury trial as to all issues triable by a jury.

## PRAYER FOR RELIEF

139.    Wherefore, Plaintiffs demand judgment against Defendants as follows:

a.    Declaring this action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein;

b.    That the contract, combination, or conspiracy, and the acts done in furtherance thereof by Defendants be adjudged to have violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

c.    That judgment be entered for Plaintiffs and Class members against Defendants for three times the amount of damages sustained by Plaintiffs and the Class as allowed by law;

d.    That Plaintiffs and the Class recover pre-judgment and post-judgment interest as permitted by law;

e.    That Plaintiffs and the Class recover their costs of the suit, including attorneys' fees, as provided by law; and

f.    For such other and further relief as is just and proper under the circumstances.

Dated: June 24, 2013

Respectfully submitted,

H. Laddie Montague, Jr.
Eric L. Cramer
Ruthanne Gordon
Michael C. Dell'Angelo
Candice J. Enders
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA  19103
Tel: (215) 875-3000
Email: hlmontague@bm.net
        ecramer@bm.net
        rgordon@bm.net
        mdellangelo@bm.net
        cenders@bm.net

Kit A. Pierson
Richard A. Koffman
Brent W. Johnson
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave., NW
Suite 500 West
Washington, DC 20005
Tel:  (202) 408-4600
Email: kpierson@cohenmilstein.com
        rkoffman@cohenmilstein.com
        bjohnson@cohenmilstein.com

Eugene A. Spector
Jeffrey J. Corrigan
Jay S. Cohen
Rachel E. Kopp
Jeffrey L. Spector
SPECTOR ROSEMAN KODROFF &
WILLIS, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Tel: (215) 496-0300
Email: espector@srkw-law.com
        jcorrigan@srkw-law.com
        jcohen@srkw-law.com
        rkopp@srkw-law.com
        jspector@srkw-law.com

*Interim Co-Lead Counsel for Direct Purchaser Plaintiffs and the Proposed Class*

Donald L. Perelman
Roberta D. Liebenberg
Elise E. Singer
FINE, KAPLAN AND BLACK, R.P.C.
One South Broad Street, Suite 2300
Philadelphia, Pennsylvania 19107
Tel: (215) 567-6565
Email: dperelman@finekaplan.com
        rliebenberg@finekaplan.com
        esinger@finekaplan.com

Michael J. Boni
Joshua D. Snyder
John E. Sindoni
BONI & ZACK LLC
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Tel: (610) 822-0200
Email: mboni@bonizack.com
        jsnyder@bonizack.com
        jsindoni@bonizack.com

Lee Albert
Brian Murray
GLANCY BINKOW& GOLDBERG
LLP
122 East 42nd Street
Suite 2920
New York, NY 10168
Tel: (212) 682-5340
Email: lablert@glancylaw.com
        bmurray@glancylaw.com

Jonathan Shub
SEEGER WEISS LLP
1515 Market Street, Suite 1380
Philadelphia, Pennsylvania 19102
Tel: (215) 564-2300
Email: jshub@seegerweiss.com

Oren Giskan
GISKAN SOLOTAROFF ANDERSON
& STEWART LLP
11 Broadway Suite 2150
New York, NY 10004

Steve Berman
HAGENS BERMAN SOBOL SHAPIRO
LLP
1918 Eighth Ave.
Suite 3300
Seattle, WA 98101
Tel: (206) 623-7292
Email: steve@hbsslaw.com

Jeff D. Friedman
HAGENS BERMAN SOBOL SHAPIRO
LLP
715 Hearst Ave.
Suite 202
Berkeley, CA 94710
Tel: (510) 725-3000
Email: jefff@hbsslaw.com

Kendall S. Zylstra
Joseph T. Lukens
Richard D. Schwartz
FARUQI & FARUQI LLP
101 Greenwood Ave., Suite 600
Jenkintown, PA 19046
Tel: (215) 277-5770
Email: kzylstra@faruqilaw.com
        jlukens@faruqilaw.com
        rschwartz@faruqilaw.com

Joseph C. Kohn
Williams E. Hoese
Denis F. Sheils
Douglas A. Abrahams
KOHN, SWIFT & GRAF, P.C.
One South Broad Street
Suite 2100
Philadelphia, PA 19107
Tel: (215) 238-1700
Email: jkohn@kohnswift.com
        whoese@kohnswift.com
        dsheils@kohnswift.com
        dabrahams@kohnswift.com

Anthony J. Bolognese
Josh Grabar

Tel: (212) 847-8315
Email: ogiskan@gslawny.com

David H. Fink
Darryl Bressack
FINK + ASSOCIATES LAW
100 West Long Lake Road; Suite 111
Bloomfield Hills, Michigan 48304
Tel: (248) 971-2500
Email:
dfink@finkandassociateslaw.com

Jeffrey S. Goldenberg
Todd B. Naylor
GOLDENBERG SCHNEIDER, LPA
One West Fourth Street, 18th Floor
Cincinnati, Ohio 45202-3604
Tel: (513) 345-8297
Email: jgoldenberg@gs-legal.com
          tnaylor@gs.legal.com

