UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **IN RE: DOMESTIC DRYWALL ANTITRUST LITIGATION** | MDL No. 2437<br>13-MD-2437 |
| **THIS DOCUMENT RELATES TO:**<br><br>**INDIRECT PURCHASER ACTION.** | FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT |

## CLASS ACTION COMPLAINT

Plaintiffs Robert Pitter, Nicholas L. DeMarco, Howard Glaser, Afamefuna Agbodike, Brian Lisonbee, William Perry, Todd Ramsay, Geneva Clark, East Island Commercial LLC, and 220 Golden Gate Associates L.P., by and through their attorneys, bring this First Amended Consolidated Class Action Complaint ("Complaint") for indirect purchasers of gypsum wallboard against Defendants CertainTeed Corp., USG Corporation, United States Gypsum Company, New NGC, Inc., LaFarge North America Inc., American Gypsum Company LLC, TIN Inc. d/b/a Temple-Inland Inc., and PABCO Building Products, LLC (collectively "Defendants"). These Defendants, who manufacture, sell, and distribute gypsum wallboard in the United States and who together control the market for drywall, conspired to and did illegally raise, fix, maintain and stabilize the price of drywall in contravention of federal and state law beginning in the fall of 2011. Plaintiffs seek redress for themselves and those similarly situated.

## NATURE OF THE ACTION

1. This putative class action alleges that Defendants agreed, combined, and/or conspired among themselves to raise, inflate, fix, maintain, and/or stabilize the price of gypsum wallboard from at least September 2011 to the present. Because Defendants are horizontal

competitors, their conspiracy is a *per se* violation of Section 1 of the Sherman Act of 1890, 15 U.S.C. § 1 ("Sherman Act") and violates the applicable state laws referenced herein.

2. Gypsum wallboard (commonly known as "wallboard" or "drywall") is the basic material used to form walls and ceilings in over ninety percent of all new residential and commercial structures. Gypsum wallboard has no competitively significant substitutes due to its unique properties, including being easily and safely installed and resisting fire at the lowest available cost. It is a commodity product, meaning that consumers freely substitute gypsum wallboard manufactured by one defendant for that manufactured by another and differentiate between manufacturers primarily based on cost. The gypsum wallboard market bears many indicia of a market amenable to collusion, as it features (1) high barriers to entry; (2) price inelasticity; (3) a high degree of concentration; and (4) easy opportunities to conspire.

3. Starting as least as early as September 2011 and continuing through to the present day, Defendants agreed and conspired amongst themselves to raise, inflate, fix, stabilize and/or maintain the prices at which they sold gypsum wallboard in the United States, beginning with large and coordinated price increases becoming effective on or about January 1 or 2, 2012. Defendants announced these coordinated increases during late September through mid-October 2011.

4. Contemporaneously with their price increase announcements, each of the Defendants abolished the long-standing competitive pricing practice of using "job quotes" to establish prices for gypsum wallboard their customers intended to use in specific projects.[1] For decades beforehand, using job quotes had been standard industry practice in the gypsum wallboard industry. Job quotes specified set pricing for gypsum wallboard for the life of a

[1] Before September of 2011, the exact amount of Defendants' wallboard sales covered by job quotes is unknown to Plaintiffs but may well have reached the 40 percent range.

particular construction project (which could extend for months or even years), regardless of price fluctuations in the gypsum industry. The simultaneous and sudden elimination of the job quote practice facilitated Defendants' ability to monitor each other and insure collective compliance with their price-fixing scheme, ushering in a period of rising prices for gypsum wallboard and ensuring that customers could not avoid the immediate impact of those rising prices. Further, these simultaneous and sudden letters regarding price increases and the cessation of job quotes in and of themselves constituted additional discussions among Defendants concerning the conspiracy, and monitoring compliance therewith. Each Defendant knew that it would learn from its customers of the letters sent by each of the other Defendants, and would accordingly know its competitors had followed through on their pricing agreements.

5. Coordination amongst the Defendants was necessary in order to implement this dramatic change in prices and the prevailing industry practice of providing job quotes. Without knowing that the other major manufacturers of Gypsum would also raise prices dramatically while eliminating job quotes, any single Defendant doing so would have attracted an overwhelmingly negative reaction from consumers, resulting in the loss of market share and hence revenue to its competitors. This fear would have been particularly applicable to American Gypsum, the first Defendant to send any of the price increase letters. It is implausible that American Gypsum, a relatively small player in the gypsum wallboard market, would have taken the risk of increasing prices and eliminating job quotes without assurance that its competitors would follow suit. Previously, one of the two largest gypsum wallboard manufacturers (Defendant USG or Defendant National Gypsum) took the lead in announcing price increases.

6. Defendants implemented the 2012 price increases despite little prospect for substantial increases in construction activity and despite substantial overcapacity for producing

gypsum wallboard. This combination of factors makes it highly implausible that any Defendant would act independently in raising prices substantially and eliminating job quotes. Moreover, Defendants successfully maintained the inflated pricing throughout 2012, which is particularly revealing given the traditional experience in the industry, where prices historically changed multiple times in any given year.

7. Numerous meetings in the gypsum wallboard and building supply industries provided easy and convenient opportunities for Defendants to collude to hatch and then maintain their anticompetitive scheme. For example, Defendants participated in multiple trade association meetings, including meetings of the Gypsum Association and the Association of the Wall and Ceiling Industry (AWCI) Industry Executives' Conference.

8. Notably, the Defendants attended an AWCI Industry Executive Conference meeting in Coeur d'Alene, Idaho from September 13-16, 2011, where topics such as how "effective control systems are critical to maintaining margins," how "changes in quoting policies are affecting the way contractors bid and estimate jobs, and the way suppliers and distributors stock inventory," as well as "the reason for the changes to quoting policies" were discussed. Just days after this meeting, Defendants announced their price increases and ceased the job quotes policy.

9. Defendants' changes in practice beginning in fall of 2011 constituted an abrupt and dramatic disruption in how they had operated previously, the sort of sharp change that no Defendant would have attempted absent collusion. Defendants' price increase announcement letters contained an unusually long lead time between the date of the letter and the effective date of the policy change – two and a half to over three months – when, previously, 30 to 45 days had been the industry norm.

10. Each Defendant's announcement letter also indicated that the manufacturer intended to implement the price increase on the same date as each other Defendant – the beginning of the next calendar year – whereas, historically, manufacturers implemented pricing increases on divergent and unique dates based on their individual business judgment. Further, the announcement letters each indicated that the increased price would remain in effect for the entire following calendar year when, previously, announcement letters contained no pre-set term of effectiveness and, as a practical matter, remained in effect for around 90 days.

11. In the fall of 2012, Defendants again announced price increases within a short time of each other, each of which was to take effect on January 1, 2013. Again, these price increases were for markedly similar amounts. Again, these price increases excluded the possibility of independent action based on historical experience in the industry, for they remained in effect for the entire calendar year.

12. In the fall of 2011, and then again in the fall of 2012, Defendants restricted the supply of gypsum wallboard any individual customer could purchase. Defendants did so to facilitate their collective ability to raise and adhere to higher prices. Absent the supply restriction, customers with the ability to store inventory would have stockpiled supplies of cheaper gypsum wallboard in the interim between the announcement date and the effective date of the price increases, as was the normal practice in the industry. Defendants restricted supply even though the industry featured a massive amount of unused capacity, which was as high as fifty percent. No Defendant would restrict supply without assurances that its competitors would do the same, as customers otherwise would have simply turned to competing suppliers to meet their needs, leaving the Defendant who tried to restrict supply with reduced sales and profits.

13. Because of Defendants' collusion, Plaintiffs and Class Members paid artificially higher prices for gypsum wallboard than they would have paid in a competitive market.

**JURISDICTION AND VENUE**

14. Plaintiffs bring this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, to obtain equitable and injunctive relief for violations of Section 1 of the Sherman Act (15 U.S.C. § 1). The court has subject matter jurisdiction under 28 U.S.C. § 1331 for claims that arise under federal law and under 28 U.S.C. § 1337 for federal antitrust claims in particular. Plaintiffs also assert claims for damages, to seek restitution, and secure other relief, under state antitrust, unfair competition, consumer protection and unjust enrichment laws.

15. The Court additionally has subject matter jurisdiction over these state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy.

16. This court further has subject matter jurisdiction over the state law claims by virtue of the Class Action Fairness Act of 2005 ("CAFA"), which amended 28 U.S.C. § 1332 to add a new subsection (d) conferring federal jurisdiction over class actions where, "any member of a class of Plaintiffs are citizens of states different from any Defendant and the aggregated amount in controversy exceeds $5,000,000, exclusive of interest and costs." The $5 million amount-in-controversy and diverse-citizenship requirements of CAFA are satisfied in this case.

17. Under 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C. § 1391(b), (c) and (d), this District has venue over the action, for Defendants resided, transacted business, were found, and/or had agents in this District, and this District was the situs of a substantial portion of the affected interstate trade and commerce discussed herein during the Class Period.

18. Each Defendant is subject to personal jurisdiction before this Court because, among other reasons, each of them (a) transacted business, (b) sold and/or distributed gypsum wallboard, (c) maintained substantial contacts, and/or (d) engaged in an illegal and anticompetitive concerted action with respect to gypsum wallboard throughout the United States and in this District in particular. The jointly agreed upon scheme had the intended effect of injuring persons residing in, located in, or doing business throughout the United States, including in the Eastern District of Pennsylvania. By artificially establishing supracompetitive prices, the scheme restrained trade unreasonably and negatively affected the market for gypsum wallboard, harming persons throughout the United States and this District who purchased gypsum wallboard for personal use and not for resale, including Plaintiffs and members of the Classes.

## INTERSTATE TRADE AND COMMERCE

19. Defendants' activities, as described herein, were within the flow of and had a substantial effect on, the interstate commerce of the United States, including in this District, as Defendants intended.

20. Defendants manufactured, distributed, and sold gypsum wallboard in an uninterrupted and continuous flow of interstate commerce among the United States and its territories. Defendants' anticompetitive scheme consequently inflicted a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## PARTIES AND OTHER ACTORS

### Plaintiffs

21. Plaintiff Robert Pitter is a resident of Southwest Ranches, Florida. Mr. Pitter indirectly purchased gypsum wallboard manufactured by one or more of the Defendants during the relevant time period for end use and not for resale. As a result of the misconduct alleged

herein, Mr. Pitter has suffered injury in that he paid more for that product than he would have paid in the absence of the Defendants' misconduct.

22. Plaintiff Nicholas L. DeMarco is a resident of Albany, New York. Mr. Demarco indirectly purchased gypsum wallboard manufactured by one or more of the Defendants during the relevant time period for end use and not for resale. As a result of the misconduct alleged herein, Mr. DeMarco has suffered injury in that he paid more for that product than he would have paid in the absence of the Defendants' misconduct.

23. Plaintiff Howard Glaser is a resident of Chestnut Hill, Massachusetts. Mr. Glaser indirectly purchased gypsum wallboard manufactured by one or more of the Defendants during the relevant time period for end use and not for resale. As a result of the misconduct alleged herein, Mr. Glaser has suffered injury in that he paid more for the gypsum wallboard product than he would have in the absence of Defendants' misconduct.

24. Plaintiff Afamefuna Agbodike is a resident of the State of California. Mr. Agbodike indirectly purchased gypsum wallboard manufactured by one or more of the Defendants during the relevant time period for end use and not for resale. As a result of the misconduct alleged herein, Mr. Agbodike has suffered injury in that he paid more for the gypsum wallboard product than he would have in the absence of Defendants' misconduct.

25. Plaintiff Brian Lisonbee is a resident of Layton, Utah. Mr. Lisonbee indirectly purchased gypsum wallboard manufactured by one or more of the Defendants during the relevant time period for end use and not for resale. Mr. Lisonbee has suffered injury in that he paid more for the gypsum wallboard product than he would have in the absence of Defendants' misconduct.

26. Plaintiff William Perry is a resident of Phoenix, Arizona. Mr. Perry indirectly purchased gypsum wallboard manufactured by one or more of the Defendants during the relevant

time period for end use and not for resale. As a result of the misconduct alleged herein, Mr. Perry has suffered injury in that he paid more for the gypsum wallboard product than he would have in the absence of Defendants' misconduct.

27. Plaintiff Todd Ramsay is a resident of Elgin, Illinois. Mr. Ramsay indirectly purchased gypsum wallboard manufactured by one or more of the Defendants during the relevant time period for end use and not for resale. As a result of the misconduct alleged herein, Mr. Ramsay has suffered injury in that he paid more for the gypsum wallboard product than he would have in the absence of Defendants' misconduct.

