**Buchanan Ingersoll ⚘ Rooney** PC
Attorneys & Government Relations Professionals

Two Liberty Place
50 S. 16th Street, Suite 3200
Philadelphia, PA 19102-2555

**Steven E. Bizar**
Executive Shareholder
215 665 3826
steven.bizar@bipc.com

T 215 665 8700
F 215 665 8760
www.buchananingersoll.com

October 18, 2013

**BY HAND DELIVERY & ELECTRONIC FILING**
Honorable Michael M. Baylson
United States District Court for the
Eastern District of Pennsylvania
3810 United States Courthouse
601 Market Street
Philadelphia, PA 19106

> **Re:**    ***In re: Domestic Drywall Antitrust Litigation, MDL No. 2437, 13-MD-2437***
> ***THIS LETTER RELATES TO ALL CASES***

Dear Judge Baylson:

We represent defendant New NGC, Inc. in the above-referenced action and submit this letter concerning discovery disputes on behalf of all defendants pursuant to Pretrial Order No. 4.

Since the Court's guidance at the September 18th pretrial conference, Defendants have worked cooperatively with Plaintiffs to narrow the discovery issues in dispute. The Court clarified at that conference that it agreed in broad concept with the Defendants' proposal to limit discovery to liability questions under the Sherman Act (as opposed to causation, damages, and class certification), but refrained from limiting discovery only to evidence of an agreement among the defendants. Defendants have since substantially expanded the types and quantities of documents they have agreed to produce in this phase of the litigation.

The precise scope of each Defendant's production in response to Plaintiffs' numerous burdensome requests remains the topic of discussion between Plaintiffs and individual

October 18, 2013
Page - 2 -

Defendants. However, several global issues are irreconcilably in dispute, the resolution of which will substantially advance the litigation:

- First, the parties dispute the number of document custodians from whom Defendants NGC and CertainTeed should be obligated to collect and review documents. NGC and CertainTeed have agreed to produce documents from the files of 22 custodians (with another 64 custodians being produced by the remaining Defendants); Plaintiffs demand production from 19 additional custodians.[1]

- Second, the parties disagree over the appropriate time period, with Plaintiffs insisting that Defendants collect documents dating back to 2008, more than three years before the substantive allegations of the Complaint.

- Third, Plaintiffs ask Defendants to collect, process, and produce transaction data reflecting all sales of drywall from at least January 2009 to the present. Defendants do not believe transaction data should be a part of the discovery process in the first phase of the case.

- Finally, the parties disagree over the appropriate schedule for discovery. Because Defendants have already begun producing documents and expect to make substantial initial productions on November 8, 2013, Defendants propose a firm deadline of August 1, 2014. By contrast, Plaintiffs propose an open-ended

---

[1] American, Lafarge, PABCO, TIN, and USG have reached agreement with Plaintiffs regarding custodians and therefore do not join in the portion of this letter that addresses custodians.

deadline of eight months from the date Defendants certify that they have completed their document production.

The above issues are ripe for the Court's resolution. Further, the Court's resolution of these issues will likely facilitate the resolution of the remaining more granular issues about which the parties are still conferring.

## I. **Background and Status of Individual Discovery Requests**

In December 2012, plaintiffs filed the first of a series of complaints around the country alleging that Defendants (and former defendant Georgia-Pacific) conspired in the fall of 2011 to fix prices for gypsum wallboard and end the practice of using "job quotes" and then conspired in the fall of 2012 to raise prices again. Following proceedings before the Judicial Panel on Multidistrict Litigation, and consolidation before this Court, Direct Purchaser and Indirect Purchaser Plaintiffs filed Consolidated Amended Class Action Complaints. Although earlier complaints in other jurisdictions varied in their allegations of exactly how and when the conspiracy supposedly arose, the Consolidated Amended Class Action Complaints filed in this Court make no allegation of any conspiratorial behavior before the fall of 2011. Plaintiffs' proposed classes of direct and indirect purchasers are both limited to those who purchased wallboard after January 1, 2012. (Direct Compl. ¶ 17; Indirect Compl. ¶ 173.)

On August 2, 2013, Defendants and Plaintiffs submitted competing discovery proposals. Because the issue of agreement is likely to be dispositive of the case, Defendants proposed a first phase of discovery that related to whether Defendants entered into an agreement with respect to two drywall price increases and the discontinuation of job quotes, with a particular focus on the

October 18, 2013
Page - 4 -

evidence, or lack thereof, of communications among Defendants as to the subject matter of the alleged conspiracy. (Defs.' Letter dated Aug. 2, 2013 at 1.) This first phase of discovery would be tied to expedited and potentially dispositive summary judgment proceedings, to be followed, only if necessary, by a second round of discovery encompassing the remaining issues in the case. By contrast, Plaintiffs proposed expansive and comprehensive discovery that they contended "follows the practices observed in virtually every antitrust conspiracy case." (Pls.' Letter dated Aug. 2, 2013 at 2.)

