

Kit A. Pierson
(202) 408-4600
kpierson@cohenmilstein.com

October 23, 2013

The Honorable Michael M. Baylson
United States District Judge
3810 U.S. Courthouse
601 Market Street
Philadelphia, PA 19106-1797

      Re:    *In re Domestic Drywall Antitrust Litigation*, No. 13-md-2437
              This letter relates to: All Actions

Dear Judge Baylson:

      Defendants chose not to move to dismiss, yet now attempt to deprive Plaintiffs of discovery to support their allegations in the complaint. Defendants' proposals would deprive both the Plaintiffs and the Court of the evidentiary record that is appropriate and required to resolve the issues framed in Pretrial Order 4:

      **1. <u>Transactional Data.</u>** The Third Circuit has been clear that economic evidence "is relevant and courts should as a general matter consider it" when assessing whether "sufficient proof of an agreement exists to preclude summary judgment." *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 361 n.12 (3d Cir. 2004).[1] *Flat Glass*, on which Defendants lean most heavily, says that "[t]he *most* important evidence will *generally* be non-economic evidence," *id.* at 361 (emphasis added)— not that

---

[1] *See also, e.g.*, *In re Titanium Dioxide Antitrust Litig.*, No. 10-cv-318, 2013 WL 1855980, at *4 (D. Md. May 1, 2013) ("Courts regularly admit expert testimony regarding whether conduct is indicative of collusion.") (internal quotation marks omitted). *Titanium Dioxide* squarely rejected the argument that economists cannot testify whether evidence is indicative of collusion. 2013 WL 1855980, at *4 (D. Md. May 1, 2013). The one case cited by Defendants for this proposition, *Ohio ex rel. Montgomery v. Louis Trauth Dairy, Inc.*, 925 F. Supp. 1247, 1254 (S.D. Ohio 1996), *see* Defs.' Ltr. at 18 n.10, actually *supports* the admissibility of such testimony. *See Titanium Dioxide*, 2013 WL 1855980, at *4.

October 23, 2013
Page 2

non-economic evidence is the *only* important evidence or *always* the most important evidence. This is a classic "trap" laid by defendants in price-fixing cases: suggesting "that if no single item of evidence presented by the plaintiff points unequivocally to conspiracy, the evidence as a whole cannot defeat summary judgment." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655 (7th Cir. 2002). Similarly, Defendants are wrong that no "court has denied or reversed summary judgment for the defendants where there [was no evidence of communications among the defendants on the subject matter of the conspiracy]." Defs.' Ltr. at 20. *See, e.g.*, *City of Tuscaloosa v. Harcross Chem., Inc.*, 158 F.3d 548, 569-73 (11th Cir. 1998); *In re Flat Glass Antitrust Litig. (II)*, No. 11-cv-658, 2012 WL 5383346, at *4 (W.D. Pa. Nov. 1, 2012); *In re Universal Serv. Fund Tel. Billing Practices Litig.*, 2008 U.S. Dist. LEXIS 107727, at *89 (D. Kan. June 30, 2008). Contrary to Defendants' claim, it is well recognized that econometric models are directly relevant to whether market actors engaged in collusion – the exact issue that Defendants purport to base a summary judgment on. *See* ABA Section of Antitrust Law, *Proof of Conspiracy Under Federal Antitrust Laws* at 218, 220 (2010) ("In assessing *the likelihood that collusion occurred* during a particular time period, economists often compare prices and other market outcomes during the period when the alleged conspiracy was in effect with the same variables during periods not allegedly impacted by the conspiracy.") (emphasis added).[2]

    **2. <u>Time Period.</u>** Defendants cite *no* cases that limited discovery to just eight months prior

---

[2] *See also id.* at 218 ("economic experts can make useful inferences *about the existence of a conspiracy* by analyzing the behavior of both prices and sales, as well as by studying capacity, allocation of customers, allocation of markets, and market shares") (emphasis added).

In asserting that production of data is burdensome, Defendants do not even estimate the supposed burden of *producing* the data, but rather of producing *and analyzing* the data. If the data were irrelevant to Defendants' summary judgment motion, Defendants would not need to analyze it. That Defendants anticipate doing so – and request *additional* data from Plaintiffs – shows that they recognize its relevance.

October 23, 2013
Page 3

to the public manifestation of an anticompetitive agreement (and provide no principled basis for cutting discovery off on December 31, 2012). In actuality, courts routinely permit discovery pre-dating a conspiracy, often for much longer than period Plaintiffs request here.[3] Defendants do not even challenge the relevance of discovery in this period; clearly, it is important to understand why Defendants' simultaneous announcements in 2011 succeeded where their uncoordinated attempts in earlier years failed, whether market conditions changed in a way that explains the increases, and how Defendants compete when they are *not* engaged in a conspiracy. Defendants' claim that this is "not seriously in dispute," Defs.' Ltr. at 18, is belied by their refusal to even *entertain* discussions over stipulations that might remove such issues from dispute. Their burden arguments are even thinner; going back to 2008 would not "more than double the volume of Defendants' discovery obligations," Defs.' Ltr. at 13, because Defendants have likely deleted the vast majority of emails from 2008-2010. And notably, Defendants have explicitly requested the same discovery from Plaintiffs on or after January 1, 2008, and Plaintiffs have agreed to produce materials for that time period. *See* Exhibit A (Defendants' Document Requests).

        Respectfully submitted,

        /s/ Kit A. Pierson
        Kit A. Pierson

        *On behalf of all Direct and Indirect Purchaser Co-Lead Counsel*

---

[3] *See, e.g.*, *B-S Steel of Kan., Inc. v. Tex. Indus., Inc.*, No. 01-cv-2410, 2003 WL 21939019, at *3 (D. Kan. July 22, 2003) (["I]n antitrust cases . . . plaintiff is ordinarily permitted to discover defendant's activities for a reasonable period of time antedating the earliest possible date of the actionable wrong.") (internal quotation omitted); *see also, e.g.*, *Am. Health Sys., Inc. v. Liberty Health Sys.*, No. 90-cv-3112, 1991 WL 30726, at *3 (E.D. Pa. Mar. 5, 1991) (collecting cases up to ten years).