IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: DOMESTIC DRYWALL ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO: ALL ACTIONS | MDL No. 2437<br><br>13-MD-2437 |

## MEMORANDUM APPROVING CLASS ACTION SETTLEMENTS

**Baylson, J.**                                                                                                         **August 20, 2015**

In this consolidated multi-district antitrust class action, plaintiffs allege that the defendant manufacturers violated the Sherman Act by conspiring to raise prices and eliminate job quotes for wallboard (also known as drywall or plasterboard). The plaintiff classes consist of direct purchasers—those who purchased wallboard directly from the manufacturers—and indirect purchasers—those who purchased wallboard through a retailer, contractor, or other intermediary.

The plaintiffs, both direct purchasers and indirect purchasers, have reached settlements with two of the defendants, TIN, Inc. and the USG defendants (including USG Corporation, United States Gypsum Company and L&W Supply Corporation), and have filed motions for approval of the settlements on a class-wide basis (ECF 218, 220).

The Court held a hearing on these motions on July 15, 2015.

There has been extensive discovery in this case, and by Pretrial Order No. 4 (ECF 64), the Court ruled that discovery would take place initially and exclusively on the issue of whether plaintiffs could prove the existence of an agreement, the foundation of liability under Section 1 of the Sherman Act. According to statements of counsel at various hearings in these cases, there has been a very extensive exchange of documents, and numerous depositions. Counsel have

1

conducted virtually all of this discovery without any Court intervention, and the incidents of motions to compel discovery have been very low. Counsel agreed upon a protocol for electronically stored information ("ESI") and a Protective Order concerning confidential information.

Of the seven defendants currently in this case, two of them have chosen to enter into settlement agreements. The motions for approval and supporting papers verify that these settlements were reached after extensive arm's-length bargaining between very experienced counsel, for both plaintiffs and defendants. The filings show that the amounts of the settlements reflect a fair award for the plaintiffs, less than what might be gained after a lengthy trial and subsequent appeals, but still a significant sum relative to the actual sales of drywall products by these defendants.

The class as defined by the direct purchaser plaintiffs for settlement purposes is described as follows:

> All persons or entities that purchased Wallboard in the United States directly from any of the Defendants or their subsidiaries from January 1, 2012 through November 30, 2014. Excluded from the Settlement Classes are Defendants, officers, directors and employees of any Defendant, the parent companies, subsidiaries, and affiliates of any Defendant, the legal representatives and heirs or assigns of any Defendant, any federal governmental entities and instrumentalities of the federal government, any judicial officer presiding over the Action, and any member of his or her immediate family and judicial staff.

The indirect purchasers class is defined similarly on behalf of individuals or entities who purchased wallboard in the United States on an indirect basis, *i.e.*, from contractors, retailers, etc.

The amount of the settlement for the direct purchasers is $5.25 million from TIN, Inc. and $39.25 million from USG, for a total of $44.5 million. For indirect purchasers the amount of settlement is $1.75 million from TIN and $8.75 million from USG, for a total of $10.5 million. Thus the overall settlement amount for all plaintiffs from both defendants is $55 million.

I.     **Analysis of the <u>Girsh</u> Factors**

The Third Circuit has described nine factors that a district court must consider in determining whether to approve a class action settlement in the leading case of <u>Girsh v. Jepson</u>, 521 F.2d 153, 157 (3d Cir. 1975):

1.     <u>The complexity, expense and likely duration of the litigation</u>

This treble damage antitrust litigation is very complex, the amount of discovery has been huge, and there has been to date no government action as a precedent to these actions. There is no certainty as to any particular result if the litigation proceeds to trial and through appeal.

2.     <u>The reaction of the class to the settlement</u>

There was only one objection to the direct purchaser action settlements and only two objections to the indirect purchaser action settlements. Although there were a number of opt outs, virtually all of them pertained to home builders who had filed their own class action. Overall, the reaction of the class is very positive.

3.     <u>The stage of the proceedings and the amount of discovery completed</u>

The initial phase of discovery, focused on whether there was an agreement among two or more of the defendants, has been completed, giving counsel for both plaintiffs and defendants the opportunity to evaluate the merits of their claims and the risks of trial.

