## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **IN RE: DOMESTIC DRYALL**<br><br>**ANTITRUST LITIGATION**<br><br>**THIS DOCUMENT RELATES TO:**<br><br>**All Direct Purchaser Actions**<br><br>**All Indirect Purchaser Actions** | **MDL No. 2437**<br><br>**13-MD-2437**<br><br><br><br>**Judge Michael M. Baylson**<br>**United States District Ct Judge** |

## MEMORANDUM RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

I.    Introduction ................................................................. 1

II.   Procedural History ....................................................... 4

III.  Plaintiffs' Allegations in Amended Complaints........................... 6

IV.  Discovery.................................................................... 8

V.   Settling Defendants ...................................................... 9

VI.  Motions for Summary Judgment........................................ 10

     A. American.................................................................. 11

     B. National ................................................................. 13

     C. Lafarge................................................................... 15

     D. PABCO. ................................................................. 16

     E. CertainTeed ............................................................ 17

VII.  Summary Judgment Standard ....................................... 18

VIII. Legal Analysis in Oligopoly Cases.................................. 20

     A. *Matsushita Elec. Indust. Co., Ltd. v. Zenith Radio Corp.*.......... 24

     B. *Petruzzi's IGA Supermarkets Inc. v. Darling-Delaware Co. Inc.* ................................................... 25

     C. *In re Baby Food Antitrust Litig.* ............................................ 27

     D. *In re Flat Glass Antitrust Litig.* ............................................ 28

     E. *In re Chocolate Confectionary Antitrust Litig.* ....................... 30

IX.  Undisputed Background Facts........................................ 31

     A. Wallboard Industry Background ......................................... 31

         1.   Market Share........................................................ 32

         2.   Demand ............................................................ 33

3.       Capacity ................................................................. 34

4.       Job Quotes ............................................................. 34

B. Trade Association Membership & Meetings ........................... 35

X.     *Bourjaily* and Application of the Co-Conspirator Hearsay
       Exception ..................................................................................... 37

A. Brief History of the Co-Conspirator Exception ...................... 38

B. Impact of Federal Rules of Evidence ..................................... 39

C. *Bourjaily* Ends the Rule Against Bootstrapping ..................... 41

D. Admissibility of Hearsay Statements in Antitrust Suits Under
   the Co-Conspirator Exception Post-*Bourjaily* ........................ 44

1.  *Big Apple BMW, Inv. v. BMW of N. Am., Inc.* ............... 44

2.  *In re Flat Glass Antitrust Litig.* ................................... 47

E. Role of the Co-Conspirator Exception in this Case ................ 49

XI.    Chronology of Material Facts .................................................... 50

A. February – October 2011 ..................................................... 51

B. 2012 Activity...................................................................... 73

XII.   Evidentiary Findings Pursuant to Fed. R. Evid. 104 ................... 91

A. Parties' Statements .............................................................. 92

B. Business Records ................................................................ 92

C. Co-Conspirator Statements & *Bourjaily* ............................... 93

XIII.  Plaintiffs' Theory of the Drywall Conspiracy............................. 97

A. Timing and Similarity of Defendants' Announcements
   Related to Elimination of Job Quotes and the 2012 and
   2013 Price Increases............................................................. 98

1.  Pricing Practices Prior to Fall 2011 ................................. 99

2. Price Increase and Elimination of Job Quotes
Effective January 2012 ................................................ 100

    a. American Announcement ............................................ 100

    b. USG Announcement ................................................... 102

    c. National Announcement .............................................. 103

    d. CertainTeed Announcement ...................................... 103

    e. Lafarge Announcement .............................................. 104

    f. TIN Announcement ................................................... 104

    g. PABCO Announcement.............................................. 104

    h. Implementation & Results......................................... 105

3. Events Leading up to the 2013 Price Increase ................. 106

    a. Pricing Guidance Following the Drake Group
Meeting.................................................................... 107

    b. Fall 2012 Pricing Announcements ............................. 108

B. Intercorporate Communications........................................... 110

1. Keith Metcalf's April and Early September
Communications ............................................................ 111

2. September L&W Phone Calls........................................... 113

3. PABCO & American Phone Call ..................................... 115

4. National's Reference to "[V]erbal [A]greements for a
[L]arge [P]rice [I]ncrease in 2013" ................................. 117

C. Communications with Research Analysts ............................. 118

1. Analyst Background Information ..................................... 119

2. Legal Viability of Plaintiffs' Conduit Theory ................. 120

    a. Authority Supporting Plaintiffs' Conduit Theory......... 121

      b.  Authority Undermining Plaintiffs' Conduit Theory ...... 123

   3.  Evidence Allowing Inferences of Defendants' Using Analysts As
      Conduits ...................................................................... 124

      a.  National Signaling Through Thompson
         and Longbow? ......................................................... 124

      b.  Lafarge Signaling Through Longbow? ........................ 128

   D.  Defendants' Non-Price Conduct ..................................... 131

      1.  Limiting Supply ................................................. 132

         a.  Limiting Supply Prior to 2012 Increase ............. 132

         b.  Limiting Supply Prior to 2013 Increase ............. 134

      2.  Declining to Compete for Customers ...................... 135

XIV. Analysis – Consideration of Plus Factors ................................. 138

   A. Motive    .......................................................................... 139

   B. Actions Against Self-Interest ............................................ 140

   C. Traditional Conspiracy Evidence ....................................... 145

      1. American ................................................................. 147

      2. National ................................................................. 148

      3. PABCO ................................................................... 149

      4. Lafarge .................................................................. 150

      5. CertainTeed ............................................................ 150

   D. Conclusion ...................................................................... 154

## I.   Introduction

In fall 2011, several U.S. gypsum wallboard manufacturers announced substantial changes to their pricing, ending a long-standing pricing practice and scheduling a very large price increase to commence in January 2012 and to be effective for the entire year. Then, in fall 2012, these manufacturers again announced similar price increase to take effect in January 2013. In this multidistrict litigation ("MDL"), Plaintiffs allege that the Defendants' 2012 and 2013 price increases and other changes in pricing practices were the result of an agreement, in violation of federal and state antitrust laws.

Currently before the Court are four motions for summary judgment: Defendants' Joint Motion for Summary Judgment (ECF 206), Defendant CertainTeed's Motion for Summary Judgment (ECF 207-08), Defendant Lafarge's Motion for Summary Judgment (ECF 204), and Defendant PABCO's Motion for Summary Judgment (ECF 205). For the reasons that follow, the court GRANTS the Motions for Summary Judgment as to CertainTeed and DENIES the Motions for Summary Judgment as to American, National, Lafarge, and PABCO.

At the outset of these consolidated cases, the Court convened a pretrial conference on September 18, 2013 to discuss pretrial issues including discovery and initial pleadings. Defendants' counsel indicated that it was not their intention to file Rule 12 motions, although their clients strenuously disputed the truth of the allegations against them. Eventually, a consensus was reached among counsel and the Court that discovery would be initially limited to

1

whether there was an agreement between any Defendants in violation of Sherman Act § 1. (ECF 64). Thus, the Court postponed discovery on issues such as class action, damages, antitrust injury, etc.

By and large, discovery proceeded without any need for intervention. There was substantial production of documents by Defendants, and a deposition program was initiated and completed.

Following the close of discovery, Defendants, as planned, filed motions for summary judgment. As detailed below, each Defendant has supported its motion for summary judgment by declarations and deposition testimony by their officers and managers involved with the pricing of their drywall products. These testimonial materials assert that there was no agreement between their employer and any other Defendant.

Against this forceful show of denial, Plaintiffs have come forward with detailed facts that Plaintiffs assert show a genuine dispute that would allow a jury to find that there was an agreement by all of Defendants concerning prices.

Included within the factual material are excerpts from documents and testimony by the two third-party research organizations that had been subpoenaed and provided documents and deposition testimony, Longbow Research ("Longbow") and Thompson Research Group ("Thompson").

As required by the Court's practice order, Defendants have supported their motions for summary judgment with statements of undisputed facts. Plaintiffs have come forward with responses to many of these assertions,

2

claiming there are disputed facts, and have added additional facts to which Defendants have responded.

As of result of this mélange of factual materials, the Court believes that the "core facts" of the case, as contained in documents produced by all of Defendants, or third parties, along with deposition testimony by their officers and managers, are largely undisputed. The task of the court is to determine whether inferences favorable to Plaintiffs can be drawn from these factual materials.

In proceeding towards the appropriate analysis, the Court believes that there are three issues that must first be analyzed in detail, as follows:

First, the Court will review the history of the drywall industry in the United States, which satisfies the accepted definition of an oligopoly, and the drywall manufacturers' efforts to raise prices following the well-documented housing slump in 2008-2010.

Second, the Court will provide the legal analysis of the decision by the Supreme Court in the *Matsushita* case and a number of Third Circuit opinions analyzing antitrust claims involving oligopoly industries such as drywall. The Court must recognize the unique economic discipline that applies to price fixing allegations against companies in an oligopoly setting, and the required hesitation, if not disinclination, to find any type of conspiracy from merely ambiguous evidence, but also, a duty to consider what courts have called "plus factors."

Third, the Court will review the evidence rules concerning alleged co-conspirator statements.

In making this review and analysis, the Court recognizes that this is not an occasion for fact finding. Defendants' motions assert their innocence; Plaintiffs assert their liability with equal vigor. The Court's role is not take sides, find facts, or determine liability or innocence, but only to determine what, if any, inferences can be drawn consistent with the governing case law on antitrust price fixing and the rules of evidence on allegedly co-conspirator statements.

After laying the groundwork on the industry background and legal principles, the Court will embark upon a chronological review of the factual materials, highlighting those facts that Plaintiffs have asserted are the strongest towards showing an agreement. The Court will then explain its decision as to admissibility of hearsay evidence, and separately, the ability of the jury to draw reasonable inferences of agreement based on the record in this case.

## II.    Procedural History

In April 2013, the Judicial Panel on Multidistrict Litigation ordered consolidation in this District before the undersigned of various drywall antitrust cases from this and other Districts for pretrial proceedings. The original Defendants were U.S. domestic drywall manufacturers, namely CertainTeed Gypsum ("CertainTeed"), United States Gypsum Company ("USG") and its parent USG Corporation ("USG Corp."), New NGC, Inc. ("National"), LaFarge North America Inc. ("LaFarge"), American Gypsum Company LLC

("American") and its parent company Eagle Materials Inc. ("Eagle"), TIN, Inc. ("TIN"), and PABCO Building Products, LLC ("PABCO").

By May 2013, multiple putative class actions had been consolidated in the MDL. These actions had been filed on behalf of proposed classes of Plaintiffs who purchased drywall either directly or indirectly from Defendants.[1] The direct purchaser actions alleged violations of § 1 of the Sherman Act, 15 U.S.C. § 1; the indirect purchaser actions sought injunctive relief through § 16 of the Clayton Act, 15 U.S.C. § 26, based on allegations of violations of § 1 of the Sherman Act, 15 U.S.C. § 1, and sought damages based on alleged violations various of state laws.[2] The Court has jurisdiction over the federal law claims by virtue of 28 USC §§ 1331, 1337. The Court has jurisdiction over the Indirect Purchasers' state-law claims through 28 U.S.C. § 1367 and 28 U.S.C. § 1332 ("CAFA").

By Order dated May 7, 2013 (ECF 11), this Court consolidated, for pretrial purposes, (1) all pending indirect purchaser actions and any indirect purchaser actions filed thereafter ("Indirect Purchaser Action") and (2) all pending direct purchaser actions and any direct purchaser actions filed

---

[1]     The Direct Purchaser Actions were comprised of those who purchased wallboard directly from the manufacturers; the Indirect Purchaser Actions were comprised of those who purchased wallboard through a retailer, contractor, or other intermediary, and whose claims are based on state laws.

[2]     At least one case has been consolidated with this MDL but is not at issue today because it was filed as an individual action as opposed to a class action. *Ashton Woods Holdings LLC v. USG Corp.*, 15-1712 (E.D. Pa.) (also known as "Home Builders Action"). The cases at issue today are only those that were filed as class actions.

thereafter ("Direct Purchaser Action"). (ECF 11) Additionally, the Court ordered the Direct and Indirect Purchaser Actions to coordinate for pretrial purposes. These Direct and Indirect Purchaser Actions are the subjects of the instant Motions for Summary Judgement.

### III.   Plaintiffs' Allegations in the Amended Complaints

On June 24-25, 2013, the consolidated putative classes of Indirect Purchaser Plaintiffs and Direct Purchaser Plaintiffs both filed Amended Consolidated Class Action Complaints (ECF 20 (Direct), 21 (Indirect)). Both complaints allege that beginning in 2011, Defendants in the domestic drywall industry violated the antitrust laws by conspiring to raise prices, restrict supply, and eliminate the long-standing pricing practice of providing job quotes.

Drywall, also known as gypsum wallboard, sheetrock, and wallboard, is the basic material used to form walls and ceilings in over 90% of all new residential and commercial structures. The domestic drywall industry is oligopolistic. Defendants account for more than 89% of U.S. drywall sales, and the four largest Defendants (USG, National, CertainTeed, and American) account for approximately 70% of those sales.

According to the complaints, prior to fall 2011, Defendants typically announced multiple price changes each year because of the commodity nature of wallboard and fluctuations in costs. These increases were typically announced through letters distributed to customers 30 to 45 days before the effective date of the increase. Additionally, since the 1980s, manufacturers had competed for price in part by providing "job quotes." Through job quotes, manufacturers

provided a quoted price to a customer for a specific "job" and that price would remain the valid price throughout the duration of the job, regardless of market fluctuation.

Like most construction industries, the drywall industry was significantly injured by economic events in the early 2000s, including the 2008-2010 Recession. According to Plaintiffs, prices had generally been flat or declining from 2008 to 2011. Defendants had attempted to raise prices multiple times in 2010 and 2011, but Plaintiffs allege Defendants were unable to obtain a meaningful increase because of the economic climate and because of competition with each other.

Then, over the span of a few weeks in late September and early October 2011, six Defendant-manufacturers distributed letters announcing that they would implement a price increase on January 1, 2012 and that the new price would remain in effect for the entire year. In those letters, five of those Defendants either announced or expressed anticipation that the 2012 price would be as high as a 35% increase over current prices, the steepest increase announced in over ten years. Six Defendants also used the letters to announce the immediate elimination of job quotes. The only Defendant-manufacturer who did not announce the elimination of job quotes in its letter, USG, still unofficially eliminated or significantly curtailed new job quotes in fall 2011.

According to Plaintiffs, unlike the previous price-increases attempted earlier in 2011 and prior years, Defendants' January 2012 price increase was effective for the entire year, even though there had been no meaningful increase

in drywall demand or manufacturers' costs. Plaintiffs allege these increases succeeded because Defendants had agreed to increase the prices, eliminate job quotes, and limit the supply of wallboard, in violation of antitrust laws.

Following the success of the 2012 price increase, Defendants again announced substantial price increase in fall 2012 to take effect in January 2013 and to last the duration of 2013. As with the 2012 increase, Plaintiffs allege that Defendants agreed to implement the January 2013 price increase and restrict supply in the months preceding the increase, and that Defendants succeeded in achieving these goals, thus increasing the cost of wallboard over what would have been charged in a truly competitive market.

## IV.   Discovery

In September 2013, the Court ordered a phased discovery process, limiting Phase I to a single issue: "Whether the record contains sufficient facts and/or opinions, admissible at trial, to allow a jury to find a violation of Section 1 of the Sherman Act, including whether there was an agreement between or among defendants." (ECF 64).

After considerable discovery, a dispute arose when Defendants moved to compel Plaintiffs to answer so-called "contention interrogatories," which asked for detailed facts. (ECF 99). After oral argument on April 22, 2014, the Court issued a Memorandum, noting that, based on the briefs that had been filed, the Plaintiffs had gathered a great deal of detailed factual information from the documents produced by Defendants. *In re Domestic Drywall Antitrust Litig.*, 300 F.R.D. 228 (E.D. Pa. May 12, 2014). The Court therefore concluded that the

most expeditious way to encapsulate the discovery that had so far taken place was to require Plaintiffs to file a "contention statement," indicating the detailed facts that supported their allegations. *Id.*

In this Memorandum, the Court noted the success that Plaintiffs had realized from sophisticated deployment of electronic discovery, and therefore, the Court concluded that it would not be burdensome for Plaintiffs to "parlay" the facts learned in discovery into contention statements as an alternative to answers to interrogatories to which Defendants would then have to respond. *Id.*

The only other major discovery dispute concerned a third-party subpoena to a research group, Thompson, which is in the business of collecting information, analyzing trends, and making predictions on the economics of various businesses, including drywall manufacturers. This dispute resulted in a lengthy opinion setting forth the facts that Thompson would have to reveal, but provided protection for proprietary or truly confidential information. *In Re Domestic Drywall Antitrust Litigation*, 300 F.R.D. 234 (E.D. Pa. 2014).

## V.     Settling Defendants

In February 2015, Plaintiffs, both direct and indirect purchasers, reached settlements with a number of original Defendants: TIN, Inc. and the USG entities (including USG Corp., USG, and L&W[3]). The Court granted preliminary approval of the settlements in March 2015 (ECF 183-186), and granted final approval and issued a final judgment order on August 20, 2015. (ECF 276-279).

---

[3]     L&W Supply Corporation, a wholly-owned subsidiary of USG Corporation, was not named as a defendant, but was included in the settlement agreement.

9

Although the settling Defendants are not parties to the instant Summary Judgment Motions, this Memorandum will discuss some of the facts related to those original Defendants to the extent they are relevant to the pending motions by the remaining Defendants.

## VI.    Motions for Summary Judgment

On May 12, 2015, the non-settling Defendants moved for summary judgment, arguing that Plaintiffs had failed to uncover enough evidence to create a fact issue about whether Defendants entered a price-fixing conspiracy. Together, all Defendants filed a joint motion for summary judgment (ECF 206). Additionally, three Defendants filed supplemental motions for summary judgment to make Defendant-specific arguments: Lafarge (ECF 204), CertainTeed (ECF 207), and PABCO (ECF 205).

In accordance with Rule 56, each Defendant has submitted factual materials, including affidavits, declarations, and/or deposition testimony, "asserting that a fact" alleged by Plaintiffs (namely, that Defendants agreed to fix prices and make other price-related changes to the industry) cannot be proven, and "show[ing]" the absence of a genuine dispute. Fed. R. Civ. P. 56(c).

In support of the joint motion, Defendants argue that the undisputed evidence reveals that Defendants were merely "following the leader," which they argue is an expected and legal business practice in an oligopoly. Defendants paint the drywall industry in 2011 as suffering from a dire economic outlook for the manufacturers, who were still feeling the impact of the downturn in the construction industry from 2006-2008 and the Great Recession that begin

10

in 2008. Defendants claim that by September 2011, they had tried various methods of raising prices and reducing costs, but were nonetheless experiencing substantial losses each year between 2008 and 2011.

Desperate to find solutions to improve its bottom line, on September 20, 2011, American became the first manufacturer to issue a letter to customers that (1) eliminated job quotes effective immediately and (2) announced a 35% price increase to take effect on January 1, 2012 and last throughout all of 2012. Defendants submit declarations and depositions arguing that American's announcement took the industry by surprise, but seeing an opportunity to improve profitability, Defendants followed American's lead based on their independent conclusions that the changes announced by American were in the best interest of each individual manufacturer. Defendants argue that the same was true of the price increase that went into effect for 2013.

Each Defendant has satisfied its burden under Rule 56(c)(1) by filing declarations, and/or depositions of high-ranking corporate officers in which those officers deny the existence of, and their participation in, a price-fixing conspiracy. In reviewing Defendants' evidence, the Court focuses on the declarations of those individuals who are the most relevant to this litigation, where possible. When declarations are not available, the Court relies on deposition testimony.

### A.    American

American submitted declarations from David Powers (President, American) and Keith Metcalf (Sr. VP of Sales, Marketing, and Distribution,

American), both of which support American's contention that it was not involved with any agreement to raise prices, eliminate job quotes, or restrict supply in either 2012 or 2013.[4] Exs. 48 (Powers decl.), 50 (Metcalf decl.).

According to these declarations, Messrs. Powers and Metcalf worked together to develop American's pricing strategy for 2012 and 2013, though Mr. Powers had final say over any pricing decisions. Ex. 48 ¶ 7; Ex. 50 ¶¶ 17-20, 33-35. Sometime in summer 2011, the two men worked to develop a new pricing strategy in light of American's financial woes,[5] ultimately deciding to increase prices by 35% because "the larger the increase that American Gypsum announced, the better chance American Gypsum had of successfully implementing at least a portion of the increase." Ex. 48 ¶ 31; *accord* Ex. 50 ¶ 19.

In an attempt to achieve this price improvement, Mr. Powers came up with the idea to eliminate job quotes. Ex. 48 ¶¶ 30-31; Ex. 50 ¶ 21. Messrs. Powers and Metcalf took their plan to Steven Rowley, President and CEO of Eagle Materials (American's parent company), and Mr. Rowley made the suggestion to create a calendar-year price given the large size of the price increase. Ex. 48 ¶ 31; Ex. 50 ¶ 22. American announced the increase "in late September because

---

[4]     American also submitted the declaration of Timothy Gleason (Attorney, Will & Emery LLP), but this declaration was related to the discovery process rather than the merits of the case.

[5]     In his declaration, Mr. Powers detailed that, because of the economic downturn in the early 2000s, American's price for wallboard dropped from $165 per thousand square feet in 2006 to $91 per thousand square feet in 2011, a 45% decrease. Ex. 48 ¶ 20; *accord* Ex. 50 ¶ 14.

builders like to know how much their costs are increasing at that time since they negotiate the price for their next year's projects in October and November" and to provide "additional notice as a courtesy because of the change in job quote policy and the amount of the increase." Ex. 50 ¶ 25.

In making the announcement, Messrs. Powers and Metcalf recognized that they were taking a risk and could lose market share, but "American Gypsum was willing to lose some market share if it could realize higher prices, and hence a profit, on the sales that remained." Ex. 48 ¶ 32; Ex. 50 ¶ 20. And, if American "received negative feedback from [their] customers or if sales declined too much, then the company always had the option of rescinding, modifying, or selectively implementing the increase . . . ." Ex. 48 ¶ 32; *accord* Ex. 50 ¶ 20.

Messrs. Powers and Metcalf state that they did not discuss increase with any employee of any other wallboard manufacturer and that they independently reached the decision to increase prices in 2012 and 2013 and to eliminate job quotes. Ex. 48 ¶¶ 34-36; Ex. 50 ¶ 53. The declarations also assert that American competed with the other Defendants throughout the class period, "reduc[ing] prices for individual customers on hundreds of occasions in order to meet prices offered by its competitors in 2012." Ex. 50 ¶ 30.

**B.    National**

National submitted the declaration of Craig Weisbruch (Sr. VP of Sales and Marketing, National), which supports National's contention that it was not

involved in any agreement in violation of the Sherman Act. Ex. 210 (Weisbruch decl.).[6]

According to Mr. Weisbruch's declaration, he "did not enter into any agreement with any other drywall manufacturer regarding drywall prices, supply, or job quotes." Ex. 210 ¶ 38. He learned of American's price announcement on September 20, 2011 because two customers emailed him copies of the American letter. Ex. 210 ¶ 10. Prior to receiving the letters, Mr. Weisbruch did not know of "any plans by American Gypsum to raise prices or end job quotes," though, he "had heard secondhand reports from customers that USG had discussed with customers possibly ending USG's practice of issuing job quotes." Ex. 210 ¶ 11.

Upon receiving the American letter, Mr. Weisbruch placed a moratorium on job quoting and called an emergency meeting of the sales leadership team to decide how to proceed.[7] Ex. 210 ¶ 13. The team concluded that it was in the best interest of National to follow American's lead, though it decided to hold off on announcing the "hard dollar" amount of the increase until December 2011 so it

---

[6]     National also submitted the declaration of John Corsi (VP of Manufacturing, Operations, and Engineering, National), but this declaration goes to the operational status of National's plants and the production capacity of those plants, rather than to whether National entered into an agreement. Ex. 30.

[7]     During the class period, National's pricing decisions were made by "discuss[ing[ the issue and reach[ing] a consensus within a group of decision-makers consisting of [Mr. Weisbruch] and Messrs. Withrock [Dir. Demand Management], Kelly [Dir. Dealer Sales], Crutchfield [Dir. Dealer Sales], and Wood [Dir. Nat'l Accounts]." Ex. 210 ¶ 3. After a decision was reached with this group, the decision would be run by Tom Nelson (CEO, National), who had "ultimate authority over [National]'s pricing actions and during this period routinely approved of the recommendations of the sales leadership team." Ex. 210 ¶ 4.

could "collect competitive intelligence from [its] customers and form a more complete competitive picture." Ex. 210 ¶¶ 14-19.

In 2013, Mr. Weisbruch stated that National decided to raise prices by 30% because of its independent business judgment, which was based on information about what other manufacturers were doing, business conditions, and financial need. Ex. 210 ¶¶ 23-31.

The record contains substantial evidence documenting Mr. Weisbruch's communications with research analysts. In his declaration, Mr. Weisbruch clarified that he

> never intended for anything [he] said to any industry analyst to be directly or indirectly conveyed to another drywall manufacturer. No analysts ever suggested to [him] that [the analyst] would convey anything [Mr. Weisbruch] said to another manufacturer. Nor did [he] ever ask an analyst to pass information [he] provided to any other manufacturer.

Ex. 210 ¶ 36.

## C.   Lafarge

Lafarge did not submit any declarations or affidavits, but every Lafarge employee that Plaintiffs deposed denied under oath that there was ever any discussion or agreement among Defendants regarding pricing or job quotes. Ex. 1102 (DeMay dep.) at 371:4-375:6; Ex. 59 (Preston dep.) at 197:15-202:6; Ex. 80 (Pearson dep.) at 291:17-22, 294:3-4; 297:11; Ex. 81 (Conlin dep.) at 181:9-14; Ex. 82 (Wilson dep.) at 145:25-150:3.

As with National, there is some evidence in the record of communications with Stephen DeMay (VP Sales, Lafarge) and a third-party analyst at Longbow. In their supplemental briefing, Lafarge cites the depositions of the research

analysts at Longbow to support that Mr. DeMay never asked an analyst to pass information to another drywall manufacturer and the analysts never agreed to pass such information along. Lafarge Suppl. Br. at 20.

D.    PABCO

PABCO's declarations of Ryan Lucchetti (President, PABCO) and Mark Burkhammer (Dir. Sales – North, PABCO) both support PABCO's assertion that it did not participate in any agreement in violation of the Sherman Act.[8] Exs. 93, 99.

According to his declaration, Mr. Lucchetti first learned of American's September 2011 announcement from a customer, at which time Mr. Lucchetti forwarded to letter to Mark Burkhammer, Phil Kohl (VP Sales and Marketing, PABCO), Todd Thomas (Dir. Sales – South, PABCO), Foster Duval (Sales Manager, PABCO), and Emil Kopilovich (VP Manufacturing, PABCO). Ex. 93 ¶¶ 23-24. Mr. Duval responded to the email, informing Mr. Lucchetti, for the first time, that Mr. Duval had spoken with Mr. Powers (President, American) the day before. Ex. 93 ¶¶ 24-25.

Mr. Lucchetti explained that PABCO decided to follow the lead of its competitors in 2011 regarding the price increase and elimination of job quotes after it had received the increase letters from American, USG, National, CertainTeed, and Lafarge. Ex. 93 ¶ 29. Similarly, before announcing a price increase for 2013, PABCO waited to see what the other manufacturers would do,

---

[8]      PABCO submitted additional declarations, but these declarations are related to issues other than whether Defendants reached an agreement (*e.g.*, plant operation during the relevant time period).

deciding to raise prices only after receiving announcements from American, National, CertainTeed, and Lafarge. Ex. 93 ¶ 42.

Mr. Lucchetti claims that he "did not use or rely on information obtained from [any gypsum industry research analysts]" when making his pricing decisions. Ex. 93 ¶ 59.

### E.    CertainTeed

Of all Defendants, CertainTeed submitted by far the most declarations, offering approximately 90 declarations from CertainTeed leadership, employees, and customers. CertainTeed Exs. 1-50, 54-67, 69-94, 102-105. Almost all declarations deny knowledge of any agreement between CertainTeed and another manufacturer.[9] *Id.* Every declaration made by an employee of CertainTeed and its parent and sister companies also categorically denies entering into any agreement with any drywall competitor. CertainTeed Exs. 1-91, 93-94, 102-104.

According to the declaration of Steve Hawkins (VP Sales, CertainTeed), CertainTeed first learned of American's plans to increase prices and eliminate job quotes on September 20, 2011, when a customer emailed one of CertainTeed's Regional Sales Managers a copy of the American letter. CertainTeed Ex. 2 ¶ 50. The letter was forwarded to Mr. Hawkins, who sent it to John Donaldson (President, CertainTeed). Between September 20 and October 3, CertainTeed "went through a deliberative process . . . to come to a decision on

---

[9]     There are six exceptions, all of which were written by employees of CertainTeed's parent corporation. Exs. 37, 39, 43, 74, 76, 77. These declarations do not indicate that the individuals were aware of an agreement; they simply fail to state lack of awareness while the other declarations state as much prominently.

the best approach for CertainTeed. And the deliberative process over [CertainTeed's] specific price levels did not conclude until late December." CertainTeed Ex. 1 ¶¶ 45-56.

