IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: DOMESTIC DRYWALL ANTITRUST LITIGATION | MDL No. 2437 <br> 13-MD-2437 |
| THIS DOCUMENT RELATES TO: <br> All Indirect Purchaser Actions | |

**INDIRECT PURCHASER PLAINTIFFS' RENEWED MOTION FOR AUTHORIZATION TO UTILIZE A PORTION OF THE USG AND TIN SETTLEMENT FUNDS FOR ONGOING LITIGATION EXPENSES**

**I.   INTRODUCTION AND SUMMARY**

Indirect Purchaser Plaintiffs ("IPPs") respectfully submit this Motion to renew their request for authorization to use a portion of the TIN and USG settlement funds to pay future litigation expenses. IPPs seek permission to use up to $1 million of the funds during Phase 2 proceedings.

IPPs have already notified settlement members that IPPs' counsel may seek to use up to $2.5 million of the $10.5 million in settlement funds for litigation expenses. This Court's August 20, 2015 order on IPPs' prior request for litigation funds ("Expense Order")[1] allowed IPPs to use $416,661.70 to pay then-outstanding expert expenses. If this Court grants the present motion, the total amount granted IPPs would be well below the $2.5 million specified in the Notice.

Phase 2 proceedings – which will focus on class certification, injury, and damages – pose unique expenses for IPPs. While both Direct Purchaser Plaintiffs ("DPPs") and IPPs must show Defendants' direct customers paid inflated prices for Drywall, "[s]howing impact to direct

---

[1] The Expense Order invited IPPs to reapply for "permission to use more of the [USG and TIN] settlement funds for litigation expenses" if the case survived Defendants' summary judgment motions. ECF #274 at ¶4. As the Court is aware, the case has survived summary judgment making this application ripe. *Id.*

1

purchasers is, of course, only the first step in the IPPs' burden. . . . [T]hey must also show 'pass-through' of the overcharges to the IPP class." *In re Optical Disk Drive Antitrust Litig.*, No. 3:10-md-2143 RS, 2016 U.S. Dist. LEXIS 15899, at *48-50 n.4 (N.D. Cal. Feb. 8, 2016). IPPs expect that a significant portion of their Phase 2 efforts will focus on these pass-through issues.

IPPs' counsel, who are working on a strictly contingent basis, have borne significant expenses thus far. While the $416,661.70 authorized by the Expense Order covered approximately 54.7% of IPPs' common expenses incurred prior to July 27, 2015, IPPs retained responsibility for the remaining $345,028.92 in common expenses (a figure that does not include individual firms' held costs, such as travel). At present, IPPs do not seek reimbursement of these past expenses, nor do they seek any interim award of attorneys' fees. Instead, IPPs only seek creation of a litigation fund to offset future expenses.

If this Court grants IPPs' request, IPPs will use the litigation fund solely to pay common litigation expenses (*i.e.* "costs that are paid out of an attorney's assessment fund, such as transcript costs, expert costs, and document storage and litigation support services," Expense Order at 6.). IPPs will return any portion of the Litigation Fund not used for common expenses to the Settlement Fund.

## II.   THE CLASS WILL BENEFIT FROM THE REQUESTED FUNDS BECAUSE SUCH FUNDS WILL PROMOTE THE CONTINUED VIGOROUS PROSECUTION OF THIS COMPLEX ACTION

IPPs counsels' vigorous litigation efforts during Phase 1 proceedings involved significant cost and effort and led to the two settlements achieved thus far. Nothing suggests Phase 2 proceedings will be any easier. IPPs fully expect Defendants – large corporations with substantial financial resources, represented by some of the most respected law firms in America – to continue their skilled and vigorous defense of this action. Under such circumstances, "[t]he

advanced litigation funds will benefit . . . class members by assisting Class Counsel to prosecute this case effectively." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-1827, Order at ECF # 2474 (N.D. Cal. Feb. 17, 2011) (filed in this case as ECF 220-4).

### a. Phase 2 Discovery and Class Certification Proceedings Will Require IPPs to Incur Unshared, But Necessary, Expenses.