Jayne A. Goldstein
POMERANTZ GROSSMAN
HUFFORD DAHLSTROM & GROSS
LLP
1792 Bell Tower Lane, Suite 203
Weston, FL 33326
Tel: (954) 315-3454
Email: jagoldstein@pomlaw.com

Dianne M. Nast
Erin C. Burns
NAST LAW LLC
1101 Market Street, Suite 2801
Philadelphia, Pennsylvania 19107
Tel: (215) 923-9300
Email: dnast@nastlaw.com
          eburns@nastlaw.com

Simon Bahne Paris
Patrick Howard
SALTZ, MONGELUZZI, BARRETT &
BENDESKY, P.C.
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, PA 19103

BOLOGNESE & ASSOCIATES, LLC
Two Penn Center
1500 JFK Boulevard
Suite 320
Philadelphia, PA 19102
Tel: (215) 814-6750
Email: abolognese@bolognese-law.com
          jgrabar@bolognese-law.com

Solomon B. Cera
Thomas C. Bright
GOLD BENNETT CERA & SIDENER
LLP
595 Market Street, Suite 2300
San Francisco, California 94105
Tel: (415) 777-2230
Email: sbc@gbcslaw.com
          tcb@gbcslaw.com

Daniel E. Gustafson
Daniel C. Hedlund
Raina C. Borrelli
GUSTAFSON GLUEK PLLC
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, Minnesota 55402
Tel: (612) 333-8844
Email: dgustafson@gustafsongluek.com
          dhedlund@gustafsongluek.com
          rborrelli@gustafsongluek.com

Robert J. Gralewski, Jr.
KIRBY MCINERNEY LLP
600 B Street, Suite 1900
San Diego, CA 92101
Tel: (619) 398-4340
Email: bgralewski@kmllp.com

Daniel Hume
KIRBY MCINERNEY LLP
825 Third Avenue
New York, NY 10022
Tel: (212) 371-6600
Email: dhume@kmllp.com

Jon A. Tostrud

Tel: (215) 575-3986
Email: sparis@smbb.com
      phoward@smbb.com

Michael D. Hausfeld
James J. Pizzirusso
Mindy B. Pava
HAUSFELD LLP
1700 K Street, NW, Suite 650
Washington, DC 20006
Tel: (202) 540-7200
Email: mhausfeld@hausfeldllp.com
      jpizzirusso@hausfeldllp.com
      mpava@hausfeldllp.com

Brent W. Landau
HAUSFELD LLP
1604 Locust Street, 2nd Floor
Philadelphia, PA 19103
Tel: (215) 985-3273
Email: blandau@hausfeldllp.com

Arthur N. Bailey
ARTHUR N. BAILEY &
ASSOCIATES
111 W. 2nd Street, # 4500
Jamestown, NY 14701
Tel: (716) 664-2967
Email: artlaw@windstream.net

Jay W. Eisenhofer
Linda P. Nussbaum
Peter A. Barile, III
GRANT & EISENHOFER P.A.
485 Lexington Avenue
New York, NY 10017
Tel: (646) 722-8500
Email: jeisenhofer@gelaw.com
      lnussbaum@gelaw.com
      pbarile@gelaw.com

Michael E. Criden
Kevin B. Love
CRIDEN & LOVE, P.A.
7301 S.W. 57th Court, Suite 515
South Miami, FL 33143

TOSTRUD LAW GROUP, P.C.
1901 Avenue of the Stars, Suite 200
Los Angeles, CA 90067
Tel: (31 0) 278-2600
Email: jtostrud@tostrudlaw.com

Michael J. Freed
Steven A. Kanner
Douglas A. Millen
Michael E. Moskovitz
Michael L. Silverman
FREED KANNER LONDON &
  MILLEN, LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Tel: (224) 632-4500
Email: mfreed@fklmlaw.com
      skanner@fklmlaw.com
      dmillen@fklmlaw.com
      mmoskovitz@fklmlaw.com
      msilverman@fklmlaw.com

Guido Saveri
R. Alexander Saveri
Cadio Zirpoli
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA 94111
Tel: (415) 217-6810
Email: rick@saveri.com
      cadio@saveri.com

W. Joseph Bruckner
Robert K. Shelquist
Elizabeth R. Odette
LOCKRIDGE GRINDAL NAUEN
P.L.L.P.
100 Washington Avenue South
Minneapolis, MN 55401
Tel: (612) 339-6900
Email: wjbruckner@locklaw.com
      rkshelquist@locklaw.com
      erodette@locklaw.com

Karl L. Cambronne
Jeffrey D. Bores

Tel:(305) 357-9000
Email: mcriden@cridenlove.com
      klove@cridenlove.com

Larry S. McDevitt
David M. Wilkerson
THE VAN WINKLE LAW FIRM
11 North Market Street
Asheville, NC 2880
Tel: (828) 258-2991
Email: dwilkerson@vwlawfirm.com
      lmcdevitt@vwlawfirm.com

Steven J. Greenfogel
LITE DEPALMA GREENBERG, LLC
151 Locust Street
Philadelphia, PA 19102
Tel: (215) 564-5182
Email: sgreenfogel@litedepalma.com