28. Plaintiff Geneva Clark is a resident of Pine Bluff, Arkansas. Mrs. Clark indirectly purchased gypsum wallboard manufactured by one or more of the Defendants during the relevant time period. As a result of the misconduct alleged herein, Mrs. Clark has suffered injury in that he paid more for that product than he would have paid in the absence of the Defendants' misconduct.

29. Plaintiff East Island Commercial LLC ("East Island") is a Massachusetts limited liability corporation created by Lawrence Community Works ("LCW"), a 501(c)(3) nonprofit community development organization with its principal place of business in Lawrence, Massachusetts, for the express purposes of building, owning and managing certain commercial real estate projects in the City of Lawrence, Massachusetts. East Island indirectly purchased gypsum wallboard manufactured by one or more of the Defendants during the relevant time period for end use and not for resale. As a result of the misconduct alleged herein, East Island has suffered injury in that it paid more for gypsum wallboard than it would have paid in the absence of the Defendants' misconduct.

30. Plaintiff 220 Golden Gate Associates L.P. ("220 Golden Gate") is a California limited partnership created by Tenderloin Neighborhood Development Corporation ("TNDC"), a 501(c)(3) nonprofit organization with its principal place of business in San Francisco, California, for the express purpose of building, owning, and managing residential and health clinic properties for low income persons in the City and County of San Francisco, California. 220 Golden Gate indirectly purchased gypsum wallboard manufactured by one or more of the Defendants during the relevant time period for end use and not for resale. As a result of the misconduct alleged herein, 220 Golden Gate has suffered injury in that it paid more for gypsum wallboard than it would have paid in the absence of the Defendants' misconduct.

**Defendants**

31. Defendant USG Corporation is a public corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Chicago, Illinois. Through its wholly-owned subsidiaries, United States Gypsum Company and L&W Supply Corporation, USG Corporation is a leading manufacturer and distributor of gypsum wallboard. USG Corporation and its subsidiaries are referred to collectively as "USG."

32. A wholly-owned subsidiary of USG Corporation, Defendant United States Gypsum Company, is organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Chicago, Illinois. USG manufactured and sold gypsum wallboard to buyers in the United States during the Class Period. In 2011, approximately 25% of American gypsum wallboard sales were made by USG.

33. Defendant New NGC, Inc. ("National Gypsum") is a wholly-owned subsidiary of Delcor, Inc., which is referred to as National Gypsum Company, and is a privately-held corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Charlotte, North Carolina. National Gypsum manufactured and distributed

gypsum wallboard to buyers in the United States during the Class Period. In 2011, approximately 23% of American gypsum wallboard sales were made by National Gypsum.

34. Defendant LaFarge North America Inc. ("LaFarge"), a wholly-owned subsidiary of LaFarge SA., is a corporation organized, existing, and doing business under the laws of the State of Maryland, with its headquarters in Reston, Virginia. LaFarge manufactured and distributed gypsum wallboard to buyers in the United States during the Class Period. In 2011, approximately 8% of American gypsum wallboard sales were made by LaFarge.

35. Defendant CertainTeed Corporation ("CertainTeed"), a wholly-owned subsidiary of Saint-Gobain Corp., is a corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Valley Forge, Pennsylvania. CertainTeed manufactured and distributed gypsum wallboard to buyers in the United States during the Class Period. In 2011, approximately 13% of American gypsum wallboard sales were made by CertainTeed.

36. Defendant American Gypsum Company LLC ("American Gypsum") is a corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Dallas, Texas. It is a subsidiary of Eagle Materials Inc. American Gypsum manufactured and distributed gypsum wallboard to buyers in the United States during the Class Period. In 2011, approximately 10% of American gypsum wallboard sales were made by American Gypsum.

37. Defendant TIN Inc., d/b/a Temple-Inland Inc. ("Temple-Inland"), a wholly-owned subsidiary of International Paper Co., is a corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Memphis, Tennessee. Temple-Inland manufactured and distributed gypsum wallboard to buyers in the United States

during the Class Period. In 2011, approximately 7% of American gypsum wallboard sales were made by Temple-Inland.

38. Defendant PABCO Building Products, LLC is a corporation organized, existing, and doing business under the laws of the State of California, with its headquarters in Rancho Cordova, California and is referred to collectively with its subsidiary PABCO Gypsum Company as "PABCO." PABCO manufactured and distributed gypsum wallboard to buyers in the United States during the Class Period. In 2011, 4% of American gypsum wallboard sales were made by PABCO.

## CO-CONSPIRATORS AND AGENTS

39. The acts taken by Defendants, as alleged herein, were authorized, ordered and condoned by their respective parent companies and authorized, ordered and performed by their officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of their business affairs.

40. Various other persons, corporations, or firms not named as Defendants herein have participated in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

## FACTUAL ALLEGATIONS

### A. Gypsum Wallboard

41. Gypsum is a very soft sulfate mineral composed of calcium sulfate dihydrate, with the chemical formula $CaSO_4 . 2H_2O$, commonly extracted from mines in the United States and elsewhere or synthetically produced using residue from coal-burning plants. To produce wallboard, gypsum must be partially dehydrated or calcined. This involves crushing the raw gypsum into a powder, drying it, and heating it to remove chemically bound water.

42. Manufacturers create gypsum wallboard by sandwiching a core of wet gypsum between two sheets of heavy paper. When the core sets and is dried in a large drying chamber, the sandwich becomes rigid and strong enough for use as a building material. Manufacturers also sometimes sandwich gypsum between fiberglass mats for use primarily in the exterior of commercial buildings, but that product occupies a smaller niche market distinct from the gypsum wallboard market and the uses for which gypsum wallboard is employed.

**B. Gypsum Wallboard's Use in Construction**

43. Production of gypsum wallboard consumes around 90% of gypsum mined in the United States. Generally, contractors install wooden pieces of frame, and then workers attach gypsum wallboard to this frame by either screws or nails before seaming individual sheets of gypsum wallboard together using a special drywall compound, leaving an even and flat surface.

44. Historically, roughly 50% of construction gypsum wallboard goes to new residential construction, although that percentage is around 35% currently. The current percentages of wallboard consumption are around 55% for home remodel and repair and 11% for commercial applications. Further, over 90% of the new homes constructed in the United States use gypsum wallboard. A typical American single-family home, newly constructed, contains over 6,144 square feet and 7.31 metric tons of gypsum wallboard, meaning that gypsum wallboard accounts for 3-5% of the cost of the typical new home.

**C. Gypsum Wallboard is a Commodity**

45. According to the Gypsum Association, gypsum wallboard is "a family of sheet products consisting of a noncombustible core primarily of gypsum with a paper surfacing or facing." Defendants' gypsum wallboard products are functionally interchangeable. Gypsum wallboard made by one manufacturer does not differ significantly from that made by another,

and builders and consumers can easily substitute one manufacturers' gypsum wallboard for another's. Once the installer removes the paper striping identifying the manufacturer of the wallboard as part of the installation process, neither an installer nor a customer could tell which manufacturer produced the wallboard in a building.

46. Manufacturers sell gypsum wallboard in standardized dimensions: width, length, and thickness. The most commonly found thicknesses are 1/2 inch and 5/8 inch, while the most commonly produced height and length is 12 feet by 4 feet. 1/2 inch board is typically used for residential applications and 5/8 inch is typically for commercial application where fireproofing is needed. Generally, the 5/8 inch is faced with vermiculite or glass. Manufacturers sell considerably more 1/2 inch board than 5/8 inch board.

47. In markets consisting of standardized and interchangeable products, price drives consumers' purchasing decisions. Because price is the primary driver of competition, a competitor selling its product at a lower price than its competitors gains market share, and a competitor selling its product at a higher price that its competitors loses market share. Gypsum wallboard is such a market: indeed, one Defendant has characterized gypsum wallboard as a "commodity," where the primary difference between sheets of gypsum wallboard made by different manufacturers is the price at which each manufacturer sells its gypsum wallboard.[2]

48. To be competitive, wallboard manufacturers must adhere to standards set by ASTM (American Society for Testing Materials) and UL (Underwriters' Laboratories) to be compliant with applicable building codes for construction projects. Compliance with these standards commoditizes wallboard since the standards effectively dictate the quality and composition of the vast majority of wallboard sold in the United States (including that sold by Defendants).

---

[2] *See, e.g.*, Defendant Temple Inland's Form 10Q SEC Filing, 3rd Quarter 2011 at p. 21.

49. In the industry, wallboard manufacturers refer to costs per thousand square feet of wallboard. It costs approximately $105 to make 1,000 square feet. Of that sum, approximately $60 is for raw material (*i.e.*, rock and paper), broken down as follows: $20 for rock, $35 for paper, and $5 for other ingredients (silicon/glass). Of that $105, approximately an additional $40 is for "converting costs," broken down as follows: $15 for labor, $8 for electricity, and $12 for natural gas. The remaining $5 covers miscellaneous costs.

50. The cost of manufacturing wallboard is highly sensitive to the price of natural gas. For example, each increase in $1 per mbtu of natural gas costs results in increased manufacturing costs of $3- $4 per thousand square feet because the furnaces used in the process of manufacturing wallboard consume large quantities of natural gas.

51. The cost of wallboard amounts to approximately 25 to 30% of the price charged by a typical contractor installing gypsum wallboard. The remainder is largely attributable to labor costs.

52. Gypsum manufacturers also make wallboard using synthetic gypsum, typically recovered from coal-fired power plants during the scrubbing process. The costs of acquiring gypsum from this source are lower than from other sources. However, the quantities available are limited and manufacturers have long-term contracts with individual power plants, preventing this source from serving the entire Gypsum industry.

53. Commodity products are more amenable to collusion among competitors. Because the competing products are interchangeable, competition is largely focused on price, making it easier for competitors to collude and co-ordinate their collusion relative to industries where competition focuses more heavily on non-price terms, such as features, network effects, or service quality.

## D. Gypsum Wallboard is Unique, Making It Distinct from Other Wall and Ceiling Materials

54. Because gypsum wallboard offers a variety of unique benefits unavailable in other products, the vast majority of all new residential and commercial construction projects in the United States use gypsum wallboard. As explained in the article *Living with Gypsum: From Raw Material to Finished Products,* published by the EuroGypsum organization:

> Gypsum is virtually indispensable for the interiors of homes and offices, and indeed all types of building where people congregate such as schools, shops, airports, etc. Its superior performance in providing everyday comfort, in fire resistance, thermal and sound in insulation, heralds an ever greater role for it in buildings of the future. In fact, the safety and protection of people and property against fire, and the effective thermal and acoustic insulation of buildings depends, more often than not, on the unique properties of Gypsum. And many of the attractive features of modern interiors would be impossible without the versatility of Gypsum as a building material.

55. Workers can install gypsum wallboard much more easily than other products.[3] Indeed, two experienced workers can install gypsum wallboard in an entire house in one or two days whereas it would take them a week or so to cover the equivalent surfaces with plaster. There is a network of gypsum wallboard installers who can easily install wallboard but who do not have the skills and training to install other materials to fashion walls or ceilings, even if such materials were available. No comparable network exists for any alternative wall or ceiling product. Indeed, gypsum wallboard is easy enough to use that many amateur home carpenters install it themselves.

56. In North America, gypsum wallboard is by far the most commonly used interior finish when fire resistance classifications are required. Its noncombustible core contains nearly 21% chemically combined water, which, under high heat, slowly releases as steam. Because steam will not exceed 212 degrees Fahrenheit under normal atmospheric pressure, it retards the

[3] *See Using Gypsum Board for Walls and Ceilings Section* § 1 Gypsum Association (2013) (ease of installation is an outstanding advantage of using gypsum board for walls and ceilings).

transfer of heat and the spread of fire very effectively. Even after complete calcination of the gypsum wallboard (*i.e*,. after it releases all the water from its core under high heat), gypsum wallboard continues to serve as a heat-insulating barrier. Indeed, tests conducted in accordance with a standard known as ASTM E 84 show that gypsum wallboard has a low flame-spread index and a low smoke-density index.[4]

57. Moreover, safety concerns – particularly with respect to Chinese gypsum wallboard – and transportation costs prevent imported gypsum wallboard from constituting an adequate substitute for domestically produced gypsum wallboard. The industry experience in 2005 underscores the point. At that time, demand for drywall exceeded U.S. gypsum wallboard manufacturers' capacity, and some companies accordingly began importing Chinese drywall for approximately 6 to 8 months. They stopped because of safety issues, performance failures, and because of the cost of paying ocean freight for shipments from China. No significant importation of drywall from China took place before or since that time and U.S. demand has never exceeded capacity since that brief period in 2005.[5]

58. Because drywall fills the void between wall studs at a cheap price, there is no economically viable substitute for drywall. While consumers can put a premium product between studs for sound-proofing or other purposes, only a tiny percentage of customers are willing to bear the expense of doing so for highly specialized applications.