At the September 18, 2013 pretrial conference, the Court explained that it agreed with Defendants that "without any question, the primary factual issue and legal issue in this case is whether there was a conspiracy to fix prices" and the Court saw "a lot of reasons for agreeing with the defendants that that should be the focus of the discovery at the outset." (Hr'g Tr. (Sept. 18, 2013) at 8:9-11, 19-22.) However, the Court expressed reservations about limiting discovery to evidence of an agreement among the defendants. (*Id.* at 8:22-9:9.)

Ultimately, the Court ordered that

[I]nitial discovery shall be limited to the following issue:

Whether the record contains sufficient facts and/or opinions, admissible at trial, to allow a jury to find a violation of Section 1 of the Sherman Act, including whether there was an agreement between or among defendants.

(Pretrial Order No. 4.)

The Court's direction facilitated the parties' efforts over several weeks to reach substantial agreement as to the scope of discovery. Respecting the Court's direction, Defendants have agreed to expand greatly the categories of documents they are willing to produce to

October 18, 2013
Page - 5 -

Plaintiffs in "Phase One" of discovery. In a telephonic meet and confer on September 24, Plaintiffs indicated they would continue to press forty-nine independent requests for the production of documents. During that telephone conference, Defendants agreed to produce documents responsive to twenty-five of those requests. In the ensuing weeks, as a result of additional discussions with Plaintiffs, and in an effort to narrow the issues before the Court, Defendants ultimately agreed to produce documents responsive to nearly all, if not all, of Plaintiffs' remaining twenty-four requests. This will include substantial volumes of documents relating to various "plus factors," which Plaintiffs argue they will be able to use to prove an illegal agreement under the Sherman Act. (*See* Pls.' Letter dated Aug. 2, 2013.) The lone exception for which all Defendants continue to stand on their objections is with respect to Plaintiffs' request for transactional data, as discussed in more detail below. (*See infra*.) Tables and correspondence setting forth Defendants' respective positions as to the forty-nine requests pressed by Plaintiffs are attached hereto as Exhibits 1-6.

Thus, Defendants have moved significantly from their August 2nd proposal of producing five streamlined categories of documents targeted at evidence, or lack thereof, of an agreement, to now offering to produce documents responsive to nearly fifty of Plaintiffs' requests. Defendants' agreement to expand the universe of documents to be produced comes at substantial cost. Not only will Defendants incur substantially greater vendor and legal fees, but the expansion in scope of discovery also has potential ramifications for the overall schedule for the initial phase of this case.

October 18, 2013
Page - 6 -

Plaintiffs are continuing to discuss with each Defendant the precise scope and timing of each Defendant's agreement to produce documents in response to the requests at issue. The parties are hopeful that they will reach agreement on those requests without further Court involvement. However, as discussed in detail below, the parties' disputes relating to document custodians, time frame, transactional data, and discovery schedule appear to be intractable.

With respect to Defendants' requests of Plaintiffs, the parties have conferred several times. While there are no issues currently ripe for submission to the Court, some significant questions remain to be answered. For example, the Direct Purchaser Plaintiffs have not yet provided information like organizational charts or even a list of names and titles of all of their businesspeople that would enable Defendants to evaluate the adequacy of the Direct Purchaser Plaintiffs' proposed custodians. Similarly, the corporate Indirect Purchaser Plaintiffs only proposed a list of custodians late last night, and the parties have not yet had an opportunity to discuss that proposed list.

For Defendants' document requests, Plaintiffs have not fully explained how they intend to respond to the requests that Defendants have indicated they will press in this phase of the case. The Direct Purchaser Plaintiffs have stated that they object to "downstream" discovery, but certain information is clearly necessary to evaluate Plaintiffs' claims relating to Defendants' job quote practices. Further, it is unclear which "downstream" documents Plaintiffs intend to exclude from their productions. The parties continue to discuss these and other matters relating to Defendants' discovery requests of Plaintiffs.

October 18, 2013
Page - 7 -

II.  **Defendants have agreed to produce documents from all custodians likely to have documents relevant to Plaintiffs' claims and should not be required to add custodians that are duplicative and cumulative.**

Defendants NGC and CertainTeed have been unable to reach agreement with Plaintiffs on which document custodians should be included in their phase one productions. After meeting and conferring in good faith, NGC and CertainTeed have agreed to produce documents from 22 employees – a group that includes all custodians who reasonably could be expected to have non-duplicative documents relevant to plaintiffs' claims. Plaintiffs have demanded that phase one discovery be expanded to include 19 additional custodians whose documents are highly unlikely to contain information not already included in the significant number of documents that Defendants have agreed to produce.