4.     <u>The risks of establishing liability</u>

A treble damage antitrust litigation presents great risks for both plaintiffs and defendants. Although it can be difficult for plaintiffs to prove a conspiracy, particularly in the absence of a prior government criminal or civil suit, there is a distinct possibility that a jury may find one or more of the defendants liable and that any damages would be trebled.

### 5. The risks of establishing damages

Even if liability is established, a jury may minimize or maximize the damages. The settlements provide certainty to both plaintiffs and the settling defendants.

### 6. The risks of maintaining the class action through the trial

The class action sought by the plaintiffs may be certified pretrial, but there is always a risk that going to trial may result in the Court later ruling that one or more of the elements of Rule 23 have not met, particularly that common questions do not predominate.

### 7. The ability of the defendants to withstand a greater judgment

The Court does not have a strong picture of the financial health of either TIN or USG. But regardless of their current status, there is always a risk that by the time litigation is completed, including all appeals, the financial condition of a particular defendant could be perilous which may render a large treble damage award meaningless.

### 8 and 9. The range of reasonableness of the settlement fund in light of the best possible recovery and the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation

The Court is aware that a verdict for the plaintiffs after a trial, and affirmed on appeal, would likely bring in a greater amount of the class, but the risks and delay in achieving such a result are substantial.

Having considered all of these factors, the Court concludes that these factors favor approving the settlements.

## II. Requests for Permission for Plaintiff's Class Counsel to Allocate Settlement Funds for Past and Future Litigation Expenses

Plaintiff's counsel included, in the requests for approval of the settlement, a request that the Court allow counsel to use a significant portion of the settlement proceeds with the two settling defendants for payment of already incurred expenses, including expert witness fees, and

for future litigation expenses in the litigation that will continue against the other five corporate defendants.  The settlement papers filed with the Court did not have very many details on this issue, and the Court raised concerns about these requests at the hearing on July 15, 2015.  The Court requested counsel to submit letters *in camera* describing in more detail the nature of the expenses they had incurred and the purposes for which they intend to use whatever settlement funds the Court may allow to be allocated for litigation expenses.  The Court has received *in camera* letters from lead counsel for both the indirect and direct purchaser classes.

Although these letters, because they contain certain strategic and confidential information, should not be placed on the public record, the amounts involved are of interest to the public and the class members.  The Court sees no problem in disclosing those.  As public documents show, the direct purchasers settled with TIN for $5.25 million and USG for $39.25 million, for a total of $44.5 million.  Direct purchasers request that $2.5 million from the settlements be made available to pay on-going "common litigation expenses," including costs already incurred, but not paid, as well as future costs.  For indirect purchasers the amount of settlement is $1.75 million from TIN and $8.75 million from USG, for a total of $10.5 million, of which indirect purchasers also request to set aside $2.5 million for common litigation expenses.

Initially, the Court notes that it is common for plaintiffs and defendants in class action antitrust cases to retain experts, often on economic issues.  In a price fixing case, it is common for experts to review voluminous pricing data, as well as actual invoices, together with any evidence of advertising, shipping costs, volume rebates, "most favored nations" clauses, etc., to assemble a body of data from which the experts may conclude that the defendants were, or were not, involved in an illegal agreement, or conspiracy, to fix prices.  With seven defendants, as in this case, all involved in the same business, and conducting hundreds of transactions per day, and

thousands per year, the data base that will usually form the basis of an expert's opinion is very large. Sometimes the data for both plaintiffs and defendants are the same, and sometimes they vary, for reasons that the experts will explain and that are often subject to dispute.

This brief explanation serves to demonstrate that the topic is a complex one and likely to lead to differing opinions. After an antitrust trial with expert testimony on both sides, the resulting jury verdict is often impossible to predict.

In the present case, the direct and indirect plaintiffs are only seeking funds to be available to pay "common litigation expenses" which they have defined as costs that are paid out of an attorney's assessment fund, such as transcript costs, expert costs, and document storage and litigation support services.