Similarly, Mr. Hawkins recalls being surprised by American's March 2012 announcement that it would likely raise its 2013 prices by 25-30%.[10] CertainTeed Ex. 2 ¶ 86. CertainTeed did not immediately start providing guidance because "it was too difficult to try to forecast industry conditions that far in advance" and because CertainTeed was unsure about "how much of the 2012 price increase would be realized." *Id.* ¶ 87. In August 2012, senior leadership at CertainTeed met and concluded that they "would like to announce a 30% price increase for 2013." *Id.* ¶ 88. On September 13, 2012, after receiving news that National had decided to raise its prices by 30% for 2013, CertainTeed announced the same increase for 2013. *Id.* ¶¶ 91-92.

## VII.  Summary Judgment Standard

To avoid summary judgment, Plaintiffs must show that a genuine issue of material fact exists as to whether Defendants entered into an anti-competitive agreement. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984).

"[A] non-movant's burden in defending against summary judgment in an antitrust case is no different than in any other case." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1230 (3d Cir. 1993) (quoting *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358. 1363 (3d Cir. 1992)). Thus, as when reviewing any summary judgment motion,

---

[10]  Mr. Donaldson retired from CertainTeed on March 9, 2012, so his declaration does not address the 2013 price increase. CertainTeed Ex. 1 ¶ 9.

we must "view the facts and any reasonable inferences drawn therefrom in the light most favorable to the party opposing summary judgment," considering the evidence as a whole and refraining from weighing evidence or making credibility determinations. *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357 (3d Cir. 2004) (quoting *Intervest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 160 (3d Cir. 2003)); *accord Petruzzi's*, 998 F.2d at 1230.

To avoid summary judgment, Plaintiffs must submit evidence that when considered holistically, "'tends to exclude the possibility' that the alleged conspirators acted independently" or interdependently. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)); *accord In re Flat Glass*, 385 F.3d at 357. "[A] nonmovant plaintiff in a section 1 case does not have to submit direct evidence, *i.e.*, the so-called smoking gun, but can rely solely on circumstantial evidence and the reasonable inferences drawn from such evidence." *Petruzzi's*, 998 F.2d at 1230; *accord Matsushita*, 475 U.S. at 588.

"The extent of what constitutes a reasonable inference in the context of an antitrust case, however, is somewhat different from cases in other branches of the law in that 'antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case.'" *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 124 (3d Cir.1999) (quoting *Matsushita*, 475 U.S. at 588). "[I]n drawing favorable inferences from underlying facts, a court must remember that often a fine line separates unlawful concerted action from legitimate business practices." *Petruzzi's*, 998 F.2d at 1230. "[E]vidence which is *equally* consistent

19

with legal and illegal conduct, standing alone, cannot support an inference of antitrust conspiracy." *Id.* at 1231 (emphasis added).[11]

That said, Defendants are "not entitled to summary judgment simply because they demonstrated a plausible rationale for their behavior. Rather, the focus must remain on the evidence proffered by the plaintiff and whether that evidence 'tends to exclude the possibility that [the defendants] were acting independently.'" *Id.* at 1232 (quoting *Monsanto*, 465 U.S. at 764).

After review of the relevant case law, the following sections will detail the undisputed facts regarding the industry prior to 2011 as well as Plaintiffs' evidence that the manufacturers entered price-related agreements during 2011 and 2012, and related arguments. Subsequently, the Court will apply the asserted factual disputes to the legal principles, addressing the evidence against each Defendant in turn.

## VIII. Legal Analysis in Oligopoly Cases

The antitrust laws prohibit only overt concerted action. *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 359-60 (3d Cir. 2004). Firms are not prohibited from making decisions that are based on the actions of other firms. *Id.*

It is undisputed that the market for drywall is oligopolistic. Oligopolistic markets tend to be interdependent. Phillip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law* § 14.03 (Wolters Kluwer Law & Business, 4th

---

[11]    The Court recognizes that much of the evidence in this case is consistent with both Plaintiffs' and Defendants' version of events. That fact alone does not entitle Defendants to summary judgment. Rather, Defendants are entitled to summary judgment only if the evidence is *equally* consistent with Plaintiffs' and Defendants' narratives. *Petruzzi's*, 998 F.2d at 1231.

ed. 2015 supp.). Interdependence is the market state in which market participants' decisions depend on what the participants' believe their competitors will do or their observations of competitors' behavior. Areeda & Hovenkamp, *supra*, § 14.03. Oligopolistic markets tend to be interdependent because competitors are more likely to consider each other's actions in markets dominated by few sellers. Thus, though each firm in an oligopoly "may independently decide upon its course of action, any rational decision must take into account the anticipated reaction" of the other firms. *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 122 (3d Cir.1999). Because the firms are aware of what their competitors are doing, "oligopolists' decisions may be interdependent," meaning the decisions were made upon considering competitors' actions or reactions. *Id.* (quoting, Areeda, *Antitrust Law* § 1429 (1986)). But such decisions are nonetheless considered to have been "arrived at independently." *Id.* (quoting, Areeda, *Antitrust Law* § 1429 (1986)).

Interdependence may sometimes result in conscious parallelism, in which the firms engage in the same behavior because they consider the actions of their competitors, but not because they have overtly agreed to engage in that behavior. *In re Flat Glass*, 385 F.3d at 359. Conscious parallelism may enable "firms in a concentrated market [to] maintain their prices at supracompetitive levels, or even raise them to those levels, without engaging in any overt concerted action." *Id.* Consciously parallel conduct does not violate antitrust laws. *Id.* Only actual agreement (*i.e.*, a "conscious commitment to a common scheme designed to achieve an unlawful objective") qualifies as an unreasonable

restraint of trade in violation of antitrust law. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984).

For Plaintiffs to create a fact issue about whether Defendants entered an agreement, Plaintiffs must present evidence tending to exclude the possibility of independent conduct, including interdependent conduct (*e.g.*, conscious parallelism). *In re Flat Glass*, 385 F.3d at 359. In the Third Circuit, Plaintiffs may show that Defendants' parallel conduct is attributable to an agreement (rather than interdependence) by showing three elements:

1.   Defendants' behavior was parallel;

2.   Defendants were conscious of each other's conduct and awareness was an element in their decision-making processes;

3.   plus factors showing an actual agreement: (1) motive, (2) actions contrary to Defendants' interests, and (3) traditional conspiracy evidence.

*Id.* at 360 n.11. The third element's list of plus factors is non-exhaustive, but those three factors have been relied on repeatedly by the Third Circuit. *Id.* at 360.

In their Summary Judgment Motions, Defendants do not meaningfully contest the first two elements. In fact, their defense is that the manufacturers were doing the same things because they were "following the leader," which essentially concedes the first two elements.

But the third element is disputed. Plaintiffs typically establish motive by showing market factors that would be conducive to collusion (*e.g.*, market concentration, high barriers to entry, etc.). *E.g.*, *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 398 (3d Cir. 2015). Often it is plaintiffs' inability

22

to establish motive (rather than their ability to establish it) that will have the greatest impact on the plaintiffs' case, because "the absence of any plausible motive to engage in the conduct charge is highly relevant to whether a 'genuine issue for trial' exists within the meaning of Rule 56(e)." *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 596 (1986).

"[E]vidence of actions against self-interest means there is evidence of behavior inconsistent with a competitive market." *In re Chocolate Confectionary*, 801 F.3d at 398. For example, evidence that prices were raised despite no rise in demand or costs might indicate defendants are acting contrary to their interests. *In re Flat Glass*, 385 F.3d at 359.

But in oligopolies, even a showing that the relevant market was ripe for collusion and that the defendants raised prices without a rise in demand or costs will usually be insufficient to rule out interdependent conduct. *Id.* at 361. "By nature, oligopolistic markets are conducive to price fixing and will often exhibit behavior that would not be expected in competitive markets. Therefore, these factors are neither necessary nor sufficient to preclude summary judgment, at least where the claim is price fixing among oligopolists."[12] *In re Chocolate*, 801 F.3d at 398. Nonetheless, courts must consider these first two factors because they are relevant and inform the inferences that might be drawn from plaintiffs' other evidence. *In re Flat Glass*, 385 F.3d at 361 n.12.

---

[12]   The Third Circuit has indicated that there may be some instances in which evidence of the first two factors would do more than show an interdependent market (*e.g.*, unilateral exchanges of confidential price information). *In re Flat Glass*, 385 F.3d at 361 n.12

Traditional conspiracy evidence will generally be "[t]he most important evidence" in a price-fixing case involving an oligopoly. *In re Flat Glass*, 385 F.3d at 361 (quoting *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655 (7th Cir. 2002)). This category of evidence "may involve 'customary indications of traditional conspiracy,' or 'proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown.'" *Id.* at 361 (quoting Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, 243 (2d ed. 2000)).

There are five particular cases in which the Supreme Court and the Third Circuit have developed the law of the plus factors: *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224 (3d Cir. 1993); *In re Baby Food Antitrust Litig.*, 166 F.3d 112 (3d Cir.1999); *In re Flat Glass Antitrust Litig.*, 385 F.3d 350 (3d Cir. 2004); and *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383 (3d Cir. 2015). The Court has relied heavily on these cases in reaching its decision today.

### A.    *Matsushita Elec. Indust. Co., Ltd. v. Zenith Radio Corp.*

In *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986), the plaintiffs, manufacturers and sellers of consumer electronic products, sued numerous competitor-manufacturers who were headquartered in Japan. *Id.* at 577. The plaintiffs' theorized that defendants had engaged in a "scheme to raise, fix and maintain artificially *high* prices for television

24

receivers sold by [defendants] in Japan and, at the same time, to fix and maintain *low* prices for television receivers exported to and sold in the United States." *Id.* at 577 (quoting *In re Japanese Elec. Prod. Antitrust Litig.*, 723 F.3d 238, 251 (3d Cir. 1983)).

The Supreme Court held that plaintiffs had not submitted sufficient evidence to survive the defendant's summary judgment motion, stressing that the Court was unwilling to make inferences of conspiracy from the ambiguous evidence offered by plaintiffs in light of defendants' lack of motive to conspire. *Id.* at 593-94. The Court explained that "[l]ack of motive bears on the range of permissible conclusions that might be drawn from ambiguous evidence: if petitioners had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy." *Id.* at 596-97.

**B.**   ***Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.***

In *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224 (3d Cir. 1993), the Third Circuit affirmed in part and reversed in part a district court's grant of defendants' summary judgment motion. The plaintiffs had accused the defendants, companies in the oligopolistic fat and bone rendering industry, of conspiring to allocate customers and entering various other agreements related to enforcement of the underlying conspiracy. *Id.* at 1228.

The court distinguished the *Petruzzi's* plaintiffs from those in *Matsushita*, explaining that the *Petruzzi's* plaintiffs' theory of conspiracy made "perfect

economic sense" because it would "enable [defendants] to make profits that the free market would not allow them, in both the short-run and the long-run." *Id.* at 1232.

The court also concluded that two of the three defendants acted against self-interest in a way that was "not attributable to interdependence," explaining that "[l]eaving all other things the same, absent an agreement it does not make economic sense for defendants not to bid on an account unless they have some problem like capacity or they know that the existing price is too high." *Id.* at 1245-46.

Although it appears that the plaintiffs' showing of actions against self-interest might have been sufficient standing alone to avoid summary judgment, the plaintiffs had also submitted substantial traditional conspiracy evidence against two of the defendants, including testimony from employees referring to a "code" that defendants had to not solicit each other's clients; recordings of secretly taped conversations of one of the defendants in which that defendant made reference to not taking other people's accounts; and expert testimony concluding that the economic data was consistent with a conspiracy. *Id.* at 1233-34, 1236, 1244. Considering all of the factors, the Third Circuit reversed the grant of summary judgment for these two defendants.

As to the remaining defendant, the court acknowledged that defendant had "made claims of capacity problems" and there was evidence that the firm actually took some accounts from the other two defendants. *Id.* at 1245. Thus, the court affirmed summary judgment as to the third defendant.

26

C.      *In re Baby Food Antitrust Litig.*

Six years after *Petruzzi's*, the Third Circuit addressed allegations of price fixing in the oligopolistic baby food manufacturing industry, in *In re Baby Food Antitrust Litig.*, 166 F.3d 112 (3d Cir.1999). The plaintiffs argued that the defendants had engaged in an 18-year price-fixing conspiracy to "fix, raise, and maintain wholesale prices and price levels of baby food in the United States." *Id.* at 116. The district court granted the defendants' summary judgment motion, and the Third Circuit affirmed. *Id.* at 116.

The plaintiffs had submitted an expert report to show that the defendants had motive to conspire and acted against self-interest. *Id.* at 134. But the court gave the expert report little to no weight given the expert's admission that his opinion was based on the assumption that defendants had conspired and that he had not "looked at whether the baby food industry fits the model of manufacturers following in their pricing practices the price leader." *Id.*

As further evidence of the defendants' actions against self-interest, the plaintiffs had also relied on (1) an internal defendant memorandum in which an employee referred to "our truce" and (2) one manufacturer's unwillingness to enter into new markets. As to the "truce" reference, the court explained that "the single use of the term in a highly competitive business environment and in the face of continuing fierce competition is as consistent with independent behavior as it is with price fixing." *Id.* at 127. As to the manufacturer's choice not to enter new markets, the court noted that only that manufacturer "was in a position to decide whether it was in its best interest to make such commitments"

27

in light of the "substantial capital expenditures and resource commitments" that entering a new market would require. *Id.*

The court also placed little weight on the plaintiffs' traditional conspiracy evidence, which included documentation of industry chatter, manufacturer notes about anticipated competitor price movements, and a manufacturer's notes indicating its intent to achieve "parity" with a competitor's price. *Id.* at 130-31, 133.

### D.   *In re Flat Glass Antitrust Litig.*

In *In re Flat Glass Antitrust Litigation*, 385 F.3d 350 (3d Cir. 2004), the plaintiffs argued that manufacturers in the oligopolistic flat glass industry had conspired to fix the prices of flat glass and auto replacement glass. *Id.* at 354.[13] All of the defendants except one, PPG, settled with plaintiffs. PPG then filed for summary judgment, which the district court granted. *Id.* at 353. The Third Circuit reversed the grant of summary judgment as to the flat glass allegations, but affirmed summary judgment as to the alleged auto replacement glass price-fixing conspiracy. *Id.* at 356, 378.

---

[13]    Notably, prior to the initiation of the private suits against the flat glass manufacturers, two executives of one of the industry's manufacturers were indicted on unrelated criminal charges. *In re Flat Glass Antitrust Litigation*, 385 F.3d 350, 354 (3d Cir. 2004). Related to that proceeding, they claimed their employer (Libbey-Owens-Ford, "LOF") "had conspired with its competitors to fix the price of the glass products it sold." *Id.* LOF then submitted an admission to the Department of Justice admitting to as much, but not specifically naming its co-conspirators. *Id.* Although the *Flat Glass* court considered LOF's proffer to the Department of Justice, it noted that the evidence submitted by the plaintiffs was sufficient to warrant reversal of summary judgment regardless of LOF's proffer. *Id* at 363 n.14.

In reversing summary judgment, the court specifically considered the plaintiffs' plus-factor arguments as to motive, actions against self-interest, and traditional conspiracy evidence. The court concluded that the plaintiffs had shown motive in part because the demand for flat glass was in decline at the time of the alleged conspiracy and the industry experienced excess capacity. *Id.* at 361. The court also determined that plaintiffs had shown that the defendants had acted against their self-interest because "no evidence suggest[ed] that the increase in list prices was correlated with any changes in costs or demand." *Id.* at 362. Nonetheless, the court held that although the plaintiffs' first two plus factor allegations indicated "that the price increases were collusive," the plaintiffs had failed to show "whether the collusion was merely interdependent or the result of actual agreement." *Id.* at 362. Thus, the court turned to traditional conspiracy evidence.

The *Flat Glass* court concluded that plaintiffs' traditional conspiracy evidence was sufficient. Plaintiffs submitted evidence showing that the manufacturers were in possession of each other's price information in advance of announcements, which the court distinguished from the price exchange evidence submitted by the *Baby Food* plaintiffs because "the exchanges of information [in *Flat Glass* were] more tightly linked with concerted behavior and therefore they appear[ed] more purposive." *Id.* at 368-69. Moreover, "several of the key documents [in *Flat Glass*] emphasize[d] that the relevant price increases were not economically justified or supportable, but required competitors to hold the line." *Id.* at 369. Other documents suggested knowledge

29

of "the plans of multiple competitors," as opposed to just a single one. *Id.* at 369. And "[p]redictions of price behavior were followed by actual price changes." *Id.* at 369.

**E.**     ***In re Chocolate Confectionary Antitrust Litig.***

Most recently, the Third Circuit clarified the plus-factor analysis in *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383 (3d Cir. 2015). Direct and indirect purchaser classes sued the three major chocolate manufactures, who together controlled more than 75% of the domestic chocolate market. *Id.* at 391. The court concluded the defendants had motive to conspire "[g]iven the market concentration and high barriers to entry." *Id.* at 398. The court relied primarily on the plaintiffs' experts to conclude that defendants had acted against their self-interest, relying on the experts' opinions that the cost increases in the chocolate market could not explain the price increases. *Id.* at 399. But, as stated in *Flat Glass*, the court explained that "evidence of a price increase disconnected from changes in costs or demand only raises the question: was the anticompetitive price increase the result of lawful, rational interdependence or of an unlawful price-fixing conspiracy?" *Id.* at 400. The court concluded the plaintiffs had failed to point to evidence that went beyond interdependence. *Id.* at 401.

Thus, as with *Flat Glass*, the most important evidence was the traditional conspiracy evidence. But here, the court found that evidence wanting. There were two internal memos from Hershey reflecting that Hershey had advance notice of price increases scheduled by Mars and Nestle USA. *Id.* at 407-08. But

the court did not give much weight to those documents because the plaintiffs had "no direct or strong circumstantial evidence that the information came from Hershey's competitors, much less their upper-level executives." *Id.* at 408. There were three email exchanges among the competitors, but the court did not give them much weight, explaining that "sporadic communications among individuals without pricing authority are insufficient to create a reasonable inference of a conspiracy." *Id.* at 409. The court also noted that the timing of the communications and the actual price increases were not suspicious. *Id.* at 407, 409. Plaintiffs attempted to rely on defendants' departure from their pre-conspiracy conduct as traditional evidence, but the changes they cited were not "radical" or "abrupt" enough to create an inference greater than interdependence. *Id.* at 410 (quoting *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 935 (7th Cir. 2000)).[14]

## IX.  Undisputed Background Facts

In antitrust cases, it is often helpful to understand the mechanics of the industry.

### A.  Wallboard Industry Background

Wallboard is a building-material panel consisting of a gypsum core pressed between sheets of paperboard. It is used in the construction of interior walls and ceilings for residential and commercial buildings. There are a variety of types of wallboard, varying in thickness, length, core formulations, and

---

[14]     The *Chocolate* court dedicated most of its traditional conspiracy evidence analysis to the plaintiffs' evidence of a Canadian conspiracy that mirrored the conspiracy alleged by the plaintiffs. *Id.* at 403. Because Plaintiffs here have not submitted any comparable evidence, the Court does not discuss that analysis.

applications. Some product lines include different properties, such as fire-resistance, mold-resistance, and impact-resistance. The core ingredient of wallboard is gypsum, but other costs for manufacturers include paper, energy, and labor.

### 1.    Market Share

From 2010 through 2012, there were eight manufactures of gypsum wallboard located in the United States: American, CertainTeed, Lafarge, National, PABCO, TIN, USG, and Georgia-Pacific.[15] Manufacturer market share varied from region to region, but nationally each manufacturer's market share in 2011 was approximately[16] as follows:

- USG: 24-26%
- National: 21-26%
- CertainTeed: 10.3%-11.7%
- American: 10%
- Lafarge: 10%
- Georgia-Pacific: 10%
- TIN: 7%[17]

There are multiple distribution channels in the wallboard industry, and Defendants typically sell to the following customers, though no Defendant sells

---

[15]    Georgia-Pacific was never a party to the Direct or Indirect Purchaser Actions, and USG and TIN have settled.

[16]    The parties disagree slightly about the precise percentage. The Court has indicated a range to capture the positions of both parties.

[17]    Georgia-Pacific acquired the assets of TIN in July 2013. These numbers reflect market shares at the time of the events giving rise to this case, which predated the acquisition.

to all of the customer types: (1) gypsum specialty dealers,[18] (2) independent building material dealers[19] and lumber yards, (3) mass merchandisers, and (4) manufactured housing, (5) lumber yard buy-groups,[20] (6) two-step distributors,[21] (7) manufacturers that use the drywall to fabricate specialty products, and (8) contractors. Plaintiffs in the Direct Purchaser Action belong to one of the customer groups. Plaintiffs in the Indirect Purchaser Action purchased wallboard from at least one of the listed customer groups.

### 2. Demand

Demand for wallboard is directly related to the level of activity in the construction industry. The early 2000s saw the end of the housing boom in 2006 and the Great Recession. As a result, demand for new residential and commercial construction in 2011 was approximately 65% less than it was in 2006. The downturn in the construction industry caused the prices of manufacturers' wallboard products to drop precipitously. As a result, manufacturers shuttered some of their plants. The total number of operating plants in the United States in the mid-2000s was 77 plants, but during 2011 and 2012, there were only 60 operating plants. Ex. 123.

---

[18]    Gypsum Specialty Dealers serve the commercial construction and new residential construction industries and sell wallboard to builders, contractors, and sub-contractors.

[19]    Independent building material dealers and lumber yards sell other building materials in addition to wallboard.

[20]    Lumber yard buy-groups are collections of lumber yards that attempt to leverage their combined buying power.

[21]    Two-step distributors purchase wallboard and other construction materials and sell those products to lumber yards.

### 3.    Capacity

The parties have offered two ways to measure capacity (and thus supply) in the wallboard industry. Theoretical, or "nameplate," capacity is the capacity of a wallboard plant if it runs seven days a week, 24 hours a day. The theoretical capacity of the entire wallboard industry in the United States is approximately 33.5 billion square feet per year. Effective capacity, or "crewed capacity," is the capacity of a wallboard plant as it is presently staffed. Defendants urge that the proper measure of supply in the wallboard industry is as a percentage of the crewed capacity. Ex. 48 (Powers decl.) ¶ 39; Ex. 22 (Salah dep.) at 196:4-16, 197:23:11. Plaintiffs, with the support of their experts, counter that the proper measure of supply is as a percentage of the theoretical capacity.  Pls. Response Br. at 93-94.

### 4.    Job Quotes

At least prior to 2011, manufacturers offered their customers a variety of rebates, discounts, credits, and other price reductions. Thus, regardless of the list price, the actual price that customers paid widely varied.

One price negotiation tool was "job quoting." The practice of job quotes began over 30 years ago to help commercial contractors bid on large jobs. Typically, manufacturers provided job quotes for commercial jobs requiring one million square feet of wallboard or more. Manufactures gave distributors a quote for the entire job ("job quote") so that the distributor's customers, the contractors, could big on projects 12 to 18 months in advance. The use of job quotes grew from their inception in the 1980s, and by the 1990s, they were no

34

longer limited to large commercial projects.[22] The job quote practice was easily abused to the detriment of at least some of the manufacturers.[23] The abuses were exacerbated by the recession. Additionally, job quotes were a one-way liability for manufacturers because customers were not required to buy on the quote. Thus, if the market price dropped below the quote price, customers could simply buy drywall using the market price.

### B.    Trade Association Membership & Meetings

Plaintiffs have noted numerous instances in which Defendants' senior leadership were in the same place at the same time. For instance, the drywall and building materials industries have trade shows and conventions that are attended by customers, manufacturers, and dealers.[24] And during the class

---

[22]    Plaintiffs object to the use of Defendants' evidence that stems from before 2010 because the Court limited the discovery period to 2010-2013. The Court acknowledges Plaintiffs' objection but the facts merely provide background information.

[23]    Plaintiffs dispute that USG's customers abused job quotes, but they do not provide evidence to create a fact dispute about whether the other manufacturers were impacted by job quote abuses.

[24]    Plaintiffs submit evidence that Defendants had a presence at the following trade shows and customer-sponsored events: Association of the Wall and Ceiling Industry's ("AWCI") Interior Exterior Commercial Construction ("INTEX") Expo in April 2011 and 2012 and AWCI's Industry Executives' Conference & Committee Week in September 2011 and 2012 (PSOF ¶¶ 447-51); Global Gypsum Conference in October 2011 (PSOF ¶ 463); the Annual Meeting of AMAROK (a group of gypsum specialty dealers), held in April 2011 and 2012; the semi-annual meetings of the Drake Group (association of gypsum special dealers), held in February 2011 and 2012 and September 2012 (PSOF ¶¶ 467-71); the Annual Show of ENAP (buying group) in March 2011 and 2012 (PSOF ¶¶ 472-74); the annual show of Guardian (for-profit buying group) in January 2011 and 2012 (PSOF ¶¶ 475-77); the semi-annual shows of LMC (collective buying group) held in March 2011 and March 2012 (PSOF ¶¶ 478-80).

35

period, all Defendants belonged to the same trade association, the Gypsum Association, which hosted events attended by Defendants.[25]

But it is now cannon that evidence of competitors meeting together, without more, is insufficient to raise inferences of conspiracy without additional evidence. *E.g.*, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 567 n.12 (2007); *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 409 (3d Cir. 2015); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1242 n.15 (3d Cir. 1993); *Fragle & Sons Beverage Co. v. Dill*, 760 F.2d 469, 473 (3d Cir. 1985). That said, opportunities to conspire may be probative of a conspiracy when meetings of Defendants are closely followed in time by suspicious actions or records. *See In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 878 (7th Cir. 2015) (explaining that plaintiffs' evidence of opportunities to conspire would have been "more compelling if the immediate sequel to any of these meetings had been a simultaneous or near-simultaneous price increase by the defendants"); *Fragle & Sons Beverage Co.*, 760 F.2d at 474 (concluding, in a non-oligopoly case, that plaintiffs had submitted sufficient evidence to survive summary judgment in a refusal-to-deal conspiracy, where the plaintiff showed that a dealer-defendant agreed to sell to plaintiff and later repudiated that agreement and that an intervening meeting took place between the dealer-defendant and plaintiff's direct competitor); *In re Linerboard*

---

[25]     Plaintiffs submit evidence that Defendants had a presence at Gypsum Association events in March 2011, June 2011, October 2011, March 2012, July 2012, and October 2012. PSOF ¶¶ 452-62.

*Antitrust Litig.*, 504 F. Supp. 2d 38, 59 (E.D. Pa. 2007) ("Importantly, plaintiffs do not offer their evidence of opportunity to conspire in isolation.").

To the extent Plaintiffs have submitted evidence of opportunities to conspire that are closely linked in time with suspicious documents or changes in pricing practices, the Court will consider that evidence below. But, the Court will not give weight to any evidence that shows a bare opportunity to conspire, without more.

## X.   *Bourjaily* and Application of the Co-Conspirator Hearsay Exception

In considering whether Plaintiffs have submitted sufficient evidence to survive summary judgment, the Court may consider only admissible evidence. Fed. R. Civ. P. 56(c). This case involves multiple Defendants who are alleged to have been in a conspiracy. And most of Plaintiffs' evidence involves internal corporate communications from which Plaintiffs contend agreement might be inferred, rather than direct communications among Defendants. As such, the chief evidentiary question the Court must address is whether the hearsay statements made by one Defendant are admissible against the other Defendants. More specifically, are the statements made by one Defendant attributable to all Defendants by virtue of the co-conspirator exception to the rule against hearsay?

In answering this question, the Court finds it helpful to review the evolution of the co-conspirator exception and its application in the Third Circuit, particularly in civil antitrust cases.

## A.     Brief History of the Co-Conspirator Exemption

Before the adoption of the Federal Rules of Evidence in 1975, which codified the co-conspirator hearsay exemption, federal courts had long applied the doctrine that the declarations of one conspirator made to a third party are admissible against his co-conspirators so long as the declarations were made in furtherance of the objects of the conspiracy. *See Lutwak v. United States*, 344 U.S. 604, 617-18 (1953); *Logan v. United States*, 144 U.S. 263, 308-09 (1892).