IPPs were able to mitigate costs during Phase 1 discovery through careful collaboration with the DPPs, and will continue those efforts where possible. However, they will be required to shoulder a much greater percentage of the costs of Phase 2 discovery alone.

As this Court is aware, Phase 1 discovery was "limited to whether there was an agreement between any Defendants in violation of Sherman Act § 1," and "the Court postponed discovery on issues such as class action, damages, [and] antitrust injury" until Phase 2. *In re Domestic Drywall Antitrust Litig.*, MDL No. 2437, 2016 U.S. Dist. LEXIS 19487, at *4 (E.D. Pa. Feb. 18, 2016). Thus, Phase 2 proceedings will focus on these critical issues: class certification, damages, and antitrust injury.

While there may be some overlap, "IPPs, unlike DPPs, have a two-fold burden in securing class certification in matters such as this. Not only must they show that all or nearly all of the original direct purchasers . . . bought at inflated prices, they must also show those overcharges were passed through all stages of the distribution chain." *Optical Disk Drive Antitrust Litig.*, 2016 U.S. Dist. LEXIS 15899, at *59-60. As a result, IPPs' discovery on both injury and damages, as well as the concomitant class certification proceedings, presents issues unique to them that are both expensive and difficult. In the words of one court, the "'problem of proof in an indirect purchaser case is intrinsically more complex [than in a direct purchaser case], because the damage model must account for the actions of innocent intermediaries who allegedly passed on the overcharge.'" *In re Static Random Access Memory Antitrust Litig.*, 264 F.R.D.

603, 612 (N.D. Cal. 2009) (citation omitted; addition in original). During Phase 2, IPPs must conduct discovery aimed at proving this so-called "pass-through," and pay experts to perform the corollary analysis for certification. In this, IPPs must proceed alone: pass-through is simply irrelevant to the direct purchasers, as downstream purchases have nothing to do with their case.[2]

While IPPs cannot yet know their specific method of proof, showing pass-through traditionally involves discovery aimed at participants in the distribution chain, primarily of transactional data showing purchases and sales of the affected products. For example, in *In re OSB Antitrust Litig.*, No. 06-826, 2007 U.S. Dist. LEXIS 56617 (E.D. Pa. Aug. 3, 2007), indirect purchaser certification required the parties to seek and receive transactional data "from third-party distributors such as Home Depot, Lowe's, and BlueLinx," as well as from multiple "OSB retailers and distributors." *Id.* at *30. IPPs expect they will conduct similar discovery, and then pay their experts to conduct the necessary analysis of this data to construct a methodology showing pass-through exists and can be proven on a class-wide basis. *Id.* (describing analysis).[3]

---

[2] One court appropriately described the interaction between direct and indirect purchaser discovery as follows:

> Pursuant to court order, the parties conducted common liability discovery in a coordinated manner. In addition to the coordinated discovery, the Indirect Purchaser Plaintiffs also propounded discovery on third parties, directed principally to the issue of the pass-through of the alleged overcharge to indirect purchasers, and reviewed and carefully analyzed the third-party information obtained (which consisted of thousands of pages of documents).

*In re Dynamic Random Access Memory Antitrust Litig.*, No. M-02-1486-PJH, 2013 U.S. Dist. LEXIS 188116, at *112 (N.D. Cal. Jan. 7, 2013). IPPs expect the same interaction here.

[3] *See also In re : Cathode Ray Tube (CRT) Antitrust Litig.*, No. 1917, 2013 U.S. Dist. LEXIS 137945, at *116 (N.D. Cal. June 20, 2013) ("Dr. Netz then conducted 40 empirical pass-through studies using third-party data produced in response to plaintiffs' subpoenas as well as other data produced by defendants."); *see also id.* at *90 ("Dr. Netz's studies include over forty data sets from twenty-nine different entities."); *In re Polyurethane Foam Antitrust Litig.*, No. 1:10 MD 2196, 2014 U.S. Dist. LEXIS 161020, at *167 (N.D. Ohio Apr. 9, 2014) ("Lamb feeds the

4

In Phase 1, IPPs incurred $662,314.20 in expert costs alone, to say nothing of the additional common expenses. While IPPs cannot predict costs with specificity, IPPs do anticipate that the complexities outlined above will likely cause IPPs' expert expenses during Phase 2 to exceed those incurred in Phase 1. The requested amount is necessary in light of the future expenses IPPs anticipate.