Steven A. Asher
Mindee J. Reuben
Jeremy S. Spiegel
WEINSTEIN KITCHENOFF &
  ASHER LLC
1845 Walnut Street, Suite 1100
Philadelphia, PA 19103
Tel: (215) 545-7200
Email: asher@wka-law.com
      reuben@wka-law.com
      spiegel@wka-law.com

Garrett Blanchfield
REINHARDT WENDORF &
  BLANCHFIELD
E1250 First National Bank Bldg.
332 Minnesota Street
St. Paul, MN 55101
Tel: (651) 287-2100
Email: g.blanchfield@rwblawfirm.com

Scott Gilchrist
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Tel: (317) 636-6481

Bryan L. Bleichner
CHESTNUT CAMBRONNE PA
17 Washington Avenue North, Suite 300
Minneapolis, MI 55401
Tel: (612) 339-7300
Email:
kcambronne@chestnutcambronne.com
      jbores@chestnutcambronne.com
      bbleichner@chestnutcambronne.com

Daniel J. Mogin
THE MOGIN LAW FIRM, P.C.
707 Broadway, Suite 1000
San Diego, CA 92101
Tel: (619) 687-6611
Email: dmogin@moginlaw.com

Vincent J. Esades
Renae D. Steiner
James W. Anderson
HEINS MILLS & OLSON, PLC
310 Clifton Avenue
Minneapolis, MN 55403
Tel: (612) 338-4605
Email: vesades@heinsmills.com
      rsteiner@heinsmills.com
      janderson@heinsmills.com

Joseph W. Cotchett
Steven N. Williams
Adam J. Zapala
Elizabeth T. Tran
COTCHETT, PITRE & MCCARTHY,
LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Tel: (650) 697-6000
Email: jcotchett@cpmlegal.com
      swilliams@cpmlegal.com
      azapala@cpmlegal.com
      etran@cpmlegal.com

Charles E. Tompkins
Anthony J. O'Neill
Bethany C. Teska

Email: sgilchrist@cohenandmalad.com

Rodney C. Olsen
MORRISON, FROST, OLSEN,
IRVINE &
  SCHARTZ, LLP
323 Poyntz, Suite 204
Manhattan, KS 66502
Tel: (785) 776-9208

Terry Gross
Adam C. Belsky
Sarah Crowley
GROSS BELSKY ALONSO LLP
One Sansome Street, Suite 3670
San Francisco, CA 94104
Tel: (415) 544-0200
Email: terry@gba-law.com
        adam@gba-law.com
        sarah@gba-law.com

Christopher M. Burke
Walter W. Noss
John T. Jasnoch
SCOTT+SCOTT, ATTORNEYS AT
LAW
707 Broadway, Suite 1000
San Diego, CA 92101
Tel: (619) 233-4565
Email: cburke@scott-scott.com
        wnoss@scott-scott.com
        jjasnoch@scott-scott.com

D. Michael Campbell
CAMPBELL LAW
1861 N. Crystal Lake Drive
Lakeland, FL 33801
Tel: (863) 292-9929
Email: dmcampbell@campbelllaw.com

Daniel D. Moody
MOODY LAW, P.A.
P.O. Box 266
Bartow, FL 33831
Tel: (863) 733-9090
Email: dan@moodylaw.com

WILLIAMS MONTGOMERY & JOHN
233 South Wacker Drive, Suite 6100
Chicago, IL 60606
Tel: (312) 443-3200
Email: cet@willmont.com
        ajo@willmont.com
        bct@willmont.com

Howard J. Sedran
Austin B. Cohen
Keith J. Verrier
LEVIN, FISHBEIN, SEDRAN &
BERMAN
510 Walnut St. , Suite500
Philadelphia, PA 19106
Tel: (215) 592-1500
Email: hsedran@lfsblaw.com
        acohen@lfsblaw.com
        kverrier@lfsblaw.com

David P. McLafferty
 MCLAFFERTY & ASSOCIATES, P.C.
923 Fayette Street
Conshohocken, PA 19428
Tel: (610) 940-4000
Email: dpmclafferty@yahoo.com

David R. Scott
SCOTT+SCOTT, ATTORNEYS AT
LAW 156 South Main Street
P.O. Box 192
Colchester, CT  06415
Tel: (860) 537-5537
Email: david.scott@scott-scott.com

Joseph P. Guglielmo
Donald A. Broggi
SCOTT+SCOTT, ATTORNEYS AT
LAW
The Chrysler Building
405 Lexington Ave., 40th Floor
New York, NY 10174
Tel: (212) 223-6444
Email: jguglielmo@scott-scott.com
        dbroggi@scott-scott.com

48

David M. Cialkowski
Anne T. Regan
Brian C. Gudmundson
ZIMMERMAN REED, P.L.L.P.
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Tel: (612) 341-0400
Email:david.cialkoswki@zimmreed.com
       anne.regan@zimmreed.com
       brian.gudmundson@zimmreed.com

*Counsel for Direct Purchaser Plaintiffs and the Proposed Class*