59. In their non-litigation business discussions and analyses, the wallboard manufacturers consistently refer to the United States sales of wallboard as a market.

60. Accordingly, there are no adequate substitutes for gypsum wallboard, and gypsum wallboard in the United States constitutes a distinct market.

---

[4] *See, id.*

[5] "Imports . . . represent a relatively small portion of domestic demand, at 1.8%." H. Shipp, Ibis World Industry Report, *Gypsum Product Manufacturing in the U.S.* 25 (2013).

**E. <u>The Gypsum Industry</u>**

61. The vast majority of Defendants' direct customers of drywall tend to fall into three broad categories.

62. First and largest of Defendants' direct customers are GSDs (Gypsum Specialty Distributors). GSDs operate facilities called yards, where they sell wallboard to contractors and other customers. GSDs typically buy from multiple manufacturers in an effort to enjoy the full benefits of price competition, avoid supply bottlenecks, and ensure access to a full array of products. The largest independent GSD is Gypsum Management Supply ("GMS") with 125 yards. The next largest GSDs have 10 to 12 yards. USG owns a GSD even bigger than GMS, called L&W, which sells primarily USG wallboard and, perhaps, some American Gypsum wallboard. GSDs typically sell to large volume customers within in a 250 mile radius of their location.

63. The second category of direct customers is "power retailers," containing chains such as Lowe's, Home Depot, and Menards. Lowe's is well postured in the do-it-yourself market, selling to consumers doing their own home improvement projects, while Home Depot is relatively more successful selling to small contractors and subcontractors. Lowe's and Home Depot generally carry 85% 1/2 inch drywall, with Home Depot carrying slightly more 5/8 inch wallboard than Lowe's to satisfy small contractor demand. Retail vendors choose their suppliers differently than GSDs, undertaking "line reviews" where manufacturers make presentations to have their products carried by the store. Generally, power retailers sell vendor positions by region. USG, however, entered into an exclusive lightweight drywall contract with Home Depot pursuant to which USG has 80% of the Home Depot business. Georgia Pacific has 8%, and

National has the remaining 12%. Due to the costs of switching vendors retailers are reluctant to switch vendors for a particular store absent a meaningful and non-transitory price advantage.

64. The third major category of Defendants' direct customers is buying groups. There are two types of buying groups. In the first type (such as the buying groups for Ace, Do It Best, and LMC), the group buys on behalf of its members and bills through the group to negotiate lower prices and take advantage of volume rebates. In the second type, such as the buying groups known as Drake and Amarock, the buying group buys for GSDs (approximately 220 yards). The gypsum manufacturer bills group members directly and carries any credit risk. Buying groups obtain construction materials other than drywall for their members. In both instances, the manufacturer ships directly to the buying group member.

65. The breakdown among the three types of customers in terms of dollar volume of purchases is approximately as follows:

| Customer | Drywall % |
|---|---|
| Gypsum Specialty Dealers ("GSDs") | 60% |
| Power Retail (*i.e.*, Lowe's, Home Depot, and Menards) | 20% |
| Buying Groups | 20% |

66. Collectively, gypsum wallboard sales in the United States, predominated by Defendants, exceed $3 billion dollars annually. Most gypsum board companies, including the named Defendants herein are vertically integrated. In other words, these Defendants participated in successive steps in the production process, starting with mining and fabricating other principle

components such as paper, and then using these inputs to fabricate gypsum wallboard as it is sold to customers. As the U.S. Geological Report, *Gypsum* 2010 states on page 1:

> The U.S. gypsum industry consisted primarily of a few large, vertically integrated companies that mined gypsum and manufactured wallboard, plaster, and other gypsum products. Companies with the most mines were USG Corp. (USG) with eight mines; Georgia Pacific LLC (GP) with seven mines; National Gypsum Co. (NGC) with six mines; CertainTeed Corp. with six mines; American Gypsum with three mines; Temple Inland Inc. (TI) with two mines; and PABCO Gypsum with one mine. For 2010, these seven companies produced 74% of the total U.S. crude gypsum.

67. Traditionally, gypsum manufacturers provide two categories of discounts to their direct purchaser customers: functional discounts and volume discounts. Functional discounts are discounts from the manufacturers' list price and apply to every dollar purchase by a customer. Volume discounts are typically discounts rebated after customers pass certain purchase volume thresholds. Manufacturers typically pay rebates at the end of the calendar year, which encourages many direct purchasers not to switch suppliers until the end of the year to avoid losing the advantage of the volume rebate.

## F. <u>The Gypsum Wallboard Market Is Amenable To Collusion</u>

68. The gypsum wallboard market's structural features make collusion particularly feasible and attractive. Specifically, the gypsum wallboard market (1) is highly concentrated, (2) features inelastic prices, (3) has high barriers to entry, and (4) offers numerous opportunities for collusion.

### 1. The Gypsum Wallboard Market in the United States is Amenable to Collusion Because It Is Highly Concentrated.

69. The smaller the number of firms that dominate a market, the more highly concentrated it is. The gypsum wallboard market in the United States is very highly concentrated by any measure. Taken together, Defendants make more than 89% of American

gypsum wallboard sales, with the three largest Defendants USG, National Gypsum and CertainTeed, accounting for more than 60% of those sales:

| ***Manufacturer*** | ***Market Share 2011*** |
|---|---|
| USG | 25% |
| National Gypsum | 23% |
| Saint Gobain/ CertainTeed | 13% |
| American Gypsum | 10% |
| LaFarge | 8% |
| Temple-Inland | 7% |
| PABCO | 4% |

70. The level of market concentration grew over the last two decades. In the 1990s, the market included several smaller regional manufacturers, with only one or two plants each. Before 1997, there were as many as 13 companies in the United States manufacturing gypsum wallboard at 78 plants. Defendants' SEC filings mentioned "smaller, regional competitors" in the United States before 2002. After 2002, however, the industry consolidated and references to smaller, regional competitors ceased. The number of market participants steadily declined as well until, by 2010, just eight companies in the United States manufactured gypsum wallboard at 62 plants.

71. Basic industrial organization economics teaches that higher levels of concentration foster the formation and operation of cartels by reducing the number of firms needed to agree to fix prices and monitor a cartel.

72. The measure industrial organization economists frequently use in evaluating market concentration is "$CR_4$": the share of product sales accounted for by the four largest firms

in a given industry. A seminal study of Department of Justice price-fixing investigations found that 76% of cartels occurred in sectors with a $CR_4$ score of 50% or higher, which was approximately double the average $CR_4$ for manufacturing. As demonstrated above, the $CR_4$ for the gypsum wallboard market as of 2011 was at least 71%, a level of market concentration highly conducive to cartelization. *See also* H. Shipp, Ibis World Industry Report, *Gypsum Product Manufacturing in the U.S.* 27 ("The four largest players currently account for 88.9% of industry revenue.") (2013).

73. Historically, the market viewed Defendants USG, National, and CertainTeed as national gypsum manufacturers and PABCO, Temple, LaFarge, and American Gypsum as regional manufacturers. For example, PABCO competes in the Western United States, but not significantly in the Midwest or East. Well before the fall of 2011, however, American Gypsum opened a gypsum plant in South Carolina, thereby expanding its national presence in the industry.

74. As is typical in highly concentrated markets, prior to the fall of 2011, one of the two largest gypsum manufacturers (Defendant USG or Defendant National Gypsum) generally initiated price increases, which the other manufacturers tended to follow. However, prior to fall of 2011, LaFarge and American Gypsum developed reputations as price-cutters.

### 2. The Gypsum Wallboard Market in the United States is Amenable to Collusion Because Prices for Gypsum Wallboard are Inelastic.

75. "Elasticity" describes the sensitivity of the amount demanded of a product to a change in the price charged for it. The more sales of a certain product decline as the price of that product increases, the more elastic the prices of that product. Conversely, inelastic pricing exists when the amounts sold of a certain product do not decline significantly even when the price of that product increases significantly.

76. In other words, when customers have few or no practical alternatives to a given product in the form of cheaper products of similar quality and functionality, they will pay higher prices for the product they need with relatively little reduction in the quantity they purchase.

77. For a cartel to profit by raising prices above competitive levels, pricing must be inelastic. Otherwise, the price increase would result in such a substantial decline in quantities sold as customers purchased substitute products or declined to buy altogether, rendering the price increase counter-productive for cartel members. Thus, price inelasticity facilitates collusion.

78. Pricing for gypsum wallboard is highly inelastic, as there are no adequate substitutes for the product. As established above, nearly all new construction and renovation for commercial or residential buildings in this country utilize gypsum wallboard because no product with equivalent functionality is available. Thus, the cartel's substantial increase of gypsum wallboard prices predictably did not lead to a substantial drop in the quantities sold, for there were simply no feasible alternative materials that buyers could use.

79. In short, Defendants took advantage of the high inelasticity of gypsum wallboard demand in order to raise prices to supra-competitive levels, generating more revenue and profit than they could have obtained in a competitive marketplace.

**3. The Gypsum Wallboard Market in the United States is Amenable to Collusion Because It Features High Barriers to Entry.**

80. Without barriers to entry, cartels that raise prices to supra-competitive levels attract new entrants seeking the supra-competitive profits accompanying those prices. Left unchecked, that process would result in steadily increasing supply exerting downward pressure on prices, ultimately driving them back to competitive levels. Where high barriers to entry exist, however, new entrants are less likely to enter the market or refrain from entering it altogether. Thus, barriers to entry facilitate the formation and maintenance of cartels.

81. Substantial barriers preclude, reduce, or make entry into the gypsum wallboard market so difficult in the United States as to prevent the existence of new entrants from providing a competitive discipline to the market.

82. One such barrier to entry into the gypsum wallboard market is the daunting capital required.[6] Entry into the gypsum wallboard market would require around $300 million dollars, for capital items such as a new plant with equipment, before considering other requirements such as obtaining regulatory approvals, building out the transportation and electrical infrastructure for distribution, and acquiring labor with the requisite skill and experience. Constructing the plants and acquiring the equipment in particular would be a lengthy process requiring at least 18 to 36 months, if not longer, because such items must conform to the particular requirements of the operation and its location. As an example of the cost of merely acquiring one gypsum plant, a plant located in Nashville, Arkansas sold for $97 million in 1997. American Gypsum stated in 2005 that would cost $125 million to build a new wallboard manufacturing plant in South Carolina. This estimate proved on target, as National Gypsum in fact spent $125 million constructing a new wallboard facility in North Carolina in 2007.

83. Moreover, as alleged above, most gypsum wallboard manufacturers are vertically integrated. Therefore, to compete profitably in the gypsum wallboard market, a new entrant would have to put together the components necessary to operate at the various vertical levels occupied by the incumbents. Consequently, the new entrant would have to acquire or purchase access to one of a limited number of gypsum sources, develop a distribution network of

[6] "Barriers faced by new competitors in this industry are high . . . [T]o compete in the more technologically complex wallboard segment of this industry, new entrants must invest heavily in capital equipment and into establishing a regional market foothold." H. Shipp, Ibis World Industry Report, *Gypsum Product Manufacturing in the U.S.* 26 (2013).

warehouses and shipping, and build out the sales and customer service staff to market and support its products. Illustrative of the costs, Celotex Corporation sold its gypsum wallboard business in 2000 for $345 million.[7]

84. These high barriers to entry inspired and enabled Defendants' anti-competitive scheme, reassuring the conspirators that new entrants could not emerge to undercut their supra-competitive prices or offer an alternative to their supply restrictions and prohibition of job quote pricing.

### 4. The Gypsum Wallboard Market in the United States is Amenable to Collusion Because of the Numerous Opportunities for Defendants to Collude.

85. Defendants had numerous opportunities to agree to fix prices and coordinate pricing policies through analyst phone calls and trade association activities. Every Defendant belongs to a trade association called the Gypsum Association (the "Association"), founded in 1930, with most Defendants having a representative appointed to the Association's Board. Every April, the Association had a meeting of the Board of Directors. In April 2010, that meeting took place in Woodlands, Texas; in April 2011, in San Francisco, California; in April 2012, in New Orleans, Louisiana; and in April 2013, in Tucson, Arizona. During 2011-2012 the following were on the Association's Board of Directors: Past Chairman Stephen Raley (Temple-Inland), First Vice President John K. Donaldson (CertainTeed), Second Vice President Joseph Holmes (USG) and Treasurer Craig Robertson (National Gypsum). For 2012-2013, the following were on the board of directors: Chairman Joseph Holmes (USG), First/Second Vice Chairman Craig Roberson (National Gypsum), and Treasurer Ryan Lucchetti (PABCO).