For example, Defendant NGC has agreed to produce documents from 16 custodians, including (a) all employees who had involvement in evaluating or approving the 2012 and 2013 price increases and the decision to eliminate job quotes; (b) all employees who have authority to set or change the prices of drywall, including list prices and customer-specific prices, and all employees involved with the evaluation or approval of job quotes; (c) all senior sales staff, including the sales directors overseeing different regions of the country; (d) all members of NGC's pricing department; (e) all employees who have had any significant involvement in any industry trade association during the relevant period; and (f) all employees who attended the specific trade association meetings referenced in the complaint. Plaintiffs seek to have NGC expand this list to include eight additional mid-level sales people who have no pricing authority and who are therefore extremely unlikely to have unique, non-duplicative documents relevant to plaintiffs' claims.

October 18, 2013
Page - 8 -

Defendant CertainTeed similarly has offered to produce documents from (1) each employee with authority for drywall pricing or job quotes, (2) every other employee who was materially involved in the decisions that are the subject of this litigation (i.e., the decisions to eliminate job quotes and to raise prices in January 2012 and January 2013), and (3) employees who were officers of the trade associations identified in Plaintiffs' complaints. For all of these custodians, CertainTeed is producing documents in response to every single request for production that Plaintiffs have deemed relevant to phase one of discovery, except those few requests focused entirely on transactional data (for reasons discussed further below). These materials will provide Plaintiffs with full discovery regarding CertainTeed's decision-making process and any interactions between those decision-makers and customers or competitors regarding these decisions. Yet Plaintiffs have demanded documents from an additional eleven custodians, none of whom has relevant decision-making authority. And, as discussed further below, Plaintiffs rejected a compromise that would have provided them with documents from seven of those eleven individuals.

Rule 26(b)(2)(C) specifically requires courts to limit discovery if the information sought is "unreasonably cumulative or duplicative," and directs courts to limit discovery when "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case . . . the importance of the issues at stake . . . and the importance of the discovery in resolving disputes." "This underlying principle of proportionality means that even in complex litigation, discovery does not require leaving no stone unturned." *Manual for Complex Litigation, Fourth,* § 11.41.

October 18, 2013
Page - 9 -

The key question is whether documents found in the files of the 19 additional custodians demanded by Plaintiffs are likely to uncover information that is not duplicative of the 86 custodians for which Defendants have agreed to produce documents. Mere speculation does not suffice; Plaintiffs must specifically describe what important, non-duplicative information they expect to be found in the files of these additional custodians. *See Garcia v. Tyson Foods, Inc.*, CIV.A. 06-2198-JWL, 2010 WL 5392660 (D. Kan. Dec. 21, 2010) (holding that "Plaintiffs must present something more than mere speculation that responsive e-mails *might* exist in order for this Court to compel the searches and productions requested" and denying request for additional custodians). During the parties' meet and confer sessions on this issue, Plaintiffs have failed to identify any relevant non-duplicative information that these custodians would possess. Instead, the additional custodians were selected by Plaintiffs based largely on their review of the organizational charts produced by Defendants, which is not a sufficient basis for imposing the costs and burdens associated with expanding discovery. *See Kleen Products LLC v. Packaging Corp. of Am.*, 10 C 5711, 2012 WL 4498465 (N.D. Ill. Sept. 28, 2012) objections overruled, 10 C 5711, 2013 WL 120240 (N.D. Ill. Jan. 9, 2013) (noting that plaintiffs did not identify "any specific, noncumulative evidence they expect to find with the additional custodians. Instead, they selected the additional custodians by examining each Defendant's organizational charts").

With respect to NGC, for example, Plaintiffs have argued that mid-level sales employees should be included as custodians simply because they might have documents showing "the timing and content of what was being communicated with customers." Even assuming this were true, Plaintiffs have failed to explain why such documents would be relevant. NGC

October 18, 2013
Page - 10 -

communicated its 2012 and 2013 price changes through a written price announcement, and NGC has agreed to produce documents from all custodians who had any involvement whatsoever in deciding what NGC's message to customers would be, when and how that message would be communicated to customers, and any involvement with drafting or revising the price announcement (along with every custodian who had any involvement with evaluating or approving the 2012 and 2013 price changes themselves). Moreover, when customers had comments, questions or complaints about NGC's price increases, those issues were routinely raised with the more senior members of NGC's sales and pricing departments, whose documents are being produced. Plaintiffs have not explained why the mere transmission of NGC's written pricing announcement to customers is relevant to the question of whether the Defendants conspired to raise prices. Because mid-level sales managers who lack pricing authority could not have independently carried out an industry-wide conspiracy to raise prices, the incremental information to be gained from inclusion of these custodians would be trivial and pales in comparison to the burden of collecting, processing, reviewing, and producing documents from these employees.

As to CertainTeed, Plaintiffs are demanding documents from the following eleven employees: (a) seven regional sales managers ("RSMs"), (b) three national account managers ("NAMs"), and (c) Vice President, U.S. Board Operations. As noted above and explained to Plaintiffs, none of these individuals has relevant decision-making authority; the key decision makers are already custodians. Thus, if CertainTeed is required to produce documents from these eleven employees, its discovery costs will increase substantially without adding a single

October 18, 2013
Page - 11 -

document from an employee with authority as to pricing or job quote policies.[2] These added costs are particularly unnecessary here because, to the extent these individuals have materials that are pertinent to this litigation, that will be reflected in the documents produced from the agreed custodians (e.g., the Vice President of Sales), and if, after reviewing those documents, Plaintiffs still believe that they need discovery from additional custodians, they can renew their request at that time.