In most class actions, and in particular antitrust actions, it is commonly expected that the lawyers who undertake to represent plaintiffs in the case and to certify the class will advance the funds necessary for litigation. These include not only the minimal initial filing fees, but also the costs of collecting and processing of documents, preparing deposition transcripts, and paying expert witness fees. The plaintiffs who have actually filed the claims are seldom in a position to advance expenses of this nature, and the advancement of these costs by counsel is both expected, lawful, and consistent with the professional responsibility rules of all jurisdictions. The same factors apply in personal injury cases as well, if only because litigation is so expensive that an attorney undertaking to advance his or her client's expenses will do so only after a review of the merits, so that it represents an expression of confidence in the merits of the plaintiff's case. Of course, in some cases there are variations of this and some plaintiffs may advance a portion of their out-of-pocket costs, depending on the nature of the case and their economic circumstances.

There are substantial economic risks in proving these cases. Fairness requires counsel to share these risks with members of the class, by advancing expenses, many of which may not be reimbursed if the case does not result in recovery against all defendants.

The common litigation expenses are generally paid out of an attorney's assessment fund representing contributions by all the plaintiffs' law firms. The relative contributions may depend upon the responsibilities that each plaintiff firm has undertaken in the litigation, and there may be agreements regarding reimbursement in the event of a successful settlement, or trial judgment, that reflect the relative contributions to the attorney's assessment fund.

However, common litigation expenses do not include the individual expenses of the particular lawyers, such as firm overhead, travel costs, the firm's own document processing costs, and any expenses relating to the firm and its individual clients, such as reimbursement for travel, meals, etc.

As is obvious, although both direct and indirect purchasers are requesting the same amount, the percentages are widely different. The amount requested by the direct purchasers is about 5.6 percent of the total settlements to date, whereas the amount requested by the indirect purchasers is about 23.8 percent of the amount of their settlements with the two settling defendants.

The Court's concern does not arise out of the request of the direct and indirect purchasers to be reimbursed for common litigation expenses which they have already incurred in this case. The Court believes that these requests should be granted because their efforts have, to a significant degree, resulted in the settlements of TIN and USG, and the attorneys, having

advanced the funds used so far, have achieved a result which the Court believes is fair to the plaintiffs for the reasons set forth above.[1]

The concern arises that the five non-settling defendants may show that they are entitled to summary judgment, and they have all filed very detailed motions for summary judgment, with voluminous exhibits, that will take some time for the Court to review. If any one or more of the non-settling defendants are successful in persuading the Court to grant summary judgment, there is likely to be the inevitable appeal, but before an appeal is timely, there may be a trial (or settlement) for those defendants as to whom the Court does not grant summary judgment. In any event, the issue arises as to what extent the Court should now allow a large amount of settlement funds to be used for continuing the litigation against the non-settling defendants, and whether that would be fair to the class members.

At one extreme, if the Court were to grant summary judgment in favor of all five non-settling defendants, then the class members would only have the net settlement funds from TIN and USG for distribution, after the Court awards attorneys' fees and reimbursement of costs. To the extent that plaintiffs' counsel have used a portion of those settlement funds to unsuccessfully pursue additional defendants, the members of the existing settlement class may have a legitimate objection that the funds to which they were entitled have been unnecessarily and unjustifiably minimized by the use of the $5 million requested, in that funds were used for future expert work, in excess of work to date, and such future expert work was not effective in securing additional settlements.

---

[1] The Court notes that this discussion has nothing to do with attorneys' fees. Counsel have not yet requested a fee award and nothing in this opinion should be construed as having any impact on the amount of fees that may be awarded in the future.

The plaintiffs assert that the work of the experts has been invaluable in securing the class settlement. Indeed, pursuant to Pretrial Order No. 9 (ECF 171), the plaintiffs produced their expert reports in January 2015 and the defendants produced their expert reports in March 2015, with all expert discovery completed by April 23, 2015. The initial motions for settlement were filed on February 12 and 13, 2015 (ECF 180 and181) and the Court assumes that the settlement negotiations between the parties have included references and perhaps more detailed documentation from the work product from the plaintiffs' experts.