In *Glasser v. United States*, 315 U.S. 60, 74 (1942), the Supreme Court winnowed the viability of the co-conspirator exemption by providing that "such declarations are admissible over the objection of an alleged co-conspirator, who was not present when they were made, only if there is proof aliunde that he is connected with the conspiracy." "Otherwise," the Court continued, "hearsay would lift itself by its own bootstraps to the level of competent evidence." *Id.* The Court reiterated this so called "bootstrapping-rule" again in *United States v. Nixon*, 418 U.S. 683 (1974). In *Nixon*, the Court provided that "[d]eclarations by one defendant may also be admissible against other defendants upon a sufficient showing, by independent evidence, of a conspiracy among one of more other defendants and the declarant and if the declarations at issue were in furtherance of that conspiracy." *Id.* at 701 (emphasis added). In a footnote, the Court explained "by independent evidence" as requiring "substantial, independent

evidence of the conspiracy, at least enough to take the question to the jury." *Id.* at 701 n.14.[26]

## B.   Impact of Federal Rules of Evidence

With the advent of the Federal Rules of Evidence in 1975, what had been a clearly articulated prohibition on bootstrapping was called into question in the Circuit Courts. Federal Rule of Evidence 801(d)(2)(E), which codifies the co-conspirator exception, provides that a statement is not hearsay if it is "offered against an opposing party and . . . was made by the party's coconspirator during and in furtherance of the conspiracy." Demonstrating a conspiracy, and the declarant's and non-offering party's participation therein, are preliminary questions of fact for purposes of admissibility under Rule 801(d)(2)(E). Fed. R. Evid. 104(a). Rule 104(a) provides that "[t]he court must decide any preliminary question about whether . . . evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege." *Id.*

Accordingly, courts began to question the prohibition on bootstrapping, musing that, under the new Rules, a court could consider the proffered hearsay statements, in addition to the independent evidence of conspiracy, in determining whether a conspiracy existed for purposes of the co-conspirator exception. *See, e.g.*, *James R. Snyder Co., Inc. v. Associated Gen. Contractors*

---

[26]   The lower federal courts uniformly interpreted this statement as requiring a hearsay proponent in the co-conspirator context to present independent evidence of the conspiracy, without any reference to the hearsay statement itself. *See, e.g.*, *United States v. Rodrigues*, 491 F.2d 663, 666 (3d Cir. 1974) ("In order to be properly admitted under the co-conspirator exception to the hearsay rule, there must be independent evidence linking the declarant to the defendant.").

*of Am., Detroit Chapter, Inc.*, 677 F.2d 1111, 1117 (6th Cir. 1982) ("The out-of-court statements themselves now may be used to convince the trial judge of the conspiracy's existence and the defendant's participation in it."); *United States v. Petrozziello*, 548 F.2d 20, 23 n.2 (1st Cir. 1977) (recognizing that, while *Glasser* and earlier case law rejected bootstrapping, the new Rule "suggests that a conspiracy may be proved by the very statement seeking admittance.").

The Third Circuit engaged in an extended analysis of the effect the new Federal Rules of Evidence had on the *Glasser* rule *In re Japanese Elec. Prods. Antitrust Litig.* (*Japanese Elec. Prod.*), 723 F.2d 238, 259-66 (3d Cir. 1983), *reversed on other grounds sub nom. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).[27] In that case, the plaintiffs, manufacturers and sellers of consumer electronic products, sued numerous competitor-manufacturers, most of whom were headquartered in Japan. *Japanese Elec. Prod.*, 732 F.2d at 250. The plaintiffs alleged, among other things, violations of Sherman Act §§ 1 and 2. *Id.* The district court judge[28] made evidentiary rulings excluding most of the plaintiffs' evidence that had been proffered in opposition to the defendants' summary judgment motions. The Court applied the *Glasser* rule and concluded that there was no admissible evidence that could raise an issue of fact as to the existence of a conspiracy in violation of Sherman Act § 1.

---

[27]    As indicated by the citation, *In re Japanane Electronics Litigation* is the Third Circuit opinion that was reversed by *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986), a case that this Court has already discussed in the section on legal analysis in oligopoly cases.

[28]    The judge was Edward R. Becker, who later became Chief Judge of the Third Circuit Court of Appeals.

*Id.* at 256. Thus, the court granted summary judgment on all of the plaintiffs' remaining claims and entered final judgment in favor of the defendants. *Id.* at 256-67.

On appeal, the plaintiffs challenged the district court's exclusion of the purported statements of co-conspirators. *Id.* at 260-66. The plaintiffs argued that the trial court erred by applying the *Glasser* rule because the Federal Rules of Evidence had abrogated the *Glasser* rule. *Id.* at 260. The Third Circuit disagreed, concluding that neither Federal Rule of Evidence 104(a) nor Federal Rule of Evidence 801(d)(2)(E) "was intended to change the settled law that there must be independent proof aliunde of the existence of and membership in a conspiracy before coconspirator statements are admissible against a party." *Id.* at 261.

As this truncated history demonstrates, the Courts of Appeal were in disagreement as to whether the enactment of the Federal Rules of Evidence had indeed rendered the Glasser rule obsolete. The Supreme Court finally had cause to confront the issue in *Bourjaily v. United States*, 483 U.S. 171 (1987).

## C. *Bourjaily* Ends the Rule Against Bootstrapping

In *Bourjaily*, which is the Rosetta Stone for determining admissibility of co-conspirator statements, the Supreme Court squarely confronted the issue of "whether the court must determine by independent evidence that the conspiracy existed and that the defendant and the declarant were members of the conspiracy" for purposes of determining admissibility under Rule 801(d)(2)(E). *Bourjaily*, 483 U.S. at 173. The facts of *Bourjaily* were straightforward:

41

In May 1984, Clarence Greathouse, an informant working for the Federal Bureau of Investigation (FBI), arranged to sell a kilogram of cocaine to Angelo Lonardo. Lonardo agreed that he would find individuals to distribute the drug. When the sale became imminent, Lonardo stated in a tape-recorded telephone conversation that he had a "gentleman friend" who had some questions to ask about the cocaine. In a subsequent telephone call, Greathouse spoke to the "friend" about the quality of the drug and the price. Greathouse then spoke again with Lonardo, and the two arranged the details of the purchase. They agreed that the sale would take place in a designated hotel parking lot, and Lonardo would transfer the drug from Greathouse's car to the "friend," who would be waiting in the parking lot in his own car. Greathouse proceeded with the transaction as planned, and FBI agents arrested Lonardo and petitioner immediately after Lonardo placed a kilogram of cocaine into petitioner's car in the hotel parking lot. In petitioner's car, the agents found over $20,000 in cash.

*Id*. at 174.

Mr. Bourjaily was charged with conspiring to distribute cocaine and possession of cocaine with intent to distribute. *Id*. At trial, the Government introduced, over Mr. Bourjaily's objection, Mr. Lonardo's telephone statements about his "friend's" participation in the contemplated transaction. *Id*. In holding that Mr. Lonardo's out-of-court statements satisfied Rule 801(d)(2)(E) and were not hearsay, the district court found that the Government had established, by a preponderance of the evidence, that a conspiracy involving Messrs. Lonardo and Bourjaily existed. *Id*. In so finding, the district court considered both the events in the parking lot *and* Lonardo's out-of-court telephone statements. *Id*. Mr. Bourjaily was ultimately convicted on both counts. *Id*.

On appeal, Mr. Bourjaily argued that the district court erred by considering Mr. Lonardo's out-of-court statements to determine whether a conspiracy existed and whether the defendant was a member of it for purposes

of Rule 801(d)(2)(E). *Id.* at 176. Mr. Bourjaily argued that the district court violated a strict reading of *Glasser*, namely that "a court should not consider hearsay statements at all in determining preliminary facts under Rule 801(d)(2)(E). *Id.* at 177.

The Supreme Court acknowledged that a majority of the Courts of Appeals had adopted this strict interpretation of *Glasser*, but noted that "[b]oth *Glasser* and *Nixon* . . . were decided before Congress enacted the Federal Rules of Evidence in 1975." *Id.* at 177. According to the plain meaning of Rule 104(a), courts may make preliminary factual determinations "by considering any evidence it wishes, unhindered by considerations of admissibility." *Id.* at 178. The Court acknowledged that "[o]ut-of-court statements made by anyone, including putative co-conspirators, are often hearsay. Even if they are, they may be considered, *Glasser* and the bootstrapping rule notwithstanding." *Id.* The Court in *Bourjaily* did not decide whether a trial court could rely *solely* upon hearsay statements to determine that a conspiracy had been established by a preponderance of the evidence. *Id.* at 181. Rather, the Court's holding merely provided that a court, in making a preliminary factual determination pursuant to Rule 801(d)(2)(E), can consider the proffered hearsay statements themselves. *Id.* A subsequent amendment to the Federal Rules of Evidence in 1997 clarified that "[t]he statement must be considered but does not by itself establish . . . the existence of the conspiracy or participation in it under (E)." Fed. R. Evid. 801(d)(2)(E).

### D.   Admissibility of Hearsay Statements in Antitrust Suits Under the Co-conspirator Exception Post-*Bourjaily*

In the Third Circuit post-*Bourjaily*, "[i]n order for an out-of-court statement to be admissible pursuant to Rule 801(d)(2)(E), the district court must find by a preponderance of the evidence that: (1) a conspiracy existed; (2) the declarant and the party against whom the statement is offered were members of the conspiracy; (3) the statement was made in the course of the conspiracy; and (4) the statement was made in furtherance of the conspiracy." *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 375 (3d Cir. 2004) (quoting *United States v. Ellis*, 156 F.3d 493, 496 (3d Cir. 1998)). A district court's preliminary finding will not be disturbed on appeal unless it is clearly erroneous. *Bourjaily*, 483 U.S. at 181; *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548 (11th Cir. 1998). Alternatively, a district court has "considerable discretion" to admit the statements conditionally, subject to their later being connected up. *United States v. Mobile Materials, Inc.*, 881 F.2d 866, 869 (10th Cir. 1989) (quoting *United States v. Hernandez*, 829 F.2d 988, 994 n.6 (10th Cir. 1987)).

In the antitrust context, plaintiffs and prosecutors commonly seek to introduce the statements of purported co-conspirators that help to establish the existence of an agreement in violation of the Sherman Act. Two cases following the Supreme Court's decision in *Bourjaily* explain the Third Circuit's use of the co-conspirator exception in civil antitrust cases.

#### 1.   *Big Apple BMW, Inv. v. BMW of N. Am., Inc.*

In *Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358 (3d Cir. 1992), applicants for several BMW franchises ("applicants") sued the

U.S. distributor for BMW automobiles ("BMW distributor"), alleging that the BMW distributor and its dealers conspired to exclude the applicants from becoming dealers, in violation of the Sherman Act.

The applicant-plaintiffs based their claim on the fact that they had been denied BMW dealerships in the Tri-State area on each of the three times they had applied for them. The applicants argued that the area dealers, who would have been the applicants' competitors, persuaded the BMW distributors to deny the applicants' application so that the dealers could avoid price competition. Although the evidence underlying the first two denials was relevant to the suit, the Third Circuit addressed the co-conspirator exception to the hearsay rule in connection with only the evidence underlying the third denial.

The third denial occurred after the applicants had reached a written buy-sell agreement with Philadelphia BMW dealer Irvin Green. *Id.* at 1370. This agreement was made contingent on the applicants securing BMW and Volkswagen franchises by a certain date. *Id.* at 1371. But the BMW distributor once again denied the applicants' franchise application, and Mr. Green ultimately sold his BMW franchise to an existing BMW dealer. *Id.* at 1372.

The applicants claimed that they were denied a BMW dealership due to area dealers' concerns about price competition. In support of this theory, the applicants proffered the testimony of Bruce Braverman, the applicants' lease manager. *Id.* at 1372. Mr. Braverman's testimony took two forms, both of which the district court excluded as inadmissible hearsay.

45

First, Mr. Braverman testified at his deposition to several statements

allegedly made to him by Don Mitchell, a BMW leasing representative:

> Don Mitchell told me that the BMW dealers in the area would not
> let [the applicants] get the franchise because they were afraid that
> [the applicants'] reputation of selling cars cheaper than everybody
> else was not something that [the BMW dealers] wanted to get
> involved with. [The BMW dealers] didn't want to be involved in
> price competition. They wanted to keep their price levels where
> they were and that [sic] they were going to do what they could to
> make sure that [the applicants] did not get the franchise.

*Id.* Furthermore, Mr. Braverman testified that BMW's leasing representative

> indicated to [Mr. Braverman] that he had spoken to dealers. The
> dealers, it was the dealers who did not want [the applicants] to get
> the franchise, it wasn't BMW who had rejected them. . . . [I]t
> seemed like it was a conspiracy of the dealers in the tri-state area
> that didn't want [the applicants] to get that franchise. I don't think
> BMW cared.

*Id.* Second, the applicants proffered a memorandum memorializing

Mr. Braverman's alleged conversation with the BMW leasing agent.[29]

The Third Circuit reversed the district court's evidentiary finding,

concluding first that the leasing agent's statement was made as a representative

of BMW subsidiaries and therefore bound the BMW distributor as the corporate

parent. *Id.* at 1373. Accordingly, under Rule 801(d)(2)(D), Mr. Mitchell's

statements to Mr. Braverman were admissible. *Id.*

The Third Circuit then applied the co-conspirator exception to hold that

the various dealer statements[30] to the BMW leasing agent were also admissible.

---

[29]     The Court notes National's objection to the admissibility of Ex. 1515
under the hearsay exceptions due to the memorandum containing the subjective
impressions of the analyst. The Court disagrees. *See Big Apple BMW*, 974 F.2d
at 1372-74; *United States v. SKW Metals & Alloys, Inc.*, 195 F.3d 83, 88-89 (2d
Cir. 1999).

*Id.* at 1374. The court cited *Bourjaily* for the premise that a court "may look to independent evidence plus the statement itself for evidence of a conspiracy." *Id.* The court also explained that "mere association" would be insufficient evidence to establish the existence of a conspiracy and the declarant and defendant's connection to it, but "timing, circumstances, or a series of meetings," may prove sufficient. *Id.* at 1372-74. With these principles in mind, the court concluded that "the [applicants] ha[d] proffered evidence to show concerted action in violation of the Sherman Act," and that therefore, "they ha[d] demonstrated the requisite conspiracy for admissibility under Rule 801(d)(2)(E)."[31] *Id.* Thus, the Third Circuit concluded that the evidence was admissible. *Id.* at 1374.

### 2.   *In re Flat Glass Antitrust Litig.*

The Third Circuit most recently addressed Rule 801(d)(2)(E) in the context of civil antitrust suits in *In re Flat Glass Antitrust Litig.*, 385 F.3d 350 (3d Cir. 2004). Although the court affirmed summary judgment as to the alleged conspiracy to fix automotive replacement glass, it reversed as to the flat glass

---

[30]    The excerpts from Mr. Braverman's testimony that are presented here do not specifically identify the dealers. But, in light of other evidence presented in the case, the Third Circuit concluded that that the identity of the dealers implicated by Mr. Mitchell's statement was sufficiently clear.

[31]    The BMW distributor also made an additional argument relevant to the exclusion of this evidence. Because the BMW leasing agent categorically denied ever making the statements, the BMW distributor attempted to exclude (1) Mr. Braverman's recollection of the conversation with the BMW leasing agent and (2) the dealers' underlying communications with the BMW leasing agent. The Third Circuit rejected this argument, noting that the admissibility of co-conspirator statements under Rule 801(d)(2)(E) "is premised upon our adversarial system rather than in reliance upon indicia of reliability or trustworthiness," and it is "the factfinder [who] must decide which of the diametrically opposed witnesses is truthful." *Id.*

price-fixing conspiracy. *Id.* at 369. After summarizing the evidence that, when considered as a whole, allowed the plaintiffs to move forward on their flat glass price-fixing claim against the defendant-appellee PPG, the Court turned to a number of evidentiary rulings the district court had made. *Id.* at 370. One such ruling was the district court's exclusion of two categories of handwritten notes produced by Ronald Skeddle, the former President and Chief Executive of Libbey-Owens-Ford Company ("LOF"), a flat glass manufacturer that was not party to the suit.

On appeal, the Third Circuit considered whether the notes were admissible under the co-conspirator exception to the rules against hearsay. In making its Rule 104 finding, the district court had concluded that there was insufficient evidence from which a jury could conclude that PPG entered into an agreement to fix prices. In reviewing the district court's grant of summary judgment, the Third Circuit had already concluded that a jury could find that PPG entered into an agreement. Based on the Third Circuit's opinion in *Big Apple BMW*, one would have expected this to be the end of the matter.

But, the Third Circuit explained that it could not conclude whether the district court abused its discretion, explaining that "simply because a jury *could* find by a preponderance of the evidence that PPG entered into a conspiracy, it is not the case that the District Court *must* find that plaintiffs showed by a preponderance of the evidence that PPG entered into an agreement." *Id.* at 375-76. The Court then stated:

> Any particular factual determination requires making a number of more particularized factual determinations and weighing the

48

relevant importance of those determinations. And two factfinders could feasibly reach different conclusion [sic], especially under a preponderance of the evidence standard.

*Id.* at 376.

In so clarifying, the Third Circuit appeared to guard against the kind of bootstrapping employed in *Big Apple BMW.* However, the Court closed its discussion of the co-conspirator exception with a reminder that, "[t]o be sure, however, 'the Federal Rules of Evidence are to be liberally construed in favor of admissibility.'" *Id.* (quoting *United States v. Pelullo*, 964 F.2d 193, 204 (3d Cir. 1992)).

### E.    Role of the Co-Conspirator Exception in this Case

It is Plaintiffs' burden to show, by a preponderance of the evidence, that Rule 801(d)(2)(E) requirements have been met. Abiding by the Third Circuit's holding in *Flat Glass* on the district court's obligations under Rule 104, this Court will make Rule 104 findings relevant to the admissibility of statements under Rule 801(d)(2)(E). Those findings will be made following this Court's presentation of the chronology of material facts, and Rule 104 findings will be made separately from and prior to any findings on Plaintiffs' ability to withstand the summary judgment motion.

The Rules of Evidence are to be liberally construed in favor of admissibility. To that end, the Court notes that it "may admit the proposed evidence on the condition that the proof be introduced later." Fed. R. Evid. 104(b). And the Court recognizes its wide berth in conditionally admitting co-conspirator statements at the summary judgment stage. *See United States v.*

49

*Mobile Materials, Inc.*, 881 F.2d 866, 869 (10th Cir. 1989).[32] The Court will exercise this option.

## XI.   Chronology of Material Facts

Although Rule 56 focuses on factual disputes, in this case, most facts are undisputed. The facts presented, in both supporting and contesting Defendants' motions, come largely from Defendants' own documents, employee depositions, and/or memoranda of telephone calls made by various parties' representatives or third parties. The declarations filed by Defendants in support of their motions are not directly contradicted; instead, Plaintiffs cite facts from other materials that they assert would allow contradictory inferences and conclusions.

Thus, the Court's task becomes one of determining what inferences a jury could make from all facts, disputed and undisputed. This analysis is mostly about what inferences are reasonable. "[T]he acceptable inferences which can be drawn from circumstantial evidence vary with the plausibility of the plaintiffs' theory and the dangers associated with such inferences." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1232 (3d Cir. 1993). As previously discussed, Plaintiffs must submit sufficient evidence to

---

[32]    *See also United States v. Misle Bus & Equip. Co.*, 967 F.2d 1227, 1233 (8th Cir. 1992) (noting that the district court acted properly when it admitted co-conspirator statements conditionally and then, at close of evidence, specifically found that the government had met its burden in satisfying the requirements of *Bourjaily*); *ZF Meritor LLC v. Eaton Corp.*, No. 6-623, 2009 WL 2920851 at *2 (D. Del. Sept. 14, 2009) (admitting, with conditions, co-conspirator statements); *Consolidated Credit Agency v. Equifax, Inc.*, No. 3-1229, 2004 WL 5644363, at *13 n.19 (C.D. Cal. Aug. 5, 2004) (stating "on a motion for summary judgment the Court may conditionally consider hearsay evidence, subject to a subsequent determination as to whether plaintiffs can prove the existence of the conspiracy as well as the participation of the declarant in the conspiracy.").

permit an inference of conspiracy that is reasonable in the context of an oligopolistic market, which can prove to be a demanding standard.

Before reaching the permissible inferences, the Court finds it helpful to present a timeline of the events of this case without drawing any inferences. Plaintiffs submitted a separate statement of facts along with supporting record evidence. The Court has distilled that evidence into a timeline of what the Court believes contains Plaintiffs' most persuasive evidence.

After presenting the chronology, the Court will make Federal Rule of Evidence 104 findings and address Plaintiffs' arguments about the inferences that can be drawn from the facts discussed in the chronology.

### A.   February – October 2011

**1.   2/18/2011: Craig Weisbruch (Sr. VP of Sales and Marketing, National) indicated in an internal National email that Longbow had shared competitor information with him. Ex. 1266.**

As early as February 2011, it appears that Longbow would share information among competitors. In an internal National email between Craig Weisbruch and Tom Nelson (Pres. and CEO, National), Mr. Weisbruch wrote:

> I just finished a long conversation with the guys from Longbow. If I were to summarize 45 minutes, it would be…the dealers tell them that the manufacturers are dead serious about this increase and they are going to get it. And, our smaller competitors are telling Longbow that they are serious about this one, and while they don't feel comfortable leading future increases, they are more than ready to follow them.

Ex. 1266.

**2.   2/30/2011: Zoran Miling (Analyst, Longbow) emailed Craig Weisbruch (Sr. VP Sales and Marketing, National) to share**

**"some commentary from a few of [National's] peers" (Eagle and USG). Ex. 1276.**

Mr. Miling (Analyst, Longbow) wrote that Longbow had "held our Construction Materials Conference last week and wanted to pass along some commentary from a few of your peers." Ex. 1276. He then disclosed information regarding USG and Eagle Materials, including those companies' impressions of recent price increase attempts. Ex. 1276. Mr. Weisbruch responded that he "appreciate[d] the insight." Ex. 1276.

**3.    4/3/2011-4/7/2011: Representatives from all Defendants attended the Las Vegas Trade Meeting. PSOF ¶ 448.[33]**

Both parties agree that the attendees included, at least, David Bates (American), Keith Metcalf (American), Keith Metcalf (American), Matt Byrne (USG), Steve Bjorklund (USG), Christopher Griffin (USG), Scott Blanchard (USG), Rob Waterhouse (L&W), Donna Sue Mims (PABCO), Mark Burkhammer (PABCO), Philip Kohl (PABCO), Ryan Lucchetti (PABCO), Todd Thomas (PABCO), Bill Campbell (TIN), Jay Wyatt (TIN), Stephen Raley (TIN); Jay Conlin (Lafarge), Stephen DeMay (Lafarge), Isabelle Shiffrin (Lafarge), Robbe Pearson (Lafarge), Wayne Wilson (Lafarge), Bill Kelly (National) Scott Crutchfield (National), Craig Weisbruch (National), Duane Wood (National), Kurt Withrock (National), John Donaldson (CertainTeed), Steve Hawkins (CertainTeed). Defs. Resp. PSOF ¶ 448.

---

[33]    The Court will occasionally reference paragraphs from Plaintiffs' Supplemental Statement of Facts ("PSOF") or Defendants' Statement of Facts ("DSOF"), rather than citing to the underlying exhibits. The Court is not relying on the statement of facts as evidence; it is using the reference merely as shorthand to refer to the exhibits listed in the statement of facts' paragraphs.

Plaintiffs also argue that Bill Mazurie (CertainTeed) and John Mixson (National) attended, and they presented evidence that these two were at least pre-registered for the event. Ex. 1732. Defendants argue these two did not attend, though they present no evidence to support that contention.

The parties also dispute whether the meeting was held from April 3-7 or April 2-7. Defs. Resp. PSOF ¶ 448.

### 4. 4/27/2011: Keith Metcalf (Sr. VP of Marketing, Sales, and Distribution, American) sent internal email indicating that there might be "a movement from all manufacturers to eliminate job quotes." Ex. 1165.

Susan Hall (Dir. of Sales, South, American) sent an email to Keith Metcalf (Sr. VP of Marketing, Sales, and Distribution, American) to ask a question related to how to quote jobs going into calendar year 2012. Ex. 1165. Mr. Metcalf responded: "Please don't quote anything in 2012. We may have a movement from all manufacturers to eliminate quotes." *Id.*

When deposed, Mr. Metcalf could not recall the source of the information that caused him to write that passage in April 2011. Ex. 1124 (Metcalf dep.) at 140:19-143:11.

### 5. 6/30/2011: Zoran Miling (Analyst, Longbow) sent Craig Weisbruch (Sr. VP Sales and Marketing, National) an email "to pass along some commentary from a few of your peers," namely, USG and American. Ex. 1276.

### 6. 7/8/2011: Longbow issued a report that directly quoted from an analyst's notes from a call with Lafarge. Exs. 1280, 2081, 1122 (Miling dep.) 310:15-23.

In July 2011, Zoran Miling (Analyst, Longbow) had a discussion with someone at Lafarge. Ex. 1122 (Miling dep.) at 310:15-23. Mr. Miling took

detailed notes from the call. *Id.*; Ex. 1280. Portions of notes from this call appear verbatim in a July 8, 2011 Longbow report. Ex. 2081 at 7-8.

7.   **7/21/2011: Kathryn Thompson (Founder and Dir. of Research, Thompson) shared information about USG directly with Craig Weisbruch (Sr. VP Sales and Marketing, National). Ex. 1275; PSOF ¶ 207.**

On July 21, 2011, Craig Weisbruch (Sr. VP of Sales and Marketing, National) emailed to Kathryn Thompson (Founder and Dir. of Research, Thompson): "I can't believe that USG is going in to their call tomorrow as the only company to not announce an increase." Ex. 1275.

Ms. Thompson responded later that day: "The message I think you will hear from USG is they likely won't participate at all. If pressed, they'll say this decision is driven by their belief there is so much protected business in the market. Either way, let's compare notes when USG reports." Ex. 1275.

Mr. Weisbruch forwarded her response to Tom Nelson (Pres. and CEO, National), writing: "If true (and it sounds like she's spoken to them), here's a company that has truly run off the tracks." Ex. 1275.

8.   **7/28/2011: Zoran Miling (Analyst, Longbow) emailed Craig Weisbruch (Sr. VP of Sales and Marketing, National) industry information on American and USG. Ex. 1281.**

Mr. Weisbruch responded to American's unexpectedly low volume by commenting, "Our opinion is that American is trying to be a good steward of the price." Ex. 1281.

9.   **Early 9/2011: Internal PABCO email indicated recognition that a united manufacturer front would be necessary to cause a price increase. Ex. 1287.**

Todd Thomas (Director of Sales, South, PABCO) wrote and circulated a confidential, internal PABCO memo that provided a market update for August 2011. The memo is not dated, but the context indicates it may have been written in early September 2011. Speaking about a price increase scheduled to take effect in early September 2011, Mr. Thomas wrote:

> It will take strong united effort by all manufacture [sic] to manage current job pricing and improved forward pricing for this increase attempt to yield any price improvement. I do believe that the poor financial performance by all manufacturers, a reality check that demand improvements are not coming any time some [sic], and price improvement is the only answer [sic] will result in all manufactures falling in line to support price improvement in the coming year.

Ex. 1287.

**10.   9/2/2011: Keith Metcalf (Sr. VP of Marketing, Sales, and Distribution, American) sent an internal email prohibiting staff from providing job quotes except in limited circumstances. Ex. 1482.**

On September 2, Keith Metcalf sent another email to American Gypsum employees.

> Effective immediately, during the remaining time for calendar 2011, no quotes should be given to a customer unless they hand you the PS's that day or make a commitment to [American] on that job for the balance of the year.

> When looking ahead to January 2012 and moving forward we would like to hold off on giving any quotes until September 19[th], at which time we will reevaluate.

> Some of this may sound odd but if you would like to discuss further please give me a call.

Ex. 1482.

The impetus for this email was explained in an email exchange on September 20. On that date, Mary Schafer (VP of National Accounts, American) received an email from an American salesman asking whether he could provide a job quote for a particular project, referencing Mr. Metcalf's September 2 email. Ex. 2098. In response, Ms. Schafer wrote:

> We should pursue. *The email below [the Metcalf email] is referencing an anticipated announcement from one or more of the big boys relative to job quoting*. We're still waiting. Just want to proceed cautiously and not get locked in to big volume at low prices, especially if there is a game-changer event on the near horizon.

Ex. 2098 (emphasis added).

11. **9/6/2011, 1:45PM: Mr. Metcalf (Sr. VP Sales, Marketing, and Distribution, American) called Rob Waterhouse (Sr. VP of Sales and Operations, L&W); the call lasted 24 seconds. At 1:48PM, Mr. Waterhouse called Mr. Metcalf. The call lasted 4 minutes. Exs. 2146, 2187.**

12. **9/6/2011, 1:56PM: Rob Waterhouse (Sr. VP of Sales and Operations, L&W) called Greg Salah (Sr. VP of Sales and Marketing, USG). The call lasted two minutes. Ex. 2187.**

13. **9/7/2011: Greg Salah (Sr. VP of Sales and Marketing, USG) emailed to USG leadership an internal draft letter creating an annual price for wallboard and eliminating job quotes. Ex. 2191.**

14. **9/12/2011: Phil Kohl (VP of Sales and Marketing, PABCO) sent a memo to PABCO leadership indicating that unanimous manufacturer action would be required to achieve price improvement. Ex. 1366.**

Under the heading "General Market Conditions," the memo read:

> Real sustainable price improvement is impossible without a unanimous resolve to push through a price increase coupled with an absolute tightening and strict policing of all existing quotes. All gypsum companies see the need for an increase but the failure to achieve this end is caused by their apparent inability or refusal to tightly manage their existing quotes. In such an oversupplied market, even one lose open-ended quote can be the catalyst for the collapse of any price improvement.