### III.   THE FUNDS IPPs REQUEST ARE REASONABLE

IPPs are highly cognizant of the Court's desire to ensure disbursements from the settlement fund are fair to members of the settlement class. The requested amount – $1 million – would mean the Court has authorized $1,416,661.70 in total, or approximately 11% of the total settlement fund. This is fair, and in line with other interim awards made in this and neighboring Districts.

For example, in *In re OSB Antitrust Litigation,* 06-826 (E.D.Pa.), when considering interim settlements totaling approximately $3.35 million with three of eight defendants in an indirect purchaser antitrust class action, Judge Diamond awarded $1,050,000 for ongoing litigation expenses. *In re OSB Antitrust Litigation,* 06-826 (E.D.Pa.) at ECF #772 p.4 & 23 (seeking approval of $3.35 million in settlements and a $1,050 litigation fund) and ECF #835 (granting requests). Similarly, in *In re Chocolate Confectionary Antitrust Litig.*, 2011 U.S. Dist. LEXIS 151516 (M.D. Pa. Dec. 12, 2011), the Court finally approved a interim indirect purchaser settlement of $250,000 and permitted the plaintiffs to use the entirety of the settlement fund to pay litigation expenses: "Plaintiffs may use the Settlement Fund to pay from time to time such

---

Direct-Purchaser-to-Retailer regression with a dataset of 35,000 'usable observations of the [retail] prices paid' for end-use products obtained from such firms as Home Depot, Lowe's, Art Van, Costo, and Macy's.")

5

expenses as may reasonably be incurred in the prosecution of the Class Action, subject to an accounting to the Court at the time of the final resolution of the Class Action." *Id.* at *43.[4]

IPPs acknowledge that some of the cases cited in the Expense Order involved interim awards of expenses of a smaller percentage of a settlement fund that those requested here, but submit the substantial expenses IPPs will incur in the immediate future, coupled with the unique procedural posture of this case, militate in favor of the amount requested. Of course, this Court will retain full authority over any further requests for expenses or fees out of the existing or any future settlement funds.

## IV.  CONCLUSION

Given the substantial expenses IPPs will incur in Phase 2 proceedings, and given the relatively small percentage of the settlement fund IPPs request be committed to a settlement fund, IPPs respectfully request this Court permit them to use up to $1 million of the USG and TIN Settlement Funds for litigation expenses.

Dated: March 15, 2016

Respectfully submitted,

| | |
|---|---|
| /s James Robert Noblin | /s Michael G. McLellan |
| Robert S. Green | Michael G. McLellan |
| James Robert Noblin | Douglas G. Thompson, Jr. |
| GREEN & NOBLIN, P.C. | L. Kendall Satterfield |
| 700 Larkspur Landing Circle, Suite 275 | FINKELSTEIN THOMPSON LLP |
| Larkspur, CA  94939 | 1077 30th Street NW, Suite 150 |
| Tel: (415) 477-6700 | Washington, D.C. 20007 |
| Fax: (415) 477-6710 | Tel:  (202) 337-8000 |

---

[4] Moreover, courts making expense awards at the conclusion of cases have awarded expense awards in excess of those contemplated here. For example, in *Glaberson v. Comcast Corp.*, No. 03-6604, 2015 U.S. Dist. LEXIS 127370 (E.D. Pa. Sep. 22, 2015), the court approved an expense award totaling $8,574,896.16, or "approximately 17.15% of the settlement fund." *Id.* at *32. Notably, the settlement in *Glaberson* was not an all-cash settlement: rather, it contained "a cash component valued at $16,670,000, and a services component valued at $33,330,000," and the 17.15% figure considered the non-cash component at full value. *Id.* at *5.

Fax: (202) 337-8090

/s Whitney Street
Whitney Street
/s Lesley E. Weaver
Lesley E. Weaver
BLOCK & LEVITON, LLP
492 9th Street, Suite 260
Oakland, CA 94607
Tel: (617) 398-5600
Fax: (617) 507-6020

*Co-Lead Counsel for the Proposed Class of Indirect Purchasers*