---

[7] "The highly concentrated structure of the industry restricts entry to new competitors." H. Shipp, Ibis World Industry Report, *Gypsum Product Manufacturing in the U.S.* 27 (2013).

86. The Association conducts quarterly meetings and a yearly conference attended by many employees of Defendants, including their CEOs and executives. The meetings feature not only formal seminars and presentations, but also more informal dinners, sporting activities and side trips, where the conspirators could easily and freely discuss pricing.

87. Further, there have been between 100 and 200 associations, chapters, or committees at various levels, including regional, state, and metropolitan, which invited gypsum manufacturers to events that those manufacturers attended, where their executives could communicate.

88. In addition, each Defendant also belongs to the Association of the Wall and Ceiling Industry ("AWCI"). Most notably, the representatives of the Defendants attended an AWCI Industry Executive Conference meeting in Coeur d'Alene, Idaho from September 13-16, 2011, with over 140 attendees. Defendant USG sponsored the entire event while Defendant National Gypsum sponsored the golf tournament. On September 15, 2011 a "Supplier and Manufacturers Committee" meeting occurred. On September 16, 2011 the Gypsum Board Committee met. During the overall conference, attendees discussed topics, including how "effective control systems are critical to maintaining margins," how "changes in quoting policies are affecting the way contractors bid and estimate jobs, and the way suppliers and distributors stock inventory," as well as "the reason for the changes to quoting policies." Just days after this meeting, Defendants began announcing the coordinated price increases and changes in their job quotes policies.

89. Shortly after these announcements, the Defendants met in mid-October at the Gypsum Association trade meeting in Las Vegas, Nevada, attended by over 280 delegates. One of the express purposes of the meeting was to "give industry participants the opportunity to meet together . . . [and] bring themselves up-to-date with the latest developments" in the industry.

At that meeting, Dr. Bob Bruce, owner of Innogyps, Inc., and a leading observer of the gypsum industry, acknowledged that the industry faced difficult economic conditions and warned explicitly that those conditions did not support a price increase. In particular, he stated "[t]he industry needs to achieve in the region of 85% capacity utilization to be able to push through price raises, rather than the 55% level we are at right now." Executives at gypsum manufacturers have stated, based on their experience in the industry, that Dr. Bruce's statement was accurate. Another predicted shortly before the price announcements of fall 2011, "Significant industry excess capacity will persist into the near-term keeping downward pressure on operating rates . . . sales prices and profits." In other words, price increases traditionally follow high capacity utilization rates, not low capacity utilization rates.

90. In addition, the Gypsum Association conducted Board meetings in Woodlands, Texas, where members of the Board of Directors of the Gypsum Association, representing each of the Defendants, discussed matters affecting the industry.

91. Meetings involving the Drywall Finishing Council ("DWFC") provide another opportunity to collude. USG, National Gypsum, CertainTeed and LaFarge, and perhaps other Defendants are members of DWFC and attend its annual convention each fall and its spring social event. Similarly, some Defendants belong to a trade association known as Drywall & Interior System Contractors Association.

92. These numerous industry meetings, among others, provided opportunities for competitors to discuss otherwise confidential information, including the price of gypsum wallboard, elimination of competitive job quotes, restriction of gypsum wallboard supply, and implementation as well as maintenance of the conspiracy described herein.

93. Many former USG employees have migrated to American Gypsum, allowing these two companies to communicate by way of current American Gypsum employees

communicating with their former comrades at USG. Most significant of these American Gypsum employees is Keith Metcalfe, Vice President of Marketing Sales and Distribution of American Gypsum, who signed American Gypsum's letters eliminating job quotes and announcing price increases on September 20, 2011 and August 22, 2012, and who also is a former USG employee. Similarly, the National Account Manager at American Gypsum, Charles Olson, held that same position at USG. Further, the Director of Sales at American Gypsum since 2003, David Bates, was a district sales manager for USG from 1994 until his move to American Gypsum. The significance of these channels of communications is evident from the fact that American Gypsum sent the first price announcement letter followed almost immediately by USG.

94. Communications from manufacturers to their clients provide another opportunity to collude. Given the relationship between the manufacturers and their direct customers, consumers often relay communications from one manufacturer to competing manufacturers. For example, when one manufacturer sends out a letter announcing a price change effective in the future, a customer will frequently show that letter to a competing manufacturer and inquire what the competing manufacturer will do and if the competing manufacturer can beat the price contemplated in the letter. Because this sort of communication occurs routinely in the industry, manufacturers know before sending out any communications to customers that their competitors will see those communications. This allows manufacturers to communicate reliably with each other via letters from each of them to their own customers in order to arrange for and continue collective action.

**5. The Gypsum Wallboard Industry's History of Collusive Behavior**

95. The price-fixing conspiracy alleged herein is not Defendants' first experience with violating antitrust and unfair competition laws. For example, the European competition

authority in 2002 fined four gypsum companies – including two companies selling gypsum wallboard in the United States, Defendant LaFarge and a predecessor of Defendant CertainTeed – $455 million dollars for conspiring to inflate prices from 1992 through 1998.

96. As far back as 1948, the United States Supreme Court, in *U.S. Gypsum Co. v. National Gypsum Co.*, 333 U.S. 364 (1948), upheld a complaint alleging that gypsum wallboard manufacturers, including USG, violated the Sherman Act by colluding to fix prices on not only gypsum wallboard, which was then patented, but also affiliated products, by means of standardizing the production and final output of gypsum wallboard, regulating distribution and instituting a regime of minimum resale prices.

97. In 1971, a federal court found gypsum manufacturers including Defendants USG and National Gypsum engaged in a conspiracy to fix the price of gypsum wallboard. *Wall Products Co. v. National Gypsum Co.*, 326 F. Supp. 295 (N.D. Cal.).

98. Later in the 1970s, a jury convicted gypsum manufacturers, including Defendants USG and National Gypsum of committing felonies by engaging in a nationwide cartel inflating gypsum wallboard prices. While those convictions were reversed on appeal, the Third Circuit nevertheless found the evidence sufficient to support the conclusion that the Defendants had conspired to violate the antitrust laws. *United States v. United States Gypsum Co.*, 600 F.2d 414, 419-20 (3d Cir. 1979).

**D. <u>Defendants' Collusion</u>**

99. Beginning at least as early as mid-September 2011, Defendants implemented a multi-faceted anticompetitive scheme to raise gypsum wallboard prices to supracompetitive levels and maintain them there, to eliminate the prevailing industry practice of providing "job quotes," and to restrict the supply of gypsum wallboard.

100. Prior to the fall of 2011, gypsum manufacturers typically announced price increases to their customers by way of letters 30 to 45 days before the effective date of the increase.

101. Prior to the fall of 2011, because of the commodity nature of wallboard and because of fluctuations in input prices, gypsum manufacturers typically announced multiple price changes per year (i.e. approximately every 90 days).

**1. Gypsum Manufacturer's Failed Efforts to Increase Prices Prior to the Fall of 2011**

102. Prior to fall of 2011, price competition thrived in the gypsum wallboard industry. LaFarge, in particular, was known in the industry to seek to increase its market share through lower pricing.

103. In the first three quarters of 2011, individual gypsum manufacturers attempted to implement price increases on multiple occasions.

104. Each such attempt failed because of price competition. When individual manufacturers informed their customers that they were increasing prices, those customers would in turn inform the manufacturers that they could purchase gypsum wallboard elsewhere for lower prices. If the manufacturer nevertheless insisted on an increase, they would lose the customer to a lower-priced competitor.

105. Moreover, if a manufacturer lost customers to competitors due to price competition, it could not immediately regain those customers by dropping prices. This is because competing manufacturers would seek to use volume rebate programs to incentivize customers to refrain from switching to competitors absent significantly lower pricing by the competitor. Because customers only receive volume rebates when they achieve certain purchase

volume thresholds from an individual manufacturer in a particular year, switching the manufacturer from whom they purchase mid-year would put those rebates at risk.

106. Similarly, big box retail customers like Home Depot and Lowe's typically stock only one manufacturer's product in any given region, and there are costs to Home Depot and Lowe's in switching from one manufacturer to another. Consequently, if a manufacturer announces a price increase that causes such stores to switch vendors, the manufacturer may well never sell product through that store again.

107. Thus, the consequences of independently raising prices was not just a short-term and temporary drop in business, but rather a long-term (and potentially permanent) loss of a customer, even if the manufacturer later reversed its price increase.

**2. Defendants' Fall 2011 Collusive Price Increases**

108. Between the AWCI meeting in Coeur d'Alene in September 2011 and the Gypsum Association trade meeting in Las Vegas, Nevada in October 2011, six of the seven Defendant manufacturers sent letters to their American customers uniformly announcing that their gypsum wallboard prices would spike by an unprecedented 35% in January 2012, an inexplicable increase in the face of such weak demand. They also announced that – unlike historical pricing, which fluctuated multiple times per year – these price increases would remain in place throughout 2012.

109. Each Defendant's announcement contained remarkably similar language:

- On September 20, 2011, Defendant American Gypsum stated, "Effective January 1, 2012, we will implement a 35% price increase on all gypsum wallboard products. This increased price (up 35%) will be your price for the entire year 2012. This increase applies to all segments of the business."
- On September 28, 2011, Defendant USG stated that "new pricing…will be effective on all wallboard purchases beginning January 1, 2012."
- On September 30, 2011, Defendant National Gypsum stated "National Gypsum Company will implement a price increase of 35% on all wallboard products, to be

effective on January 1, 2012. It is our intention that the resultant price (up 35%) will apply for all 2012."

- On October 3, 2011, Defendant CertainTeed stated that customers would receive a new price schedule on November 15 for "all wallboard products." CertainTeed later stated that "our price increase, intended to be in effect for the calendar 2012 year, will range between 35% and 37% for all gypsum wallboard products." This letter was erroneously dated October 3, 2012, although the body of the letter makes clear that it was actually issued on October 3, 2011.
- On October 4, 2011, Defendant LaFarge North America stated "on Monday, January 2nd 2012 we will implement a 35% increase on all our wallboard products." Tellingly, this letter contained an error identical to the one committed by CertainTeed: it was also mistakenly dated October 4, 2012, although the body of the letter makes clear that it was actually issued on October 4, 2011. The fact that LaFarge made the same dating mistake as CertainTeed strongly suggests that LaFarge's letter was copied from CertainTeed's, or that both were copied from the same source.
- On October 12, 2011, Defendant PABCO stated "Effective January 1, 2012, PABCO will implement a 35% price increase across all product lines. This increase will establish pricing for the calendar year 2012."

110. Defendant Temple-Inland announced similar substantial price hikes, effective for all of 2012, around this time.

111. In December 2011, one distributor summarized the situation as follows: "As you are probably now aware, all the drywall manufacturers have revised their pricing strategies beginning in 2012. ... The manufacturer letters that have been published vary slightly from manufacturer to manufacturer but it amounts to approximately 35% across the gypsum wallboard category."[8]

112. Unlike the prior attempts to increase prices, this price increase "stuck." That the price increase did so came as a surprise to long-time industry participants who were unaware of Defendants' collusion. Due to that ignorance, they predicted that the announced price increases would fail as had so many others in the preceding years. One distributor incorrectly predicted,

[8] National Lumber Online Networking Forum. *See* http://nationallumber.wordpress.com/2011/12/20/2012-drywall-price-increase-explanation/

"The whole thing will . . . slowly but surely collapse." Another opined, "It's pretty basic economics; demand is simply too low . . . to allow for an increase and policy change this drastic."

113. The price increase "stuck" because Defendants policed the conspiracy and did not undercut one another. As one example, after receiving the letters from Defendants referenced above, an official of Home Depot approached several gypsum manufacturers (including several Defendants) and said any one of them could have the considerable volume of sales for which he was responsible at Home Depot if they simply held their 2011 price throughout 2012. He said he had "no takers."

114. Throughout 2012, purchasers of Defendants' gypsum board paid substantially higher prices for drywall than they did the previous years. Indeed, Defendants' control of the market was so vast that even non-conspirators were able to increase prices without fear of competition. In short, in 2012, there was a large and historically unprecedented increase in the price paid for gypsum wallboard. Unlike previous years, no Defendant has retracted its price increase, and the ability of customers to make Defendants compete against each other on price has been virtually eliminated. Rather, as an industry analyst reported in 2012, the price increase "continues to hold nearly in full."