For these reasons, CertainTeed strongly believes that these eleven individuals should not be custodians; however, in the spirit of compromise, CertainTeed offered to produce documents from several RSMs and to let Plaintiffs choose which RSMs were included.[3] Plaintiffs rejected this offer. In a further effort to avoid submitting this dispute to the Court, CertainTeed then offered to produce documents from all seven RSMs, but Plaintiffs likewise refused this compromise and insisted that CertainTeed include as custodians the NAMs and the Vice President of U.S. Board Operations. These individuals, however, are not appropriate custodians, both for the reasons provided above as well as others. For example, the NAMs work with many products other than drywall that have no relevance to this litigation (e.g., insulation and siding), and it will be impossible to exclude documents relating to those irrelevant products from the review and production. To the extent the NAMs work with drywall, that will be reflected in the files of the agreed custodians, because the NAMs coordinate their work with the drywall sales team (e.g., relevant periodic reports would have been provided to the Vice President of Sales). As for the Vice President of U.S. Board Operations, the bulk of his responsibilities – relating to

---

[2] This is particularly so if the relevant time period is expanded as Plaintiffs have requested.
[3] CertainTeed also provided Plaintiffs with data about sales volumes and tenure to help them select the RSMs.

October 18, 2013
Page - 12 -

matters such as engineering, mining and safety – have nothing to do with the issues in this case. With respect to the issues that Plaintiffs contend are relevant to phase one, such as the volume of drywall that CertainTeed manufactures, he does not have decision-making authority; those decisions are made by employees who are already custodians.[4]

Because these eleven individuals lack pricing authority and are unlikely to possess pertinent documents that are unavailable from other custodians, their value as custodians is minimal, particularly in light of the associated costs. Nevertheless, in order to find some common ground, CertainTeed proposes that Plaintiffs choose four of its seven RSMs to serve as custodians without prejudice to their right to seek further discovery later.

Plaintiffs request for additional custodians should be denied. By reviewing responsive documents from the 86 custodians for which Defendants have agreed to produce documents, Plaintiffs "will either find the information [they] suspect[], or find enough information to request additional custodians in good faith." *In the Matter of Certain Electronic Imaging Devices*, USITC No. 337-TA-850, 2012 WL 5881783, at *2 (U.S. Intern. Trade Comm'n Nov. 19, 2012) (rejecting demand for additional document custodians beyond the 15 proposed by responding party).

---

[4] Plaintiffs' stated rationale for seeking documents from the Vice President of U.S. Board Operations is that he is listed on CertainTeed's initial disclosures as having knowledge about capacity. But those initial disclosures were made months before the operative complaints were filed and long before the Court issued Pretrial Order No. 4. He was included at that time out of an abundance of caution. Similarly, CertainTeed provided phone record information for the RSMs and NAMs, subject to its reservations of objections as to the ultimate relevance of those individuals, in light of Plaintiffs' concern that relevant phone records held by the various telephone carriers might soon be overwritten under the normal retention practices of the respective carriers.

October 18, 2013
Page - 13 -

### III. Defendants Have Agreed to Produce Documents Spanning Beyond the Time Period for Which the Complaint Alleges Defendants Engaged in a Sherman Act Violation

Defendants have agreed to collect, review, and produce nearly 50 categories of documents, for dozens of document custodians, for the entire time period for which the Complaints purport to allege violations of Section 1 of the Sherman Act—September 2011 through the end of 2012. (*See* Complaint ¶¶ 3-15.) Further, because Plaintiffs seek additional documents from the time period *before* the alleged conspiracy, Defendants have also agreed to produce documents from the eight months preceding the start of Plaintiffs' substantive allegations. In total, Defendants have all agreed to produce documents for more than 80 custodians, encompassing all of the agreed categories, dating from January 1, 2011 through December 31, 2012.

Plaintiffs, however, ask Defendants to collect, review, and produce documents dating back to January 2008. Thus, although the Complaint's allegation of a Sherman Act violation is exclusively focused on a fifteen-month period from September 2011 through December 2012, Plaintiffs ask Defendants to produce five years' worth of documents for each one of their forty-nine document requests. Their request is unduly burdensome under Federal Rule of Civil Procedure 26(b)(2)(C)(iii).