In coming to a conclusion on this issue, the Court will grant the request of plaintiffs' counsel in part, as described further below. To the extent that the plaintiffs' counsel have actually incurred costs, including expert costs, the Court will allow reimbursement of some of those costs actually incurred from the settlement fund to plaintiffs' counsel. However, the Court will not allow reimbursement of all incurred costs nor payment of future costs at this time. The Court assumes that while the pending motions for summary judgment are under consideration by the Court there will be somewhat of a lull in activity in this case. Phase I discovery has been completed and discovery has not yet started on any other issue. For this reason, plaintiffs' counsel are not prejudiced by a delay in any further authorization of settlement funds for future litigation expenses.

In addition, the Court's ruling will be a type of "revolving door reimbursement" which is fair to both plaintiffs' counsel and members of the class. Plaintiffs' counsel have so far advanced (to varying degrees) the funds for experts, deposition transcripts, etc., and their success in achieving settlements with two of the seven defendants warrants reimbursement of some of those out-of-pocket costs. However, to the extent further costs may be necessary, a decision on this can await further developments, and in particular, can await decision on the summary

judgment motions to determine to what extent, if any, the case will continue against any one or more of the remaining five non-settling defendants.

The Court also notes that there have been a number of district court decisions approving advancement of costs in similar situations with partial settlements. E.g. In re Microcrystalline Cellulose Antitrust Litig., No. 01-cv-111, Final Judgment Order at ¶ 7 (E.D. Pa. June 15, 2005) (O'Neill, J.) (filed in this case as ECF 218-5) (approving use of $2.5 million from settlement for expenses); In re Linerboard Antitrust Litig., 292 F. Supp. 2d 631, 643 (E.D. Pa. 2003) (noting that partial settlement "provides class plaintiffs with an immediate financial recovery that ensures funding to pursue the litigation against the non-settling defendants"). In most of these cases, the percentage of the settlement allowed by the Court for reimbursement is much closer to the percentage sought by the direct purchaser plaintiffs. In re Packaged Ice Antitrust Litig., No. 08-md-01952, 2011 WL 717519, at *14 (E.D. Mich. Feb. 22, 2011) (approving $13.5 million settlement and $750,000 litigation fund (5.6%)); In re WorldCom, Inc. Sec. Litig., No. 02-cv-3288, 2004 WL 2591402, at *1 (S.D.N.Y. Nov. 12, 2004) (approving $2.575 billion settlement and $5 million litigation fund (0.19%)); In re Auto. Refinishing Paint Antitrust Litig., MDL No. 1426, Memo. & Order, at 1, 25 (E.D. Pa. Oct. 13, 2004) (Surrick, J.) (filed in this case as ECF 218-6) (approving $66.75 million settlement and $1 million expense fund (1.5%)); In re California Micro Devices Sec. Litig., 965 F. Supp. 1327, 1337 (N.D. Cal. 1997) (approving settlement with an estimated total value of approximately $19 million and $1.5 million litigation fund (about 7.9%)); but see Newby v. Enron Corp., 394 F.3d 296, 300 (5th Cir. 2004) (affirming approval of $40 million settlement and $15 million expense fund (37.5%)); In re TFT-LCD (Flat Panel) Antitrust Litig., No. 07-1827 Order, at 2 (ECF 2474) (N.D. Cal. Feb. 17, 2011) (filed in

this case as ECF 220-4) (approving $17 million settlement and $3 million expense fund (17.6%)).

The Court finds that the percentage sought by the indirect purchaser plaintiffs is excessive and out of line with the weight of the prior case law.

**III.     Allowed Expenses**

The Court now turns to the precise amounts of expenses to be allowed and how to treat counsel for both classes of plaintiffs equitably.