Ex. 1366.

### 15.   9/19/2011: Dave Powers (President, American) called Foster Duvall (Sales Manager, PABCO). Exs. 1168, 1128.

They spoke for 19 minutes. *Id.* Both men acknowledged the call in their deposition testimony. Exs. 1128 (Powers dep.) 220:24–222:21, 1104 (Duval dep.) 181:10–182:11. And in an email the day after the call, Mr. Duvall wrote that he and Mr. Powers discussed a "lack of leadership in the industry" on the call. Ex. 1168.

Mr. Powers said this call reflects him merely returning a call from Mr. Duvall. Ex. 1128 (Powers dep.) at 220:24–222:3. Mr. Powers explained that he "seriously debated" whether to place the call because he knew American was about to release its announcement that would eliminate job quotes, create calendar-year pricing, and impose a 35% price increase for 1/1/2012. *Id.* But he decided to call Mr. Duvall nonetheless because Mr. Duvall was a personal friend, who had just had open-heart surgery multiple times. *Id.* Mr. Powers testified that they mostly discussed Mr. Duvall's health and family, but that they ended the call as they always did by slamming their former employer, USG, which involved talking about a lack of leadership in the industry. *Id.* at 222:07–223:09.

Mr. Duvall does not remember the call or what was said on it, though he does not contest that it occurred. Ex. 1104 (Duvall dep.) at 182:10–182:22.

**16.  9/20/2011: American announced calendar-year pricing and the end of job quotes. Ex. 1489.**

On September 20, 2011, American Gypsum circulated to customers a to-the-point announcement:

> **To our Customers:**
>
> Effective January 1, 2012, we will implement a 35% price increase on all gypsum wallboard products. This increased price (up 35%) will be your price for the entire year of 2012. This increase applies to all segments of the business.
>
> Effective immediately, we will no longer be providing job quotes. We thank you for your continued support.

Ex. 1489. The letter was signed by Keith Metcalf (Sr. VP Sales, Marketing, and Distribution, American).

**17.  9/20/2011: An internal PABCO email shows that PABCO leaders knew USG was considering elimination of job quotes. Ex. 1496.**

Todd Thomas (Director of Sales, South, PABCO) emailed Ryan Lucchetti (President, PABCO) and Mark Burkhammer (Director of Sales, North, PABCO):

> I just heard USG is coming out with a letter in the next day or so for a ~$25 – 30 increase January 1[st]. The letter will include wording about how they will handle job quotes. My understanding [sic] National and American are on board.

Ex. 1496.

**18.  9/20/2011-9/21/2011: PABCO's president commented on the American announcement. Ex. 1168.**

A customer forwarded the American to Ryan Lucchetti (President, PABCO) at 2:29pm on September 20. Mr. Lucchetti forwarded the email to

58

Foster Duvall (Sales Manager, PABCO) at 4:07pm, saying, "Well here is the 1st." Ex. 1168. Mr. Duval responded: "Dave [from American] gave me a call yesterday and mentioned his frustration with the lack of leadership in the industry. Eliminating job quotes would be a great start for the price improvement." *Id.* The next day, Mr. Lucchetti responded, "Dave Powers is my new hero." *Id.*

Mark Burkhammer (Director of Sales, North, PABCO) also received Ryan Lucchetti's (President, PABCO) email forwarding the American announcement ("Well here is the first"). Mr. Burkhammer forwarded the letter to Marty Brand (VP Sales and Operations, L&W), writing "Hope this works." Ex. 1244. Mr. Brand responded, "Interesting idea. I hope this does fly. I like the way they put it out there 2-1/2 months ahead of time!" *Id.*

### 19.    9/20/2011-9/21/2011: CertainTeed leadership discussed American's announcement. Ex. 1491.

A customer emailed Bill Mazurie (Regional Manager, CertainTeed) a copy of the American increase letter. Ex. 1491. Mr. Mazurie forwarded it to Steve Hawkins (VP of US Sales, CertainTeed), writing: "Here it is. USG probably will be next." *Id.* Mr. Hawkins then forwarded the letter to other CertainTeed leaders, including John Donaldson (President, Gypsum-North America, CertainTeed).

In response, Mr. Donaldson indicated that he needed an "urgent recommendation on our approach." Ex. 1498. Later in the same email chain, Mr. Donaldson indicated that he was "very much in favor of matching the [American] announcement as closely as possible." Ex. 1498.

59

20. **9/20/2011: Craig Weisbruch (Sr. VP Sales and Marketing, National) had a call with Kathryn Thompson (Founder and Dir. of Research, Thompson) about job quotes.** *See* **Ex. 1499 ("after our conversation yesterday about job quotes").**

21. **9/21/2011, 8:17 a.m.: Craig Weisbruch (Sr. VP of Marketing and Sales, National) revealed he knew that USG was considering job quote elimination. Exs. 1500, 1510.**

Craig Weisbruch (Sr. VP of Sales and Marketing, National) received a copy of the American announcement and forwarded it to National's President and CEO (Tom Nelson). In the body of the email Mr. Weisbruch wrote, "Looks like American beat USG to the punch. This will be interesting to watch play out." Ex. 1500. Mr. Nelson responded, "This might change the outlook slightly."

22. **9/21/2011, morning hours: Kathryn Thompson (Founder and Dir. of Research, Thompson) and Craig Weisbruch (Sr. VP of Sales and Marketing, National) exchanged emails about job quote elimination. Ex. 1499. PSOF ¶¶ 238, 252, 323.**

On 9/21/2011 at 7:38am, Craig Weisbruch (Sr. VP Sales and Marketing, National) wrote to Kathryn Thompson (Founder and Dir. of Research, Thompson) to follow-up about a conversation the two had the day before: "I should have added, again, after our conversation yesterday about job quotes, [the elimination of job quotes] is another way of telling the dealers that they are sick of pricing being manipulated by constant job quoting." Ex. 1499. Later in the same email chain, Mr. Weisbruch indicated that he thought the industry would follow American's lead. Ex. 1499.

Ms. Thompson quoted this email in a Thompson report that was circulated later that day.

60

23.   **9/21/2011, 4:45 p.m.: National placed "a moratorium on job quoting until such time as [they] determine[d] [their] position on this subject going forward." Exs. 1500, 1510.**

24.   **9/21/2011, 6:00 p.m.: American employee indicated awareness that the price increase is not commensurate with demand. Ex. 1359.**

The day after the American announcement, David Bates (Director of Sales – West, American) wrote an external email to a distributor related to the American announcement:

> I don't think demand matters anymore. Job quotes are the killers!!!!! I am already hearing Pabco, USG and National are going to announce something similar as well. The industry needs this increase badly.

Ex. 1359.

25.   **9/21/2011: A Thompson Flashnote anticipated that the successful elimination of job quotes would require all manufacturers to do so simultaneously. Ex. 1259.**

On 9/21/2011, Thompson sent out a "flashnote" to clients assessing American's 9/20/2011 letter:

> **The elimination of job quotes effectively stops price protection, which has been the bane of the wallboard industry.** Anywhere from 30%-70% of wallboard pricing is protected in the current market, according to TRG contacts, which limits the effectiveness of price increases. As one TRG wallboard industry contact quipped this morning, "this is another way of telling the dealers that they are sick of pricing being manipulated by constant job quoting."
> ***
> **Additional Color**. It is our understanding that USG floated the idea of elimination of job quotes to certain customers over the past month or so. *As such, EXP's [American's] letter yesterday effectively supports USG's idea and also draws the proverbial line in the sand (i.e., "I dare you not to follow suit").*

61

> **TRG Opinion.** Elimination of job quotes/price protection would be a positive for the wallboard industry, in our opinion. For this to work, however, all wallboard manufacturers would need to fall in line, and ***initial checks suggest this could be possible*** . . . .

Ex. 1259 (emphasis in original).

At least American received this report. Ex. 1259 (Thompson forwarding the report to American to keep American "in the loop").

**26.   9/22/2011: Greg Salah (Sr. VP of Sales and Marketing, USG) sent an internal email that was optimistic about price improvement. Ex. 1502.**

Greg Salah (Sr. VP of Sales and Marketing, USG) wrote to Scott Blanchard (VP of Sales, USG) only two days after the American announcement: "I do know one thing, we will not lose money in 2012. We have got to get wallboard to a point that we can get U.S. Gypsum to break even." Ex. 1502.

**27.   9/22/2011: Longbow emailed National about Longbow's conversation with American/Eagle. Ex. 1277.**

The day after the American announcement, Zoran Milling (Analyst, Longbow) asked Craig Weisbruch (Sr. VP of Sales and Marketing, National) about Mr. Weisbruch's thoughts on the American announcement. Ex. 1277.

Mr. Weisbruch responded to this email. Portions of his response appeared verbatim in Longbow's October 11, 2011 report, which was received by L&W, USG, TIN, Lafarge, and CertainTeed. *See* Exs. 1261 (L&W bates stamp), 1349 (USG bates stamp), 2046 (TIN bates stamp), 1363 (Lafarge bates stamp), 1858 (CertainTeed bates stamp).

Zoran Miling (Analyst, Longbow) responded, thanking Mr. Weisbruch for the input and adding:

> We spoke with Eagle earlier this morning to get their take on the matter . . . . Management's tone was much more stern in regard to this increase attempt relative to others, with [Eagle]'s CFO saying 'we're serious this time around.' . . . Interestingly, they were open in telling us that they don't care if they lose market share because of the new strategy.

Ex. 1277.

**28.   9/27/2011: L&W and PABCO employees discussed the elimination of job quotes. Ex. 1244.**

On September 27, Mark Burkhammer (Director of Sales, North, PABCO) invited Marty Brand (VP of Sales and Operations, L&W) to dinner through an email. In the email chain, Mr. Burkhammer said:

> I look forward to seeing you and sharing some tales... maybe talk a little strategy if all the announcements are out by then. Even though we haven't officially stated our intention I sent an email to the troops getting them ready. No more job quotes and 30 days to close any open quotes getting our system down to secured work through our distributors with footage and address's. I am suggesting, wherever and to whoever will listen, that the manufacturers have to police. . . . I don't know how this will all work out but it has some people thinking but getting something done by seven manufacturers for the good of the industry is like being in the house of reps in DC.

Ex. 1244.

**29.   9/28/2011: USG sent letter out announcing elimination of job quotes and a shift to calendar-year pricing, but not announcing the specific amount of the January 1, 2012 increase. Ex. 1617.**

**30.   9/29/2011: Kathryn Thompson (Founder and Dir. of Research, Thompson) called Craig Weisbruch (Sr. VP of Sales and Marketing, National). The call lasted for 15 minutes. Ex. 2167.**

Portions of Ms. Thompson's notes of this call (Ex. 1515) are repeated nearly verbatim in a 10/3/11 Thompson Research Group report. Ex. 1346.

**31.   9/29/2011: CertainTeed stopped offering job quotes. Ex. 1299.**

Although CertainTeed stopped offering job quotes by 9/29/2011, it officially distributed the letter eliminating job quotes and announcing calendar year pricing on 10/3/2011. Ex. 1299. The letter was misdated as 10/3/2012. Ex. 1299. CertainTeed promised a new price schedule by 11/15/11. Ex. 1299.

32. **9/30/2011: National distributed letter announcing the elimination of job quotes and shift to calendar-year pricing. Ex. 1319.**

National released its letter on 9/30/2015, but it had already indicated that it would follow American's lead. Ex. 1499. National's Director of National Accounts (Duane Wood) testified that he did not recall whether National considered what National would do if the other manufacturers did not also eliminate job quotes. Ex. 1138 (Wood dep.) at 141:10–17.

33. **10/3/2011: Craig Weisbruch (Sr. VP of Marketing and Sales, National) called Kathryn Thompson (Founder and Dir. of Research, Thompson); the call lasted 15 minutes. Ex. 2171.**

34. **10/3/2011: Thompson released a flashnote that reproduced nearly verbatim Ms. Thompson's notes from a 9/28/2011 meeting with Craig Weisbruch (Sr. VP of Sales and Marketing, National).** *Compare* **Ex. 1515 (9/28/2011 New York City meeting notes from meeting with National);** *with* **Ex. 1346 (10/3/2011 Thompson flashnote, Lafarge bates stamp).**

35. **10/3/2011: CertainTeed distributed a letter announcing the end of job quotes and beginning of calendar-year pricing. The letter did not include the amount of the January 2012 price increase. Ex. 1299.**

36. **10/4/2011: Lafarge sent out letter announcing elimination of job quotes and shift to calendar-year pricing with a 35% increase. Ex. 1522, 1102.**

Lafarge's VP of Sales (Steve DeMay) testified that he did not recall anyone at the company putting anything in writing to justify these changes. Ex. 1102 at 151:17-21.

**37. 10/10/2011: A manufacturer exchanged emails with Longbow. Ex. 2133.**

The sender of the email is redacted, but Longbow's October 11, 2011 report quoted directly from the email and attributed the quote to a manufacturer, without specifying which manufacturer. Ex. 2133. In the email exchange, the manufacturer-sender summarized the current manufacturer announcements and wrote that he anticipated the manufacturers to take measures to limit pre-buying. Ex. 2133.

**38. 10/11/2011: Longbow issued a report indicating that Longbow was not confident that the price increase for January would stick, which was received by L&W, USG, Lafarge, CertainTeed, and TIN. Ex. 1342.**

Longbow summarized the "key takeaway" as being that

industry players recognize the January increase attempt as a new approach to pricing, one that could end up being at least partially successful. However, without capacity reductions or consolidation (assuming Lafarge continues to struggle to find a buyer for its wallboard assets), we are taking a wait and see approach given the difficulty the industry has had in the past securing long term price increase success despite many attempts during the downcycle.

Ex. 1342 at 1-2.

Multiple Defendants received this report. Exs. 1261 (L&W bates stamp), 1349 (USG bates), 578 (Lafarge bates stamp), 1263 (Lafarge bates stamp), 1858 (CertainTeed bates stamp), 2046 (TIN bates stamp).

39. **10/11/2011: A TIN sales manager told his sales team that TIN would support the January increase; TIN did not formally announce elimination of job quotes but quotes were eliminated by mid-October 2011. Exs. 1503, 1523.**

40. **10/11/2011: Kathryn Thompson (Founder and Dir. of Research, Thompson) called John Donaldson (President, Gypsum-North America, CertainTeed) and the call lasted for 17 minutes. Ex. 2155.**

41. **10/12/2011: PABCO gave Longbow advanced notice of its price increase (which would be issued later that day); within minutes of receiving this notice, Longbow forwarded the notice to Craig Weisbruch (Sr. VP of Sales and Marketing, National). Ex. 1278, 2030, 1278, 1122 (Miling dep.) at 100:3-103:1.**

42. **10/12/2011: PABCO announced elimination of job quotes and implementation of calendar-year pricing with a 35% increase. Exs. 1095, 1118, 1320.**

But prior to that announcement, PABCO had already curtailed job quotes. Ex. 1095 (Burkhammer dep.) at 120:20-22. The 35% price increase was the highest PABCO had ever announced. Ex. 1118 at 177:6-8.

43. **10/13/2011: PABCO sent an internal email reflecting that American had told its employees to stop sending written reports regarding any competitive information. Ex. 1493.**

Phil Kohl (VP of Sales and Marketing, PABCO) emailed Ryan Lucchetti (President, PABCO) and Brian Hobdy (CFO, PABCO) with the subject "American and Temple-Inland Talk":

> Gary Miranda reports that American is telling their salesmen to discontinue all 'written' reports in regards to *all competitive information*; American apparently wants to limit their paper trail in regards to their thinking on the industry's planned $35 price increase. American is concerned that there may be a market backlash with claims of collusion if this increase becomes a reality in 2012.

Ex. 1493.

**44.  10/13/2011: National expressed concern about existing job quotes, worrying those quotes might "blow the deal" if American were to think that National had "broken ranks." Ex. 1560.**

Kurt Withrock (Dir. Demand Management, National) sent an email to Scott Carlsen (unknown position, National) about Colorado "job numbers." Mr. Withrock was asking whether Mr. Carlsen could pare down the job numbers, writing: "This scares me more than anything I see in the system. I'd hate to think we blow the entire deal because American thinks we've broken ranks and job quoted well into 2012 in their backyard . . . when we hardly cover variable on all that footage." Ex. 1560.

**45.  10/14/2011: Lafarge President instructed sales staff to tow the line following a Longbow report that criticized Lafarge for lacking pricing discipline. Ex. 1263.**

**46.  10/14/2011: Greg Salah (Sr. VP Sales and Marketing, USG) sent an email to Chris Griffin (President, USG), indicating that USG would go on a controlled distribution by 11/1/2011 to prevent flooding the market with cheap board, even though controlling supply was risky because competitors could steal market share. Ex. 1580.**

Mr. Salah also wrote that he knew that "a couple of competitors . . . have already gone on controlled distribution." Ex. 1580.

**47.  10/19/2011: Keith Metcalf (Sr. VP Sales, Marketing, and Distribution, American) advised an American's Sales Director to tell a customer to expect other manufacturers to impose the same price increase as American, but he did so before the amount of the increases were officially announced by all American's competitors. Ex. 1169.**

67

On October 19, one of American's clients sent an American Sales Director an email intimating that the customer would go elsewhere if American went through with the January 2012 increase. Ex. 1169.

The sales director forwarded the email to Keith Metcalf (Sr. VP of Marketing, Sales, and Distribution, American) to get Mr. Metcalf's advice about how to proceed. Metcalf responded: "I would tell Albert that when he re-engages the other manufacturers he will find the same answer." Notably, at the time Mr. Metcalf sent this email, all of the manufacturers that would announce an increase in the price had announced that an increase would be made, but they had not all announced what precisely the increase would be.

### 48.    10/19/2011: USG expressed concern that competitors might perceive that USG was involved in L&W's job quoting. Ex. 1564.

Rob Waterhouse (Sr. VP of Sales and Operations, L&W) sent Greg Salah (Sr. VP of Sales and Marketing, USG) some documents related to how L&W was handling the recent manufacturer price announcements. Salah responded:

> My only concern is your comments on jobs. We are taking a very hard line with all of our customers and not accepting job commitments dealers made on their own. It appears that L&W will be protecting a good deal of jobs and I assume the market will believe we are part of it.

> As a follow-up to our conversations, we will not be able to protect any jobs that were not in our job quote file with a specific identifiable job prior to September 28. Understanding this could cost USG volume in 2012, we feel we have no choice but to be very firm on our policy. Job quotes have decimated our pricing over the last 3-4 years. We cannot take a chance of creating the impression that we are not serious about our new pricing policy.

Ex. 1564.

68

49. **10/27/2011: National would not undercut USG's pricing when approached by a customer because the job "violate[d] [National's] pricing policy established on 9/28" and National was "not in a position to provide special pricing." Ex. 1553.**

50. **10/28/2011: National listened to Eagle/American's earnings call. Ex. 1581.**

The information learned on the call was then passed around at National:

For those of you who did not listen in, here is a transcript from EXP's earnings call. They say they are very serious about a 35% price increase and are willing to take less volume to make it stick. They are also planning to shut down all of their wallboard plants for a 2 to 3 week period at the end of December (because that is a low volume period).

Ex. 1581.

51. **11/3/2011: In an internal email, Lafarge indicated that it was restricting supply. Ex. 1505.**

Ike Preston (President, Lafarge) summarized the industry status:

So far the announcement [of the elimination of job quotes and a 35% price increase] has had the full support of the industry and we are seeing distributors scrambling to build up inventory. We have focused on limiting the inventory build up by limiting production and not running overtime in the plants. Similar moves have been made by our competitors so we believe we have good reason to feel positive about the increase.

Ex. 1505.

52. **11/18/2011: CertainTeed refused to lower the price for Lowe's even though Lowe's had absorbed a price increase in April 2011 that the rest of CertainTeed's customer base didn't absorb. Ex. 1520.**

A national accounts manager for CertainTeed emailed Steve Hawkins (VP of US Sales, CertainTeed), asking how firm the increase was for Lowe's:

Lowe's took an average increase of $10 in April 2011. While the market has retreated, the Lowe's increase stayed intact. I have

69

> started prepping Steve Edwards for our pending January 2012
> increase. He has advised that 35%/$50 is a bit steep. We are also
> hearing market reports that retail is not expecting to take the full
> increase. Since we were able to hold the April increase, I would
> recommend only going up $35-45 to come to the $50 you are
> seeking. . . . Please let me know your thoughts and I will work with
> Ian to get the Lowe's pricing matrix updated.

Ex. 1520. After the manager sent one follow-up email requesting a response,

Hawkins responded:

> We must fully support [sic] increase. I have instructed Ian to update
> Lowes matrix reflecting our increase of $50-75-100. Makes no
> difference what happened last year or Zelman's opinion. We have
> no choice but to support. Thanks.

Ex. 1520.

### 53.    11/21/2011: Longbow issued a research report. Ex. 1589.

The report characterized the January increase announcements and

provided an outlook.

> From the beginning, manufacturers have collectively communicated
> the same date for the increase, a similar amount, and all have
> uniformly abandoned the use of job quotes. In the past, differences
> in dates and magnitude have also tended to undermine the increase.
> In addition, they have communicated these items will in advance to
> allow time for distributors and contractors to digest the information
> and make the necessary accommodations. Even though USG is the
> lone manufacturer who has yet to announce a price increase amount
> (they will do so in December), many of its distributors through its
> subsidiary L&W are quoting prices beyond January 1st with 35%
> escalators.
>
> ***
>
> Working against [the manufacturers] is that the same weak demand
> environment that has scuttled so many prior price increase attempts
> still exists. Capacity utilization is still 50% and the distribution
> channel is still having difficulty passing along increases of their

70

own after manufacturers last raised prices successfully back in March.

Ex. 1589 at 3.

**54.    11/21/2011: Zoran Miling (Analyst, Longbow) emailed Craig Weisbruch (Sr. VP of Sales and Marketing, National) the most recent report. Ex. 1589.**

Mr. Miling drew specific attention to information about USG and L&W: "Worth noting is that though USG has yet to announce a price increase, it's [sic] L&W arm is quoting prices beyond January 1st with $35-$40/MSF (~36%) escalators." Ex. 1589. He also wrote: "I'm sure plenty of lies are and will continue to be told, but from our perspective it appears as though the line is being held firmly." Ex. 1589. Mr. Weisbruch forwarded this to Tom Nelson (President, National), writing: "Don't know if you saw this or not. Pretty positive!" *Id.*

**55.    11/28/2011: USG sent an internal email instructing sales staff that they could provide verbal guidance that USG would not quote jobs in 2013 and that the 2013 calendar-year price would likely be +20% from the 2012 calendar price. Ex. 1671.**

**56.    12/2/2011: In an internal email, a National director indicated his unwillingness to attempt to solicit competitors' customers. Ex. 1558.**

**57.    12/7/2011: Longbow sent an email report to TIN, PABCO, and National regarding a meeting between Longbow and Eagle (American). ¶ Ex. 1267, 1258, 1268.**

Zoran Miling (Analyst, Longbow) sent individual, nearly identical emails to TIN, PABCO, and National regarding "a series of meetings" it hosted "with

71

EXP [Eagle] management in Chicago." Ex. 1267 (email to PABCO), 1258 (email to TIN), 1268 (email to National). He indicated that "[o]verall, the meetings had an optimistic tone regarding the upcoming wallboard price increase." Under the label "Wallboard Price Increase – Continue to Say and Do the Right Things," Mr. Miling summarized:

- . . . EXP [Eagle] indicated that it should know if the price increase holds by early February. Our recent channel checks have confirmed that the industry has put distributors on allocation and we estimated the full impact of the increase won't be known until March/April when distributors will look to stock up for the spring building season. . . .

- While a prebuy is currently occurring, the industry has not added shifts or capacity to meet the order rates. As a result, while inventories are high at distribution, the manufacturers' allocation has limited the degree distributors can stock up in advance. . . Additionally, as [Eagle] is taking its wallboard plants down for maintenance this month, it essentially caps at current levels the amount its customers can order. Lastly, given space constraints at distribution and as wallboard can't be stored outdoors in the winter (or most anytime for that manner), distributors are limited in this regard to how much they can prebuy.
  ***
- *While 40% of past demand was subject to job quotes*, EXP estimates that lingering projects that were subject to the prebuy will be only 10% in early CY 12. Additionally, EXP estimates projects tied to previous quotes will roll of[f] and by mid CY12.

Ex. 1267, 1258, 1268

**58.  12/7/2011: Steve DeMay (VP of Sales, Lafarge) had a 27-minute conversation with Zoran Miling (Analyst, Longbow), which Mr. Miling memorialized. Ex. 1269.**

The notes of this call, found at Exhibit 1269, are discussed in depth in this memorandum. Portions of the notes from this call appeared verbatim in a February 23, 2012 Longbow report. *Compare* Ex. 1269; *with* Ex. 1624 at 9.

**59.  12/27/2011: In an internal USG email, USG's VP of Sales - West indicated that USG would not produce more board despite a shortage. Ex. 1576.**

Scott Blanchard (VP Sales – West, USG) received an email regarding board shortage. Mr. Blanchard indicated that USG might run some extra shifts at the plants, but that "[i]t's in the best interest of the market to keep it tight in January." Ex. 1576.

**60.  12/27/2011: In an internal email, PABCO commented that if the industry could create wallboard scarcity, the price increase would be more likely to stick. Ex. 1582.**

PABCO's VP of Sales and Marketing sent out an email entitled "Contrarian Thought," in which he explained that he

> wouldn't be too anxious to empty the warehouse...starting next week we need to believe that PABCO will get an additional $35/msf more on everything we ship... if we don't believe, how can we expect our customers to believe. In an oversupplied market with many participants bent on the increase's destruction PABCO's message needs to be strong along with that of our competitors.

Ex. 1582.

**B.  2012 Activity**

**61.  1/9/2012: A representative from Longbow called Craig Weisbruch (Sr. VP Marketing and Sales, National), and they spoke for approximately 34 minutes. Ex. 2172.**

**62.  1/19/2012: In an internal Lafarge email, Lafarge's VP of Sales expressed concern that any cut in price to a wholesaler would be communicated to competition. Ex. 1563.**

Steve DeMay (VP of Sales, Lafarge) exchanged emails with Wayne

Wilson (Regional Sales Manager, Lafarge). Mr. Wilson wanted to know about a

regional pricing issue. Mr. DeMay responded:

> I don't want to lose any high return business but as well do not
> want to be labeled as the price cutter. Both of these accounts are
> wholesalers so any move will likely be communicated to
> competition.

Ex. 1563.

**63.    1/27/2012: In an internal American email, Keith Metcalf (Sr. VP
        Sales, Marketing, and Distribution, American) indicated that
        American would be unofficially providing 2013 pricing guidance
        to customers. Ex. 1172.**

In response to an inquiry about pricing for 2013, Keith Metcalf (Sr. VP

Sales and Marketing, American) responded:

> We are not ready to put a [sic] official notice out yet. If you would
> like you could send him and [sic] email to let him know our
> guidance. The guidance would be; [sic] for 2013 you will see
> increases from manufacturers up to 30% on today's numbers.

Ex. 1172.

**64.    2/7/2012: Longbow research report on USG reported, "[USG's]
        [m]anagement also stated that it has no intention of
        undermining the increase – a key concern in the industry – as it
        views pricing as the best way to improve profitability given
        weak industry volumes." Ex. 1594.**

**65.    2/10/2012: A TIN email to a customer estimated the price
        increase for 2013, estimating a $40 upswing from 2012 pricing.
        Ex. 1683.**

**66.    2/14/2012: A representative from Longbow called Bill Kelley
        (Dir. Dealer Sales, National); they spoke for 16 minutes. Exs.
        2167; 2172; 2175; 2173.**

**67.    2/23/2012: A Longbow report summarized the status of the wallboard market in light of the January 2012 changes. Ex. 1531.**

One paragraph is most relevant to the tactic of volume restriction:

> The price increase continues to hold at or near the previously communicated level with contacts noting that certain manufacturers – chiefly [Eagle], National Gypsum and CertainTeed – continue to hold the line likely at the expense of volumes. Despite prior concerns to the contrary, both USG and Lafarge continue to act rationally. . . . In fact, the various manufacturers we spoke with told us they were more than willing to cede some share at the expense of price and our various discussions with industry contacts supports that view.

Ex. 1531.

**68.    2/25/2012-2/27/2012: Defendants' employees attended 2012 Drake Group meeting in San Antonio, TX. PSOF ¶ 470.**

The Drake Group LLC is a network of approximately 61 gypsum specialty dealers, which uses the aggregate buying power of its members to secure competitive rebates and discounts from vendors, including drywall vendors. The Drake Group does not purchase building products itself; it only negotiates the rebates and discounts made available to its members.

The parties agree that employees of some Defendants attended a February 25-27, 2012 Drake Group meeting in San Antonio, Texas. Drake Group meeting attended included Scott Blanchard (VP of Sales, USG), Matt Byrne (VP of Sales, USG), Cristopher Griffin (President, USG), Greg Salah (Sr. VP of Sales and Marketing, USG), John Donaldson (Pres., Gypsum-North America, CertainTeed), Steve Hawkins (VP of USG Sales, CertainTeed), Keith Metcalf (Sr. VP Sales, Marketing, and Distribution, American), David Powers

(President, American), and Craig Weisbruch (Sr. VP of Sales and Marketing, National).