115. This price increase reflected a historically unprecedented means both of pricing gypsum wallboard and of announcing price increases. It is implausible that Defendants each independently decided to implement this wholly new practice to the industry.

116. Moreover, this new strategy was inconsistent with independent decision-making, and with sound business practice. If any manufacturer had attempted to implement these

changes independently, they would have suffered the predictable consequences of failing to price competitively, *i.e.*, losing customers, market share, and revenue.

117. Many aspects of this increase were unusual and cannot be explained by a Defendant acting in its rational self-interest absent collusion.

118. First, the 35% price increase for gypsum wallboard was the largest in more than ten years and the only such increase ever attempted in such a market with such weak demand. In the face of declining demand and thriving, price-based competition, no rational manufacturer would take the risk of implementing such a price change absent assurance that its competitors intended to implement similar increases. This is so because each Defendant was aware that, by doing so, it would suffer both a short- and long-term loss of business and market share. Indeed, lone actors prior to fall of 2011 suffered just these consequences, forcing them to reduce their prices to competitive levels.

119. Second, all of the Defendants indicated that they would implement this price increase on virtually the same date, either January 1 or January 2, 2012. Previously, Defendants typically announced their own price changes with disparate effective dates scattered throughout the calendar year. They did so in order to take advantage of (or escape the consequences of) unpredictable fluctuations in input prices, demand, and other factors – flexibility creating competitive benefits. It is implausible that these factors led each Defendant to decide independently to implement a price increase at precisely the same time as each other Defendant, particularly in light of the historically unprecedented nature and size of the increase.

120. Third, Defendants' announcements indicate the price hikes were to be effective for the entirety of 2012. Previously, many Defendants had changed prices more frequently than on an annual basis, typically on a quarterly basis. For example, in the first eight months of

2008, there were four announced price changes by gypsum wallboard manufacturers. Such a practice made sense from a business perspective, as frequent price changes allowed manufacturers to respond effectively to fluctuations in input prices, demand, and other factors. No Defendant would abandon this competitive practice without knowledge that its competitors would do the same.

121. Fourth, Defendants made the fall 2011 price announcements far in advance of their effective date – another change from historical practice, where price increase announcements were made 30-45 days in advance of their effective date. Historical practice enabled manufacturers to correlate their pricing to the input costs, demand, and competitive conditions in place on the effective date of the increase. This ensured their pricing was as competitive as possible in light of their underlying costs, which frequently fluctuated. No Defendant would give up this competitive advantage absent knowledge others would do the same. Indeed, the most plausible explanation for this change is that Defendants intended to signal their adherence to a pricing agreement.

122. Fifth, American Gypsum – the defendant with the smallest market share – sent the first of the price increase letters. This was a change from historical practice, where competitors with larger market share such as Defendant USG or Defendant National Gypsum, drove the price increases. It is implausible that American Gypsum, a relatively small player in the gypsum wallboard market, would have taken the risk of increasing prices and eliminating job quotes without assurance that its competitors would follow suit.

123. Sixth, the price hikes announced in the fall of 2011 were largely implemented when specified and maintained materially throughout the year, whereas earlier price announcements were frequently modified after announcement. For example, some gypsum

manufacturers announced price changes effective in November 2010, then subsequently delayed those increases and rolled them out in two installments: one in March 2011 and one in May 2011. The fact that no subsequent changes in the price hikes announced in 2011 occurred further suggests coordination.

124. Seventh, the large spike in gypsum wallboard prices in the fall of 2011 was not in response to, or in expectation of, increased demand. The reality was precisely the opposite: industry analysts warned investors that in 2012 "demand for drywall would be no better this year than last."[9] National Gypsum stated that the level of wallboard quantities purchased "has essentially been flat and at historically low levels" and projected that the "outlook for the next 12 to 18 months might at best be described as a slow 'climb out.'"[10] CertainTeed projected in October 2011 that "[t]he housing market is still anemic with little expectation of real improvement in the coming year."[11] Similarly, in October 2011, USG stated that it believed that the market is "going to be flat next year."[12] Such reduced or stable demand economically suggests reduced or stable pricing; the fact that Defendants successfully raised prices in the face of these conditions suggests collusion.

125. Indeed, before the announcement in the fall of 2011 of Defendants' collusive price spike, gypsum wallboard prices had been falling for three straight months: down 0.6% in July 2011, 1.7% in August 2011 and 1.7% in September 2011.[13] Defendants anticipated the soft market for their products to continue, but announced large increases in gypsum wallboard

---

[9] *See* http://online.wsj.com/article/BT-CO-20120206-712258.html.
[10] *See* http://www.oldfort.com/pdf/NatGyp_093011.pdf.
[11] *See* http://www.karpp.com/c/document_library/get_file?uuid=b98d6f22-b77a-41c8-a2af-5a2992954e14&groupId=12804. [The letter bears the ostensible date of October 2012, but the content of the letter reflects that the ostensible date is a typographical error, and that the letter in fact was written in October *2011*.]
[12] *See* Interview: "USG's CEO Discusses Q3 2011 Results" at p. 15.
[13] *See* http://eyeonhousing.wordpress.com/2011/11/03/sharp-rise-in-gypsum-prices-likely-in-new-year/.

prices. Economic facts could neither justify nor uphold the price hike, and thus the only plausible explanation for its existence was Defendants' conspiratorial conduct.

126. Eighth, the costs of the major inputs into gypsum wallboard were stable or even falling in 2011 and 2012. Accordingly, there was no increase in production or selling costs that would explain the large price increase. Indeed, average wholesale natural gas prices (which, as noted above, wallboard pricing is highly sensitive to) fell by 31% in 2012.[14] Moreover, as alleged above, most of the Defendants are vertically integrated. Consequently, they could and did exert control over the other major component costs that go into gypsum wallboard, components such as the mineral itself and paper.

127. Ninth, Defendants announced and then imposed their price hikes when the industry was experiencing extensive overcapacity. This overcapacity resulted largely from the decline in construction caused by the financial crisis. According to the Census Bureau, construction spending in the United States dropped from a peak of $1,198 billion in 2006 to $787.4 billion in 2011, the year Defendants announced their upcoming price increases and discontinuance of the practice of job quotes. Similarly, gypsum production declined from roughly 15,700,000 metric tons in 2007 to 8,800,000 metric tons in 2011,[15] even though much of the capacity that produced the higher figure was still available four years later. It is well-known in the industry that the existence of overcapacity typically drives prices down.

128. Defendants openly acknowledge this excess capacity. In October 2011, US Gypsum stated, "Currently, there is significant excess wallboard production capacity industry wide in the United States. Industry capacity in the United States was approximately 32.9 billion square feet. We estimate that the industry capacity utilization rate was approximately 52%

---

[14] *See* U.S. Energy Information Administration, *2012 Brief: Average wholesale natural gas prices fell 31% in 2012*, January 8, 2013 (available at http://www.eia.gov/todayinenergy/detail.cfm?id=9490).
[15] U.S. Geological Survey Report, 2012, a p.70.

during the first nine months of 2010. We project that the industry capacity utilization will remain at approximately that level for the balance of 2011."[16] Historical experience in the industry in non-collusive periods demonstrates that, when capacity utilization drops below 90%, prices fall.[17]

129. Tenth, Defendants timed the effective date of the price increase at the beginning of January, a time when customers otherwise had maximum flexibility because they had just received their volume rebates for the previous year and could switch to purchasing from another supplier without undercutting the volume of purchases required to maximize their rebate for the calendar year. If any individual Defendant were going to attempt such a large price increase, absent collusion, they would not attempt to impose it when it was easiest for customers to switch to another manufacturer's product. Indeed, prior to this price increase, individual Defendants implemented price increases on various and disparate dates.

130. Despite all of the factors described above, Defendants increased prices for gypsum wallboard without fear that their customers could turn to competitors who were selling at a lower price, precisely because those competitors had agreed not to sell at a lower price. Without such conspiratorial conduct, gypsum wallboard prices should have remained relatively stable in light of costs and market expectations. That prices rose substantially and for all Defendants in 2012, despite competitive conditions dictating stable prices, indicates collusive behavior.

131. In the absence of collusion, the independent self-interest of each Defendant would have led it to keep its prices relatively stable to reap the benefit in terms of increased

[16] *See* USG Corp. Form 10Q for 3rd Quarter 2011 at p. 28 http://www.sec.gov/Archives/edgar/data/757011/000095012311093430/c65920e10vq.htm; *See also* http://seekingalpha.com/article/650501-usg-a-great-bet-on-a-north-america-housing-turnaround ("The utilization rate in the Gypsum industry is around 55%.")
[17] See JP Morgan report (quoting Eagle) at p. 16.

sales to customers dissatisfied with a competitor's price increases. Simply put, any one Defendant, or even a small subset of Defendants, could not have maintained sharp price increases given market conditions, for it would have lost revenues when customers responded by purchasing gypsum wallboard from companies that did not sharply increase prices. Consequently, only collective action enabled Defendants to jointly impose price increases.

### 3. Defendants' Collusive Elimination of Job Quotes

132. In the same letters announcing the 2012 price increase, Defendants announced that they were immediately eliminating job quotes. This was another dramatic and simultaneous change from prior practice.

133. Job quotes (also called "price protection") have been a standard feature of the gypsum wallboard industry for decades. In fact, one distributor said the practice ran so deep that it was "ingrained" in the industry. This practice guaranteed customers a set price (or an initial price with a series of specified adjustments) for gypsum wallboard for a construction project that might take months or years to complete. Specifically, manufacturers provided job quotes to a supply yard or distributor delineating a specific volume, tied to a product, and a job, for a specific period. Depending on the length of time, the job quote might include price escalators Job quotes did not necessarily run for the entire length of time that it was anticipated the project would take to complete, but often were for a specified lesser period, such as six to nine months. From the customer's point of view, a key provision of the job quote was the price protection provisions, pursuant to which the manufacturer bore the risk of volatility for the price of inputs into gypsum wallboard.

134. Typically, manufacturers provided job quotes to a distributor or yard that was attempting to help a specified contractor obtain a job by winning a bid. Theoretically, the distributor or yard could have issued its own job quote to the customer for a project without

manufacturer support, but in practice that virtually never happened because distributors and yards were unwilling to take on the risk of loss that would result if the manufacturer raised prices during the life of the job quote.

135. Defendants sharply altered the competitive landscape in the industry in the fall of 2011 by abolishing this traditional pricing practice. Prior to 2011, job quotes governed the prices for a quantity varying between 30-70 percent of gypsum wallboard sold in the United States. That is one reason why an industry observer described the elimination of job quotes as "groundbreaking" and "turning the world upside down."[18]

136. The coordinated elimination of job quotes constituted another form of price-fixing by Defendants. Prices set forth in job quotes were almost always discounted. Consequently, by eliminating the practice of job quotes, Defendants were eliminating an important component of price competition.

137. Defendants' elimination of job quotes also made it impossible for customers to circumvent the increased pricing by "locking in" fall 2011 prices for long-term projects by soliciting and receiving competitive job quotes prior to the price increases' effective date. It therefore improved the effectiveness of the conspiracy.

138. The elimination of job quotes also improved Defendants' ability to monitor the cartel, and thus enforce the conspiracy. Previously, the use of job quotes made it difficult for a competitor to monitor the prices charged by rivals in the industry. Had job quote pricing remained in place, it would have been harder for one cartel member to determine whether a low price given to a particular customer by another cartel member was pursuant to a job quote or was instead "cheating" on the cartel price. Eliminating this opportunity for subterfuge, Defendants improved their ability to monitor each other and thus discipline other cartel members

[18] http://frameworksmagazine.com/library/wallboard_update2011-10-03.pdf

in furtherance of their overall price-fixing conspiracy. By ending the job quote pricing practice collectively, the Defendants ensured that they could easily, accurately, and comprehensively observe each other's prices.

139. Job quotes were also a tool Defendants' customers used to negotiate against Defendants. It was unusual for a gypsum manufacturer to volunteer job quotes to customers. Rather, customers requested them. For example, if two competitors were competing for a particular project, a customer would seek a job quote from each as a means of distinguishing the two. Defendants' collective abandonment of this practice removed competitive discipline from the gypsum wallboard market.

140. Defendants' agreement to eliminate job quotes increased prices. As one industry research stated: "The elimination of job quotes paves the way for a meaningful price increase. . . . That, in a nutshell is the story."[19] Considering both the elimination of job quotes and the price increases announced in the fall of 2011, one distributor described the alteration of the structure of the market as "drastic." Combining the abolition of job quotes with price hikes maintained throughout the calendar year allowed Defendants to achieve much higher prices for gypsum wallboard in 2012 than in preceding years.