Plaintiffs' request for documents back to 2008 would more than double the volume of Defendants' discovery obligations in order to prove a tangential point that is not seriously in dispute. Plaintiffs' stated rationale for demanding such an expansive time period is that the earlier period could be relevant to show that Defendants' alleged price increase announcements and attendant decisions to end the practice of job quotes amounted to an "abrupt shift from

October 18, 2013
Page - 14 -

defendants' past behavior." (Pls.' Aug. 2, 2013 Letter at 2.) They contend such "abrupt shifts" may strengthen the inference of conspiracy. (*Id.*)

Although Defendants certainly dispute that the independent decision of many Defendants to end job quotes could somehow "strengthen the inference of conspiracy,"[5] there is no dispute that the practice of using job quotes was common in the industry before the September 2011 announcements announcing an end to the practice. Moreover, the practice was equally widespread in the eight months from January through August 2011, the time preceding the start of Plaintiffs' substantive allegations for which Defendants have already agreed to produce documents. And to the extent Plaintiffs claim that the price increase announcements themselves amount to an "abrupt shift," then Plaintiffs are free to obtain such prior documents from their own clients or elicit testimony regarding prior practices from Defendants' employees at deposition. There is no reason to believe that requiring Defendants to search further back in time for all forty-nine requests will add anything of value to the evidentiary record. Thus, the burden from Plaintiffs' request—more than doubling the universe of documents Defendants would have to collect, review, and produce—far outweighs its likely benefit. *See* Fed. R. Civ. P. 26(b)(2)(C)(iii). Accordingly, Plaintiffs' request should be denied.

---

[5] The case on which Plaintiffs rely explains that not just any "abrupt shift" can give rise to such an inference, but a "'complex and historically unprecedented change[ ] in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason,' may provide sufficient evidence of an illegal conspiracy." *United States v. Apple Inc.,*, Nos. 12 Civ. 2826(DLC), 2013 WL 3454986, at *40 (S.D.N.Y. July 10, 2013).

October 18, 2013
Page - 15 -

IV. **Transactional Data Is Unnecessary During This Phase Because It Is Neither Legally Sufficient Nor Factually Helpful**

Although the parties have conferred as to the production of transactional data in the first phase of discovery, they have not been able to reach agreement. Plaintiffs have proposed a full production of transactional data from 2009 to the present.[6] Defendants propose deferring the production of any transactional data until later in the litigation – if it is as needed at all – because it cannot be used to differentiate between lawful conscious parallelism and unlawful conspiracy, that is, a "conscious commitment to a common scheme designed to achieve an unlawful objective."[7] *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 768 (1984). This will permit the Parties to save substantial time and expense – potentially hundreds of thousands of dollars per Party – that may be wholly unnecessary, as explained further below.

At the September 18 case management conference, Plaintiffs argued that they can use "a regression analysis [to] show[] that the only basis for an increase in the prices is . . . the conspiracy." (Hr'g Tr. at 23:12-19; *see also id.* at 27:24-25 ("transactional data is quite important

---

[6] By "transactional data," Defendants mean information such as that requested by Plaintiffs in their requests Numbers 8 and 11, which call for, among other things, granular information from every sale of drywall over a multi-year span, including: "a) The terms of each transaction; b) The invoice number and purchaser order number; c) The location from which the Drywall was shipped; d) The customer's name and address, including the location to which the Drywall was shipped; e) The date You shipped the Drywall, the date You billed for the Drywall, and the date the purchaser took delivery; f) The specification and type of Drywall, including any unique purchaser-specific identifier, and complete product descriptions, sold in each transaction; g) The quantity (and units of measure) for each type of Drywall sold in connection with each transaction; h) All pricing information relating to the transaction, including the gross and net unit price for each type of Drywall; i) Any discounts, rebates, credits, freight allowances, free goods and/or services, and/or any other pricing adjustment of any kind made in connection with each transaction, with sufficient information to attribute these adjustments back to individual transactions; j) Whether a transaction was subject to a Job Quote and, if so, the terms of the Job Quote; k) Any costs or costs of goods sold relating to the transaction (including freight charge and transportation cost; sales and distribution cost; marketing and/or sales cost; and any cost attributed or allocated to the transaction); l) Any other data available in such a database relating to the sale or distribution of Drywall."

[7] Both Parties have concerns over using a sampling approach with respect to the transactional data, and neither side has successfully formulated a workable approach for such sampling.

October 18, 2013
Page - 16 -

to us proving the conspiracy").) This is incorrect. It is well-established that a statistical regression (or other statistical analysis) cannot establish a conspiracy because it does not (and cannot) distinguish between pricing that is consciously parallel and pricing made pursuant to an agreement. Indeed, the Third Circuit has stressed that, at the summary judgment stage of a price-fixing case such as this, the focus should be on "non-economic" evidence of the type Defendants have agreed to produce, rather than the economic analysis on which Plaintiffs intend to rely. *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 361 (3d Cir. 2004). Requiring the production of transactional data is inconsistent with this guidance, the underlying purpose of phased discovery, and the goal, articulated by the Supreme Court, of reducing the harsh burdens that antitrust discovery places on defendants. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558-60 (2007).