    A.    <u>Direct Purchaser Plaintiffs' Reported Expenses</u>

The plaintiffs' counsel representing direct purchasers have disclosed that so far they have paid over $1.4 million for common litigation expenses prosecuting this case, most of which has been for expert costs but additional substantial sums have been for document collection and processing, and deposition transcripts. <u>See</u> Exhibit A, Table 1. Direct purchasers' counsel do not seek to be reimbursed at this time for these expenses that they have already paid.

Their incurred, but yet unpaid, litigation expenses are over $1.8 million, principally for other expert fees. These plaintiffs' counsel advise that their experts have submitted two extensive reports and have been deposed by counsel for defendants. Plaintiffs' counsel represent that the expert reports they received were essential in securing the settlements by the two settling defendants, TIN and USG.

    B.    <u>Indirect Purchaser Plaintiffs' Reported Expenses</u>

Counsel for the indirect purchaser plaintiffs have submitted a separate letter that indicates they have so far paid about $250,000 in expert fees. <u>See</u> Exhibit A, Table 1. Plaintiffs' counsel advise that they now seek to use slightly over $750,000, representing about 7.25 percent of the $10.5 million settlement fund for indirect purchasers, to pay expenses for experts, document

hosting, and deposition transcripts. The letter indicates that the lawyers representing the indirect purchasers seek to use the settlement funds both to reimburse their already paid expert expenses and to pay their remaining incurred expenses.

The indirect purchasers say they have incurred additional significant expenses, including traveling for depositions and court hearings, printing costs for deposition exhibits, and processing documents for production, but they do not state an amount for these expenses and do not seek to be reimbursed for them at this time.

Indirect purchaser plaintiffs' counsel's letter goes on to describe their expert reports in further detail, and disclose hourly rates for the experts they have retained. Similar to the direct purchaser plaintiffs, indirect purchaser counsel represent that their expert analysis was very helpful in securing the settlements from the settling defendants.

The indirect purchasers' letter further states that reasonably anticipated events in this case will require additional expenditures of funds.

    C.    <u>Analysis and Conclusion</u>

The Court believes that it is necessary to keep its treatment of the two distinct groups of counsel in this case, for direct purchasers and indirect purchasers, on a fairly equitable footing as far as reimbursement of expenses is concerned.

To their credit, counsel are working together in document analysis, and depositions, and this, of course, is expected and reasonable to provide maximum efficiency in the prosecution of these cases so that maximum recovery can be generated.

However, the Court believes that it would not be fair to the members of the indirect purchaser class to have deducted from the settlement 100 percent of the common litigation expenses incurred by counsel for the indirect purchasers, whereas counsel for the direct

purchasers have advanced but do not now seek reimbursement for a substantial part of the incurred expenses, which counsel have already paid.

According to the letters, counsel for direct and indirect purchasers have both paid about 37 to 38 percent of their expert fees incurred to date. See Exhibit A, Table 1. However, the indirect purchasers' counsel seek to use the settlement funds to reimburse all these expenses, whereas the direct purchasers' counsel do not seek reimbursement. Counsel for direct purchasers have also already paid for various expenses including document collection and hosting, depositions and transcripts, and other miscellaneous costs, and do not seek reimbursement for these expenses. By contrast, indirect purchasers' counsel report that they have not yet paid any of their expenses incurred for document hosting and deposition transcripts, and seek to pay all of these expenses from the settlements.

The Court believes that counsel for both plaintiff classes should be required to bear a similar proportion of expenses themselves without reimbursement at this time. See Exhibit A, Table 2. As such, the Court believes it is appropriate to allow both direct and indirect purchasers' counsel to use the settlement funds to pay about 62 percent of expert expenses that they have incurred but not yet paid. See Exhibit A, Table 3. However, it is not appropriate at this time to reimburse counsel for expert costs already paid, nor to allow indirect purchasers' counsel to avoid advancing their share of the costs for document hosting and deposition transcripts. This result allows both indirect and direct purchasers' counsel to use the settlements to cover about 55 percent of their total reported incurred expenses, and allows counsel for both plaintiff classes to use about 4 percent of the respective settlements to pay for incurred but not yet paid expert expenses. See Exhibit A, Tables 3 & 4. Dedicating about 4 percent of the settlements to pay litigation expenses is reasonable and in line with prior case law.