**69.    2/27/2012: The last day of the Drake Group meeting, an internal National email indicated that National learned from dealers that American planned to announce formal guidance. Ex. 1677.**

In an email titled "Weekly Report," Bill Kelly (Dir. Deal Sales, National Gypsum) wrote: "Dealers tell us that American Gypsum will soon be providing price guidance for 2013 in a written communication telling customers to plan for one price increase in January of 25-30%." Ex. 1677.

**70.    2/28/2012: In an internal USG email, Scott Blanchard (VP Sales – West, USG) wrote a recap of the Drake meeting. Ex. 1638.**

Scott Blanchard (VP Sales – West, USG) summarized the Drake Group meeting for Greg Salah (Sr. VP Sales and Marketing, USG):

> In general the Drake Meeting was a non-event. Few of the customers "surprised" us at the meeting with requests or market information. There was a more positive outlook for the year with almost all the customers.
>
> From a high level these are the main takeaways;
>
> - The new Price strategy is being well received by the distributors (helped them)
> - No manufacturer has moved price
> - Some manufacturers are back in old markets because they can make money (greatest concern to distributors)
> - Lower job quotes are escalating 4/1/2012 (protected volume up at least $10/msf or cancelled by our competitors)
>                                     ***
> - What escalator should they use for 2013 (20-25% was our guideline, further discussion is necessary internally at USG)

Ex. 1638.

71.   **3/1/2012: American issued price-guideline announcement for 2013 indicating that the pricing for 2013 was "anticipated to be in the range of 25%-30% higher than [the] 2012 prices." Ex. 1679.**

Writing only "FYI," Greg Salah forwarded American's announcement to

Chris Griff (President, USG):

**To our Customers:**

In September of last year, we announced that we would no longer be providing individual job quotes. At that time, we gave you prices to be used for all your work for the year 2012. In response to customer requests for prices to be used for work on jobs beyond the end of this year, we are sending you this communication to provide you guidance with respect to our wallboard pricing for 2013.

Your January 2013 prices from American Gypsum are anticipated to be in the range of 25% - 30% higher than your 2012 prices. These January 2013 numbers and be used for all your work in 2013. This price increase is subject to further review as 2013 gets closer taking into consideration, among other things, increases in manufacturing and transportation costs.

We will give you more specifics in the fall of this year.

Ex. 1680.

72.   **3/7/2012: Jay Wyatt (Unknown position, TIN) provided internal email permitting sale staff to provide verbal guidance for 2013 pricing as "today's price plus no more than 30%." Ex. 1684**

73.   **3/10/2012: USG sent internal guidance indicating that USG would not send out a letter for 2013 pricing yet, but permitting sales staff to respond to customer inquiries by providing a verbal 25% increase estimate. Exs. 1681, 1682.**

74.   **3/15/2012: Garik Shmois (Analyst, Longbow) spoke with Ken Banas (Sr. Dir. Investor Relations, USG). Ex. 2168.**

**75.   4/2/2012: Longbow Research issues a report regarding 2013 pricing. Ex. 1270.**

Zoran Miling (Analyst, Longbow) sent an email with the subject line "Wallboard Business Conditions Survey – Longbow Research." Related to the 2013 price increase, he wrote:

- The January 1 price increase continues to find meaningful support, with contacts reporting that manufacturer pricing is up in the 28-35% range, which varies somewhat by region and manufacturer. Prices in March were stable on a sequential basis.

  . . .

- Eagle Materials has announced a 25% - 30% price increase for CY 2013 and is the first manufacturer to formally issue guidance. Competing manufacturers report that they are supportive of the attempt, but will not issue formal guidance until mid-2012 or as late as CY3Q12.

Ex. 1270. The full list of recipients is unknown, as Mr. Miling appears to have sent it to recipients as blind carbon copies (BCC). But, the bates stamp on the document indicates that at least National received this email.

**76.   4/4/2012: National drafted a letter announcing a 2013 price increase, but it never sent that letter to customers. Ex. 1686.**

The drafted letter indicated that National "anticipate[d] that January 2013 prices will be approximately 30% higher than pricing levels in January of 2012." Ex. 1686. Per Ex. 1134 (Weisbruch dep.) at 278:24-279:1, this letter was never sent out to customers.

**77.   4/11/12: Lafarge quoted the April 2, 2012 Longbow report in a PowerPoint presentation. Ex. 1955.**

The presentation quoted that

> manufacturers seem to be sticking to their guns and for the first time ever it's on the distributors to support the increase. Back in 2009/2010 these huge job quotes were offered and they were cheap. Now that they are all steadfast, it's up to the distributors to keep the price up now.

Ex. 1955 at 4.

78.   **4/12/12: An internal National email provided sales staff with a script for customer guidance regarding the 2013 price increase, which anticipated an approximately 30% increase. Ex. 1687.**

79.   **4/15/2012 – 4/19/2012: Senior Sales and Marketing personnel from most Defendants gathered at the AWCI/CISCA Convention and INTEX Expo in Charlotte, NC. Defs. Resp. to PSOF ¶ 450.**

The parties do not dispute that American, USG, National, Lafarge, CertainTeed, and TIN all sent representatives. Plaintiffs claim that PABCO also had a representative present, but the evidence cited in support of this contention does not confirm attendance by anyone from PABCO.

80.   **4/17/2012: A representative from Longbow called Craig Weisbruch (Sr. VP Sales and Marketing, National); they spoke for approximately 14 minutes. Ex. 2167; Ex. 1122 (Miling dep.) at 172:25-177:8.**

After the call, Garik Shmois (Analyst, Longbow) prepared an email to "Sales Approval" with the subject "USG Follow Up with Industry Insider." The first line explains, "We just got off the phone with an SVP (number three in the organization) of a large wallboard manufacturer to get his take on the USG results." Ex. 1600. This industry insider was Craig Weisbruch.

The call notes indicated Mr. Weisbruch's impression that USG was aggressive in January and February at winning share because its ultimate price

increase was somewhat lower than expected. "In response to share gains, the
rest of the industry responded more aggressively to re-set pricing in March on a
customer by customer basis. . . . [USG] has not responded aggressively to the
industry re-set which is a good thing longer term." Ex. 1600. Mr. Weisbruch
also indicated that he "expect[ed] some of the USG share gains to reverse in
2Q. . . . [National] ha[d] won back in the last month the majority of the share it
lost to USG and he expects most of the industry has rebalanced accordingly.
Neither USG nor anyone else has been disruptive since the recent re-set." Ex.
1600.

**81.   4/17/2012: Kathryn Thompson (Founder and Dir. of Research,
Thompson) spoke with Ken Banas (Sr. Dir. Investor Relations,
USG) and others at USG. Ex. 2168.**

**82.   April 2012: PABCO distributed monthly report. Exs. 1095, 1688.**

Mark Burkhammer, the author of the report, wrote on the 2013 increase:

I would support the intention of the American letter and have
communicated to our reps that we would recommend a 25% increase
be accounted for on any work going through January 1, 2013. I do
not think we should put any letter out in support until others
comply in writing. Not even sure we should go beyond verbal
support at this time or later.

Ex. 1688. In his deposition, Mr. Burhammer indicated that at this time
customers who requested information would be told that PABCO was expecting
a 25% increase, but PABCO was only providing that information to customers
who specifically requested it. Ex. 1095 (Burkhammer dep.) at 155:12-157:8.

**83.   5/21/2012: Bill Kelly (Dir. Dealer Sales, National) called Zoran
Milling (Analyst, Longbow); they spoke for just under 22
minutes. Ex. 2177.**

84.    **6/14/2012: Ms. Thompson's notes from a phone call with Craig Weisbruch (Sr. VP Sales and Marketing, National) reflected that there were "verbal agreements" for price increases for 2013. Ex. 1515.**

The contents of the notes from this call are discussed in greater detail later in the memorandum.

Portions of the notes are reflected in Thompson's July 15, 2012 report (Ex 1260). *Compare* Ex. 1515 ("2013 price increases? A: verbal agreements[]for a large price increase in 2013. EXP is already out for guidance for 25%-30%"); *with* Ex. 1260 ("TRG industry contacts are also telling us that manufacturers are discussing a sizable 2013 price increase to distributors (25%-30%), and we expect the industry will go on allocation by October.").

85.    **6/19/2012: USG internally circulated an email containing commentary from Longbow about Eagle Materials. Ex. 1689.**

Following Eagle's participation at the Longbow Construction Materials Investor Day 2012, Ken Banas (Sr. Dir. Investor Relations, USG) sent an internal email to USG leadership that included Eagle's "thoughts on pricing this year and next." Ex. 1689. The quotes in the email were provided directly from Longbow's research note, so it is unclear whether USG also attended Longbow's Investor Day.

Eagle's thoughts on pricing were related to its April announcement of a 25-30% price incase announcement: "While competing manufacturers have yet to follow suit, [Longbow's] recent wallboard survey (see: Pricing Holding as Downside Risks Cleared) indicated that most manufacturers have internally supported the attempt and will likely announce comparable increases of their

81

own in ~3Q12. At this point [Longbow is] modeling ~5% pricing next year, though we admit there is upside to our pricing forecase." Ex. 1689.

86. **7/2/2012: Garik Shmois (Analyst, Longbow) spoke with Ken Banas (Sr. Dir. Investor Relations, USG). Ex. 2168.**

87. **7/2/2012: A Thompson analyst spoke with Ken Banas (Sr. Dir. Investor Relations, USG). Ex. 2168.**

88. **7/9/2012: A representative of Longbow called Craig Weisbruch (Sr. VP Sales and Marketing, National); they spoke for approximately 27 minutes. Ex. 2167.**

89. **7/11/2012: Longbow Research indicated that most manufacturers had informally announced a 2013 price increase by this date and anticipated that formal letters were likely to be issued in September or October. Ex. 1234.**

90. **7/16/2012: A Thompson report indicated that Lafarge was telling customers to expect a 25% increase. Ex. 1690.**

In addition to the anticipated increase, the report indicated that at "Lafarge also indicated that sometime between Labor Day and mid-October, they will go on 'controlled distribution' (*i.e.*, allocation) in order to prevent excessive pre-buy activity." Ex. 1690.

When USG received the report, Ken Banas (Sr. Dr., Inv. Relations) cut out the portion regarding Lafarge noting that it was "worth passing along…" and forwarded it to senior staff at L&W and USG. Ex. 1690.

91. **7/25/2012: A representative from Thompson called Craig Weisbruch (VP of Sales and Marketing, National); they spoke for about 8 minutes. Ex. 2167.**

92. **7/25/2012: Ms. Thompson (Founder and Dir. of Research, Thompson) spoke with Ken Banas (Sr. Dir. Investor Relations, USG). Ex. 2168.**

93. **7/25/2012: Thompson report stated that manufacturers were discussing a price increase and that there was a potential for allocation by October. Ex. 1260**

USG produced the report in discovery. Ex. 1260 (USG bates stamp).

94. **8/6/2012: In internal email, PABCO revealed its knowledge of other manufacturers' allocation plans. Ex. 1709.**

In an August 6, 2012 email from Mark Burkhammer (Director of Sales, North, PABCO) to, inter alia, Foster Duval (Sales Manager, PABCO) and Ryan Luchetti (President, PABCO), he wrote: "I was told USG is going on allocation in September. We are also looking to allocate but I can't say I was ready to pull the trigger just yet. . . . Other manufacturers are doing the same planning. This will be an annual event to support increases." Ex. 1709.

95. **8/9/2012: Kathryn Thompson (Founder and Dir. of Research, Thompson) spoke with Ken Banas (Sr. Dir. Investor Relations, USG). Ex. 2168.**

96. **8/10/2012: A representative of Thompson called Craig Weisbruch (Sr. VP Sales and Marketing, National); they spoke for approximately 20 minutes. Ex. 2167.**

97. **8/16/2012: Internal CertainTeed communications revealed that CertainTeed considered adding a new shift at the Roxboro plant to respond to increased demand. Ex. 136.**

Because of increased demand, CertainTeed considers adding another shift to the Roxboro plan. But, the plant manager writes to Dave Engelhardt (Pres., Gypsum-North America, CertainTeed) that it will take 12-16 weeks to add the shift safely. Ex. 136.

98.    **8/20/2012: Around the time that National was preparing its 2013 price increase letter (Ex. 2201), Steve Martinez (unknown position, National) spoke with a representative from Longbow Research Group for approximately 4 minutes 44 seconds. Ex. 2149.**

99.    **8/22/2012, 10:30am: Longbow analysts spoke with a representative from Eagle Materials (American). Ex. 1692.**

Zoran Miling (Analyst, Longbow) sent Garik Shmois (Analyst, Longbow) an email on August 23 at 11:46am asking at what time the two had talked to Eagle the day before. Garick Schmois responded: "Right about 10:30. Nice. We published at about 12:30. So he definitely was typing an email when we were talking. National never had a chance to lead given Eagle was so fast." Ex. 1692.

100.    **8/22/2012, 11:30am: American distributed a formal price increase letter for 2013. The increase announced was 25% over 2012 prices. Ex. 1691.**

101.    **8/22/2012, 12:30pm: Longbow distributed a report with the "scoop" that National would put out an official price increase later that day. Ex. 1693.**

Ken Banas (Sr. Dir. Investor Relations, USG) received the Longbow report and forwarded it to the higher ups at L&W and USG, writing:

> [T]he scoop [is] that National is putting out an official 30% price increase letter for next year later today, with "official" language vs. the "to-be-modified" guidance of 20-30% from Eagle earlier in the year.
>
> Channel check info from Longbow shows wallboard supply is getting very tight in many regions, with effective capacity utilization much higher than actual utilization. They comment all of this points to the likelihood of pricing traction next year.

Ex. 1693.

When deposed, Craig Weisbruch (Sr. VP Sales and Marketing, National) acknowledged that National was prepared to send the 2013 letter on August 22, 2013, but decided not to send the letter until September 6, 2012. Ex. 1134 (Weisbruch dep.) at 300:9-303:3. He provided no reason for why that was.

**102. 8/22/2012: Kathryn Thompson (Founder and Dir. of Research, Thompson) called Craig Weisbruch (Sr. VP Sales and Marketing, National); they spoke for just over three minutes. Ex. 2167.**

**103.  8/22/2012: Garik Shmois (Analyst, Longbow) spoke with Ken Banas (Sr. Dir. Investor Relations, USG). Ex. 2168.**

**104. 8/22/2012, 1:51pm: An internal USG email provided that "[i]n an effort to manage anticipated surge buying for the remainder of 2012, we are implementing our Controlled Distribution process for all wallboard shipment on Monday, August 27th." Ex. 1712.**

**105. 8/22/2012, 2:38pm: Internal TIN email stated that "[d]ue to increased order volume the past two weeks, the gypsum management team has decided to implement a managed distribution plan for gypsum wallboard until further notice." Ex. 1711.**

**106. 8/23/2012: Internal CertainTeed emails indicated that National and American had gone on allocation in certain areas, and that CT "need[s] to discuss process to Implement our allocation as it appears conditions are upon us." Ex. 2203.**

**107. 8/23/2012: Bill Kelly (Dir. Dealer Sales, National) called Zoran Miling (Analyst, Longbow); they spoke for just under two minutes. Ex. 2177.**

**108. ~8/29/2012: National states that "between the time that [National] announced its 2013 price increase and the effective date of that increase, [National] instituted product allocation on a regional bases, as needed." Defs. Resp. to PSOF ¶ 440.**

85

109. **8/31/2012: In internal PABCO email, PABCO revealed its knowledge of other manufacturers' allocation-plan start dates. Ex. 1710.**

110. **9/5/2012: In internal USG email, USG Plant Manager expressed frustration about slowing production. Ex. 1716.**

Bruce Allen (Plant Manager, USG) writes:

I'm being told we are only scheduled to run the Sigurd Plant three days due to USG controlled allocation. We have the opportunity and staffed [sic] to run four days. . . . We have customers wanting board. So we are going to let our competition pick up our surplus business? And if business is indeed picking up we are going to give it to our competition? I'm being told USG logistics, District sales and Manufacturing VP are all on board with this.

Ex. 1716. The email was sent to Jeffrey Barth and Jeffrey Broker. The Court does not have a record of their job titles, but by the context of the email, the email appears to be an internal USG communication.

111. **9/6/2012: National issued its 2013 price increase letter, announcing a 30% increase across the board. Ex. 1694.**

112. **9/13/2012: CertainTeed announced a 30% price increase effective 1/2/2013. Ex. 1946.**

Previously, on 8/22/2012, upon receiving American's 8/22/2012 letter, Dave Engelhardt (Pres., Gypsum-NA, CertainTeed) wrote to Steve Hawkins (VP of US Sales, CertainTeed): "Beat us to the punch. We don't have a choice now but to support 25%. Do you think anyone else will come out lower?" Ex. 1695.

86

**113.   10/5/2012: Longbow issued a report stating that 50% of wallboard manufacturers had announced a price increase of 25-30% (AG, CT, Lafarge and NG) and that the other 50% were expected to announce in next 30-60 days. Ex. 1696.**

The report also recorded an industry contact as stating: "As strange as it sounds, allocation is fairly uniform across all of the manufacturers. There may be some isolated breakdowns in discipline—we haven't seen any—but some of those players in the past that I would label as first offenders have been rigid in their position[.]" Ex. 1696.

**114.   10/9/2012: PABCO internally distributed a September 2012 Market Condition Report, revealing PABCO's fear that competitors could react negatively to any perceived attempt to grab market share. Ex. 1707.**

Under the "General Market Conditions" heading, the report indicated:

[T]here is little-to-no resistance to the January 1, 2013 price increase. Quit [sic] a change from last year when all the naysayers were preaching the proposed increase would be a massive failure. Firmness across the board is the key to maximize our success... any perceived weakness or attempt to grab additional share with reduced pricing by any of the players could throw the price back into a destructive downward spiral.

Ex. 1707.

In his deposition, Phil Kohl (VP Sales and Marketing, PABCO) confirmed that PABCO was concerned about sending the wrong "signal" to competitors by extending a lower price past January's announced increase. PABCO didn't want to undercut the price and for the other manufacturers to think PABCO was trying to undercut price increase. Ex. 1118 (Kohl dep.) at 226:12-228:19.

**115.   10/15/2012: Lafarge issued its price increase letter reflecting a 30% increase for 2013. Ex. 1697.**

116. **10/24/2012: PABCO issued its price increase letter reflecting a 30% increase for 2013. Ex. 1698.**

117. **10/25/2012: PABCO confirmed to a customer that PABCO would not provide job quotes for 2013. Ex. 1672.**

118. **10/26/2012: In an internal USG email exchange (10/22-26), Scott Blanchard (VP of Sales, USG) wrote, "I do not think it is in our best interest to move off 'controlled distribution' at this point. CertainTeed and GP will see it and react." Ex. 1721.**

119. **10/30/2012: Craig Kesler (CFO, Eagle) called Garik Shmois (Analyst, Longbow); the call lasted approximately 3 minutes. Ex. 2178.**

120. **11/16/2012: USG issued price increase letter explaining that the prices would increase and that customers would be contacted individually regarding the amount of the increase. Ex. 1701.**

A separate email on November 18, 2012 indicated to sales personnel that the price increase would be 25%. Ex. 1673.

121. **11/26/2012: TIN issued price increase letter reflecting a 30% increase. Ex. 1702.**

122. **11/30/2012: L&W noted that it could not accommodate a lower price for any customer because to do so "would show our competition that we are protecting work and that would have the potential to harm the chances of this increase sticking." Ex. 1654.**

Marty Brand (VP of Sales and Operations, L&W) rejected a regional sales manager's request for a flexible price, explaining that "it would show our competition that we are protecting work and that would have the potential to harm the chances of this increase sticking." Ex. 1654. Mr. Brand closed by

writing, "Hold firm and keep me informed if you hear what the competition is doing in your markets." Ex. 1654.

**123.   12/5/2012: Bill Kelly (Dir. Dealer Sells, National) called Zoran Miling (Analyst, Longbow); the call lasted approximately 14 minutes. Ex. 2177.**

**124.   12/7/2012: Longbow issues two reports, and USG leadership is pleased with the report on USG.**

One of the Longbow reports was a summary of USG's meetings with investors in the week leading up to the report. In an internal USG email, Ken Banas (Sr. VP of Investor Relations, USG), wrote that he had spent three days with Garik Shmois (Analyst, Longbow) talking to investors, and that he thought Mr. Shmois "did an accurate job of capturing our key messages around L&W strategic focus, deleveraging the balance sheet and [USG]'s commitment to 2013 pricing" in the Longbow report. Ex. 1237.

Relevant to those messages, the Longbow report included such lines as: "[W]e heard all the right things about USG's willingness to support the industry's January 1 price increase . . . Our discussions with management confirms that 'they get it' in that pricing is more important than volume . . . and that disruptive pricing behavior on the company's part could quickly undermine the pricing strength seen over the past year." Ex. 2195. At least one manufacturer, Lafarge, received the report. Ex. 1364.

125. **12/11/2012: A representative of Longbow called Craig Weisbruch (Sr. VP Sales and Operations, National); the call lasted approximately 37 minutes. Ex. 2167; Ex. 1706 (call notes).**

Garik Shmois (Analyst, Longbow) created thorough notes from the call, portions of which appear nearly verbatim in a December 18, 2012 Longbow report. Ex. 1674.

126. **12/13/2012: Garik Shmois (Analyst, Longbow) spoke with Ken Banas (Sr. Dir. Investor Relations, USG). Ex. 2168.**

127. **12/17/2012: Garik Shmois (Analyst, Longbow) spoke with Ken Banas (Sr. Dir. Investor Relations, USG). Ex. 2168.**

128. **12/18/2012: Longbow report indicated that manufacturers' elimination of job quotes remained in effect for 2013 and commented on the controlled distribution and capacity of manufacturers going into 2013. The report confirmed that CertainTeed, National, American, and Georgia-Pacific were not offering job quotes. The report also commented on manufacturer allocation. Ex. 1674.**

As for the elimination of job quotes, the report indicated:

We note that throughout the course of the downturn, job quotes obstructed manufacturers' ability to ultimately realize price increases; however since the elimination of this practice, manufacturers have been able to shift price risk from themselves and onto the distributor and ultimately the contractor as distributors themselves . . . have remained largely disciplined. Again, this has allowed for greater price certainty in the market and thereby has allowed contractors and distributors to compete more on service rather than price.

Ex. 1674 at 9.

As to future pricing:

**Future Pricing:** The entire industry has thus far communicated their pricing intentions for 2013 in written form. National Gypsum,

90

CertainTeed, Lafarge and Temple-Inland have each announced an increase of 30% whereas American Gypsum (EXP) has announced an increase of 25%. Neither Georgia-Pacific nor USG have announced a dollar amount, through [sic] distribution contacts report that each is communicating an increase of $40/MSF, which is ~30%. Additionally, as L&W is out with a $50/MSF price increase, we believe 2013 pricing will exceed our prior expectations.

Ex. 1674 at report p. 2.

**129.    12/21/2012: In USG's Form 10-K for financial year ending 12/21/2012, USG indicated that demand was low for wallboard. Ex. 1222 at 7.**

**130.    12/26/2012: Greg Salah (Sr. VP Sales and Marketing, USG) wrote that there couldn't be any "slop over" with price despite shipping issues because of potential market reaction. Ex. 1708.**

In response to emails that severe weather was causing shipping problems, Greg Salah wrote internally at USG: "We cannot do any slop over. To great of a risk of perception that we are pursuing share at the expense of price." Ex. 1708.

## XIII. Evidentiary Findings Pursuant to Fed. R. Evid. 104

The evidence just presented by the Court was presented without an eye towards the admissibility of the evidence. This is in part because the Court can consider both admissible and inadmissible evidence in determining whether certain evidence is admissible under the co-conspirator exception, as discussed in the *Bourjaily* sections, *supra*. Before confronting the inferences that Plaintiffs ask the Court to reach, the Court will address the three primary exceptions under which much of Plaintiffs' evidence is deemed admissible.

### A.    Parties' Statements

This is a relatively straightforward finding dictated by Federal Rule of Evidence 801(d)(2). The Court has limited its review of the evidence concerning statements made by officers/employees of each Defendant to those that the evidence warranted the Court finding was a "party's agent or employee on a matter within the scope of that relationship and while it existed." All of Defendants' representatives quoted in this memorandum were either officers or managers who had some involvement with, or responsibility for, pricing drywall during the relevant time period. Thus, their statements are admitted against the speaker's employer.

### B.    Business Records

Defendants have objected to the Longbow and Thompson reports as inadmissible hearsay. *See* Defs. Resp. PSOF ¶ 273. Notably, Zoran Miling of Longbow and Kathryn Thompson of Thompson were both deposed. Ex. 1122 (Miling dep.); Ex. 1131 (Thompson dep.). Thus, their first hand impressions are not hearsay.

For the sole purpose of summary judgment, the Court concludes that the hearsay portions of their reports are admissible under Rule 803(6), the business records exception to the hearsay rule, to the extent that any hearsay statements support their opinions of the market. Some portions of the reports quote unnamed industry insiders. The Court has not relied on any of those portions of the reports in deciding whether Plaintiffs have satisfied their summary judgment

showing, so the Court does not need to determine at this time whether those portions of the reports will be admissible.

## C.   Co-Conspirator Statements & *Bourjaily*

As noted above, pursuant to Rule 104(b), the Court delayed making findings until it reviewed the evidence in the record. Having reviewed the most relevant evidence, the Court pauses to make threshold findings pursuant to *Bourjaily* and Federal Rule of Evidence 104. Under *Bourjaily*, the Court's ruling is one of admissibility of evidence only, and is not a ruling as to sufficiency of Plaintiffs' evidence to prove liability as to any specific Defendant. Hearsay evidence may be admissible under the co-conspirator rule, as to only some Defendants. It is not necessarily a conclusion that the overall evidence is sufficient to deny that Defendant's motion for summary judgment, especially in an antitrust case where special rules apply on motions for summary judgment.[34]

The fact that hearsay is admitted under Rule 104 as to a particular Defendant, does not necessarily compel a conclusion that Defendant has joined an agreement on prices in violation of § 1 of the Sherman Act. *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 375-76 (3d Cir. 2004).

---

[34]     "It is argued that a preponderance of the evidence test usurps the function of the jury to determine whether a conspiracy exists. This has surface appeal until it is remembered that what is involved here is a ruling on the admission or exclusion of particular evidence, and on this question only. As with all such judicial decisions on admissibility, the effect upon the outcome may be profound, but this comes from the ruling itself and not from the manner in which the law requires the trial judge to make it." *James R. Snyder Co. v. Associated Contractors of Am., Detroit Chapter, Inc.*, 677 F.2d 1111, 1117 (6th Cir. 1982).

Given the size of this industry, the large amount of money paid by the two settling Defendants, and the exposure to damages faced by the remaining Defendants, the Court has taken a long pause before making any rulings that will expose Defendants to liability, especially given Defendants' testimonial denials and vociferous arguments that Plaintiffs have failed in their efforts to show that an agreement existed.

In considering the Court's duty under Rule 104, Third Circuit law requires the Court make rulings favorable to Plaintiffs if Plaintiffs have presented, by a preponderance of evidence, sufficient facts to warrant admissibility.

Based on the review of the facts presented by Defendants in their motion for summary judgment, the factual assertions put forth by Plaintiffs in their responses, and the legal arguments made by both parties, the Court has come to nine findings under Federal Rule of Evidence 104:

1.      The depressed economy that the drywall manufacturers endured following the 2008 recession, which affected many parts our nation's economy, was a frustrating time for all of the manufacturers in this industry. A number of individual efforts to raise prices failed, which a jury may find contradicts Defendants' assertions that the industry had always practiced "price followership." The communications with customers and industry analysts show, without any doubt, that all U.S. drywall manufacturers were anxious for the opportunity to raise prices.

2.      The price increase that was announced in fall 2011 to become effective January 1, 2012, was historically a very large, if not the largest ever,

percentage increase, announced at 35% for most manufacturers, and was followed by all Defendants, resulting in increased prices to purchasers.

3.     Accompanying the price increase was the elimination of job quotes. Job quotes are a pricing mechanism, and they had long served as an effective way for purchasers to achieve discounts from list prices. The Court concludes a jury could find that the elimination of job quotes either was intended to cause, or Defendants knew would result in, very few if any discounts from the announced price increase. A jury could conclude that the elimination of job quotes resulted in a form of price maintenance. Plaintiffs have produced evidence that shows that each Defendant enforced elimination of job quotes during calendar years 2012-2013.

4.     There are at least some actions taken by several of Defendants that could be considered as conduct against their self-interest, at least as that term has been defined in antitrust jurisprudence following *Matsushita*.

5.     The record of this case shows several intercorporate communications. Many documents show very frequent discussions about prices between Defendants and analysts or customers. The Court agrees with Defendants that some of the evidence of pricing communications is, on its own, normal, innocuous, and insufficient to allow any inference of conspiracy. However, some of these communications could be interpreted as encouragement or affirmation that price increases announced in and following September 2011 would be adhered to.