141. As with the price hike announcements, Defendants' 2011 announcements abolishing job quotes bear uncanny similarities, indicative of collusion (all emphasis added):

- "Our past job quote policy is no longer appropriate as we seek to improve the consistency and administrative efficiency of our pricing policies. In light of the changing market, ***USG will no longer offer job quotes and/or price protection on wallboard, effective immediately***." (USG letter, September 28, 2011)
- "The practice of providing job quotes is broken and counterproductive to meaningful and consistent price management needed to support profitability.

[19] Brian Johnson, *Not Good Timing: Drywall Prices Rising*, FINANCE & COMMERCE, Feb. 16, 2012 (quoting Kathryn Thompson, Senior Research Analyst for the Thompson Research Group). *See http://finance-commerce.com/2012/02/%e2%80%98not-good-timing%e2%80%99-drywall-prices-rising/*

Therefore, ***effective immediately, we will discontinue for all product lines the policy of providing job quotes***." (National Gypsum letter, September 30, 2011).

- "In review of our business practices and policies for bringing products to market, we have noted a significant increase in the amount of job quote requests and find the process to be inefficient and administratively burdensome. Accordingly ***we find it necessary to cease all job quotes immediately***." (CertainTeed letter, October 3, 2011, bearing the erroneous issue date of October 3, 2012).

- "***Effective immediately, we will no longer be providing job quotes***." (American Gypsum Letter, September 20, 2011).

- "... ***[E]ffective immediately, we will cease all job quotations***." (LaFarge Letter, October 4, 2011, bearing the erroneous issue date of October 4, 2012).

- "***Effective immediately, PABCO Gypsum will discontinue the policy of providing job quotes***." (PABCO Letter, October 12, 2011).

142. Each of the remaining Defendants communicated to its customers at or near this time that it was abolishing job quotes effective immediately. Unilaterally abolishing job quotes contravened the self-interest of any one Defendant. Any independent Defendant singly discontinuing the practice of making job quotes available would have triggered an extremely hostile customer reaction, leading to plummeting revenues and lost profits as customers flocked to competitors offering job quotes.

143. In short, no one Defendant held the market power to eliminate the practice of providing job quotes by itself. Only by colluding could Defendants eliminate the practice to further suppress competition.

144. Defendants timed the elimination to further their efforts to negotiate and implement their anticompetitive scheme. In the letters quoted above, Defendants announced that they were eliminating the practice of providing job quotes immediately, but not implementing the price hikes until months later. Consequently, each Defendant had the opportunity to prove its "good faith" commitment to the anticompetitive scheme by immediately

implementing the elimination of job quotes. If other Defendants had backed out of the scheme by failing to publicly announce their elimination of job quotes, then any given Defendant would know that the scheme had collapsed before implementing its own price increase the following January. That Defendant could then back away from its price increase long before actually assessing it against customers and thereby avoid the risk of losing the patronage of those customers to Defendants who did not comply with the scheme.

145. The timing of the announcements concerning job quotes also confirms the existence of the conspiracy in another way. Traditionally in the gypsum industry, the quantity of gypsum sold declines in winter as construction activity softens. Consequently, prices frequently change in February, as purchases accelerate in anticipation of increased construction volume in the spring. As a result, autumn has historically been the time of greatest demand for job quotes, as purchasers wish to lock in a price for a project that will extend beyond the February price fluctuations. Absent collusion, no individual Defendant would have an independent interest in declining to provide job quotes at the time when demand for those job quotes is highest, because customers in that event would likely switch to competing manufacturers who continued the historical practice of providing job quotes.

146. Defendants have reaffirmed their refusal to offer job quotes since the initial announcements in the fall of 2011. On September 6, 2012 National Gypsum stated that "our elimination of the practice of providing job quotes remains in effect and is strictly enforced." Similarly, CertainTeed stated on September 13, 2012, that it "continues our policy of not providing price quotes to customers for specific projects." The other Defendants also continue to refuse to provide job quotes. In each of these statements, Defendants refer to the key price protection aspect of job quotes. Thus, while Defendants may agree to supply a particular job,

and may provide a quote for the supply, Defendants no longer assure their customers that that price will "stick" during the entirety of the job. Defendants instead keep the discretion to raise prices mid-job, regardless of their initial quote (and, as a result of the agreement described here, they can do so with no fear that a competitor will undercut their pricing). The elimination of price protection perniciously harmed competition, as alleged herein.

147. Moreover, because of their overwhelming market power, Defendants' refusal to offer job quotes has reduced the ability of customers to demand job quotes, even when that customer is dealing with a non-conspiring manufacturer, because customers can no longer plausibly threaten to seek job quotes from another market participant.

148. Looking at all the changes in the fall of 2001, both the price increase announcements and the elimination of job quotes, a manufacturing executive with decades of experience in the wallboard industry indicated that these changes were not only unprecedented and troubling from an antitrust perspective, but also that, in his view, he knew of no reason why the changes would have been in the unilateral interest of any wallboard manufacturer in a competitive marketplace.

**4. Defendants' Fall 2011 Supply Restrictions**

149. Prior to the fall of 2011, price increases announced by Defendants did not involve supply restrictions. Accordingly, many customers would respond by buying increased quantities of gypsum wallboard in the interval between the announcement of the price increase and the effective date of the increase to "stockpile" for the upcoming year. This practice helped customers resist price increases. Further, this increase in gypsum wallboard purchases in the interval resulted in reductions of the amount demanded for gypsum wallboard shortly after the effective date, a consequence making it more difficult for manufacturers to maintain the price increase. As a result, manufacturers sometimes announced price increases that they knew they

could not maintain in the long run in order to boost sales during the interval for cash flow reasons.

150. By contrast, when Defendants announced price hikes and abolished job quotes in the fall of 2011, they also implemented supply restrictions. Around September 2011, Defendants USG, National Gypsum, American Gypsum, PABCO, and CertainTeed prohibited purchasers from buying a greater quantity of gypsum wallboard than they had bought in comparable periods earlier in the year. For example, Defendant CertainTeed stated in a letter dated October 26, 2012 that "to address the likelihood of increased product demand, prior to the new price, CertainTeed reserve[d] the right to regulate shipments prior to the increase."

151. This policy reduced the ability of cartel members to cheat on the cartel by way of making large sales of gypsum wallboard at the lower prices prevalent before the price hikes took effect, and prevented customers from stockpiling gypsum wallboard purchased at lower prices.

152. To enforce the supply restrictions, Defendants monitored purchasers to prevent them from increasing inventory in an effort to evade the price hikes. Defendants have also notified each other, as a part of their concerted action, when a particular customer holds out the prospect of building up inventory excessively. They have then notified such customers, typically distributors, that they have begun monitoring its purchases.

153. With respect to the announcement in 2012 of price increases to take effect in 2013, one analyst noted that "most distributors were reminded of their limited ability to procure product ahead of last year's price increase, which was driven in large part by controlled distribution and manufacturers rather uniformly taking down their plants for maintenance in mid to late December, which severely limited distributors' ability to procure product at that time." The analyst went on to state that, around mid-September 2012, "manufacturers implemented a

national allocation program," limiting distributor's ability to place new orders to reflect their average quantities purchased over the last one or two quarters.

154. Defendants imposed these supply restrictions in the face of an excessively large amount of unused capacity, as alleged above. Indeed, Defendant USG recognized in 2012 that the manufacturer's capacity utilization was still at a "historically low" level.

155. Restricting supply contravenes the independent interests of any individual Defendant, especially in light of the overcapacity in the industry. Had an individual manufacturer in a truly competitive market attempted to restrict the amount of purchases by a given buyer, the buyer would have solicited competing manufacturers, who would have been eager to employ their unused capacity to fill such orders. Consequently, a gypsum wallboard manufacturer restricting supply independently would almost certainly lose the specific order and would likely lose the customer permanently by causing the customer to buy from another manufacturer who was not imposing such restrictions. By acting collusively rather than independently, Defendants successfully imposed both sharp price hikes and supply restrictions, each secure in the knowledge that its co-conspirators would not win over disaffected customers.

### 5. Defendants' Fall 2012 Collusive Price Increase Announcements

156. Defendants announced a second simultaneous and unjustifiable price increase in August and September 2012. Similar to the previous increase, each Defendant's increase took effect on January 1, 2013 and remained in place for all of 2013. Specifically:

- Defendant American Gypsum stated on August 22, 2012 that it would impose an additional 25% price increase on all gypsum board products on January 1, 2013, applying throughout 2013.
- Defendant National Gypsum stated on September 6, 2012, that it "will increase prices on its entire Gypsum Wallboard product line… by 30% across the board. It is once again, our intention that this increase will be good for the entire calendar year of 2013. In addition, our elimination of the practice of providing job quotes remains in effect and is strictly enforced."

- Defendant CertainTeed stated on September 13, 2012, that it "will increase price effective with shipments on January 2, 2013 by 30%. This increase amount will apply to all gypsum board products and is intended to be in effect for the entire year." CertainTeed also stated that it was continuing "our policy of not providing job quotes to customers for specific projects."

- Defendant LaFarge stated on October 15, 2012 that effective January 1, 2013, prices of all wallboard products would increase by 30% and "[t]his price increase applies to all our gypsum board products and is intended to be in effect for all of 2013."

- Defendant PABCO stated on October 24, 2012 that "[e]ffective January 1, 2013, PABCO Gypsum will implement a 30% price increase across all product lines. This increase will establish pricing for the Calendar Year 2013."

- Defendant USG stated on November 16, 2012 that, effective January 1, 2013, that "USG will not provide job quotes or price protection for any wallboard products," and that price increases on the order of 30% would be imposed on customers "in effect for all of 2013."

- Defendant Temple-Inland stated on November 26, 2012, for all customers that Temple-Inland "will be increasing the price 30% on all gypsum wallboard products" effective December 30, 2012.

157. Defendants imposed this second round of sharp price hikes even though excess capacity remained a persistent feature of the market. No single Defendant, acting independently, could hope to adhere to such high prices because competitors would employ excess capacity to increase supply, undercutting such a sharp price hike. As USG stated in April 2012:

> [T]here is significant excess wallboard production capacity industry-wide in the United States. Industry capacity in the United States was approximately 31.9 billion square feet as of January 1, 2012. We estimate that the industry capacity utilization was approximately 54% during the first quarter of 2012 compared to 51% during the first quarter of 2011 and 56% during the fourth quarter of 2011. We project that the industry capacity utilization rate will remain at approximately the current level for the balance of 2012.

158. Further, USG acknowledged that "such a low level of capacity utilization" puts "pressure on gypsum wallboard selling prices and gross margins."

159. Moreover, Defendants enabled the fall 2012 price hikes by maintaining the supply restrictions implemented in fall 2011. USG, National Gypsum, American Gypsum, Temple-Inland, LaFarge, and CertainTeed each announced their intent to restrict purchase volume for fall 2012. For example, around September 18, 2012, USG stated that it had "put in a controlled distribution policy for our customers" and, consequently, customers "know there's a ceiling on what they can purchase."

160. Defendants' price increases from 2012 to 2013 resulted in even higher supra-competitive prices than had been in place in 2012. After surveying retailers and distributors, industry analysts stated that the 2013 price increases were successful.[20]

**E. <u>The Price Increases Were Passed Through To Class Members</u>**

161. The structure of the gypsum industry is such that Defendants' conspiracy impacted Plaintiffs and class members by causing them to pay higher prices for gypsum wallboard than they would have absent the conspiracy.

162. The chain of distribution between Defendants and end-users of gypsum wallboard is short.

163. GSDs primarily sell to contractors, who then sell to the home or building owner. When pricing for a particular job, the majority of contractors "break out" the cost of materials, including gypsum wallboard, as a separate line item, making the cost of gypsum wallboard easily discernible. Even in instances where the contractor provides an "all in" price, the price to the consumer directly correlates to the price of gypsum. The margins at all levels of the distribution chain are sufficiently thin that price increases for gypsum wallboard force other participants in the chain to increase prices immediately when the cost of gypsum wallboard

[20] J. P. Morgan North America Equity Research, February 27, 2013: "USG Corporation: Survey Points to Successful Wallboard Price Increase for 2013."

increases. In such instances, the contractor uses component costs, including the cost of gypsum wallboard, as the starting point for all price calculations.

164. Similarly, purchasers buying gypsum wallboard through buying groups generally sell directly to contractors, who then sell directly to the end user. Again, the majority of contractors "break out" the cost of materials, including gypsum wallboard, as a separate line item, making the cost of gypsum wallboard easily discernible. Even in instances where the contractor provides an "all in" price, the price to the consumer directly correlates to the price of gypsum. The margins at all levels of the distribution chain are sufficiently thin that price increases for gypsum wallboard force other participants in the chain to increase prices immediately when the cost of gypsum wallboard increases. In such instances, the contractor uses component costs, including the cost of gypsum wallboard, as the starting point for all price calculations.