Even if Plaintiffs were correct that they can hire an economist to prove their conspiracy claims – and they are not – the approach that they advocate would be pertinent only if Defendants were planning to seek summary judgment based on Plaintiffs' failure to show that Defendants implemented the 2012 and 2013 price increases as alleged. Defendants, instead, intend to demonstrate during phase one that each Defendant made its pricing decisions independently and that there is no evidence – direct or indirect – that Defendants acted pursuant to an agreement among themselves. Transactional data is irrelevant to that issue.[8]

---

[8] For the avoidance of doubt, if the case proceeds beyond phase one, Defendants reserve the right to argue that variability in actual pricing further undermines Plaintiffs' claims of conspiracy and, among other things, renders class certification inappropriate. Deferring such arguments until a later date – and thereby avoiding the related, burdensome discovery – is consistent with the recommendations of the Manual for Complex Litigation.

October 18, 2013
Page - 17 -

### A. Violations of Section 1 Require Proof of an Agreement, and Transactional Data Cannot Satisfy This Burden.

It is axiomatic that, in order to prevail on their price-fixing conspiracy claims, Plaintiffs must establish that Defendants acted pursuant to an agreement. *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 117 (3d Cir. 1999) ("an agreement is the hallmark of a Section 1 claim."). If Plaintiffs' evidence does not tend to exclude the possibility that each Defendant acted independently, Plaintiffs' claims fail, even if each Defendant hoped and expected that the others would take the same actions. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588 (1986); *Intervest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159 (3d Cir. 2009) ("Unilateral activity by a defendant, no matter the motivation, cannot give rise to a section 1 violation.").

In a case such as this based on allegations of parallel conduct, Plaintiffs simply cannot use an economist to divine the existence of a price-fixing agreement from transactional data. Numerous antitrust scholars have recognized this, stating, for example, that "the discipline of economics ha[s] no competence to determine whether parallel behavior among independent actors amount[s] to a legal 'agreement.'" Herbert Hovenkamp, *Economic Experts in Antitrust Cases* in David L. Faigman et al., *Modern Scientific Evidence* § 38-2.0, at 179 (1999); *see also* William H. Page, *Communication and Concerted Action*, 38 Loy. U. Chi. L.J. 405, 417 (Spring 2007) ("Nor can economic testimony assist the jury on the ultimate issue of agreement"); Michael O'Hara, *The Economic Expert in the Antitrust Arena*, 12 Antitrust L. & Econ. Rev. 17, 19-20 (1980) ("Collusion . . . is not particularly the subject of economic expertise"). An economist's regression analysis of transactional data can at most "conclude" that price moves are

October 18, 2013
Page - 18 -

not "caused" by factors such as increases in costs or changes in capacity or demand.[9] Pricing is not expected to correspond perfectly with such factors, however, but is often consciously parallel, unable to be predicted with precision by econometric models. As a result, a regression analysis that determines, for example, that pricing patterns are parallel or do not track demand says nothing about whether they are the product of a conspiracy, as opposed to being the product of interdependence.[10] *See, e.g.*, Page, *supra*, at 424 ("Econometric studies showing departures from the behavior of competitive firms cannot distinguish consciously parallel from concerted practices"); Hays Gorey, Jr. and Henry A. Einhorn, *The Use and Misuse of Economic Evidence in Horizontal Price-Fixing Cases*, 12 J. Contemp. L. 1, 28 n.111 (1986) ("no statistical or economic study can establish that there was a conspiracy"); F.M. Scherer, *The Posnerian Harvest: Separating Wheat from Chaff*, 86 Yale L.J. 974, 983 (1977) (expressing doubt that economists can credibly infer tacit collusion from such factors as "stability of market shares, persistent price discrimination, divergent regional price patterns, identity of bids, profitability and the like;" procuring adequate data is difficult and, moreover, "economic analysis is an elastic instrument and . . . some economists' consciences are also elastic").

---

[9] Plaintiffs' statement at the hearing that they need cost data for this very purpose, that is, to show that prices do not track costs misses the point for the reasons outlined herein. (Hr'g Tr. at 28:8-11.)

[10] An economist is also unqualified to opine on the ultimate question of whether defendants conspired. *See, e.g.*, *State of Ohio v. Louis Trauth Dairy, Inc.*, 925 F. Supp. 1247, 1254 (S.D. Ohio 1996) (economists "may not express an opinion in the form of a legal conclusion regarding the existence of an illegal conspiracy"); Page, *supra*, at 424 ("[C]ourts routinely prevent economists from offering an opinion [on whether behavior is the result of a conspiracy] because economics has surprisingly little to say about this issue"); Hays Gorey, Jr. and Henry A. Einhorn, *supra*, at 30-31 ("[T]here is no way for an economist simply to 'perceive' the existence of an agreement . . . . What was in the minds of a group of people at a given point in time is not within the expertise of an economist"). Nor can economists opine on the meaning of business documents. *See* George J. Stigler, *What Does an Economist Know?*, 33 J. Legal Educ. 311, 311 (1983) (economists have "no special skill in reading documents and relating them to actual behavior").