Appropriate Orders follow.

O:\13-MD-2437 - drywall\13md2437.memo.settlememt.8.20.2015.docx

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **IN RE: DOMESTIC DRYWALL ANTITRUST LITIGATION**<br><br>**THIS DOCUMENT RELATES TO: ALL ACTIONS** | MDL No. 2437<br><br>13-MD-2437 |

## EXHIBIT A
## TO MEMORANDUM APPROVING CLASS ACTION SETTLEMENTS

| Table 1. Expenses to date paid by counsel as reported in letters to chambers | | | | | | |
|---|---|---|---|---|---|---|
| | Indirect Purchaser Plaintiffs | | | Direct Purchaser Plaintiffs | | |
| | Incurred | Paid By Counsel | Percent Paid | Incurred | Paid By Counsel | Percent Paid |
| Experts | $662,314.20 | $245,652.50 | 37.1% | $2,913,874.60 | $1,101,978.60 | 37.8% |
| Document Costs | $75,869.39 | $0.00 | 0.0% | $205,920.25 | $205,920.25 | 100.0% |
| Transcripts / Deposition Costs | $23,507.03 | $0.00 | 0.0% | $77,311.83 | $77,311.83 | 100.0% |
| Miscellaneous | not specified | not specified | n/a | $15,084.38 | $15,084.38 | 100.0% |
| Total Reported Expenses | $761,690.62 | $245,652.50 | 32.3% | $3,212,191.06 | $1,400,295.06 | 43.6% |

| Table 2. Expenses to be advanced by counsel as outlined in memorandum | | | | | | |
|---|---|---|---|---|---|---|
| | Indirect Purchaser Plaintiffs | | | Direct Purchaser Plaintiffs | | |
| | Incurred | Paid By Counsel | Percent Paid | Incurred | Paid By Counsel | Percent Paid |
| Experts | $662,314.20 | $245,652.50 | 37.1% | $2,913,874.60 | $1,101,978.60 | 37.8% |
| Document Costs | $75,869.39 | $75,869.39 | 100.0% | $205,920.25 | $205,920.25 | 100.0% |
| Transcripts / Deposition Costs | $23,507.03 | $23,507.03 | 100.0% | $77,311.83 | $77,311.83 | 100.0% |
| Miscellaneous | not specified | not specified | n/a | $15,084.38 | $15,084.38 | 100.0% |
| Total Reported Expenses | $761,690.62 | $345,028.92 | 45.3% | $3,212,191.06 | $1,400,295.06 | 43.6% |

| Table 3. Expenses to be reimbursed by settlement funds as outlined in memorandum | | | | | | |
|---|---|---|---|---|---|---|
| | Indirect Purchaser Plaintiffs | | | Direct Purchaser Plaintiffs | | |
| | Incurred | Paid From Settlement | Percent Paid | Incurred | Paid From Settlement | Percent Paid |
| Experts | $662,314.20 | $416,661.70 | 62.9% | $2,913,874.60 | $1,811,896.00 | 62.2% |
| Document Costs | $75,869.39 | $0.00 | 0.0% | $205,920.25 | $0.00 | 0.0% |
| Transcripts / Deposition Costs | $23,507.03 | $0.00 | 0.0% | $77,311.83 | $0.00 | 0.0% |
| Miscellaneous | not specified | not specified | n/a | $15,084.38 | $0.00 | 0.0% |
| Total Reported Expenses | $761,690.62 | $416,661.70 | 54.7% | $3,212,191.06 | $1,811,896.00 | 56.4% |

| Table 4. Allowed expenses as a percentage of total TIN and USG settlements | | | |
|---|---|---|---|
| | Total Settlements | Allowed Expenses | % of Settlement |
| Indirect Purchaser Plaintiffs | $10,500,000.00 | $416,661.70 | 4.0% |
| Direct Purchaser Plaintiffs | $44,500,000.00 | $1,811,896.00 | 4.1% |

O:\13-MD-2437 - drywall\13md2437.memo.settlememt.8.20.2015.docx