6.     Concerning Plaintiffs' theory that Defendants communicated with each other through analysts at Longbow and Thompson (the "conduit theory"), the Court finds, in what appears to be a novel factual situation, the above chronology shows frequent use of Thompson's and Longbow's communications for pricing information, as well as for market reports. However, exchange of market information, including prices, is not necessarily evidence of agreement. Admitting these facts into evidence as to all Defendants may allow a jury to determine whether the use of analysts was a "facilitating device" that enabled at least some Defendants to communicate with each other under the guise of providing highly detailed, and often confidential, pricing information about their own company and others. The conduit evidence may also be a form of "signaling" between competitors that would have allowed Defendants to conclude that they were maintaining the increased prices and elimination of job quotes.

7.     The expert opinions offered by Plaintiffs support the above findings, allowing admissibility of hearsay evidence. Although, by themselves, the expert opinions would not warrant a conclusion that Plaintiffs had met their burden of proof, under established Third Circuit precedent, the Court is within its discretion in citing and relying on the experts' opinions as having some relevance on Defendants' motions. It is appropriate to consider these opinions on the pending motions for summary judgement because a jury will be entitled, if finding Plaintiffs' experts credible, to rely on those opinions as part of its

review of the evidence to determine whether Plaintiffs have proved that an agreement existed.

8.    Under Rule 104, taking all the evidence in the light most favorable to Plaintiffs, Plaintiffs have shown by a preponderance of the evidence that an agreement existed, as to at least some Defendants. Plaintiffs' evidence is more than merely "ambiguous" and proves sufficient to allow a jury to find that these hearsay statements, and perhaps others not specifically mentioned in this memorandum, were made during and in furtherance of an agreement by Defendants American, National, PABCO and Lafarge. Under *Bourjaily* and its progeny, the hearsay evidence cited by Plaintiffs is admissible against these Defendants to the extent the statements were made during and in furtherance of the conspiracy. Whether it proves enough to deny the motion for summary judgment as to these Defendants will be discussed below, individually.

9.    Plaintiffs' evidence as to Defendant CertainTeed is not sufficient to show that CertainTeed participated in the conspiracy. Therefore, the Court finds that the hearsay statements made by other Defendants or their agents, even when about CertainTeed, are not admissible against CertainTeed as statements of co-conspirators.

## XIII. Plaintiffs' Theory of the Drywall Conspiracy

Relying on the evidence outlined in the chronology, Plaintiffs argue that a jury could draw inferences that Defendants entered an agreement to fix prices. Specifically, Plaintiffs argue that culpable inferences can be drawn from (1) the timing and similarity of Defendants' announcements of the elimination of job

97

quotes and the 2012 and 2013 price increases, (2) Defendants' communications with one another in close proximity to major price announcements or under otherwise suspicious circumstances, (3) Defendants' communications with research analysts, and (4) Defendants' non-price conduct (*e.g.*, restricting supply), which facilitated the success of the increases.

The Court acknowledges that Plaintiffs have provided no "smoking guns," and that courts in this circuit "have been cautious in accepting inferences from circumstantial evidence in cases involving allegations of horizontal price-fixing among oligopolists." *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 358 (3d Cir. 2004). But even keeping this in mind, based on Plaintiffs' arguments and the record evidence, the Court concludes that when Plaintiffs' evidence is considered as a whole, there is substantial evidence, ranging temporally from Spring 2011 through the end of 2012, from which a jury could conclude that at least some Defendants reached an agreement with at least one other competitor. *Cf. Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1233 (3d Cir. 1993*)* ("We consider [the plaintiff's] evidence as a whole and with the reasonable inferences that we can draw from it.").

### A.   Timing and Similarity of Defendants' Announcements Related to Elimination of Job Quotes and the 2012 and 2013 Price Increases

Defendants do not dispute that they eliminated job quotes and announced price increases around the same time. Nor do they dispute that they did so with knowledge that the other manufacturers were doing the same. In fact, Defendants argue that they eliminated job quotes and increased prices *because* the other manufacturers were doing so. There is significant evidence supporting

Defendants' arguments that Plaintiffs' evidence in this vein permits an inference of no more than price followership. And Defendants are correct that the Court must not rely on mere price followership activity because price followership is expected in oligopolistic markets.

The Court has nonetheless provided a fairly detailed review of the facts leading up to the price increases in January 2012 and January 2013 and will provide review of Plaintiffs' arguments related to those facts. Evidence that participants in an oligopolistic market acted the same way at the same time will always be insufficient, standing alone, to defeat a summary judgment motion. But, the timing and content of the manufactures' announcements is relevant to Plaintiffs' showing, even though the evidence in isolation is not dispositive.

## 1.    Pricing Practices Prior to Fall 2011

Between 2010 and the September 20, 2011 American announcement, Defendants attempted seven price increases. Plaintiffs argue that the increases were all unsuccessful and also attribute the following characteristics to those increases:

- Usually one competitor would attempt to take market share and ends up wrecking the increase. PSOF ¶ 163.

- One of the larger manufacturers (National or USG) would lead typically the increase. PSOF ¶ 165.

- Increases were usually announced approximately 30 days before their effectiveness (presumably because it was difficult to anticipate conditions more than 30 days out). PSOF ¶ 166.

- Summer and early fall were the best times for an increase, but winter was inhospitable to increases. PSOF ¶¶ 167-68.

Defendants deny that the prior increases had these attributes. They also deny that the increases failed, admitting only "that some Defendants tried to raise prices at least seven times between January 2010 and fall 2011 with various levels of success." Defs. Resp. PSOF ¶ 162. And Defendants "deny that market conditions did not support those attempts or that they did not result in price appreciation." *Id.*

### 2. Price Increase & Elimination of Job Quotes Effective January 2012

In fall 2011, the status quo for pricing in the drywall industry changed dramatically. Ex. 1263; *see* Ex. 1085 (Lamb Report) ("Job quotes were an integral part of the industry, and their near simultaneous virtual elimination by Defendants in the last quarter of 2011 created a structural change in the Paper-backed Gypsum Wallboard industry.").

### a. American Announcement

In a letter to customers on September 20, 2011, American announced a move to calendar-year pricing, a 35% price increase, and the elimination of job quotes. Ex. 1489. The letter was short and to the point:

> To our Customers:
>
> Effective January 1, 2012, we will implement a 35% price increase on all gypsum wallboard products. This increased price (up 35%) will be your price for the entire year of 2012. This increase applies to all segments of the business.
>
> Effective immediately, we will no longer be providing job quotes. We thank you for your continued support.
>
> Sincerely,
> American Gypsum Company

100

Keith Metcalf
Sr. VP of Marketing, Sales & Distribution

Ex. 1489. As noted in a Longbow report, American's announcement reflected a "new approach to pricing," including five features that differentiated it from prior price-increase attempts in the drywall market:

1. The elimination of job quotes – the list price will now be the purchase price
2. The duration of the increase – it's good for the entire year and will be the only one
3. The lead time in advance of the increase
4. The size of the increase
5. The content of the increase letter

Ex. 1263 at 1, 3.

Although this price announcement was substantially larger than those prior, American did not engage in any documented analysis prior to announcing these changes. Plaintiffs point out that American produced over 450,000 pages of documents in this litigation, yet Plaintiffs were unable to locate a single document in American Gypsum's production setting forth any analysis, study, or modelling of the plan to eliminate job quotes or raise prices by 35% on January 1, 2012. PSOF ¶ 233. American asserts that it reached its decision during undocumented discussions between three members of senior leadership. Ex. 48 (Powers decl.) ¶¶ 30-38; Ex. 50 (Metcalf decl.) ¶¶ 17-22. But American has not identified any contemporaneous documents that memorialize its process.

Relying in part on one of Defendants' experts, Plaintiffs argue that the lack of written analysis is suspicious. CertainTeed's expert, Dr. Barry Harris, testified that he would have expected a firm making this dramatic a shift from industry practices to have done more (*e.g.*, conducting customer research,

101

considering potential responses from competitors, evaluating the impact of the announcement on the manufacturer's operations and financials) before making the announcement.[35] Ex. 1110 (Harris dep.) at 67:8–68:24.

### b.   USG Announcement

Other manufacturers quickly followed American's lead. USG was the first manufacturer to issue a formal announcement, distributing a letter to customers on September 28, 2011 that announced its elimination job quotes and implementation calendar-year pricing. No specific price was announced, but USG promised to notify customers of the 2012 price on December 1, 2011.

Although USG never provided a formal letter to all customers providing a uniform price increase, by October 5, USG's senior leadership approved the distribution of guidance for dealers of a 35% increase in prices. Ex. 1508. Ultimately, USG decided to allow prices to vary from market to market. According to USG, the final price increase was below 30% in every geographic market and below 20% in over one-third of geographic markets. DSOF ¶ 663.[36]

---

[35]   Defendants object to Plaintiffs' interpretation on Dr. Barry Harris's testimony, arguing that in this context Dr. Harris was explaining the types of actions that CertainTeed undertook in making its announcement. The Court rejects this reading. Although Dr. Harris was discussing the steps CertainTeed took, Dr. Harris also agreed that there were "important business reasons" for a company to take steps such as those taken by CertainTeed and that he would expect a company to take similar measures prior to making a decision to eliminate job quotes, dramatically increase prices, and shift to calendar-year pricing.

[36]   Plaintiffs argue that "to the extent USG varied its price increase amounts, such variation is attributable to existing differences in prices prior to January 1, 2012." Pls. Resp. DSOF ¶ 655.

### c.   National Announcement

National released its letter on September 30, 2011, but prior to that date, it had already internally and externally indicated that it would follow American's lead. The day after American distributed its announcement, National placed a moratorium on job quoting by sending an internal email to area managers. Exs. 1500, 1510. That same day, Craig Weisbruch (Sr. VP of Sales and Marketing, National) indicated externally that National would follow American's lead, reporting to a Thompson Research Group analyst that American's announcement "is the beginning of the manufacturers saying we can't survive in this unchanged climate for two or three more years. If there is going to be no volume increase, then there needs to be a new clearing price that allows us to be profitable at current volumes." Ex. 1499. National's Director of National Accounts testified that he did not recall whether National considered what National would do if the other manufacturers did not also eliminate job quotes. Ex. 1138 (Wood dep.) at 141:10-17.

### d.   CertainTeed Announcement

CertainTeed distributed a letter eliminating job quotes on October 3, 2011[37] (though they had unofficially stopped quoting jobs by at least September 29, 2011). Exs. 1299, 1517. CertainTeed promised to provide the new 2012 price by November 15, 2011.

---

[37]   The letter was misdated as October 3, 2012. Ex. 1299.

CertainTeed opened its letter by explaining that the housing market "continues to face very depressed market conditions . . . with little expectation of real improvement within the coming year." Ex. 1299.

### e.  Lafarge Announcement

Lafarge sent a customer letter on October 4, 2011, announcing the immediate elimination of job quotes and the implementation of calendar-year pricing, along with a 35% increase. Ex. 1522. Lafarge's VP of Sales (Mr. DeMay) testified that he did not recall anyone at the company putting anything in writing to justify these changes. Ex. 1102 (DeMay dep.) at 151:17-21.

### f.  TIN Announcement

On October 11, 2011, TIN sales staff were informed that TIN planned to support the January 2012 increase. TIN never formally announced the elimination of job quotes, but job quotes were eliminated by mid-October 2011. Exs. 1503, 1523.

### g.  PABCO Announcement

PABCO formally announced the elimination of job quotes, implementation of a calendar-year price, and a 35% price increase on October 12, 2011. Ex. 1320. But prior to this announcement, PABCO had already curtailed job quotes. Ex. 1095 (Burkhammer dep.) at 120:20-22. The 35% price increase was the highest single increase that PABCO had ever announced, though "there had been prior years where the total combined amount of price increase announcements issued by PABCO exceeded 35%." Ex. 93 (Lucchetti decl.) ¶ 32.

### h.    Implementation & Results

As reflected in the below chart, by January 1, 2012, American, USG, National, CertainTeed, Lafarge, and PABCO had formally announced the elimination of job quotes and a shift to calendar-year pricing.[38] And all Defendants except USG had formally announced a price increase amount of approximately 35%.

| Manufacturer | Initial Price Bulletin | % Increase Ultimately Announced | Job Quote Elimination |
|---|---|---|---|
| American | 9/20/2011 | 35% | Yes |
| USG | 9/28/2011 | Less than 30%* | Yes |
| National | 9/30/2011 | 35% | Yes |
| CertainTeed | 10/3/2011 | 35-37%* | Yes |
| Lafarge | 10/4/2011 | 35% | Yes |
| PABCO | 10/12/2011 | 35% | Yes |
| TIN | 11/29/2011 | 35% | Not in letter, but eliminated in practice |
| Georgia Pacific | 12/2/2011 | NA | No |

*percentage price increase announced after initial letter

---

[38]    Plaintiffs attempt to make much of the fact that Defendants used similar language in their letters to customers in fall 2011. But it is undisputed that Defendants received copies of the other manufacturers' letters through legitimate means after each manufacturer made its announcements public (*e.g.*, the announcement was forwarded from costumers to manufacturers). Thus, the Court does not consider the similarity of the language used in the manufacturer's letters probative. *See Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007) (declining to find an inference of conspiracy from the defendants' similar contract language because "[s]imilar contract language can reflect the copying of documents that may not be secret").

The amount of the announced increase that was actually realized by Defendants is contested, but Plaintiffs' expert concluded that Defendants were "able to implement significant price increases in 2012." Ex. 1085 at 78.

### 2.    Events Leading up to the 2013 Price Increase

Even before the 2012 pricing went into effect, the amount of the calendar-year price for 2013 was already being considered by at least one manufacturer. Through an internal USG email, sales staff were instructed that they should not quote any jobs for 2013 and that "[t]he price guidance we are providing our customers is +20% from your January 2012 price for all of 2013." Ex. 1671. The email did clarify that the percentage would be confirmed at a later date. *Id.*

By January 27, 2012, American was providing "guidance" about the price increases that could be expected from manufacturers for January 2013. Ex. 1172. Keith Metcalf (Sr. VP Sales, Marketing, and Distribution, American) wrote to Susan Hall (Regional Sales Director, American): "We are not ready to put a[n] official notice out yet." Ex. 1172. But Metcalf told Ms. Hall that she could send a customer an email letting him know that "for 2013 you will see increases from manufacturers up to 30% on today's numbers." Ex. 1172. In Mr. Metcalf's deposition, Plaintiffs' counsel drew attention to the fact that Mr. Metcalf referred to "manufacturers, plural" in the email, but Mr. Metcalf responded by agreeing that "[t]he document states that, but I have no knowledge of that happening." Ex. 1124 (Metcalf dep.) at 237:3-20. Mr. Metcalf said that he didn't know which manufacturers he was referring to the email, though

106

Plaintiffs' counsel never asked Mr. Metcalf the source of the information. *Id*. at 237:21-238:1.

In early February 2012, TIN also provided at least one customer with 2013 pricing guidance of a $40 upswing from 2012 pricing. Ex. 1683.

But it wasn't until spring 2012 that plans for a 2013 price increase truly got underway.

### a.   Pricing Guidance Following the Drake Group Meeting

From February 25-27, 2012, senior executives from USG, National, American, and CertainTeed attended a Drake Group event in Austin, Texas. Lafarge and PABCO did not attend. In USG's notes recapping the Drake Group Meeting, Scott Blanchard (VP Sales – West, USG) provided "main takeaways," one of which being that "[n]o manufacturer has moved price." Ex. 1638. Mr. Blanchard also noted that USG had been providing 2013 pricing guidance at 20-25% increase, but that "further discussion is necessary internally at USG." *Id*.

On March 1, 2012, three days after the conclusion of the meetings, American became the first manufacturer to provide formal 2013 pricing guidance. Keith Metcalf (Sr. VP of Marketing, Sales, and Operations, American) sent a letter to American's customers, writing: "Your January 2013 prices from American are anticipated to be in the range of 25%-30% higher than your January 2012 prices." Ex. 1678.

Based on internal National emails, it appears that National leadership knew that American was going to take this action before the letter was sent. Ex. 1677. In an email providing a summary of the Drake Group meeting, Bill Kelly

of National wrote that dealers had told him that American would soon be providing written guidance. Ex. 1677.[39]

Some of the other manufacturers followed suit by permitting sales staff to provide verbal guidance. On March 7, 2012, TIN advised its sales staff that, upon being asked by customers, sales staff could tell customers to "use today's price plus no more than 30%." Ex. 1684. Similarly, on March 10, USG instructed its sales team that they could verbally tell customers to anticipate a 25% price increase for January 2013. Ex. 1681. National initially drafted a letter to advise customers to expect an approximately 30% increase in January 2013, but ultimately National opted not to send the letter, providing the information only verbally. Ex. 1686 (draft of letter); Ex. 1687 (script for providing verbal guidance to customers for 2013 pricing); Ex. 1134 (Weisbruch dep.) at 278:24-279:1. By April 2012, PABCO was also providing verbal guidance to expect a 25% increase in January 2013 over January 2012 prices, but this information was to be provided only to those customers who specifically asked. Exs. 1095 (Burkhammer dep.) at 156:1-18, 1688.

**b.    Fall 2012 Pricing Announcements**

Plaintiffs have submitted evidence that, by the end of July 2012, all of the manufacturers were providing at least verbal guidance for a 20%-30% increase to go into effect in January 2013. Ex. 1690 (Lafarge); Exs. 1095, 1688 (PABCO); Ex. 1681 (USG); Ex. 1684 (TIN); Ex. 1687 (National); Ex. 1678

---

[39]    Defendants make a hearsay objection to Ex. 167. The Court rejects this objection because the document is being used to show notice and is not being offered for the truth of the matter asserted.

(American); *see also* Ex. 1234 (Longbow report) ("Most manufacturers have verbally communicated a 20-30% price increase should be expected for CY13. Formal letters will likely be issued in September or October.").

But the formal announcements didn't emerge until August 2012. Plaintiffs argue the sequence of communications allow the inference of an agreement.

On August 22, 2012, Longbow announced a "scoop" that National was planning to issue a formal letter announcing a 30% price increase for January 2013. Ex. 1693. But it was American that distributed a formal price increase letter that day that announced a 25% increase over 2012 prices. Ex. 1691 (American letter); Ex. 1693 (Longbow announcement).

Despite Longbow's report to the contrary, National didn't actually distribute their letter on August 22. Ultimately, National distributed its letter on September 6, 2012, though Craig Weisbruch (VP of Sales and Marketing, National) acknowledged that National was prepared to send the 2013 letter on August 22, 2013. Ex. 1134 (Weisbruch dep.) at 300:9-303:3. In Mr. Weisbruch's deposition, he could not provide a reason as to why National delayed distributing its letter, but in his declaration, he implied that National held off because they "were very sensitive to the perception of antitrust concerns because the Florida Attorney General's Office had requested information from [National] relating to the January 2012 price increase." Ex. 210 ¶¶ 29-31.

A week after the National announcement, on September 13, 2012, CertainTeed announced a 30% price increase. Ex. 1695.

The seas were then quite for about a month. On October 15, 2012, Lafarge issued its price increase letter reflecting a 30% increase. Ex. 1697. Then PABCO issued a letter announcing its own 30% increase for 2013 on October 24, 2012. Ex. 1698. On November 16, 2014, USG issued a letter telling its customers that prices would increase in 2013. Ex. 1701. Instead of providing a price increase amount, the letter noted that customers would be provided a price list in early December. Ex. 1701. Then, on November 26, 2012, TIN also issued a price increase letter reflecting a 30% increase.

Manufacturers also continued to refuse job quotes in 2012 and 2013. Ex. 1674 (Longbow report).

The relevant case law specifies that similar price movements by competitors can be considered along with other evidence, in determining whether inferences favorable to plaintiffs are warranted. The evidence reviewed above does show very similar price increases as to both date and percentage of increase and, by January 2012, the uniform elimination of job quotes as a form of pricing.

**B.    Intercorporate Communications**

There are four exchanges that Plaintiffs chiefly rely on to argue that Defendants were communicating with each other about agreements: (1) internal American emails in April and September 2011, (2) phone calls between American and L&W shortly followed by calls between L&W and USG, (3) a phone call between PABCO and American the day before American announced the price increase, and (4) Thompson's notes about National's reference to

110

"verbal agreements for a large price increase in 2013." The Court finds that many of these, when considered as a whole with the remainder of the evidence, could raise a reasonable inference about an agreement at least among some Defendants.[40]

Of course, the Court recognizes that manufacturers are permitted to communicate with one another under most circumstances. A jury could consider the manufacturers' communications to be probative of an agreement only if there is some evidence that exchanges of information had an impact on pricing decisions. *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 369 (3d Cir. 2004); *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 125 (3d Cir.1999).

### 1.     Keith Metcalf's April and Early September Communications

In early April 2011, senior pricing officials from all of the U.S. wallboard manufacturers attended a major trade show in Las Vegas, Nevada. Both building-material suppliers and customers attended the meeting.

Approximately three weeks after the Las Vegas trade show, Keith Metcalf (Sr. VP of Sales, Marketing, and Operations, American), sent an email to American's Director of Sales for the South Region (Susan Hall). Ex. 1165. Ms. Hall had emailed Mr. Metcalf to ask how to quote jobs that would take

---

[40]     Consistent with Third Circuit precedent, the Court is not considering Plaintiffs' evidence of suspicious intercorporate and internal communications among manufacturers' low-level employees. *See In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 368 (3d Cir. 2004) ("[P]rice discussion among low level sales people has little probative weight."); *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 125 (3d Cir. 1999) ("Evidence of sporadic exchanges of shop talk among field sales representatives who lack pricing authority is insufficient to survive summary judgment.").

place in calendar year 2012. Ex. 1165. Metcalf's entire response was "[p]lease don't quote anything in 2012. We may have a movement from *all manufacturers* to eliminate quotes." Ex. 1165 (emphasis added). When deposed, Mr. Metcalf said that he could not recall the source of the information that caused him to write that passage in April 2011. Ex. 1124 (Metcalf dep.) at 140:19-143:11.[41] Based on the timing of the email in relation to the Las Vegas trade meeting, Plaintiffs ask the Court to infer that Defendants discussed the elimination of job quotes at the Las Vegas trade meeting.[42]

Then, on September 2, 2011, Mr. Metcalf sent another email that a jury could reasonably find suspicious. The email appears to have been directed to sales directors, but members of the American Gypsum leadership were also copied. Ex. 1482. In the email, Mr. Metcalf directed that "[e]ffective immediately, during the remaining time for calendar 2011, no quotes should be given to a customer unless they hand you the PO's that day or make a commitment to [American] on that job for the balance of the year." Ex. 1482. He also instructed that staff should "hold off" on giving any job quotes for projects

---

[41]    Defendants have attempted to provide the basis for Mr. Metcalf's statement after the deposition. But the fact remains that Mr. Metcalf was unable to explain the basis at the deposition, even after preparing for four days. Pls. Response Br. at 26 n.47; Ex. 1124 (Metcalf dep.) at 140:19-143:11.

[42]    Although Mr. Metcalf writes his email with the conditional "may," the Court finds that a jury could consider this email more than mere industry rumor in light of the senior leadership position of the author of the email and the timing of the email in relation to the Las Vegas trade meeting. *See In re Baby Food Antitrust Litig.*, 166 F.3d 112, 135 (3d Cir.1999) ("[The] desultory collection of information 'on the street' by sales representatives is far removed from a concerted reciprocal exchange of important pricing and marketing information by the officers of major companies, particularly an exchange pursuant to an agreement.").

that would commence or extend to 2012 or beyond until September 19, 2011.
Ex. 1482. At the close of the email, he acknowledged that "[s]ome of this may
sound odd," and invited email recipients to call him if they had concerns.
Ex. 1482.

A few weeks later, on September 20, 2011, one of the email recipients
(Mike Wagstaff, position at American unknown) forwarded the email to Mary
Schafer (VP of National Accounts, American) for clarification about whether he
could provide a job quote on a specific project. Ms. Schafer had been copied on
the original September 2, 2011 email. She responded by telling Mr. Wagstaff to
pursue the project, explaining that the original September 2 email "was
referencing an anticipated announcement from one or more of the big boys
relative to job quoting. We're still waiting. Just want to proceed cautiously and
not get locked in to big volume at low prices, especially if there is a game-
changer event on the near horizon." Ex. 2098.

Defendants have declined to make any hearsay objections to the Keith
Metcalf emails, arguing instead that the document is irrelevant.[43]

## 2.    September L&W Phone Calls

U.S.G. Corporation owns both U.S.G. Company ("USG"), a drywall
manufacturer, and L&W Supply Company, a building-products distributor. Thus,
L&W and USG are sister companies. Because USG sells wallboard to L&W,

---

[43]    Defendants have not raised any evidentiary objections to these emails,
even though all of them came up in Plaintiff's Statement of Facts, in
Defendants' reply briefing, and/or at the November 23 hearing. *See* PSOF ¶ 26
and 198, Joint Reply at 2, 21, and 32, and Hearing Tr. at 25-26, 29-31 (counsel
for Certainteed), and 128-29 (all discussing Ex. 1165); PSOF 210 (discussing
Ex. 1482); Joint Reply at 31 n.14, 70 (discussing Ex. 2098).

L&W is also a customer. But L&W also conducts business in some regions where USG does not. In those regions, L&W is a customer of American or PABCO. Plaintiffs argue that Defendants sometimes took advantage of L&W's customer-sister status with USG, using L&W as a middle-man to relay messages between drywall manufacturers.

One of these instances occurred in early September 2011. On September 6, phone records reveal two calls between American and L&W that were followed shortly by a call between L&W and USG:

- 9/6/2011, 1:45PM: Keith Metcalf (Sr. VP Marketing, Sales, and Distribution, American) called Rob Waterhouse (Sr. VP of Sales and Operations, L&W); the call lasted 24 seconds. Ex. 2146.

- 9/6/2011, 1:48PM: Rob Waterhouse (Sr. VP of Sales and Operations, L&W) called Keith Metcalf (Sr. VP Marketing, Sales, and Distribution, American). The call lasted 4 minutes. Ex. 2187.

- 9/6/2011, 1:56PM: Rob Waterhouse (Sr. VP of Marketing and Sales, L&W) called Greg Salah (Sr. VP of Sales and Marketing, USG). The call lasted two minutes. Ex. 2187.

The next day, Mr. Salah sent an internal draft letter to Christopher Griffin (President, USG; Exec. VP of Operations at USG Corp.). The letter eliminated job quotes and promised calendar-year pricing, was post-dated as September 21, 2011, and was addressed to USG customers. In the email, Mr. Salah explained that he had sent the letter in anticipation of a conversation between Mr. Salah and Mr. Griffin later that week. Mr. Griffin also mentioned a meeting scheduled for September 21 "to review 2012 pricing strategy which will include a second strategy being developed by the Sales Executive team." Ex. 2191.

114

Plaintiffs argue that the phone calls are suspiciously timed because the calls would have enabled Mr. Metcalf to funnel job-quote elimination information through Mr. Waterhouse at L&W. They rely on Mr. Salah's draft letter, sent the day following these calls, to show that the elimination of job quotes was in fact discussed on these calls. However, Mr. Salah had already sent drafts of this letter to his sales team on three occasions that predated the suspicious phone calls, including one email on September 2, 2011 that anticipated discussing the letter at the September 21 meeting. *E.g.*, Exs. 769, 773, 775.

### 3.   PABCO & American Phone Call

On September 19, 2011, David Powers (American, President) had a 19 minute call with Foster Duval (PABCO, Sales Manager).[44] Plaintiffs argue that although just a Sales Manager, Foster Duval was in fact a leader at PABCO, who had been hired because of his "high-level industry connections." Pls. Resp. Br. at 24. Defendants admit that Mr. Duval had long relationships with the Chairman, President and CEO of USG Corp.; the President and CEO of L&W; and the President of American Gypsum. Defs. Resp. PSOF ¶¶ 82-84.

When deposed, Mr. Powers said this call reflects him returning a call from Mr. Duvall. Ex. 1128 at 220:24–222:3. Mr. Powers claims that he "seriously debated" whether to place the call because he knew American was about to release the letter. Ex. 1128 (Powers dep.) at 220:24–222:3. But Mr. Duvall was

---

[44]   Mr. Powers and Mr. Duval also had other calls in 2011, including May 17, 2011 (19 minutes), July 13, 2011 (18 minutes), and August 18, 2011 (31 minutes). Defs. Resp. to PSOF ¶ 28(a).

Mr. Powers' personal friend, and Mr. Duvall had recently endured multiple open-heart surgeries. *Id.* So Mr. Powers testified he decided to call Mr. Duvall because Mr. Powers was concerned for the health of his friend. *Id.* Mr. Powers claims that the two mostly discussed Mr. Duvall's health and family, but that they ended the call as they always did by slamming their former employer, USG, which involved talking about a lack of leadership in the industry. *Id.* at 222:07–223:09.