165. In the instance of power retailers, manufacturers sell directly to retailers, who then sell directly to the customer. If the customer is a contractor, the facts described in the preceding paragraphs are true. If the customer is an end-user, the price it pays directly correlates to the price paid by the retailer. Accordingly, Defendants' conspiracy impacted retail purchasers.

166. Indeed, the structure of Defendants' conspiracy increased the likelihood that their customers would pass on price increases. When a manufacturer of gypsum wallboard increases prices, GSDs frequently request letters describing the price increase so that they can, in turn, show those letters to their customers to explain why they are increasing prices (which occurs when GSDs raise their prices to correlate to the manufacturer's price increases). Indeed, many

gypsum wallboard resellers posted Defendants' fall 2011 letter on their web pages to coach their customers to accept the passed-on overcharges.

167. Similarly, economic literature describes how price increases with long durations lead to pass-through of those increases. Because Defendants implemented year-long increases, they increased the likelihood that those increases would be passed on.

## F. ANTITRUST IMPACT AND INJURY

168. Defendants' unlawful agreement and conspiracy has had the following effects, among others:

(a) Restraining or eliminating price competition with respect to gypsum wallboard;

(b) Raising, fixing, stabilizing and maintaining prices for gypsum wallboard at artificially inflated levels; and,

(c) Depriving indirect purchasers of gypsum wallboard of the benefits of the interplay of free and unrestrained competitive forces.

169. During the Class Period, Plaintiffs and the members of the Classes paid supra-competitive prices for gypsum wallboard.

170. The market for gypsum wallboard exists to serve the end-user market, rendering the two markets inextricably linked and intertwined. Without this end-user market, gypsum wallboard has little to no value because it has no independent utility.

171. Because of the alleged violations of the antitrust laws, Plaintiffs and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for gypsum wallboard than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently

undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## CLASS ALLEGATIONS

172. Plaintiffs bring this action pursuant to Rules 23(a) (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class of plaintiffs (the "Nationwide Class" or "Class") consisting of:

> All person or entities currently residing in the United States who, from January 1, 2012 through the Present (the "Class Period") indirectly purchased gypsum wallboard in the United States manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also exclude are any federal entities, any judicial officer presiding over this action, and the member of his or her immediate family and judicial staff, and any juror assigned to his action.

173. Plaintiffs also bring this action on their own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and/or respective state statute(s), on behalf of all members of the following classes (collectively, the "Indirect Purchaser State Subclasses" or "State Subclasses")[21]:

> (a) **Arizona:** All persons and entities who, from January 1, 2012 through present, as residents of Arizona, indirectly purchased gypsum wallboard manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family

---

[21] The National Class and the State Subclasses shall be referred to collectively as the "Classes."

and judicial staff, and any juror assigned to this action (the "Arizona Indirect Purchaser Subclass").

(b) **Arkansas:** All persons and entities who, from January 1, 2012 through present, as residents of Arkansas, indirectly purchased gypsum wallboard manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Arkansas Indirect Purchaser Subclass").

(c) **California:** All persons and entities who, from January 1, 2012 through present, as residents of California, indirectly purchased gypsum wallboard manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "California Indirect Purchaser Subclass").

(d) **District of Columbia:** All persons and entities who, from January 1, 2012 through present, as residents of the District of Columbia, indirectly purchased gypsum wallboard manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "District of Columbia Indirect Purchaser Subclass").

(e) **Florida:** All persons and entities who, from January 1, 2012 through present, as residents of Florida, indirectly purchased gypsum wallboard manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Florida Indirect Purchaser Subclass").

(f) **Illinois:** All persons and entities who, from January 1, 2012 through present, as residents of Illinois, indirectly purchased gypsum wallboard manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Illinois Indirect Purchaser Subclass").

(g) **Iowa:** All persons and entities who, from January 1, 2012 through present, as residents of Iowa, indirectly purchased gypsum wallboard manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Iowa Indirect Purchaser Subclass").

(h) **Kansas:** All persons and entities who, from January 1, 2012 through present, as residents of Kansas, indirectly purchased gypsum wallboard manufactured by any of the Defendants,

their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Kansas Indirect Purchaser Subclass").

(i) **Maine:** All persons and entities who, from January 1, 2012 through present, as residents of Maine, indirectly purchased gypsum wallboard manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Maine Indirect Purchaser Subclass").

(j) **Massachusetts:** All persons and entities who, from January 1, 2012 through present, as residents of Massachusetts, indirectly purchased gypsum wallboard manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Massachusetts Indirect Purchaser Subclass").

(k) **Michigan:** All persons and entities who, from January 1, 2012 through present, as residents of Michigan, indirectly purchased gypsum wallboard manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the

legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Michigan Indirect Purchaser Subclass").

(l) **Minnesota:** All persons and entities who, from January 1, 2012 through present, as residents of Minnesota, indirectly purchased gypsum wallboard manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Minnesota Indirect Purchaser Subclass").

(m) **Mississippi:** All persons and entities who, from January 1, 2012 through present, as residents of Mississippi, indirectly purchased gypsum wallboard manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Mississippi Indirect Purchaser Subclass").

(n) **Missouri:** All persons and entities who, from January 1, 2012 through present, as residents of Missouri, indirectly purchased gypsum wallboard manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family

and judicial staff, and any juror assigned to this action (the "Missouri Indirect Purchaser Subclass").

(o) **Nebraska:** All persons and entities who, from January 1, 2012 through present, as residents of Nebraska, indirectly purchased gypsum wallboard manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Nebraska Indirect Purchaser Subclass").

(p) **Nevada:** All persons and entities who, from January 1, 2012 through present, as residents of Nevada, indirectly purchased gypsum wallboard manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Nevada Indirect Purchaser Subclass").

(q) **New Hampshire:** All persons and entities who, from January 1, 2012 through present, as residents of New Hampshire, indirectly purchased gypsum wallboard manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "New Hampshire Indirect Purchaser Subclass").

(r) **New Mexico:** All persons and entities who, from January 1, 2012 through present, as residents of New Mexico, indirectly purchased gypsum wallboard manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "New Mexico Indirect Purchaser Subclass").

(s) **New York:** All persons and entities who, from January 1, 2012 through present, as residents of New York, indirectly purchased gypsum wallboard manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "New York Indirect Purchaser Subclass").

(t) **North Carolina:** All persons and entities who, from January 1, 2012 through present, as residents of North Carolina, indirectly purchased gypsum wallboard manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "North Carolina Indirect Purchaser Subclass").

(u) **North Dakota:** All persons and entities who, from January 1, 2012 through present, as residents of North Dakota, indirectly purchased gypsum wallboard manufactured by any of the

Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "North Dakota Indirect Purchaser Subclass").

(v) **Puerto Rico:** All persons and entities who, from January 1, 2012 through present, as residents of Puerto Rico, indirectly purchased gypsum wallboard manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Puerto Rico Indirect Purchaser Subclass").

(w) **Rhode Island:** All persons and entities who, from January 1, 2012 through present, as residents of Rhode Island, indirectly purchased gypsum wallboard manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Rhode Island Indirect Purchaser Subclass").

(x) **South Dakota:** All persons and entities who, from January 1, 2012 through present, as residents of South Dakota, indirectly purchased gypsum wallboard manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of

any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "South Dakota Indirect Purchaser Subclass").

(y) **Tennessee:** All persons and entities who, from January 1, 2012 through present, as residents of Tennessee, indirectly purchased gypsum wallboard manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Tennessee Indirect Purchaser Subclass").

(z) **Utah:** All persons and entities who, from January 1, 2012 through present, as residents of Utah, indirectly purchased gypsum wallboard manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Utah Indirect Purchaser Subclass").

(aa) **Vermont:** All persons and entities who, from January 1, 2012 through present, as residents of Vermont, indirectly purchased gypsum wallboard manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family

and judicial staff, and any juror assigned to this action (the "Vermont Indirect Purchaser Subclass").

(bb) **West Virginia:** All persons and entities who, from January 1, 2012 through present, as residents of West Virginia, indirectly purchased gypsum wallboard manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "West Virginia Indirect Purchaser Subclass").

(cc) **Wisconsin:** All persons and entities who, from January 1, 2012 through present, as residents of Wisconsin, indirectly purchased gypsum wallboard manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Wisconsin Indirect Purchaser Subclass").

174. Subject to additional information obtained through further investigation and discovery, the foregoing Class definitions may be expanded or narrowed by amendment or amended complaint.

175. **Numerosity:** For each of the Classes, membership is so numerous that joinder of all members is impracticable. On information and belief, each class consists of thousands of individuals and entities who purchased gypsum wallboard manufactured by Defendants during the Class Period, and the membership of the National Class extends into the hundreds of thousands.

176. **Typicality:** Plaintiffs' claims are typical of the claims of the members of the Class and State Subclasses because each Plaintiff and all Class and State Subclass members indirectly purchased during the Class Period gypsum wallboard manufactured by one or more of the Defendants and thus each were damaged by the actions of Defendants, which caused them to pay artificially inflated prices for gypsum wallboard.

177. **Adequacy of Plaintiffs:** Plaintiffs will fairly and adequately represent and protect the interests of the Class and State Subclass members. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other Class and State Subclass members. Plaintiffs are represented by counsel experienced and respected in the prosecution of class action and antitrust litigation.

178. **Common Questions:** This case presents many common questions of law and fact that will predominate over any questions that may affect individual members of the Class and the State Subclasses, such as:

- Whether the Defendants formed and operated an agreement, combination and/or conspiracy to raise, fix, maintain and/or stabilize the prices charged for gypsum wallboard sold in the United States;
- Whether the Defendants formed and operated an agreement, combination and/or conspiracy to eliminate the practice of providing job quotes;
- The operative time period and extent of these arrangements;
- Whether each Defendant was a participant in any such agreement, combination, or conspiracy;
- Whether the actions of Defendants in so doing violated Section 1 of the Sherman Act and the applicable state laws, discussed below;
- Whether the actions of the Defendants violated the various state laws asserted below;
- Whether the Defendants' conduct had the effect of artificially fixing, stabilizing, maintaining, and/or inflating the price of gypsum wallboard sold in the United States during the Class Period;
- Whether the conduct of the Defendants caused injury to business or property of Plaintiffs and the members of the Classes;

- The appropriate nature of Class-wide equitable relief; and
- The measure and amount of damages incurred by the State Subclasses.

179. **Superiority:** A class action is superior to the other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Classes. The injury suffered by each individual member of the classes is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' misconduct. It would be virtually impossible for individual members of the Classes to redress effectively the wrongs done to them. Even if members of the Classes could afford such individual litigation, the court system could not. Individual litigation would pose a high likelihood of inconsistent and contradictory judgments. Further, individualized litigation would increase the delay and expense to all parties, and to the court system, due to the complex legal and factual issues presented by this dispute. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. This action presents no difficulties in management that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### VIOLATION OF SECTION ONE OF THE SHERMAN ACT
### (On behalf of Plaintiffs and the Nationwide Class for Injunctive Relief)

180. Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint as if set forth in full at this point.

181. Beginning at least as early as September 2011 and continuing through the present, Defendants have engaged in a continuing agreement or conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize the prices of gypsum wallboard in the United States.

182. Defendants' conduct featured anticompetitive activities, the purpose and effect of which were to artificially raise, fix, maintain, or stabilize the price of gypsum wallboard sold in the United States. These activities included:

(a) participation in meetings, conversations, and communications to discuss the price and pricing terms for the sale of gypsum wallboard in the United States;

(b) agreement during those meetings, conversations, and communications to charge prices at specified levels and otherwise to fix, raise, maintain, or stabilize prices of gypsum wallboard sold in the United States;

(c) agreement during those meetings, conversations, and communications to discontinue the industry practice of providing job quotes, in furtherance of their conspiracy to fix, raise, maintain, or stabilize the prices of gypsum wallboard sold in the United States;

(d) agreement during those meetings, conversations, and communications to impose supply restrictions in furtherance of their conspiracy to fix, raise, maintain, or stabilize prices of gypsum wallboard sold in the United States; and

(e) taking numerous steps, as set forth herein, to implement and maintain the conspiracy, including monitoring compliance of fellow conspirators.

183. Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements, combinations, and/or conspiracies described in this Complaint.

184. Defendants' contract, combination or conspiracy constitutes an unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and applicable state laws discussed herein.

185. The alleged contract, combination or conspiracy among competitors constitutes a *per se* violation of the federal antitrust laws.