October 18, 2013
Page - 19 -

Interdependent, consciously parallel pricing is to be expected in an industry such as gypsum board even if industry conditions would not otherwise support price increases. *See Twombly*, 550 U.S. at 553-54 (describing conscious parallelism as "a common reaction" of companies); *Superior Offshore Intern., Inc. v. Bristow Group, Inc.*, No. 11-3010, 2012 WL 3055849, at *6 (3d Cir. July 27, 2012); *Reserve Supply Corp. v. Owens-Corning Fiberglass Corp.*, 971 F.2d 37, 53 (7th Cir. 1992). Such pricing is perfectly lawful, even if done intentionally, because Section 1 of the Sherman Act only forbids *agreements* – "conscious commitments," mutual exchanges of promises – to price in a certain manner. *See, e.g.*, *Brooke Group v. Brown & Williamson Tobacco Corporation,* 509 U.S. 209, 227 (1993); *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 121 (3d Cir. 1999); *see also In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 627 (7th Cir. 2010) (the Sherman Act "does not require sellers to compete; it just forbids their agreeing or conspiring not to compete").

Because parallel pricing is a natural result of normal economic factors, the Third Circuit has held that plaintiffs basing a Section 1 claim on parallel pricing need to provide *non-economic* evidence of an agreement. *See Flat Glass*, 385 F.3d at 361 (quoting *In re High Fructose Corn Syrup Antitrust Litig.,* 295 F.3d 651, 661 (7th Cir. 2002)) ("The *most important* evidence will generally be *non-economic* evidence 'that there was an actual, manifest agreement not to compete.'") (emphasis added); *see also Superior Offshore Intern., Inc. v. Bristow Group, Inc.*, No. 11-3010, 2012 WL 3055849, at *5 (3d Cir. July 27, 2012) (non-economic evidence "is especially important in cases like this one wherein the plaintiff's theory of conspiracy rests on an agreement among oligopolists to fix prices at a supracompetitive level") (internal quotation and

October 18, 2013
Page - 20 -

citation omitted). The classic example of such non-economic evidence is communications among the defendants on the subject matter of the conspiracy. Where such evidence is lacking – as it is here – summary judgment is appropriate. Indeed, Defendants are unaware of a single price-fixing case in which a court has denied or reversed summary judgment for the defendants where there were no such communications, even where a regression analysis was proffered.

The insufficiency of transactional data to create a triable issue is reflected in the fact that numerous courts have rejected plaintiffs' reliance on such data and granted summary judgment. For example, in a recent decision in the First Circuit, the court of appeals affirmed summary judgment for defendant gas stations, which were accused of artificially inflating the price of gas. *White v. R.M. Packer Co., Inc.*, 635 F.3d 571 (1st Cir. 2011). The court expressly refused to reverse the lower court based on the plaintiffs' evidence of cost trends and pricing patterns, holding that the expert's report did not "undermine the conclusion that plaintiffs have failed to show that an agreement among the defendants is a more likely explanation for their pricing behaviors than bare conscious parallelism." *Id.* at 585. In another opinion, the Eleventh Circuit affirmed the lower court's order excluding the testimony of the plaintiffs' economist, because he failed to "differentiate between lawful, conscious parallelism and collusive price fixing." *Williamson Oil Co., Inc. v. Philip Morris, USA*, 346 F.3d 1287, 1322 (11th Cir. 2003). Other courts have reached similar decisions.[11] *See, e.g., Wallace v. Bank of Bartlett*, 55 F.3d 1166,

---

[11] Although the Third Circuit relied in part on economic data in its decision in *Petruzzi's IGA v. Darling–Delaware*, 998 F.2d 1224 (3d Cir. 1993), that case does not support the use of transactional data in these circumstances. As an initial matter, the court acknowledged that economic data "may not be enough to raise a jury issue." *Id.* at 1241. Moreover, *Petruzzi's* involved an alleged customer allocation scheme, and the court distinguished between allocation scheme allegations and the type of parallel pricing that Plaintiffs have alleged here. *Id.* at 1233; *see also id.* at 1244. The economic evidence presented there – showing that pricing for existing accounts was much higher than pricing for new accounts – has no application in this case. *Id.* at 1236.

October 18, 2013
Page - 21 -

1170 (6th Cir. 1995) (affirming summary judgment where one expert's conclusions were "based on nothing more than facts which . . . are equally consistent with independent [consciously parallel] actions by the Banks" and another economist's testimony was "equally consistent with independent action as it is with conspiracy").

This is why Defendants propose focusing on the independent reasons for each Defendant's decisions, and the non-existence of relevant inter-firm communications, during the first phase of discovery. Plaintiffs will receive extensive discovery relating to contacts with competitors (emails, telephone records, etc.), trade association materials, communications with customers regarding the price increase announcements, and much more. Additionally, Defendants have agreed to produce a substantial set of documents about "economic" factors – e.g., cost, demand, and capacity – and Plaintiffs will be free to advance arguments based on such factors in opposition to motions for summary judgment. But Defendants propose to draw the line at transactional data because, as noted, whatever statistical analyses of such data that Plaintiffs intend to employ, it simply cannot discern between consciously parallel and conspiratorial pricing, and it will not overcome the substantial non-economic evidence that will show that there is no merit to Plaintiffs' claims.