When deposed, Mr. Duvall could not remember the call or what was said on it, though he does not dispute that it happened. Ex. 1104 (Duvall dep.) at 182:10-22. But in an email, Mr. Duvall indicated that more may have been discussed. The day after the call between Mr. Powers and Mr. Duvall, a customer forwarded the American announcement to Ryan Lucchetti (PABCO, President). Mr. Lucchetti forwarded the email to Mr. Duvall, writing, "Well here is the 1st." Ex. 1168. Mr. Duval responded: "Dave [from American] gave me a call yesterday and mentioned his frustration with the lack of leadership in the industry. Eliminating job quotes would be a great start for the price improvement." *Id.* The next day, Mr. Lucchetti responded, "Dave Powers is my new hero." *Id.*

Defendants concede that the phone call occurred; they disagree only with Plaintiffs' suggested inferences about the topics of the phone call. But the Court finds that the timing of the phone call relative to the announcement terminating job quotes and the PABCO email exchange that followed the American

116

announcement, could both lend weight to the permissible inferences drawn from this phone call, in favor of Plaintiffs.

### 4.   National's Reference to "[V]erbal [A]greements for a [L]arge [P]rice [I]ncrease in 2013"[45]

Exhibit 1515 is a Thompson Research document that memorializes a number of conversations between Kathryn Thompson (Founder and Dir. of Research, Thompson) and Mr. Weisbruch (VP of Sales and Marketing, National), ranging in date from February 10, 2011 through November 20, 2012.

The notes dated June 14, 2012 refer to "National Gypsum marketing in NYC." Ex. 1515. Following the bullet heading "2013 price increases?" the memorandum notes, "A: verbal agreements for a large price increase in 2013." *Id.* Ms. Thompson, the author of this document, was questioned heavily about these notes at her deposition. She neither confirmed nor denied that the speaker used the word "agreement," though she explained that her use of the word "agreement" in the memo did not necessarily mean that the word "agreement" was used in the conversation.

Plaintiffs argue that Ms. Thompson's notes should be considered as evidence of agreements among manufacturers to impose another large price increase in 2013. The Court agrees that a jury may so find.

Defendants argue that Mr. Weisbruch was not referring to agreements among manufacturers, but rather, was referring to agreements between National and its distributors. But, as noted above, the Court cannot simply adopt Defendants' argument as a matter of law when the document is susceptible to

---

[45]      Ex. 1515.

multiple reasonable interpretations. Although Defendants' argument reveals one possible inference, Plaintiffs' interpretation of the evidence is equally reasonable. In an antitrust case, a defendant's use of the word "agreement" in relation to price cannot be considered merely ambiguous and insufficient to warrant inferences in favor of Plaintiffs.[46]

## C.   Communications with Research Analysts

Plaintiffs argue that Defendants relayed information to one another through research analysts, namely, analysts at Thompson Research Group[47] and Longbow Communications, and that by doing so, Defendants were able to signal to one another that they continued to participate in the agreement to increase prices (the "conduit theory"). The Court agrees that the evidence can permit the inference that at least National and Lafarge used the research analysts to signal to the other manufacturers during the class period.[48] In other words, the

---

[46]     The Third Circuit has explained that the single use of a term synonymous with agreement "in a highly competitive business environment and in the face of continuing fierce competition is as consistent with independent behavior as it is with price-fixing." *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 127 (3d Cir. 1999). But the facts of *Baby Food* are distinguishable from the facts in this case. Most significantly, here, unlike *Baby Food*, the speaker who used the word "agreements" was a member of the senior leadership at National, not a low-level employee.

[47]     The Court has previously described Thompson Research Group in greater detail. *In re Domestic Drywall Antitrust Litigation*, 300 F.R.D. 234 (E.D. Pa. May 15, 2014).

[48]     The Court notes that both Ms. Thompson and Mr. Miling have testified under oath (and Mr. Shmois has similarly declared) that they were not aware of any unlawful agreement and they never promised to convey information in support of one. DSOF ¶¶ 1183-1185. Those denials, however, are not dispositive on the issue of whether Defendants used Thompson and Longbow as unwitting conduits to transmit information to themselves.

interactions with research analysts might be considered a "facilitating practice" of an agreement regarding price.[49] However, the evidence is insufficient to permit the inference that Defendants actually reached an agreement by communicating through analysts.

The Court will first provide background information on the analysts and their relationships with Defendants, then review Defendants' challenge to the legal viability of Plaintiffs' argument, and finally review the evidence supporting Plaintiffs' arguments that Defendants used the analysts to signal information to one another.

### 1. Analyst Background Information

The principal players are Kathryn Thompson (Founder and Dir. of Research, Thompson), Zoran Miling (Corp. Stock Analyst, Longbow); and Garik Shmois (Sr. Analyst, Longbow). PSOF ¶¶ 109-110; DSOF ¶¶ 1120-28, 1138; Ex. 1876; Ex. 1023 at 13-14; Ex. 1024.

Briefly summarized, Thompson and Longbow are in the business of generating investment advice. Both prepare reports that provide financial insight into businesses and industries for clients, such as large institutional investors.

---

[49]    "A 'facilitating practice' is an activity that makes it easier for parties to coordinate pricing or their behavior in an anticompetitive way. It increases the likelihood of a consequence offensive to antitrust policy." Phillip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law* § 14.05(B)(1) (Wolters Kluwer Law & Business, 4th ed. 2015 supp.). "[T]he label 'facilitating practice' is only an invitation to further analysis, not a license for automatic condemnation." *Id.* And the labeling of a practice as a facilitating practice is not a permanent one, but rather, it is made on a case-by-case basis. *Id.*

Both companies covered the drywall industry during the relevant time period, and many Defendants obtained materials from one or both entities.

Critically, a key component of Thompson and Longbow's business models is soliciting information from industry insiders. Both Thompson and Longbow cultivated confidential contacts within the drywall industry and regularly spoke with them in an effort to make the best possible predictions and forecasts. Both companies contemporaneously documented their communications as well. *E.g.*, Exs. 1515, 1269. Thompson and Longbow processed these interactions and other information and then disseminated reports to their customer base, either as flash reports in response to a breaking development or as regular industry updates as often as once or more per month. *E.g.*, Ex. 1259 (flash report); Ex. 1201 (industry update).

### 2. Legal Viability of Plaintiffs' Conduit Theory

Plaintiffs do not cite any case law regarding the conduit theory, opting instead to treat claims of interactions between Thompson, Longbow, and Defendants as factual evidence in support of Plaintiffs' claim that Defendants conspired to fix prices. Pls. Resp. Br. at 45-49, 124. Defendants, by contrast, cite legal authority to argue that that Plaintiffs' conduit theory is not a viable means of showing an antitrust conspiracy. Defs. Joint Opening Br. at 52-56; Defs. Joint Reply Br. at 27-30.

The Court is aware of only one Third Circuit case that is arguably relevant to the legal viability of Plaintiffs' conduit theory: *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 337 (3d Cir. 2010). There, the Third Circuit

indicated that an antitrust conspiracy that required a middle-man could nonetheless be considered a conspiracy. *Id.* Based on the Court's reading of *Brokerage* and the Court's survey of the non-binding law in this area, the Court concludes that Plaintiffs' conduit theory is legally viable.

### a.    Authority Supporting Plaintiffs' Conduit Theory

Defendants attempt to distinguish Plaintiffs' conduit theory from that in *In re Titantium Dioxide Antitrust Litig.*, 959 F. Supp. 2d 799, 806 (D. Md. 2013), a case in which a district court denied the defendants' motion for summary judgment based in part on communications between the defendants and a third-party consultant. Defs. Reply Br. at 30 (citing *In re Titanium Dioxide Antitrust Litig.*, 959 F. Supp. 2d 799, 806 (D. Md. 2013)).

The record in *Titanium Dioxide* reflected involvement by the third-party consultant in the pricing conspiracy. For example, emails reflected that

- one defendant asked the consultant to confirm a price increase from another, based on the consultant's "lofty position";

- that same defendant leaked the consultant documents from a competitor and told the consultant not to "copy it verbatum [sic]" and to "screw up a few facts so it does not look like too much inside info"; and

- another defendant "as[ked the consultant] to do a little job for us – ascertain relative TiO2 inventory levels for some of our key competitors."

959 F. Supp. 2d at 812-13, 829.

Based on these exchanges, the District Court of Maryland found that the plaintiffs' evidence showed "the routine sharing of information between the individual firms and industry consultant Jim Fisher" and that these

communications "support[ed] the Plaintiffs' theory that [Fisher] served as a conduit in the alleged price-fixing conspiracy." *Id.* at 810, 829. The court characterized this evidence as "evidence implying a traditional conspiracy." *Id.*

Similarly, the Court in *In re Polyurethane Foam Antitrust Litig.*, No. 1:10 MD 2196, 2015 WL 520930, at *41 (N.D. Ohio Feb. 9, 2015) (unpublished), found that a scrap broker "served as a conduit for Defendant employees looking to build support for another underlay increase in March 2006."[50] The court noted that in a prior incident, the president of one defendant had asked the broker to send word to another defendant that "that it ought not go forward with a price increase because [the first defendant] had backed off the same increase." *Id.* at *12, 18.

These cases provide support for the conclusion that communications from Defendants to Thompson and Longbow could be indicia of a price fixing agreement. As discussed in greater detail below, evidence in the case at bar resembles the analyst activity in the *Titanium* and *Polyurethane*. Although Plaintiffs have not highlighted it, the Court notes that, despite Defendants' arguments to the contrary, the record reveals numerous instances in which the analysts directly communicated information shared by one Defendant with another Defendant either directly (*e.g.*, through emailing one manufacturer notes about the analyst's interaction with another manufacturer) or indirectly (*e.g.*, by quoting a manufacturer in an analyst report and then circulating those reports among Defendants).

---

[50]     Neither party cited this case.

### b.    Authority Undermining Plaintiffs' Conduit Theory

To support their argument that Plaintiffs' conduit theory is invalid, Defendants rely on *Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287, 1308 (11th Cir. 2003), an opinion affirming summary judgment for the defendants in an oligopolistic market.[51] The plaintiffs argued that the defendants used stock analysts to signal pricing intentions to each other and that the defendants "'clarif[ied] their agreement not to compete on price' by publicly announcing their future pricing intentions at meetings with stock analysts." *Id.* The court rejected the plaintiffs' arguments, concluding that the statement was consistent with "rational, lawful, parallel pricing behavior that is typical of an oligopoly." *Id.* at 1309-10.

Although the Court appreciates the reasoning of this case, the Court finds that the facts of this case are distinguishable from *Williamson*. Unlike the analyst in *Williamson*, the analysts in this case (as illustrated below) repeated word-for-word statements from Defendants in their industry analyses, which multiple Defendants received. When read alongside documents in which Defendants make suspicious or revelatory communications about pricing to

---

[51]    One older case, not cited by either party, rejected allegations that the defendant car manufacturers used a large national leasing and car management company, a trade association, and an individual dealer as conduits to exchange "mutual assurances that each would eliminate or substantially reduce fleet price concessions if the other did. *United States v. Gen. Motors Corp.*, No. 38219, 1974 WL 926, at *11-14, *18 ¶¶ 67-88, 118 (E.D. Mich. Sept. 26, 1974). The opinion does not, however, go into detail on precisely why the theory failed.

these same analysts, these examples could support an inference that the analysts were used as conduits.[52]

### 3. Evidence Allowing Inferences of Defendants Using Analysts As Conduits

Despite Defendants' protests to the contrary, Plaintiffs have submitted evidence that is susceptible to the inference that Craig Weisbruch (VP of Sales and Marketing, National) and Steve DeMay (VP of Sales, Lafarge) communicated to analysts knowing or intending that at least portions of their communications would be disseminated to other manufacturers.

### a. National Signaling Through Thompson and Longbow?

Most critically, although not flagged by Plaintiffs, Defendants incorrectly assert that "Plaintiffs have no evidence that Miling or Thompson relayed anything Weisbruch said to a competitor or that Weisbruch intended for them to do so." Def. Reply Brief at 27-30. In reality, there are several documented instances of Craig Weisbruch (VP Sales and Marketing, National) sending communications to Thomspon and Longbow and of excerpts of those communications appearing verbatim in industry reports, which were circulated to multiple Defendants.[53]

---

[52]     Defendants also cite *Mayor and City Council of Balt., Md. v. Citigroup, Inc.*, 709 F.3d 129 (2d Cir 2013), a case that turns the conduit theory on its head by suggesting the use of conduits *undercuts* evidence of a direct agreement between defendants. The Court is unpersuaded by the reasoning in this non-binding case and declines to address it.

[53]     Although there is no proof of receipt by another Defendant, in December 2012, a line from notes on a call that Longbow made with Mr. Weisbruch wound up appearing in a Longbow report. Ex. 2167. (AMA report); Ex. 1706 (call

The clearest example of Mr. Weisbruch possibly signaling through Longbow comes from late September 2011. On September 21, the day after American distributed its announcement, Mr. Weisbruch sent an email to Longbow about American's announcement. Ex. 1277. And on October 10, a manufacturer's employee sent Mr. Miling another email. Ex. 2133.[54] Longbow's October 11, 2011 report directly quotes lines from the September 21 and October 10 communications, though the report attributes the comments only to "manufacturers." Ex. 1342.[55] And, at minimum we know that USG (Ex. 1349),

notes); Ex. 1674 ("taking an increase. I think it's as simple as that. They're going to take one."). And in April 2012, after Mr. Weisbruch called Longbow (Ex. 2167; Ex. 1122 at 172:25-177:8), Mr. Shmois prepared an email for "external use" with the subject "USG Follow Up with Industry Insider." The first line explains, "We just got off the phone with an SVP (number three in the organization) of a large wallboard manufacturer to get his take on the USG results." Ex. 1600.

[54]      The sender of Ex. 2133 is redacted, but Plaintiffs have indicated their belief that the sender was Craig Weisbruch (VP of Sales and Marketing, National). Pls. Resp. to SOF ¶ 774 (misciting the exhibit number). The actual sender is irrelevant, however, because the Longbow report attributes the quotes from this email to a "manufacturer." Ex. 1342.

[55]      The October 11 report and September 21 email both state: "I think this is the beginning of the manufacturers telling the market that we have to have a 'fair' price for our goods that allows us to make a profit and stay in business. Because the economic outlook for housing continues to be quite dark, and may be for some time to come, we have to find some way to get into the black . . . . I don't know what the end result will be, but see it as a constructive attempt to bring some sanity to pricing." Ex. 1342 (report); Ex. 1277 (Sept. 21 email).
The October 11 report and October 10 email both state: "This is potential game changing event and yet it is occurring in a very depressed market. It's normal for the distributors to be skeptical and scared. It's an opportunity for them to get a little needed margin but they are fearful . . . I expect a lot of pleading and lying over the next few months as the job policy and price increase amount becomes more clear. Keep in mind, we are moving to a new paradigm where the distributor is taking ALL the responsibility for the quote he is

TIN (Ex. 2046), Lafarge (Exs. 1363, 1263), and CertainTeed (Ex. 1858) received copies of the report, as evidenced by the fact that they produced the reports in discovery.

There is also substantial evidence that Thompson quoted[56] Mr. Weisbruch in industry reports or otherwise included the sentiment[57] of his communications in their reports.

Plaintiffs' evidence is also susceptible to an inference that Mr. Weisbruch would have known that the analysts were likely to share his information with other manufacturers. At the time Mr. Weisbruch made these communications with analysts, he should have known that at least Longbow was routinely

---

making. Previously he had the luxury of having the manufacturer absorbing all the downside risk. . . . So the situation is still unclear, and if you're a distributor quoting longer term work it's difficult to know what to do. As usual they are all watching what L&W is doing as signal to what USGs real intention is." Ex. 1342 (report); Ex. 2133 (Oct. 10 email).

[56]    *Compare* Ex. 1515 (notes from Sept. 2011 meeting with National); *with* Ex. 1346 (10/2/2011 Thompson flashnote, Lafarge copy)

[57]    *Compare* Ex. 1515 (June 2012 meeting with National Gypsum) ("2013 price increases? A: verbal agreements[]for a large price increase in 2013. EXP is already out for guidance for 25%-30%"); *with* Ex. 1260 (USG copy of July Thompson report stating "TRG industry contacts are also telling us that manufacturers are discussing a sizable 2013 price increase to distributors (25%-30%), and we expect the industry will go on allocation by October. [. . .] Going forward, we remain acutely focused on ensuring that there aren't any cracks in the job quote elimination efforts."); *compare also* Ex. 1499 (Ms. Thompson asks Mr. Weisbruch in an email, "Do you think the industry will follow EXP's lead?" Weisbruch responds, "I'd be surprised if they didn't. As I've told you for the last six months or so, I feel like my competitors have legitimately tried to get the price up."); *with* Ex. 1259 ("TRG Opinion. Elimination of job quotes/price protection would be a positive for the wallboard industry, in our opinion. For this to work, however, all wallboard manufacturers would need to fall in line, and initial checks suggest this could be possible.").

sharing competitor information among Defendants because Longbow's analysts
were sharing other Defendants' information with him:

- In February 2011, Mr. Weisbruch received information from
  Longbow that National's "smaller competitors [we]re telling
  Longbow that they are serious about this [price increase], and while
  they don't feel comfortable leading future increases, they are more
  than ready to follow them." Ex. 1266.[58]

- In June 2011, Mr. Miling emailed Mr. Weisbruch to share "some
  commentary from a few of [National's] peers" (Eagle and USG).
  Ex. 1276.

- In September 2011, Longbow emailed Mr. Weisbruch and stated,
  "We spoke with Eagle earlier this morning to get their take on the
  matter . . . . Management's tone was much more stern in regard to
  this increase attempt relative to others, with EXP's CFO saying
  'we're serious this time around.'"). Ex. 1277.

- In October 2011, Mr. Miling emailed Mr. Weisbruch to relay
  information regarding price increases and job quote elimination that
  Longbow had "just heard from [Mr. Weisbruch's] counterpart at
  PABCO." Ex. 1278.[59]

- On November 21, 2011, Mr. Miling emailed Mr. Weisbruch to
  inform him that "though USG has yet to announce a price increase,
  its L&W arm is quoting prices beyond January 1st with $35-40/MSF
  (~36%) escalators." Ex. 1589.

Thus, at least as to National Gypsum, there is plainly evidence sufficient
to support a jury inference that National either used or attempted to use the
analysts as conduits to pass information to competitors.

---

[58]   The price increase discussed in this quote refers to an increase prior to the
one announced in September 2011.

[59]   Longbow meant "just" literally. *See* Ex. 2030 (email from PABCO source
to Miling at 11:03 a.m. on October 12, 2011); Ex. 1278 (11:07 email from
Miling to Weisbruch regarding what Miling "just heard from your counterpart at
PABCO"); Ex. 1122 (Miling dep.) at 100:3-103:1.

127

### b.      Lafarge Signaling Through Longbow?

Mr. Weisbruch was not the only one whose statements to Longbow later appeared in a report possessed by a third party.

One of the documents that received a great deal of attention during the oral argument is Exhibit 1269. This exhibit is a document reflecting Zoran Miling's (Analyst, Longbow) notes from a 27-minute phone call he held with Steve DeMay (VP of Sales, Lafarge) on December 2011. Exs. 2169; 1122 (Miling dep.) at 312:5-10. The Court concludes the document supports Plaintiffs' assertions as to several plus factors.

This exhibit is two and half single-spaced pages, the length of which, in and of itself, raises the question: Why would Mr. DeMay give such in-depth confidential financial and pricing information to Mr. Miling, knowing it was likely to be repeated to others, including manufacturers?

The first heading in the memorandum, "Response to USG and Competing Increases," noted that CertainTeed had come out with a large dollar increase, and then commented that Lafarge expected "some degree of downward negotiation from [CertainTeed's price]." Ex. 1269. The notes reflect that Lafarge anticipated that "National and some of the others that have yet to announce will be out with a dollar amount shortly," and guessed that amount might be approximately 40%. Ex. 1269. The document then continues with further thoughts on Lafarge's possible pricing, which a fact finder might conclude Lafarge would have kept confidential in the absence of an agreement. Reference is also made to L&W, a USG subsidiary.

128

The letter continues with other comments consistent with Lafarge offering highly confidential information to Mr. Milling of Longbow, allowing a jury to infer that it is likely to find its being repeated in other communications.

Furthermore, the document uses the word "undermine" three times as in the following example: "Simply put, it does not appear that as though any of the manufacturers are using the above method to undermine the price increase. If they were, we would have heard about it. So far, so good." Ex. 1269. The use of the word "undermine" in this document and in this context may allow a fact finder to conclude that it was an "agreement" that was being "undermined." Moreover, this statement reflects the constant communications all Defendants were having about prices with customers, which by themselves are not at all illegal or improper. But this document permits an inference that the pricing information received from customers had also spread among other manufacturers, either by knowing use of their customers' reports, or by the use of Thompson and Longbow.

The last and perhaps most important aspect of this document is a comment relating to the industry's fears that USG could destroy the increase. After discussing USG, Mr. DeMay is quoted as having said: "If we see them raise their price to their break-even number of $125 mill-net, there will be a collective responds [sic] from all of us – National, Lafarge, CertainTeed – all respond."[60] Ex. 1269. This language was heavily debated at the oral argument.

---

[60]   Portions of this document, including the identification of some of the referenced manufacturers, were redacted until shortly before the oral argument. Longbow, which had initially requested the redaction, withdrew the request.

The Court cannot ignore the possibility of a fact finder concluding that the phrase, "collective responds [sic]" (probably intended to be "response"), indicates intercorporate communications, past, present, and future.

The memorandum concludes with Mr. DeMay saying, "If I could talk to my counterparts at the other manufacturers . . . ." Although Defendants attempt to rely on this phrase to show that Mr. DeMay was not communicating with other manufacturers, it is equally susceptible to the inference that Mr. DeMay wanted Mr. Miling to communicate this information to the other manufacturers for him. And indeed, portions of Exhibit 1269 appeared in a February 2012 Longbow report received by USG. *Compare* Ex. 1269; *with* Exs. 1624 at 9.[61]

A jury may find that Exhibit 1269 takes on even more sinister overtones in light of the fact that previous Lafarge communications had been quoted verbatim in Longbow reports. In July 2011, Longbow had a discussion with someone at Lafarge regarding pricing and Lafarge's impression of its competitor's pricing. Portions of Miling's notes of the call appear verbatim in a

---

However, because of the redaction, there was not deposition testimony of Mr. DeMay or Mr. Milling about the identities mentioned in the memo, because it was still redacted as of the date of deposition.

[61]     Both documents say: "It remains to be seen what CertainTeed does in the short and [medium]-term with their new North Carolina plant, and subsequently how [*while Lafarge said "National," Longbow changed its language to "competing manufacturers"*] will respond. When firing up a plant you need to run it full on for three days a week, which equates to about 5M board feet each week. Clearly, you can only stockpile so much and this may indeed displace some of the other plants in the Carolinas (National) and Virginia (USG). How CertainTeed acts - that is, will they cut the price - remains to be seen . . . we can adjust to that - it won't kill the increase. [. . .] These are all known issues that we are prepared for and have contingency plans set in place."

July 8, 2011 Longbow report.[62] Although Plaintiffs have not presented proof that Lafarge possessed the July report or knew that the company had been quoted verbatim, Plaintiffs have produced sufficient evidence from which a jury could infer that Lafarge knew that direct quotation of the December 2011 conversation was possible.

The sum total of the evidence documents at least two Defendants communicating sensitive information to Longbow and Thompson only for those analysts to reprint that information verbatim in reports that other Defendants obtained.  Such conduit evidence, when viewed in light of the fact that all remaining Defendants either spoke to analysts and/or received analyst communications,[63] could lend a jury support in analyzing whether a conspiracy existed.

### D.     Defendants' Non-Price Conduct

Plaintiffs present evidence that Defendants limited supply in the months leading up to the 2012 and 2013 increases and declined opportunities to compete for customers. Plaintiffs argue that this evidence provides a plus factor from

---

[62]     *Compare* Ex. 1280; *with* Ex. 2081 p. 7-8 ("Those who are down substantially are the ones who are supplying Lowes, as they are now trying to play catchup with Home Depot, who went to stocking Lightweight wallboard almost exclusively. What LOW has done is implemented a 2 week like review for all of its stores in patches . . . . When the industry releases volumes mid-month, I would expect to see industry volumes down in the mid to high single-digits.").

[63]     Many of National's interactions with Longbow via Mr. Weisbruch have been detailed above, as have several of Lafarge's. As to PABCO, *see e.g.*, Ex. 1257. As to CertainTeed, *see e.g.*, Ex. 1858. As to American, *see e.g.*, Ex. 831.

which a jury could conclude that Defendants had entered an agreement because this evidence amounts to actions against self-interest.

Defendants counter that the use of limiting supply prior to an increase predates the class period, and that manufacturers did so to prevent customers from "loading up" on a product in advance of an increase. Defs. Opening Br. at 72.

### 1.    Limiting Supply

Plaintiffs argue that Defendants controlled distribution prior to the 2012 and 2013 increases in a way that materially differed from prior allocation plans. PSOF ¶ 298. Although Plaintiffs concede that Defendants sometimes prepared allocation plans, Plaintiffs argue that Defendants rarely actually implemented these plans prior to the 2012 and 2013 increase, and when they did, they only did so a brief time before the price increase. PSOF ¶ 298.

In contrast, Plaintiffs submit evidence that Defendants artificially limited their supply in both 2012 and 2013 for substantial periods prior to the increase.

### a.    Limiting Supply Prior to 2012 Increase

Prior to the 2012 increase, USG appears to have been the first manufacturer to decide to control distribution. Ex. 1580. On October 14, 2011, Mr. Salah sent an email to USG's president, explaining that although it was risky to control distribution because "some competitors may decide to produce more and flood the market," USG needed to go on controlled distribution on November 1, 2011 because a number of customers had indicated that they

132

planned to overbuy prior to the January 1, 2012 increase to avoid the increase. Ex. 1580.

On October 28, 2011, Eagle held an earnings call and National listened in. Following the call, Mr. George Beckwith forwarded around the transcript of the call, summarizing that Eagle said "they are very serious about a 35% price increase and are willing to take less volume to make it stick. They are also planning to shut down all of their wallboard plants for a 2 to 3 week period at the end of December (because it is a low volume period)." Ex. 1581. Walter Withrock (Dir. of Demand Management, National) and Craig Weisbruch (Sr. VP of Sales and Marketing, National) replied all to the email asking what the others at National thought about Eagle closing its plants, to which Mr. Thomas Cusack (position unknown, National) responded: "It seems to me that saying they are serious about the 35% increase, they are indirectly creating a shortage to make this happen. I can't imagine all their plants just happen to need maintenance at the same time." Ex. 1581.

On November 3, 2011, Lafarge also indicated that it planned to limit supply and indicated that it knew that other manufacturers were also limiting supply. Ike Preston (President, Lafarge) wrote: "We have focused on limiting the inventory build up [by distributors] by limiting production and not running overtime in the plants. Similar moves have been made by our competitors so we believe we have good reason to feel positive about the increase." Ex. 1505.

By November 21, 2011, Longbow was distributing reports alerting that National, American, USG, PABCO, CertainTeed, and Lafarge were limiting their

supply to prevent customers from stock-piling inventory prior to the increase.
Ex. 1589. Although Longbow noted the limits on supply, it also explained that
"we still believe moderate pre-buying will take place, especially as inventory
levels appear mostly normal." Ex. 1505.

Even as some manufacturers were coming up on a wallboard shortage,
they stuck to their allocation plans. Scott Blanchard (VP Sales – West, USG)
received an email that some customers were too low on board to wait for the
amount they had been allocated. Ex. 1576. In response, Mr. Blanchard said that
USG might open extra slots at the plant the next week, but they wouldn't be
adding any full days. Ex. 1576. "It's in the best interest of the market to keep it
tight in January." Ex. 1576.

A similar string of emails appears in PABCO's internal email. PABCO's
Senior VP of Sales and Marketing wrote that "[i]n an oversupplied market with
many participants bent on the increase's destruction PABCO's message needs to
be strong along with that of our competitors." Ex. 1582. "It's a good thing to
*not* fulfill all our customers' needs this week; an increase will be much easier to
achieve if we help the industry create a wallboard scarcity." Ex. 1582.

### b. Limiting Supply Prior to 2013 Increase

Manufacturers were more candid about their limited allocation of
wallboard prior to the 2013 increase.

Longbow's July 2012 report indicated that Lafarge planned to go on a
controlled distribution sometime between Labor Day and mid-October.
Ex. 1690.

On August 6, 2012, Mark Burkhammer (Director of Sales, North, PABCO) sent an email to PABCO leadership writing: "I was told USG is going on allocation in September. We are also looking to allocate but I can't say I was ready to pull the trigger just yet. . . . Other manufacturers are doing the same planning. This will be an annual event to support increases." Ex. 1709.

On August 22, both USG and TIN sent internal emails indicating that both manufacturers would implement controlled distribution within the week. Ex. 1711, 1712. On August 23, CertainTeed internally noted that National and American had already gone on allocation in certain areas, and that CertainTeed "need[ed] to discuss process to implement our allocation as it appears conditions are upon us." Ex. 2203. National also admitted that "between the time that [National] announced its 2013 price increase and the effective date of that increase, [National] instituted product allocation on a regional bases, as needed." Defs. Resp. PSOF ¶ 440.