186. As a result of Defendants' unlawful conduct, Plaintiffs and the other Class members have been injured in their business and property because they have paid more for gypsum wallboard manufactured by Defendants (or their subsidiaries or controlled affiliates) than they would have paid absent collusion.

187. Defendants' unlawful conduct has had at least the following effects:

(a) Restraining or eliminating price competition with respect to gypsum wallboard,

(b) Raising, fixing, stabilizing and maintaining prices for gypsum wallboard at artificially inflated levels; and,

(c) Depriving indirect purchasers of gypsum wallboard of the benefits of the interplay of free and unrestrained competitive forces.

188. Gypsum wallboard products are identifiable, discrete physical products that remain essentially unchanged when incorporated into a construction project. As a result, gypsum wallboard follows a traceable physical chain of distribution from the Defendants to the Plaintiffs and the members of the Classes, and any costs attributable to gypsum wallboard are likewise traceable through the chain of distribution to Plaintiffs and members of the Classes.

189. Defendants' antitrust violations are continuing and will continue unless enjoined by this Court.

190. Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiffs and the Class are entitled to a final and permanent injunction against Defendants, preventing and restraining the violations alleged herein.

191. Pursuant to the Clayton Act, Plaintiffs and the Class are entitled to the costs of prosecuting this suit, including reasonable attorneys' fees and expert fees.

192. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, each Plaintiff demands a jury trial as to all issues triable by a jury.

**SECOND CLAIM FOR RELIEF**
**VIOLATIONS OF STATE ANTITRUST AND RESTRAINT OF TRADE LAWS**
**(On Behalf of State Subclasses)**

193. Plaintiffs incorporate by this reference the allegations in the above paragraphs as if fully set forth herein.

194. By reason of the foregoing, the Defendants have entered into a trust, contract, combination, understanding, and agreement in restraint of trade in violation of Arizona Revised Stat. § 44-1401 *et seq.*[22]; California Bus. & Prof. Code § 16701 *et seq.*; District of Columbia Code Ann. § 28-4501 *et seq.*; 740 Illinois Comp. Stat. § 10/1 *et seq.*; Iowa Code § 553.1 *et seq.*; Kansas Stat. Ann. § 50-101 *et seq.*; Maine Rev. Stat. Ann. tit. 10, § 1101 *et seq.*; Michigan Comp. Laws. Ann. § 445.771 *et seq.*; Minnesota Stat. § 325D.49 *et seq.*; Mississippi Code Ann. § 75-21-1 *et seq.*; Nebraska Rev. Stat. §§ 59-801 *et seq.* and § 59-1601 *et seq.*; Nevada Rev. Stat. Ann. § 598A *et seq.*[23]; New Hampshire Revised Stat. Ann. § 356:1 *et seq.*; New Mexico Stat. Ann. § 57-1-1 *et seq.*; New York Gen. Bus. Law § 340 *et seq.*; North Carolina Gen. Stat. § 75-1

---

[22] In compliance with Arizona's Antitrust Act, Ariz. Rev. Stat. § 44-1415, Plaintiff notified the Arizona Attorney General of the existence of this action.

[23] In compliance with the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. Ann. § 589A.210(3), Plaintiff provided the Nevada Attorney General with a copy of this Complaint.

*et seq.*; North Dakota Cent. Code § 51-08.1-01 *et seq.*; Puerto Rico Laws Ann. tit. 10, § 257 *et seq.*; South Dakota Codified Laws § 37-1-3.1 *et seq.*; Tennessee Code Ann. § 47-25-101 *et seq.*; Utah Code Ann. § 76-10-911 *et seq.*;[24] West Virginia Code § 47-18-1 *et seq.*; and Wisconsin Stat. § 133.01 *et seq.*

195. State Subclass members in each of the states listed above paid supra-competitive, artificially inflated prices for gypsum wallboard. As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the State Subclasses have been injured in their business and property in that they paid more for gypsum wallboard than they otherwise would have paid in the absence of the Defendants' unlawful conduct.

196. As a result of the Defendants' violations of the statutes set forth above, Plaintiffs and other members of the State Subclasses seek damages and costs of suit, including reasonable attorneys' fees, and all other forms of relief available under the state antitrust statutes listed above.

## THIRD CLAIM FOR RELIEF
## VIOLATIONS OF STATE CONSUMER PROTECTION AND UNFAIR COMPETITION LAWS
## (On Behalf of State Subclasses)

197. Plaintiffs incorporate by this reference the allegations in the above paragraphs as if fully set forth herein.

198. The Defendants have engaged in unfair, unconscionable, deceptive, and fraudulent acts or practices and unfair methods of competition in violation of California Bus. & Prof. Code § 17200 *et seq.*; D.C. Code § 28-3901 *et seq.*; Florida Stat. § 501.201 *et seq.*; Massachusetts General Law, Chapter 93A; Nebraska Revised Statutes § 59-1601 *et seq.*; Nevada

[24] In compliance with Utah Code Ann. § 76-10-919(9), Plaintiff notified the Utah Attorney General of the existence of this action and provided a copy of the Complaint.

Rev. Stat. § 598.0903 *et seq.*; New Hampshire Rev. Stat. Ann. § 358-A *et seq.*; New Mexico Stat. Ann. § 57-12-1 *et seq.*; North Carolina Gen. Stat. § 75-1.1 *et seq*; Rhode Island Gen. Laws § 6-13.1-1 *et seq.*; Utah Code Ann. § 13-11-1 *et seq.*; and Vermont Stat. Ann. tit. 9, § 2451 *et seq.*[25]

199. Members of the State Subclasses for the states listed above paid supra-competitive, artificially inflated prices for gypsum wallboard. As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and the members of the State Subclasses have been injured in their business and property in that they paid more for gypsum wallboard than they otherwise would have paid absent the Defendants' unlawful conduct.

200. As a result of the Defendants' violations of the laws listed above, Plaintiffs and members of the State Subclasses for the states listed above are entitled to equitable relief, including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by the Defendants as a result of such business practices, including compensable and such other damages allowed by law.

**FOURTH CLAIM FOR RELIEF**
**VIOLATIONS OF STATE UNJUST ENRICHMENT LAWS**
**(On Behalf of the State Subclasses)**

201. Plaintiffs incorporate by this reference the allegations in the above paragraphs as if fully set forth herein.

202. By reason of their unlawful conduct, Defendants should make restitution to Plaintiffs and members of the Indirect Purchaser State Subclasses listed below.

203. Plaintiffs and members of the following Indirect Purchaser State Subclasses, by overpaying for gypsum wallboard, have conferred a benefit on Defendants. Defendants

[25] Pursuant to Massachusetts General Laws, Chapter 93A, § 1 *et seq.*, demand letters were sent to each of the Defendants on January 29, 2013. Defendants' response to those demand letters were either nonexistent or inadequate.

knowingly accepted and retained the overpayments such that it would be inequitable for Defendants to keep the inflated profits.

204. The detriment suffered by Plaintiffs and the members of the State Subclasses, and the Defendants' unjust enrichment, were related to and flowed from the wrongful conduct alleged herein, including, without limitation, the Defendants' unlawful and anti-competitive acts described above which fixed, raised, and/or maintained the purchase price of gypsum wallboard at supra-competitive levels.

205. Under common law principles of unjust enrichment, the Defendants should not be permitted to retain the benefits conferred through over-payments by Plaintiffs and members of the State Subclasses. Plaintiffs and the members of the State Subclasses accordingly are entitled to disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiffs and members of the State Subclasses may seek restitution.

206. Plaintiffs and the following Indirect Purchaser State Subclasses base their claims for unjust enrichment and disgorgement of profits upon common law principles of unjust enrichment recognized in each of their respective states:

A. Arizona Indirect Purchaser Class;

B. Arkansas Indirect Purchaser Class;

C. California Indirect Purchaser Class;

D. District of Columbia Indirect Purchaser Class;

E. Illinois Indirect Purchaser Class

F. Iowa Indirect Purchaser Class;

G. Kansas Indirect Purchaser Class;

H. Maine Indirect Purchaser Class;

I. Massachusetts Indirect Purchaser Class;

J. Michigan Indirect Purchaser Class;

K. Minnesota Indirect Purchaser Class;

L. Mississippi Indirect Purchaser Class;

M. Missouri Indirect Purchaser Class;

N. Nebraska Indirect Purchaser Class;

O. Nevada Indirect Purchaser Class;

P. New Hampshire Indirect Purchaser Class;

Q. New Mexico Indirect Purchaser Class;

R. New York Indirect Purchaser Class;

S. Puerto Rico Indirect Purchaser Class;

T. Rhode Island Indirect Purchaser Class;

U. South Dakota Indirect Purchaser Class;

V. Tennessee Indirect Purchaser Class;

W. Utah Indirect Purchaser Class;

X. Vermont Indirect Purchaser Class;

Y. West Virginia Indirect Purchaser Class; and

Z. Wisconsin Indirect Purchaser Class.

**DEMAND FOR JURY TRIAL**

207. Pursuant to Federal Rule of Civil Procedure 38(b), each Plaintiff demands a trial by jury of all claims asserted in this Complaint so triable.

**DEMAND FOR RELIEF**

208. Wherefore, Plaintiffs demand judgment against Defendants as follows:

(a) Declaring this action to be a proper class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class and State Subclasses as defined herein;

(b) That the contract, combination, or conspiracy, and the acts done in furtherance thereof by Defendants be adjudged to have violated Section 1 of the Sherman Act, 15 U.S.C. § 1 and applicable state laws described herein.

(c) That judgment be entered for Plaintiffs and the Class on the first claim awarding injunctive relief.

(d) That judgment be entered for Plaintiffs and the State Subclass members on the second claim for damages, trebled as allowed by law.

(e) That judgment be entered for Plaintiffs and the members of the State Subclasses on the third claim for relief in the amount of damages sustained and/or restitution as allowed by law.

(f) That judgment be entered for Plaintiffs and the members of the State Subclasses on the fourth claim for relief ordering restitution of amounts paid by them in excess of a competitive price as allowed by law.

(g) That Plaintiffs and the members of the Class and State Subclasses recover pre-judgment and post-judgment interest as permitted by law.

(h) That Plaintiffs and the members of the Class and State Subclasses recover their costs of the suit, including attorneys' fees and expert fees, as provided by law.

(i) For such other and further relief as is just and proper under the circumstances.

DATED: June 25, 2013

Lesley E. Weaver
Robert S. Green
James Robert Noblin
**GREEN & NOBLIN, P.C.**
700 Larkspur Landing Circle, Suite 275
Larkspur, CA 94939
Telephone: (415) 477-6700
Facsimile: (415) 477-6710
gnecf@classcounsel.com

Jeffrey C. Block
Whitney Street
Mark A. Delaney
**BLOCK & LEVITON LLP**
155 Federal Street, Suite 1303
Boston, MA 02110
Telephone: (617) 398-5600
Facsimile: (617) 507-6020
Jeff@blockesq.com
Whitney@blockesq.com
Mark@blockesq.com

Douglas G. Thompson Jr.
L. Kendall Satterfield
Michael G. McLellan
Eugene J. Benick
**FINKELSTEIN THOMPSON LLP**
1077 30th St. NW, Suite 150
Washington, D.C. 2007
Telephone: (202) 337-8000
Facsimile: (202) 337-8090
dthompson@finkelsteinthompson.com
ksatterfield@finkelsteinthompson.com
mmclellan@finkelsteinthompson.com
ebenick@finkelsteinthompson.com

*Interim Co-Lead Counsel for Plaintiffs and the Proposed Indirect Purchaser Classes*

Elizabeth C. Pritzker
Bethany L. Caracuzzo
Shiho Yamamoto
**PRITZKER | LAW**
633 Battery Street, Suite 110
San Francisco, CA 94111
Telephone: (415) 692-0772
Facsimile: (415) 366-6110
ecp@pritzker-law.com
bc@pritzker-law.com
sy@pritzker-law.com

*Attorneys for Indirect Purchaser Plaintiffs East Island Commercial, LLC and 220 Golden Gate Associates L.P.*

Peter Safirstein
Morgan & Morgan, P.A.
28 West 44th Street
Suite 2001
New York, New York 10001
Telephone: (212) 273-1135
psafirstein@forthepeople.com

*Counsel for Plaintiff Brian Lisonbee, William Perry and Geneva Clark*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 25, 2013, I caused to be electronically filed the foregoing FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT (INDIRECT PURCHASERS) with the Clerk of the Court via CM/ECF. Notice of this filing will be sent by email to all parties by operation of the court's electronic filing systems. Parties may access the filing through the Court's CM/ECF System.

Lesley E. Weaver