> **B.   The Substantial Costs of Producing and Analyzing Transactional Data Should be Deferred Until It Is Determined That Such Data Are Necessary.**

The production and evaluation of transactional data in this case – covering perhaps millions of drywall sales over a period of several years – also should be deferred because it can be hugely expensive. As an initial matter, collecting and producing transactional data is not a matter of simply "download[ing] it from [Defendants'] system," as Plaintiffs stated at the

October 18, 2013
Page - 22 -

September 18 conference. (Hr'g Tr. at 27:22-23.) It can be complicated by any number of factors, particularly in situations where the data is stored on multiple systems. To take one example, National Gypsum maintains pricing data in proprietary systems that are not designed for easy retrieval of the data. In addition to addressing Defendant-specific issues of this nature, each of the seven Defendants will have to identify the relevant sources of data, determine what data is stored in the various fields of each data source (of which there may be dozens) and which of those fields contains information relevant to the litigation, and then determine how to organize and produce the data. All of this may be the subject of considerable disputes among the parties.

It is not the collection and production of the data, however, that is usually the most significant driver of costs. Rather, it is the work required to understand and analyze the data – by both parties – that proves to be most costly. Once Plaintiffs receive the data, they (or their experts) typically compile lists of questions that may run many pages long, asking what the fields mean, how they are used, whether certain absent data is available elsewhere, and more. Each Defendant will attempt to answer those questions, but those answers often require multiple rounds of additional questions and answers due to the complexity of the data. This effort to collect and understand the data has been known to take months in similar antitrust cases. It will be time consuming, costly, and disruptive to the information technology employees responsible for the systems in question.

Once that process is complete, the lawyers and the data experts for both sides will spend hours crunching the numbers – including reconciling the varying data sets of seven different Defendants – and looking for patterns that support their positions. The total cost of all this can

October 18, 2013
Page - 23 -

easily reach the [hundreds of thousands of dollars] for a single Defendant. Defendants respectfully submit that, because it may be possible to avoid altogether this substantial drain on the resources of the parties and the Court, discovery of transactional data should be deferred until a later phase of discovery.

## V.  A Firm Deadline for Discovery Will Ensure that the Parties Complete Discovery Efficiently and Expeditiously

Both Plaintiffs and Defendants agree that a schedule governing the length of the initial discovery contemplated by Pretrial Order No. 4 is appropriate. The parties disagree, however, on the length of that schedule. Plaintiffs seek an open-ended schedule in which phase one discovery would be completed eight months from the completion of Defendants' document productions. Defendants propose a firm deadline of August 1, 2014, recognizing that the "court is always open" in the event Plaintiffs are dissatisfied with the timeliness of Defendants' productions.

Defendants' proposed schedule avoids the uncertainty associated with linking the discovery schedule to an uncertain event—the completion of Defendants' document production—which could well be subject to reasonable disagreement. Under Defendants' proposal, Plaintiffs would be free to return to the Court in the event they are dissatisfied with the timeliness of Defendants' production efforts to seek an extension of the discovery schedule. However, that circumstance is unlikely given that it is Defendants that have pressed for an accelerated timetable throughout this litigation. Defendants are eager to show Plaintiffs' claims to be meritless and have no incentive to delay their own document production. As long as the scope of Defendants' productions is not substantially broader than the time frames and document sources discussed above, Defendants expect to be able to complete their productions by January

October 18, 2013
Page - 24 -

15, 2014. To help ensure that this target can be met, Defendants respectfully suggest that the Court set another status hearing for the end of November so that parties may bring any remaining issues about the scope of initial discovery to the Court's attention.

Defendants' document production has, in fact, already begun. Defendants have already produced documents responsive to Plaintiffs' priority requests for organizational charts and telephone number and carrier information. Plaintiffs have used that telephone number and carrier information to subpoena phone records from various providers. Defendants have also agreed to produce, by November 8, documents they produced to any state or federal government agency made in connection with an antitrust investigation relating to the manufacture and sale of drywall or the acquisition of Temple Inland by Georgia-Pacific.[12] In addition, Defendants are already at work collecting their own documents for review and production to Plaintiffs. The parties are in the midst of ironing out agreed procedures relating to search terms and technology assisted review, such that review and production will not be delayed once the parameters of discovery are resolved by the Court.

---

[12] TIN is not producing documents relating to the government review of the sale of Temple-Inland to Georgia-Pacific.  TIN will produce only those documents produced to any state or federal government agency made in connection with an antitrust investigation relating to the manufacture and sale of drywall.

October 18, 2013
Page - 25 -

## VI. Conclusion

We all very much appreciate Your Honor's close attention to this matter and look
forward to discussing these issues with the Court at the upcoming hearing.

Respectfully yours,

Steven E. Bizar

cc:   All Counsel of Record (by ECF)