## 2.    Declining to Compete for Customers

Refusal to stray from the increase started very soon after it was announced. In October 2011, one of National's customers approached USG when National wouldn't give the customer the price it wanted. Ex. 1553. Greg Salah (Sr. VP Sales and Marketing, USG) directed his sales staff to turn down the opportunity:

> [N]o single job or relationship is more important that [sic] USG getting our new pricing policy in place. As tempting as the job is, it violates our pricing policy established on 9/28. . . .[W]e are not in a position to provide special pricing.

Ex. 1553.

It's also clear that manufacturers were concerned not just about actually creating price competition, but creating even the impression that they intended to compete on price. Ex. 1561. In an email chain discussing USG's potential specific price increase for 1/1/12, a USG salesman indicated that he was ok that his area had a $15 spread with the competitive low: "We're within $5 of National. . . . If they even think we're trying for share we're dead. I'd rather they wake up on 3[rd] base saying.... 'wow.... USG is selling 5/8' to the majors at $200!" Ex. 1561.

This is also evident in one of CertainTeed's internal email exchanges. On November 18, 2011, a national accounts manager for CertainTeed emailed Steve Hawkins (VP of Sales, CertainTeed) asking how firm the increase was for Lowe's:

> Lowe's took an average increase of $10 in April 2011. While the market has retreated, the Lowe's increase stayed intact. I have started prepping Steve Edwards for our pending January 2012 increase. He has advised that 35%/$50 is a bit steep. We are also hearing market reports that retail is not expecting to take the full increase. Since we were able to hold the April increase, I would recommend only going up $35-45 to come to the $50 you are seeking.

Ex. 1520. Mr. Hawkins responded that CertainTeed "must fully support [sic] increase. . . . Makes no difference what happened last year . . . . We have no choice but to support." Ex. 1520.

In December 2011, National received an email from a potential customer, asking National if they were still "running some mobile home gypsum board." ¶ Ex. 1558. In an internal email exchange, two National sale staff guessed that the

136

customer sent the email because Georgia-Pacific had sent out its announcement about pricing/job quotes. Bill Kelly (Dir. of Dealer Sales, National) responded: "Very likely the reason he asked. Now would be a very bad time to solicit somebody else's long term customer." Ex. 1558.

In January 2012, Lafarge's VP of Sales (Steve DeMay) had an email exchange with one of Lafarge's regional sales managers (Wayne Wilson). Mr. Wilson wanted to know about a regional pricing issue. Mr. DeMay responded: "I don't want to lose any high return business but as well do not want to be labeled as the price cutter. Both of these accounts are wholesalers so any move will likely be communicated to competition." Ex. 1563.

In October 2012, PABCO internally distributed a September 2012 Market Condition Report, revealing PABCO's fear that competitors could react negatively to any perceived attempt to grab market share. Ex. 1707. The report commented that "any perceived weakness or attempt to grab additional share with reduced pricing by any of the players could throw the price back into a destructive downward spiral." Ex. 1707. In his deposition, Phil Kohl (VP Sales and Marketing, PABCO) confirmed that PABCO was concerned about sending the wrong "signal" to competitors by extending a lower price past January's announced increase; they didn't want to undercut the price and they didn't want the other manufacturers to think PABCO was trying to undercut price increase. Ex. 1118 (Kohl dep.) at 226:12-228:19.

Although this evidence might create a compelling inference of collusion in a diverse market, the evidence that Defendants were concerned about other

manufacturers' impressions is entirely consistent with an oligopolistic market. But, when combined with Plaintiffs' other evidence, it is possible that this evidence could contribute to Plaintiffs' ability to tend to exclude the possibility that Defendants acted independently.

## XIV. Analysis – Consideration of Plus Factors

To avoid Summary Judgment, Plaintiffs must show that a jury could find:

1. Defendants' behavior was parallel;

2. Defendants were conscious of each other's conduct and awareness was an element in their decision-making processes; and

3. plus factors showing an actual agreement: (1) motive, (2) actions contrary to Defendants' interests, and (3) traditional conspiracy evidence.

*In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 n.11 (3d Cir. 2004). Defendants essentially concede the first two elements through their argument that they are not liable because there were merely following the leader. Implicit in such a defense is that Defendants' behavior was parallel, that they were conscious of each other's conduct, and that awareness was an element in their decision-making processes. Even if Defendants' theory of defense had been different, Plaintiffs have presented more than sufficient evidence for a jury to find that the first two elements have been satisfied.

Thus, the dispute in this case centers on whether Plaintiffs' evidence is sufficient for a jury to find plus factors indicating agreement. "[E]vidence of plus factors must tend to exclude the possibility of independent conduct." *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 133 (3d Cir.1999). "[T]he mere presence of one or more of these 'plus factors' does not necessarily mandate the

conclusion that there was an illegal conspiracy between the parties, for the court may still conclude, based upon the evidence before it, that the defendants acted independently of one another, and not in violation of antitrust laws.'" *Id.* at 122 (quoting *Balaklaw v. Lovell*, 822 F. Supp. 892 (N.D.N.Y. 1993)).

The Court pauses again to reiterate that all Defendants have presented not only an innocent rational for their conduct, but also strong testimonial denials of reaching any agreement. But Defendants are not "entitled to summary judgment merely by showing that there is a plausible explanation for their conduct; rather the focus must remain on the evidence proffered by the plaintiff and whether that evidence tends to exclude the possibility that the defendants were acting independently." *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 397 (3d Cir. 2015) (quoting *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 466 (3d Cir. 1998)). The court examines below the facts that might warrant a jury in rejecting Defendants' denials.

### A. Motive

"Evidence that the defendant had a motive to enter into a price fixing conspiracy means evidence that the industry is conducive to oligopolistic price fixing, either interdependently or through a more express form of collusion." *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004). It cannot be seriously contested that a jury could find that Defendants had the motive to enter an agreement to raise prices. Defendants own documents are littered with references to manufacturers' poor financial performance and the dire straits of the industry. And Plaintiffs' expert concluded that "[t]he market structure in the

Paper-backed Gypsum Wallboard industry was conducive to the alleged Cartel."
Ex. 1085 (Lamb Report).

But Plaintiffs' showing that Defendants had a plausible reason to conspire
does not end the inquiry. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio
Corp.*, 475 U.S. 574, 597 n.21 (1986) ("We do not imply that, if petitioners had
had a plausible reason to conspire, ambiguous conduct could suffice to create a
triable issue of conspiracy.").

### B.    Actions Against Self-Interest

Whether defendants in an oligopolistic market acted against self-interest
is a difficult question. Although the appellate case law is somewhat opaque in
this area,[64] the Third Circuit has clarified that courts should equate "actions
against self-interest" with "evidence of behavior inconsistent with a competitive
market." *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 398 (3d
Cir. 2015). But because of the interdependence problem, determining whether
Defendants' actions would have been irrational in a competitive market is a
more difficult question than it appears at first blush.

Defendants have resolutely asserted, in filing in their declarations and
briefs, that all of the actions that they have taken were in their economic self-
interest. Plaintiffs' evidence to the contrary is principally in reports by
Plaintiffs' experts. The Court is wary of relying too heavily on expert reports on
these points, but having reviewed the case law and factual and expert materials

---

[64]    "The concept of 'action against self interest' is ambiguous . . . .
[R]efusing to raise or lower prices unless rivals do the same could be against a
firm's self-interest but nevertheless could spring from independent behavior." *In
re Baby Food Antitrust Litig.*, 166 F.3d 112, 122 (3d Cir.1999).

on this topic, the Court concludes that the following actions could be found by a fact finder to be against the Defendants' self-interest, along with other evidence:

- announcing a 35% price increase despite a lack of meaningful increase in demand;

- eliminating job quotes; and

- artificially limiting supply.[65]

Defendants may have legitimate economic reasons for taking these actions, as they have argued in their briefing and at oral argument. But a fact finder could find that each of these actions were inconsistent with actions that would be

---

[65]     The Court believes that evidence of a defendant declining to pursue another manufacturer's customer could be viewed as inconsistent with a competitive market. But, evidence that a defendant refused to adjust its list price in order to secure a new customer would not be so probative. *See Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1244 (3d Cir. 1993) ("Areeda warns courts not to consider a failure to cut prices or an initiation of a price rise as an action against self-interest because it also reflects the interdependence of the industry."). Plaintiffs ask the Court to make inferences that Defendants refused to compete with each other for customers, but most of the evidence they offer reflects Defendants refusing merely to adjust their list price to secure a new customer. *See, e.g.*, Ex. 1553 (USG refusing to accept a job because it violated the pricing policy they established in September 2011); Ex. 1563 (Lafarge declining to pursue a customer because they did "not want to be labeled as a price cutter"). The one exception is that Plaintiffs have submitted one document from which a jury could conclude that National declined to offer a customer National's list price because the customer had previously been Georgia-Pacific's customer. *See* Ex. 1558 ("Now would be a very bad time to solicit somebody else's long term customer.").

taken in a competitive market, particularly in the economic circumstances of this industry.

When "no evidence suggests that the increase in list prices was correlated with any changes in costs or demand," a jury may conclude that defendants acted against self-interest. *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 362 (3d Cir. 2004). Plaintiffs have provided substantial evidence from which a jury could conclude that the dramatic increase in price was not correlated with any changes in cost or demand. *See, e.g.*, Ex. 1085 at 78 (Lamb Report) ("Wallboard prices rose despite near historically low demand, excess production capacity and stable or declining costs."); Ex. 1287 (PABCO internal email in Sept. 2011) ("[D]emand improvements are not coming any time some [sic]."); Ex. 1589 (Nov. 2011 Longbow report) ("Working against [the manufactures] is the same weak demand environment that has scuttled so many prior price increase attempts."); Ex. 1222 (USG's Form 10-K for financial year 12/21/2012) (indicating demand was low for wallboard in 2012). Had Plaintiffs presented no other evidence on this plus factor, the Court's conclusions about this plus factor would remain the same.

But Plaintiffs also submitted evidence that Defendants took other actions that a jury could perceive to be against Defendants' self-interest, or inconsistent with a competitive market. A jury could consider Defendants' decision to eliminate job quotes to have been against each Defendant's self-interest. Prior to American's announcement, job quotes had been frequently used by manufacturers as a means of providing discounts to large buyers and as a means

of competing with one another on price. By eliminating job quotes, Defendants were eliminating a major competitive tool and risking that any one Defendant would continue quoting jobs and steal substantial market share.

A jury would be permitted to find that eliminating job quotes was inconsistent with a competitive market. *Cf. Interstate Circuit v. United States*, 306 U.S. 208, 233 (1939) ("It taxes credulity to believe that the several distributors would, in the circumstances, have accepted and put into operation with substantial unanimity such far-reaching changes in their business methods without some understanding that all were to join, and we reject as beyond the range of probability that it was the result of mere chance."). As Plaintiffs' expert concluded, in a competitive market, Defendants would have been incentivized to retain job quotes to prevent loss of market share to another [manufacturer], because if one firm eliminated job quotes while the other firms did not, that firm would lose one means of competing with other firms for sales." Ex. 1085 (Lamb Report). Even a National employee admitted that such action was risky. Bill Kelly (Director of Dealer Sales, National), testified that by eliminating job quotes, National "could have substantially less business come the winter because [they] did not bid work in October and November when that . . . work was bidding." Ex. 1116 (Kelly dep.) at 182:19-24.[66]

A jury could also conclude that Defendants acted against their self-interest based on Plaintiffs' evidence that Defendants artificially limited supply

---

[66]     Mr. Kelly continued on to explain: "But this was a time and we felt an opportunity for us to get rid of a burdensome job-quoting process and we felt it was worth taking the risk." Ex. 1116 (Kelly dep.) at 182:24-183:2.

prior to the effective date of the 2012 and 2013 increases.[67] *See* Ex. 1085 at 112 (Report of Russell Lamb) (concluding that "Defendants' supply restrictions in the fall of 2011 and again in the fall of 2012" was "inconsistent with unilateral economic self-interest in the absence of the alleged Cartel"). Plaintiffs' evidence would permit a jury to conclude that, at minimum, USG, American, and Lafarge put customers on allocation prior to the January 2012 increase,[68] and PABCO, USG, TIN, CertainTeed, and National went on allocation prior to the January, 2013 increase.[69]

By limiting the amount of product Defendants were willing to sell to their customers, Defendants were risking that their customers would go elsewhere. As explained by Plaintiffs' expert: "In a market free of the alleged Cartel, if one firm refused to supply Paper-backed Gypsum Wallboard to its customers, other firms would benefit from selling to them because they would gain larger market shares, improve their capacity utilization, reduce production costs, and make higher profits." Ex. 1085 (Lamb Report) at 66. Thus, a jury could reasonably conclude that those Defendants who put customers on allocation prior to the increases were acting inconsistently with a competitive market.

---

[67]     It is a well-known antitrust principle that any concerted restrictions of output are per se illegal. *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 99 (1984).

[68]     Ex. 1580 (USG); Ex. 1581 (Eagle/American); Ex. 1505 (Lafarge); *see also* Ex. 1589 (Longbow report indicating that National, American, USG, PABCO, CertainTeed, and Lafarge had gone on allocation).

[69]     Ex. 1709 (PABCO); Ex. 1711 (USG); Ex. 1712 (TIN); Ex. 2203 (CertainTeed); Defs. Resp. PSOF ¶ 440 (National); *but see* Ex. 1118 (PABCO's Kohl dep.) at 220:2-3 ("We had a plan in place that was never – never stuck to. We emptied our warehouses again in 2012.")

Although the Court finds that Plaintiffs have submitted sufficient evidence for a jury to conclude that all Defendants acted against their self-interests, the Court recognizes that this finding is not sufficient, by itself, to defeat summary judgment because Plaintiffs have not yet tended to exclude the possibility of interdependent conduct. *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 361-62 (3d Cir. 2004); *cf. In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 398 (3d Cir. 2015) (explaining that a showing the defendants had motive and acted against self-interest "is neither necessary nor sufficient to preclude summary judgment, at least where the claim is price fixing among oligopolists"). Rather, to elevate a finding of actions against self-interest to a finding that a jury could conclude that Defendants entered an agreement, Plaintiffs must supply traditional conspiracy evidence.

### C.   Traditional Conspiracy Evidence

In § 1 Sherman Act cases involving oligopolies, the "most important evidence will generally be non-economic evidence 'that there was an actual, manifest agreement not to compete.'" *In re Flat Glass*, 385 F.3d at 361 (quoting *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655 (7th Cir. 2002)). Traditional conspiracy evidence "may involve 'customer indications of traditional conspiracy,' or 'proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown.'" *Id.* (quoting Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, 243 (2d ed. 2000)).

Plaintiffs have submitted sufficient traditional conspiracy evidence for a jury to conclude that American, National, PABCO, and Lafarge had entered an agreement in violation of the Sherman Act. But, Plaintiffs have fallen short as to CertainTeed.[70]

Before evaluating the evidence on a Defendant-by-Defenant basis, the Court pauses to consider three pieces of traditional conspiracy evidence that could be considered against one or more Defendants based on the Court's *Bourjaily* findings:

1.    Keith Metcalf's (Sr. VP Marketing, Sales, and Distribution, American) April 2011 email indicating that there might be "a movement from all manufacturers to eliminate quotes," which was written a few weeks after all Defendants sent representatives to the Las Vegas trade meeting (Ex. 1165);

2.    the notes from the call between Steve DeMay (VP of Sales, Lafarge) and Zoran Miling (Analyst, Longbow), indicating that National, Lafarge, and CertainTeed would react to certain price moves by USG (Ex. 1269); and

3.    the notes from the meeting between Kathryn Thompson (Founder and Dir. of Research, Thompson) and Craig Weisbruch (Sr. VP Marketing and Sales, National) indicating that there were *verbal agreements* for a large price increase in 2013 (Ex. 1515).

These statements alone might prove to be sufficient traditional conspiracy evidence for a jury to conclude that Defendants reached an agreement in violation of the Sherman Act.[71] *Cf. In re Flat Glass Antitrust Litig.*, 385 F.3d

---

[70]    The Court does not consider the traditional conspiracy evidence involving TIN or USG because those manufacturers have settled.

[71]    These statements are not admissible against CertainTeed because CertainTeed did not make any of the statements and the co-conspirator exception to the rule against hearsay doesn't apply as to CertainTeed, unlike the other Defendants, because the Court concluded that Plaintiffs failed to show by

350, 363 (3d Cir. 2004) ("[The manufacturer's] response to the Antitrust Division does not directly state that it agreed with [the defendant] to raise prices. But a reasonable factfinder could infer such an agreement from [the manufacturer]'s reference to an 'across the board' price increase."). And as outlined at length in this opinion, Plaintiffs have provided far more evidence than these three exhibits.

Additionally, Defendants' decision to eliminate job quotes may qualify as traditional conspiracy evidence to avoid summary judgment. In *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 410 (3d Cir. 2015), the plaintiffs attempted to rely on the defendants' departure from their pre-conspiracy conduct as traditional conspiracy evidence. The court explained that "[f]or a change in conduct to create an inference of a conspiracy, the shift in behavior must be a 'radical' or 'abrupt' change from the industry's business practices." *Id.* (quoting *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 935 (7th Cir. 2000)). Given the evidence that job quotes had been a feature in the drywall industry since the 1980s and that all Defendants eliminated this practice within weeks of each other in fall 2011, a jury might be justified in concluding that Defendants' shift in behavior was radical enough to contribute to the inference of conspiracy.

### 1.  American

Plaintiffs' evidence permits the inference that American reached an agreement to raise prices and eliminate job quotes, and specifically that Mr. Metcalf reached an agreement with other manufacturers to eliminate job quotes

_____

a preponderance of the evidence that CertainTeed was a member of the conspiracy.

and increase prices during the Las Vegas Trade meeting in April 2011 and that Mr. Powers communicated about the status of the agreement with PABCO the day before announcing the increase in fall 2011. *See, e.g.*, Ex. 1165 (April 2011 Metcalf email) ("We may have a movement from all manufacturers to eliminate quotes."); Ex. 2098 (explaining that Mr. Metcalf's September 2011 email was "referencing an anticipated announcement from one or more of the big boys relative to job quoting"); Ex. 1168 (PABCO email after American announcement) (indicating that Mr. Powers (President, American) and Mr. Duvall (Sales Manager, PABCO) had a conversation about lack of industry leadership the day before the American announcement); Ex. 1110 (Harris dep.) at 67:8-68:24 (CertainTeed's expert's deposition) (testifying that he would expect a company announcing the changes that American announced in fall 2011 to have conducted more formal analysis).

### 2.   National

Plaintiffs' evidence permits the inference that National participated in agreements to eliminate job quotes and raise prices, largely because of the frequent communications between Craig Weisbruch (Sr. VP Sales and Marketing, National) and analysts at Thompson and Longbow. *See, e.g.*, Ex. 1277 (email between Mr. Weisbruch and Thompson) ("I think this is the beginning of *the manufacturers* telling the market that we have to have a 'fair' price for our goods. . . ." (emphasis added)); Ex. 1560 (Withrock October 2011 email) ("I'd hate to think we blow the entire deal because American thinks we've *broken ranks* and job quoted well into 2012 in their backyard." (emphasis

added)); Ex. 1515 (Thompson's notes from a June 2012 meeting with Weisbruch) ("2013 price increase? A: *verbal agreements* for a large price increase in 2013 . . . . *[T]he industry* will be on planned distribution for the last 2-3 months to curtail excessive pre-buy activity." (emphasis added)).

### 3.     PABCO

Plaintiffs' evidence permits the inference that PABCO participated in an agreement to eliminate job quotes and raise prices. *See, e.g.*, Ex. 1287 (email from PABCO's Director of Sales, South in September 2011) ("It will take strong united effort by all manufacture [sic] to manage current job pricing and improve forward pricing for this increase attempt to yield any price improvement."); Ex. 1168 (PABCO email after American announcement) (indicating that Mr. Powers (President, American) and Mr. Duvall (Sales Manager, PABCO) had a conversation about lack of industry leadership the day before the American announcement and that "[e]liminating job quotes would be a great start for *the* price improvement" (emphasis added)); Ex. 1244 (email from PABCO's Director of Sales, North on 9/27/2011) ("I am suggesting, wherever and to whoever will listen, that the manufacturers have to police. . . . [G]etting something done by seven manufacturers for the good of the industry is like being in the house of reps in DC."); Ex. 1278 (indicating that PABCO gave advanced notice of its price increase to Longbow and that within minutes of receiving that notice, Longbow forwarded the information to Craig Weisbruch at National); Ex. 1709 (email from PABCO's Director of Sales, North on 8/6/2012) ("Other manufacturers are doing the same planning [for allocation prior to the 2013

increase]. This will be an annual event to support price increases."); Ex. 1707 (10/9/2012 email from PABCO's VP of Sales and Marketing) ("[A]ny perceived weakness or attempt to grab additional share with reduced pricing by any of the players could throw the price back into a destructive downward spiral.").

### 4.     Lafarge

Plaintiffs' evidence permits the inference that PABCO participated in an agreement to eliminate job quotes and raise prices, particularly in light of the information shared between Steve DeMay and Longbow in December 2011. *See, e.g.*, Ex. 1102 (DeMay dep.) at 151:17-21 (testifying that he didn't recall anyone putting anything in writing to justify the 2012 price increase and elimination of job quotes); Ex. 1269 (notes from 12/7/2011 call with Longbow) ("If we see [USG] raise their price to their breakeven number of $125 mill-net, there will be a collective responds [sic] from all of us – National, Lafarge, CertainTeed – we all respond. . . . If I could talk to my counterparts at the other manufactures [sic], I would tell them that the table is set and that we must show a degree of fortitude that we have not shown in years.").

### 5.     CertainTeed

Unlike the other Defendants, there is a dearth of evidence of any communications by CertainTeed or other plus factors that could create the inference of conspiracy. *See, e.g.*, Ex. 1491 (email from CertainTeed Regional Manager upon receiving 2011 American announcement) ("Here it is. USG probably will be next."); Ex. 1520 (email from Regional Manager) (refusing to

offer Lowe's a lower percentage increase even though Lowe's had absorbed an earlier price increase that the rest of the market had not absorbed).

As explained in the Court's Rule 104 findings, the Court is unable to conclude that Plaintiffs have shown by a preponderance of the evidence that CertainTeed was a member of a conspiracy so as to allow statements by other Defendants to be admissible against CertainTeed. The Court has considered that Steve DeMay's (VP of Sales, Lafarge) memorialized comment to Zoran Miling (Analyst, Longbow) would have been perhaps the most persuasive evidence against CertainTeed. *See* Ex. 1269 (notes from 12/7/2011 call with Longbow) ("If we see [USG] raise their price to their breakeven number of $125 mill-net, there will be a collective responds [sic] from all of us – National, Lafarge, CertainTeed – we all respond."). But the Court cannot consider Exhibit 1269 against CertainTeed because the record fails to demonstrate that CertainTeed communicated with other manufacturers or analysts on par with the other Defendants, and therefore, does not show any factual basis for Mr. DeMay to have referenced CertainTeed. The record does show interchanges between Longbow and National. Thus, the Court can consider the exhibit against National and Lafarge because the record supports the Court concluding that they were co-conspirators for the purpose of Federal Rule of Evidence 802(d)(2)(E). But, Plaintiffs have not proven CertainTeed a co-conspirator under that rule, and thus, that statement is inadmissible hearsay as against CertainTeed.

What the Court is left with then are two types of traditional conspiracy evidence that the Third Circuit has indicated in dicta might permit an inference

of a conspiracy: (1) a sudden and abrupt change in business practices (*i.e.*, the elimination of job quotes) and (2) evidence that the other firms in the drywall industry entered into an agreement and that CertainTeed acted consistent with the other firms' actions. *See In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 410 (3d Cir. 2015) (rejecting the plaintiffs' argument, which was that a change in the defendants' conduct qualified as traditional conspiracy evidence, because the change was not abrupt enough); *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 363 (3d Cir. 2004) (indicating that an inference of conspiracy may be permissible if there evidence that a defendant acted parallel to other firms and there is evidence that those other firms entered an agreement). The Court is not convinced that a jury would be justified in concluding, based on this traditional conspiracy evidence alone, that CertainTeed entered an agreement.

Although the Court accepts that Defendants' elimination of job quotes was a radical and abrupt change from prior business practice, the Court is unwilling to read *Chocolate* as indicating that a radical change alone would be sufficient to create an inference that CertainTeed entered an agreement. As for the other Defendants, the evidence of the abrupt change in business practice gains weight because it is coupled with other indicia of conspiracy.

Nor can the fact that CertainTeed made comparable price decisions to the other Defendants save Plaintiffs' claims against CertainTeed, even when considering the abrupt change in business practices alongside the parallel behavior of CertainTeed and the other Defendants. The Court reaches this

conclusion despite the Third Circuit's indication that when evidence tends to show that "six firms act in parallel fashion and there is evidence that five of the firms entered into an agreement, . . . it is reasonable to infer that the sixth firm acted consistent with the other five firms' actions because it was also party to the agreement." *In re Flat Glass*, 385 F.3d at 363. Although CertainTeed acted in parallel fashion to the other Defendants, the evidence as to CertainTeed is far less than the evidence implicating the other Defendants. Thus, the Court concludes that, even considering all the evidence in the light most favorable to Plaintiffs, making an inference based solely on CertainTeed's parallel conduct and the elimination of job quotes is not sufficient to defeat summary judgment.

Unlike the other Defendants, it is undisputed that CertainTeed did engage in a documented decision-making process before following American's lead: it "obtained information from customers, evaluated the impact of its announcement on CertainTeed's operations and financials; its senior managers evaluated the pros and cons of an announcement; and it considered the responses made by competitors." Ex. 1110 (Harris dep.) at 67:8-68:24. And this fact is not genuinely disputed by Plaintiffs.

The Court notes the over 90 declarations filed by CertainTeed in support of its Motion for Summary Judgment, and finds Plaintiffs' evidence has failed to substantially challenge CertainTeed's Rule 56 showing, which stands in contrast to Plaintiffs' persuasive showing as to the other Defendants. There are only a few communications between research analysts and CertainTeed, and those communications are far fewer than those among those analysts and Lafarge or

153

National. There is no evidence that CertainTeed provided the type of information to analysts that was provided by National and Lafarge. And unlike PABCO or American, there is no evidence allowing an inference that CertainTeed spoke with a competitor shortly before making a major pricing decision.

The relative lack of evidence that CertainTeed communicated with other manufacturers or analysts coupled with the evidence that CertainTeed did take steps indicative of independent decision making, result in the Court's conclusion that a jury could not reasonably make the inference that CertainTeed participated in an agreement in restraint of trade.

## IX.  Conclusion

When Plaintiffs evidence is considered as a whole, it tends to exclude the possibility that National, American, PABCO, and Lafarge acted independently, or even interdependently. Therefore, Defendants' Motions for Summary Judgment are being **DENIED** as to those Defendants. Plaintiffs' evidence does not tend to exclude the possibility that CertainTeed acted independently, and therefore, CertainTeed's Motion for Summary Judgment will be **GRANTED**.

"[C]ertainty generally is illusion, and repose is not the destiny of man." Oliver Wendell Holmes, Jr., *The Path of the Law*, 10 Harv. L. Rev. 457 (1897). We tell jurors they may find facts without any strict rules, but based on common sense, circumstantial evidence, etc., putting no blinders on their deliberative decision making. In contrast, Federal Rule of Civil Procedure 52(a)(1) requires a judge sitting without a jury to "find the facts specially" and to state

"conclusions of law separately." Similarly, in ruling on a summary judgment motion, judges should explain whether the evidence presented would allow a jury to make inferences in favor of the party opposing the motion. In this price-fixing antitrust case, within an oligopolistic industry, strict rules govern what inferences may be drawn from the evidence.

Because of the voluminous factual details presented by Plaintiffs, this lengthy opinion was appropriate to summarize the facts warranting the Court's conclusions as to what inferences a jury could or could not draw. The Court recognizes Defendants' exposure to significant and trebled damages, which the putative class might be able to prove if, as, and when a class is certified and proceeds to trial.

Thus, the judge's function in ruling on summary judgment is as a "gatekeeper" through which the parties must pass. Denial of a summary judgment motion bestows a legal "rite of passage"—like the trials and tribulations facing the Prince and Papageno in Mozart's *The Magic Flute*, or the adventures of Ulysses in ancient Greece.

At trial, the jury then has free rein to actually determine what inferences it will make, which may be the same, or entirely different, than the inferences the judge has stated the jury must be allowed to make.

Although pressures to settle may be present, the defendants still have the option of succeeding on a directed verdict at the close of the plaintiffs' evidence (perhaps the evidence from the mouths of witnesses falls short of the "paper" that was successful in defeating summary judgment)—or in presenting, live,

155

their officers and managers who are found more credible than the inferences plaintiffs advocate, resulting in a defense jury verdict, and again on post-trial motions, and again on appeal. The denial of summary judgment may be a temporal defeat for four Defendants, it need not be the end of the case.

"Now this is not the end. It is not even the beginning of the end. But it is, perhaps, the end of the beginning." Winston Churchill, Remarks at the Lord Mayor's Luncheon at Mansion House: The End of the Beginning (November 10, 1942).

O:\13-MD-2437 - drywall\Drywall 13md2437.SJMemo.FINAL.v1.2.18.16.docx