## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: DOMESTIC DRYWALL<br>ANTITRUST LITIGATION | |
| THIS DOCUMENT RELATES TO:<br><br>All Indirect Purchaser Actions | MDL No. 2437<br>13-MD-2437 |

**MEMORANDUM RE:**
**Indirect Purchaser Plaintiffs' Motion for Class Certification**

Baylson, J.                                                    August <u>24</u>, 2017

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     MOTIONS CURRENTLY BEFORE THE COURT ............................................. 2

III.    PROPOSED CLASSES AND CLASS CERTIFICATION STANDARD ........................ 2

IV.     STATE DAMAGES CLASSES ............................................................................ 4

A.      Rule 23(a) Prerequisites ...................................................................................... 5

  1.    Numerosity ......................................................................................................... 5

  2.    Commonality ...................................................................................................... 5

  3.    Typicality and Adequacy ................................................................................... 5

      a. Applicable Law ................................................................................................. 6

      b. Analysis ............................................................................................................ 7

B.      Rule 23(b)(3) Requirements ................................................................................ 9

  1.    Implied Ascertainability Requirement ............................................................... 9

      a. Summary of Parties' Arguments....................................................................... 9

      b. Third Circuit Opinions on Ascertainability .................................................... 11

        i.      Marcus v. BMW of North America................................................... 11

        ii.     Hayes and Carrerra ........................................................................... 12

        iii.    Grandalski v. Quest Diagnostics ...................................................... 14

        iv.     Byrd v. Aaron's Inc............................................................................ 15

        v.      City Select Auto Sales v. BMW Bank of North America.................. 16

      c. Ascertainability Analysis ................................................................................ 17

2.    Predominance ................................................................................................ 21

a. Violation of Antitrust Laws ............................................................................ 21

b. Antitrust Impact .............................................................................................. 22

    i.        Daubert Motions ................................................................................ 22

    ii.       Economic Evidence ......................................................................... 23

    iii.      Synopsis of Proposed Classwide Evidence .................................... 24

        1.        Step 1: All Direct Purchasers suffered impact ........................... 25

        2.        Step 2: Direct Purchasers passed on the overcharge, and the end users were

        impacted      .................................................................................................. 25

    iv.       Analysis ............................................................................................ 26

        1.        Overcharge to Direct Purchasers ................................................ 26

        2.        Pass-through to Indirect Purchasers ........................................... 27

c. Measurable Damages ....................................................................................... 29

    i.        Parties' Arguments ........................................................................... 29

    ii.       Analysis ............................................................................................ 30

d. Variations in State Law ................................................................................... 31

3.    Superiority ...................................................................................................... 32

V.      ALTERNATIVE CLASSES ............................................................................... 33

A.     Nationwide Injunctive Class ................................................................................. 33

B.     Issue Classes ......................................................................................................... 35

VI.     CONCLUSION .................................................................................................. 36

## I.     Introduction

In the fall of 2011, several domestic gypsum wallboard (drywall) manufacturers announced substantial changes to their pricing.  These announcements ended a long-standing pricing practice called "job quotes" and scheduled a very large price increase to commence in January 2012 and to be effective for the entire year.  Then, in fall 2012, the same manufacturers again announced a similar price increase to take effect in January 2013.  In this multidistrict litigation ("MDL"), Plaintiffs allege that the Defendants' 2012 and 2013 price increases and other changes in pricing practices were the result of an agreement, in violation of federal and state antitrust laws.

Discovery in this case was initially limited to whether there was an agreement between any Defendants in violation of Sherman Act § 1.  ECF 64.  After the first-phase of discovery period was completed, Defendants moved for summary judgment, arguing that there was insufficient evidence for a jury to conclude that the Defendants agreed to fix prices.  Following extensive briefing and argument, the Court filed an 85 page detailed opinion denying summary judgment as to all but one Defendant, Certainteed.  In re Domestic Drywall Antitrust Litig., 163 F. Supp. 3d 175 (E.D. Pa. 2016).

Through the summary judgment stage, the direct purchaser and indirect purchaser actions in this case proceeded together.[1]  However, because class certification presents different issues for these two groups, the briefing schedules on class certification diverged.  After substantial

---

[1] In addition to the direct and indirect purchaser plaintiffs, there is also a third group of plaintiffs involved in this MDL.  This third group has been referred to as the Homebuilder Plaintiffs.  The Homebuilder Plaintiffs filed suit approximately two years after the case began, and are not seeking to proceed as a class.

briefing, argument, expert reports, and expert testimony, the Court granted the Direct Purchaser's Motion for Class Certification on August 23, 2017. ECF 630.

## II.     Motions Currently before the Court

Pending now before the Court is the Indirect Purchaser Plaintiffs' ("Plaintiffs" or "IPPs") Motion for Class Certification. ECF 472. Related to Plaintiffs' Motion for Class Certification are Defendants' <u>Daubert</u> motions to preclude the testimony of Plaintiffs' experts, Dr. Mark J. Dwyer and Dr. Michael Harris. ECF 508, ECF 509. Also pending before the Court is the Defendants' Motion to Dismiss IPPs' Third Amended Complaint in Part. ECF 504.

In their Motion to Dismiss, Defendants raise issues of standing and substantive state law. Because the issues raised in the Motion to Dismiss are intertwined to some extent with class certification issues, the Court has decided to deny Defendants' Motion to Dismiss without prejudice to Defendants re-raising the issues they deem still relevant, in light of this memorandum opinion and accompanying order.

Defendants responded to Plaintiffs' Motion for Class Certification on December 12, 2016. ECF 510. Plaintiffs filed a reply on February 24, 2017. ECF 549. The Court heard Oral Argument on the Motion for Class Certification on June 28, 2017. ECF 603, ECF 604. Both parties submitted post-hearing briefs on July 11, 2017. ECF 607, ECF 608. Having considered all submissions by the parties and having heard oral argument on the Motion, for the reasons outlined below, IPPs' Motion is DENIED.

## III.    Proposed Classes and Class Certification Standard

Under <u>Illinois Brick v. Illinois</u>, 461 U.S. 720 (1977), indirect purchasers lack antitrust standing to bring claims for damages under federal antitrust laws. As a result, IPPs bring their damages claims under the laws of 11 different states. These claims fall under the states'

antitrust, consumer protection, and unjust enrichment laws.  <u>Illinois Brick</u> manifests a policy against double recovery for direct and indirect purchasers under federal antitrust law.  However, the Supreme Court has made clear that this policy does not extend to preemption of state laws which enable indirect purchaser plaintiffs to pursue damages for antitrust violations.  <u>See California v. ARC Am. Corp.</u>, 490 U.S. 93, 105 (1989).

IPPs seek certification of (1) a group of statewide classes seeking damages ("Statewide Damages Class") and (2) a nationwide class seeking injunctive relief.  In the alternative, IPPs seek certification of alternate "issue classes" that would allow the Court to adjudicate for the class all issues on which the Court finds that common issues predominate.

Plaintiffs define their Statewide Damages Class as follows: "All persons and entities who, from January 1, 2012 'through present' indirectly purchased gypsum board in [STATE][2] manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale."  IPPs further define "end use" as "persons or entities purchasing drywall as a stand-alone product for their own use, and persons or entities purchasing drywall through a contractor or other vendor for use in a property then-owned by the person or entity."  As characterized by IPPs, their case seeks to capture the "repair and remodel" segment of the market.  <u>See</u> ECF 604, Oral Argument Tr. June 28, 2017 (<u>hereinafter</u>, "Tr."), 16:17-18. [3]

Plaintiffs seek certification under Federal Rule of Civil Procedure 23(b)(3).  To be certified under this rule, Plaintiffs must meet the prerequisites set forth in Federal Rule of Civil Procedure 23(a), as well as the requirements in Rule 23(b)(3).  Under Rule 23(a), Plaintiffs must

---

[2] Plaintiffs seek certification for the following states: Arizona, California, Illinois, Florida, Massachusetts, Michigan, Minnesota, Missouri, New York, Utah, and Wisconsin.  ECF 473, IPP Mot. p. 3.
[3] At oral argument, IPPs clarified that their definition of end-user does not include purchasers of completed homes that contain drywall.  Tr. 16:18-19.

meet the threshold requirements of (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. Fed. R. Civ. P. 23(a). Then, under Rule 23(b)(3), the court considers whether (1) common questions predominate over individual issues, and (2) whether class resolution is superior to other available methods to decide the controversy. Fed. R. Civ. P. 23(b)(3). Courts have also implied an "ascertainability" requirement into the Rule 23(b)(3) inquiry. See, e.g., Marcus v. BMW of North America, 687 F.3d 583 (3d Cir. 2012).

As the Third Circuit clarified in In re Hydrogen Peroxide Antitrust Litigation, 552 F.3d 305 (3d Cir. 2008), as amended (Jan. 16, 2009), Plaintiffs bear the burden to establish each requirement by a preponderance of the evidence. Id. at 320. In determining whether or not Plaintiffs have met these requirements, the District Court must undertake a "rigorous analysis" of the evidence, even if its determinations on class certification issues overlap with the merits of the case. Id. at 309, 317. This Court conducts such a rigorous analysis below, and declines to certify any class of IPPs.

## IV.    State Damages Classes

As discussed in more detail, *infra*, there is some question as to whether IPPs have met the typicality and adequacy requirements as to certain class representatives. However, even assuming that the Rule 23(a) requirements have been met, IPPs have not carried their burden under Rule 23(b)(3) to establish that the class is ascertainable, that the class action mechanism is superior to other methods of adjudication, or that common issues predominate over individual issues.

**A. Rule 23(a) Prerequisites**

1. <u>Numerosity</u>

Rule 23(a)(1) requires that the class be so numerous that joinder of all class members be "impracticable." Though there is no minimum number to meet this threshold, the Third Circuit has held that a proposed class of at least 40 members will satisfy this requirement. <u>See</u> <u>Stewart v. Abraham</u>, 275 F.3d 220, 227 (3d Cir. 2001). Here, Plaintiffs state that the third-party transactional data produced in this case shows millions of individual purchases. IPP Mot. p. 8. Defendants do not challenge Plaintiffs' ability to meet this requirement. <u>See</u> ECF 549, IPP Reply pp. 7–8. The numerosity requirement is met.

2. <u>Commonality</u>

The commonality prerequisite contained in Rule 23(a)(2) requires that there be questions of fact or law that are common to the class. The Third Circuit has held that the bar to meeting this requirement is not a high one – a single common question can suffice. <u>Rodriguez v. Nat'l City Bank</u>, 726 F.3d 372, 382 (3d Cir. 2013). The question of whether there was an agreement to fix prices here is common to all class members, and is critical to all class members' claims. IPP Mot. p. 9. Defendants do not argue otherwise. The commonality requirement is met.

3. <u>Typicality and Adequacy</u>

Though typicality and adequacy are distinct requirements, they are often discussed together. Here, Defendants challenge the typicality and adequacy of certain class representatives. In making these challenges, Defendants discuss typicality and adequacy together, and at times confuse the two requirements in their argument.

a. <u>Applicable Law</u>

Rule 23(a)(3) requires that the claims or defenses of the representative parties are typical of the claims or defenses of the class. The purpose of the typicality requirement is to ensure that the class representatives are similarly situated to the rest of the class so that their representation of the class as a whole is fair. <u>In re Schering Plough Corp. ERISA Litig.</u>, 589 F.3d 585, 597 (3d Cir. 2009) (noting that representatives should align with the class as to their legal claims, factual circumstances, and stake in the litigation). By requiring that the representatives' interests align with those of the class, the court can then be sure that the representatives will work to benefit the entire class. <u>Pichler v. UNITE</u>, 228 F.R.D. 230, 250 (E.D. Pa. 2005), <u>aff'd</u>, 542 F.3d 380 (3d Cir. 2008).

Notably, variation in factual situations between the class representative and the other class members does not defeat typicality "if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members." <u>In re Schering Plough</u>, 589 F.3d at 598 (internal citations omitted); <u>see also</u> <u>Newton v. Merrill Lynch, Pierce, Fenner & Smith</u>, 259 F.3d 154, 184 (3d Cir. 2001). However, "a proposed class representative is not typical under Rule 23(a)(3) if 'the representative is subject to a unique defense that is likely to become a major focus of the litigation.'" <u>In re Schering Plough</u>, 589 F.3d at 598 (citing <u>Beck v. Maximus, Inc.</u>, 457 F.3d 291, 301 (3d Cir. 2006)).

Rule 23(a)(4) requires that the class representatives will "fairly and adequately protect the interests of the class," and relates both to the class representatives and its counsel. Under this requirement, the court must (1) ensure that the named plaintiff and their counsel have the ability and the incentive to represent the claims of the class vigorously, and (2) that there is no conflict between the individual's claims and those asserted on behalf of the class. <u>Dewey v. Volkswagen</u>

<u>Aktiengesellschaft</u>, 681 F.3d 170, 181 (3d Cir. 2012).  If there are intra-class conflicts, the court should ask whether the conflict is "fundamental," rendering the representation unfair to the unnamed class members.  <u>Id.</u> at 184.  A conflict is fundamental where some class members claim to have been harmed by the same conduct that benefitted other members of the class; a speculative conflict is not fundamental.  <u>Id.</u>

        b.  <u>Analysis</u>

Defendants identify nine named Plaintiffs, from eight different states, who they argue are either not typical of the putative class, or do not adequately represent the class.[4]  These arguments can be grouped into three categories: (1) the class representative is not a member of the class; (2) the class representative is subject to unique defenses; and (3) the class member lacks knowledge about their case.

Regarding the first category, Defendants argue that the evidence shows that the named plaintiffs from Florida and Minnesota purchased drywall that was manufactured by a company that is not a Defendant in this case.  Def. Br. pp. 71, 73.  As a result, Defendants argue that they do not fit the class definition, and cannot represent the class.  Although Defendants couch this as an adequacy problem, their argument fits more neatly into a typicality analysis.  That is, if the named Plaintiffs did not make a purchase of drywall manufactured by one of the Defendants or their affiliates or subsidiaries, they are not typical of a putative class of plaintiffs whose claims are based on their purchase of drywall made by a Defendant.

To show that Florida class representative Kevin Tragesser did not purchase drywall manufactured by any defendant, Defendants cite to Mr. Tragesser's deposition.  Def. Br. p. 71.

---

[4] Defendants do not challenge typicality or adequacy as to the named plaintiffs representing New York, Utah, or Michigan.

Defendants describe Mr. Tragesser's testimony as admitting that he purchased drywall on only one occasion, and the drywall he purchased was manufactured by Continental Building Products. Id. This overstates Mr. Tragesser's testimony. While Mr. Tragesser does not establish that he bought drywall manufactured by a Defendant, the testimony also does not conclusively establish that he did not purchase drywall manufactured by a Defendant or their affiliates. Def. Br., Ex. 2. It is too speculative at this point to hold that Mr. Tragesser is not a member of the putative class. The record is even less clear as to Minnesota representative Mark Petersen, and this Court declines to hold definitively that Mr. Pertersen is not a member of the class.

Turning to the second category of Defendants' typicality and adequacy arguments, Defendants argue that several named Plaintiffs vary in factual circumstances and are subject to unique defenses which make their claims atypical of the class. Though unique defenses can defeat typicality, none of the defenses argued by Defendants – Statute of Limitations, lack of injury, and evidence spoliation – rise to this level. That is, none of these are likely to become the focus of the litigation. The Court notes that the types of purchasers included in the putative IPP class vary widely, which raises questions about typicality. However, the Third Circuit has made clear that variation in factual circumstances between putative class members do not generally defeat typicality except where those factual differences create a conflict between class members. That is, in a circumstance like this one, where one unlawful scheme is alleged, the differences between class members will not be enough to defeat typicality. The variation between class members is better analyzed under the predominance framework.

In their third category of typicality and adequacy arguments, Defendants argue that certain Plaintiffs lack knowledge about their case, and therefore cannot adequately represent the class. Courts have declined to find that a lack of knowledge on the part of a named Plaintiff can

defeat adequacy, except in the most egregious of cases.  <u>Chakejian v. Equifax Info. Servs. LLC</u>, 256 F.R.D. 492, 499 (E.D. Pa. 2009) (collecting cases).  Practically speaking, class counsel, not named Plaintiffs themselves, are protecting the rights and interests of the class members. The lack of knowledge alleged by Defendants does not rise to the level required to defeat adequacy.

Though there are some questions regarding Plaintiffs' ability to satisfy the typicality requirement, the Court finds that Plaintiffs have satisfied the Rule 23(a) prerequisites to class certification.  The Court turns now to Rule 23(b)(3).

**B. Rule 23(b)(3) Requirements**

Rule 23(b)(3) contains two explicit requirements (predominance and superiority), and one implied, judicially created requirement (ascertainability).

1. <u>Implied Ascertainability Requirement</u>

Plaintiffs seeking certification under Rule 23(b)(3) must show that the identities of the class members are ascertainable.  In the Third Circuit, the ascertainability inquiry is two-fold. First, plaintiffs must show that the class is defined with reference to objective criteria, then second, that there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.  <u>See</u> <u>Carrerra v. Bayer Corp.</u>, 727 F.3d 300, 355 (3d Cir. 2013).

There is no dispute that the IPP class is defined with reference to objective criteria, so the first prong is satisfied.  However, the Plaintiffs' ability to meet the second prong of the ascertainability requirement is fiercely contested.

a. <u>Summary of Parties' Arguments</u>

IPPs contend that identifying class members will be reliable and administratively feasible.  Plaintiffs propose identifying class members via proof of purchase, and affidavit.  <u>See</u>

IPP Mot. p. 34. Plaintiffs' proposed proofs of purchase include receipts, purchase records from big box retailers, or photographs of the drywall they purchased, which, in compliance with the industry labeling and production standards, include the manufacturer name on the paper-backing of the wallboard. Id. at 35. Further, Plaintiffs submit with their motion the declaration of Shandarese Garr, a class action claims administrator, who describes how class members can be identified and how false claims can be weeded out. See id., Ex. 54.

Defendants argue that no reliable, administratively feasible method for ascertaining this class exists. Def. Br. p. 14. They point out that unlike the proposed direct purchaser class, the putative IPP class members here (end users of drywall) cannot be identified by Defendants' transactional data or other records. Id. Further, though some putative class members purchased drywall from a big box retailer like Home Depot, there are no reliable records from those retailers, because they cannot differentiate purchases of drywall "for end-use" from purchases "for resale." Id. at 16. Further, Defendants argue that the retailer records often do not specify the manufacturer or type of drywall purchased. Id. Defendants contest the reliability of the method proposed by Ms. Garr, because it relies too much on the putative class members "say so" by allowing them to substantiate their claims using documents that do not actually show purchases of drywall, such as credit card and bank statements. Id. at 17. Moreover, Defendants argue that Plaintiffs' "say so" has already proven to be unreliable, as the named Plaintiffs could not recall the manufacturer of the drywall they purchased when asked at their deposition. Id. at 19. Defendants argue that the only way to contest Plaintiffs' class membership would be via mini-trial for each Plaintiff, which is not administratively feasible. Id. at 19.

In their reply, Plaintiffs emphasize that Defendants' argument that the class members' identification must not rely on the class members "say so" would be valid only if there were no

other indicia of reliability.  IPP Reply p. 12.  IPPs propose substantiating class membership as follows: (1) through the transactional data produced in this litigation, (2) through the class members' own purchase records, i.e. receipts, invoices, contracts or other documentary proof, or (3) through the drywall itself, i.e. by providing photographs of the back of their drywall.  Id. at 13.  Defendants characterize this method as the antithesis of administrative feasibility.  See Def. Post-hrg Br. p. 3.  In response, Plaintiffs argue that Defendants misstate the law on administrative feasibility of ascertaining the class, and emphasize that "the focus is not on any purported difficulties class members would have gathering evidence to support their claim, but rather on whether the Court will need to engage in 'extensive and individualized fact-finding' when analyzing that information."  IPP Reply p. 12.

### b.  Third Circuit Opinions on Ascertainability

In the last five years, the Third Circuit has addressed the ascertainability requirement extensively – in six opinions in particular.  To understand this requirement as it is applied in this Circuit, it is useful to explore these opinions.

### i.  *Marcus v. BMW of North America*

First, in Marcus v. BMW of North America, 687 F.3d 583 (3d Cir. 2012), the Third Circuit reversed the District Court's certification of a class of "owners and lessees of . . . BMW vehicles equipped with run-flat tires manufactured by Bridgestone . . . sold or leased in the United States whose tires have gone flat and been replaced . . . ."  Id. at 592.  The Third Circuit based their reversal in part on the plaintiffs' failure to meet the ascertainability requirement.  Id. at 593.  Writing for a unanimous panel, Judge Ambro emphasized three objectives that the ascertainability requirement is intended to serve.  Id. at 593.  First, the requirement "eliminates serious administrative burdens . . . by insisting on easy identification of class members," second,

"it protects absent class members by facilitating the best notice practicable," and third, "it protects defendants by ensuring that those persons who will be bound by the final judgment are clearly identifiable." Id. (internal quotations and citations omitted).

The panel held that the plaintiffs could not meet this definition in Marcus because it could not be determined from the defendant's records which vehicles fit the class definition. Id. That is, BMW did not keep a record of which cars had Bridgestone tires on them, and there was no way for BMW to know whether a customer replaced their tire, because the class was not limited to customers who took their cars to BMW dealers for tire replacement. Id. at 593–94. The Third Circuit held that without the ability to identify class members via the defendant's records, plaintiffs were required to come up with an "administratively feasible alternative" that was more reliable than just the potential class members say-so. Id. at 594.

### ii. _Hayes_ and _Carrera_

One year later, the Third Circuit issued two opinions on ascertainability authored by Judge Scirica. See Hayes v. Wal-Mart Stores, Inc., 725 F.3d 349 (3d Cir. 2013); Carrera v. Bayer Corp., 727 F.3d 300 (3d Cir. 2013). In Hayes, the panel reiterated the two-prong ascertainability test set forth in Marcus, holding that the class must be defined with reference to objective criteria, and there must be a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition. Hayes, 725 F.3d at 355. Applying this standard, the Third Circuit reversed the District Court's certification of a class of "consumers who . . . purchased from Sam's Clubs in the State of New Jersey, a Sam's Club Service Plan to cover as-is products" excluding those "whose as-is product was covered by . . . warranty, was a last-one item" and those who received service or a refund. Id. at 353. Sam's Club, which is owned and operated by Wal-mart, did not specifically track purchases of as-is

items, let alone track the reason it was being sold "as-is."  Id. at 352.  Because Wal-mart's records could not identify which customers met the class definition and which did not, the unanimous panel remanded to the District Court, instructing that the plaintiffs bore the burden to show, by a preponderance of the evidence, that there existed a reliable, administratively feasible way to determine who was a member of the class.  Id. at 356.

Less than one month later, in Carrera, Judge Scirica had the opportunity to reprise his Hayes opinion, again writing for a unanimous panel.  Carrera, 727 F.3d 300.  In Carrera, the Third Circuit reversed the certification of a class of consumers who purchased a weight loss product produced by Bayer ("WeightSmart") in the state of Florida.  Id. at 304.  In doing so, the panel rejected the plaintiff's proposed methods of showing class membership: (1) retailer records of sales made with loyalty cards, or online sales records, and (2) affidavits of class members attesting to their purchases of WeightSmart, along with a declaration of an experienced claims administrator showing how the affidavit process would work, and a model for eliminating fraudulent claims.  Id. at 308.  The panel rejected the first type of evidence as unreliable because there was no evidence to show that all retailers that sold WeightSmart in Florida had loyalty card programs, or that these retailers' records would show the purchasers of WeightSmart.  Id. at 308–09.  The panel held that the second type of evidence was not administratively feasible, emphasizing the importance of preserving the Defendant's ability to challenge class membership.  Id. at 309.  On this topic, the panel noted that this was especially a concern where the named plaintiff's deposition testimony suggested that the putative class members would have difficulty accurately recalling their purchases of WeightSmart.  Id.

After the panel issued its decision in Carerra, the plaintiffs petitioned for rehearing en banc.  Carrera v. Bayer Corp., No. 12-2621, 2014 WL 3887938 (3d Cir. May 2, 2014).  The

Third Circuit denied the plaintiffs' petition, but the vote was not unanimous. Id. at *1. Indeed, Judge Ambro, the author of the Marcus decision, wrote a dissent from the denial of the plaintiff's petition for rehearing which was joined by three other judges. Id. In his dissent, Judge Ambro cautioned that the Carrera decision may have gone too far in its extension of the Marcus ascertainability requirement despite the Carrera panel's characterization of their decision as a straightforward application of Marcus. Id. Referencing an amicus brief filed in support of rehearing by civil procedure professors, Judge Ambro opined that the judicially created ascertainability requirement was at risk of eviscerating the purpose of Rule 23, and deserved consideration from the full court. Id.

### iii. *Grandalski v. Quest Diagnostics*

Though it was not the focus of the opinion, the Third Circuit confronted the ascertainability requirement again the next year in an opinion authored by Judge Rendell, who was among the three judges joining Judge Ambro's Carrera rehearing dissent. Grandalski v. Quest Diagnostics Inc., 767 F.3d 175 (3d Cir. 2014). In Grandalski, the Third Circuit affirmed the District Court's denial of class certification to a group of plaintiffs who alleged that they had been overbilled by a medical testing company. Id. at 177. The District Court had provided several reasons for its decision, including the putative class's failure to meet the ascertainability, predominance, and adequacy requirements. Id. at 178–79. In affirming, the panel largely agreed with the District Court's reasoning, but clarified the ascertainability requirement as distinct from the predominance requirement. Id. at 184–85. That is, though each requirement seeks to eliminate individual issues, the two analyses should not be conflated. Id. The ascertainability requirement pertains to membership in the proposed class, whereas predominance pertains to eliminating or minimizing individual issues that would be involved in determining liability. Id.

Though it did not specifically say so, the Grandalski panel seemed to suggest that it would have reversed the District Court's ascertainability determination, because the District Court improperly conflated ascertainability and predominance. Id. at 185.

#### iv. *Byrd v. Aaron's Inc.*

Standing in slight contrast to the above-described cases is the Third Circuit's treatment of the ascertainability requirement in Byrd v. Aaron's Inc., 784 F.3d 154 (3d Cir. 2015), as amended (Apr. 28, 2015). In Byrd, Third Circuit reaffirmed its holdings and reasoning in Marcus, Hayes, and Carrera, but vacated the District Court's denial of class certification on ascertainability grounds. Id. at 158–59. The plaintiffs in Byrd sought to certify a class of purchasers of computers from the defendant or its franchisee, and their household members, whose computers had a piece of spyware installed and activated without consent. Id. at 160. The District Court denied certification for three reasons: (1) the class definition was under-inclusive because it did not include all individuals whose information was gathered by defendant, (2) the class definition was overbroad because not every computer with the spyware activated would be able to state a claim under relevant law, and (3) the phrase "household members" was vague. Id. The Third Circuit reversed on each of these grounds.

First, the panel declined to impose an "underinclusivity" test onto the ascertainability requirement. Id. at 167. The court clarified that if an individual was injured by the defendant, but did not fit the class definition, then that individual would not be bound by the outcome of the class action. Id. ("The ascertainability standard is neither designed nor intended to force all potential plaintiffs who may have been harmed in different ways by a particular defendant to be included in the class.") Second, the panel rejected the District Court's reasoning that the class definition was "overbroad" and therefore not ascertainable. Id. at 168. The Third Circuit held

that the district court's decision improperly injected the explicit requirements of Rule 23(b)(3) into the ascertainability analysis. Id. (citing Grandalski, 767 F.3d at 184, and re-emphasizing the distinction between the predominance and ascertainability requirements). Third, the court held that the term "household members" had a plain-language meaning, and there was an objective, and administratively feasible method for determining who was a member of the computer purchasers' households. Id. at 170. That is, the "household members" would have to prove that they shared an address with one of the 895 computer owners or lessees that had been identified from the defendant's own records. Id. at 170–71.[5]

### v. *City Select Auto Sales v. BMW Bank of North America*

Earlier this month, the Third Circuit issued yet another opinion addressing the ascertainability requirement in class actions. City Select Auto Sales v. BMW Bank of N. Am., __ F.3d __, 2017 WL 3496532 (3d Cir. Aug. 16, 2017). In City Select, the Third Circuit vacated the district court's denial of class certification on ascertainability grounds. Notably, however, the court reaffirmed its prior precedent and did not take the opportunity to retreat from the "heightened" ascertainability standard that has been developed in this Circuit, as urged by Judge Rendell in her Byrd concurrence.[6]

---

[5] With respect to the state of the ascertainability requirement in the Third Circuit, it is relevant to note that Judge Rendell wrote a concurrence in Byrd, in which she advocated a retreat from the "administratively feasible" requirement. Id. at 172 (Rendell, J., concurring). Judge Rendell commented that the "lengths to which the majority goes in its attempt to clarify what our requirement of ascertainability means" shows that the Third Circuit's "heightened ascertainability requirement defies clarification" and unfairly narrows the availability of class actions by "requiring that plaintiffs conjure up all the ways that they might find the evidence sufficient to approve someone as a class member." Id. at 172, 174. The Second Circuit recently agreed with Judge Rendell's reasoning, declining to adopt the Third Circuit's "heightened" ascertainability requirement. In re Petrobras Sec., 862 F.3d 250 (2d Cir. 2017).
[6] In City Select, Judge Fuentes reprised Judge Rendell's Byrd concurrence, by writing separately to voice his endorsement of a retreat from the heightened ascertainability requirement

Plaintiffs in <u>City Select</u> were independent car dealers who brought claims under the Telephone Consumer Protection Act against BMW who they alleged sent them unsolicited faxes through a database called "Creditsmarts." <u>Id.</u> at *2. The plaintiffs sought to certify a class of "all auto dealerships that were included in the Creditsmarts database on or before December 27, 2012, with fax numbers identified in the database who were sent one or more telephone facsimile messages between November 20, 2012 and January 1, 2013, that advertised the commercial availability of property, goods or services offered by BMW Bank of North America." <u>Id.</u> The District Court denied certification on ascertainability grounds, concluding that "even though [p]laintiff may be able to identify the potential universe of fax recipients, there is no objective way of determining which customers were actually sent the BMW fax." <u>Id.</u> at *3.

The Third Circuit vacated and remanded, because the court determined that the use of the Creditsmarts database, which included the entire potential universe of class members because it was part of the class definition, in addition to affidavits, could have been a reliable and administratively feasible method of determining class membership. <u>Id.</u> at *6. The panel agreed with defendants that it was possible that the database could have been so over-inclusive as to render the identification method infeasible, but the panel could not make that determination because the database itself was not part of the record. <u>Id.</u> However, the Third Circuit emphasized that in that case, due to the limited universe of potential plaintiffs, two policy considerations that underpin the administrative feasibility requirement were not concerns: facilitating opt-outs and identifying persons bound by the final judgment. <u>Id.</u> at *5.

c.  <u>Ascertainability Analysis</u>

Ascertainability was discussed extensively at oral argument, and was again addressed by the Parties in their post-hearing briefs. Unsurprisingly, Plaintiffs rely heavily on the <u>Byrd</u>

decision, and emphasize the language in that opinion which tends to downplay the standard required for "administrative feasibility." The Court recognizes the small shift apparent in the language of the majority opinion in <u>Byrd</u>, and in the larger shift urged by Judge Rendell's concurrence. However, the administrative feasibility requirement remains part of the ascertainability inquiry in this Circuit, as confirmed by the Third Circuit's recent decision in <u>City Select</u>.

Plaintiffs have not proven, by a preponderance of the evidence, that their method for ascertaining membership in the State Damages Classes is administratively feasible as defined by the Third Circuit. Plaintiffs seek to capture the "repair and remodel" segment of the market, including "Do-it-yourself" purchasers (those who buy and install drywall themselves) and "Do-it-for-me" purchasers of drywall (those who pay for drywall as part of a home remodeling contract). This means that Plaintiffs seek t certify a class of homeowners, and business owners, or even tenants of residential or commercial properties, who have purchased and installed drywall in various buildings, whether factories, commercial buildings or residential homes, in the last five years. This definition probably includes millions of plaintiffs.

IPPs propose ascertaining class membership through affidavit, along with supporting evidence via limited transactional data from "big box" retailers, proof of purchase when available, and photographs of the drywall itself.

This method is not reliable or administratively feasible. Affidavits, without sufficient indicia of reliability, are not sufficient to satisfy the ascertainability requirement. See <u>Carrerra</u>, 727 F.3d at 306. The supporting evidence proposed by Plaintiffs is not sufficient indicia of reliability, and does not assist with the core concerns articulated in <u>City Select</u>, facilitating opt-outs and identifying persons bound by the final judgment. <u>City Select</u>, 2017 WL 3496532, at *5.

The best, most objective evidence proposed by Plaintiffs is the records from the big box stores, but Plaintiffs admit that the transactional data available from those stores is limited where available, and is not available from all retailers. Indeed, incomplete transactional data was rejected by the Third Circuit as a reliable method for ascertaining class membership. See Carrera, 727 F.3d at 308–09.

Plaintiffs claim that because drywall is a large purchase for most people who purchase it, those plaintiffs will be likely to have retained records memorializing their purchase. The Court recognizes that though purchasers may be more likely to retain records of drywall purchases as opposed to a product like eggs, there is still serious doubt that putative class members would have retained records for the six years at issue in this case. Further, there is no evidence to suggest that the so-called "proofs of purchase" actually prove that a consumer purchased drywall in one of the states at issue, or that was manufactured by one of the defendants. Cf. Hayes, 725 F. 3d at 357 (holding that records that cannot identify which customers meet the class definition are insufficient to meet the ascertainability requirement). Further, even if there was more complete data from the big box retailers, or if all purchasers retained their proofs of purchase, much of the data would not allow the parties or the Court to determine whether the purchasers identified by the data purchased their drywall "for end use" as is required by the class definition.

Plaintiffs next propose using the "drywall itself" as indicia of reliability, arguing that the name of the manufacturer is always printed on the back of the drywall. Even assuming that this is true for all drywall, there is no evidence in the record to indicate how long the imprint generally lasts after it is incorporated into a building. Further, even if the imprint is present, a photograph of the drywall does not allow Defendants to challenge the core feature of class membership – the purchase of drywall for end use. That is, Defendants will not be able to

determine from the photograph when the drywall was purchased, where it was purchased, if it was purchased as part of a completed home or building (which is excluded from the class definition) or as a standalone product (which is included in the class definition). In addition, the Court tends to agree with Defendants that relying on the putative class members to demolish some of their home or business to offer questionable proof of class membership is antithetical to the administrative feasibility requirement. Indeed, there has been no evidence presented which would allow the Court to understand exactly what is entailed in this demolition process and whether it produces reliable results or photographs.

The Court notes generally that this case stands in stark contrast to the factual scenarios present in the Third Circuit's recent decisions in Byrd and City Select. In both of those cases, the possible universe of plaintiffs was defined with reference to a single database, and defendants claimed that there was difficulty ascertaining who among those listed in the database qualified for class membership. This case is very different – IPPs do not even know the number of potential class members. Indeed, Plaintiffs could have defined their class more narrowly and in a manner that would have allowed for improved ease of ascertainability, but elected not do so.

In addition, IPPs include in their definition of a class member anyone who is an "end user" of drywall "to the present time." This open-ended timeframe is not warranted here, and further complicates ascertainability. This is not a case of an alleged "continuing violation" which may allow damages to be awarded for a time period after the complaint was filed. Indeed, very few cases have facts which qualify for damages "up to the present time." Moreover, the phrase is vague – does it end when the complaint was filed? At class certification? Or at some later time? It was the responsibility of counsel for IPP to limit the class in an ascertainable way,

and by including the open-ended timeframe in the definition, IPPs have provided an additional reason to find that the class is not ascertainable.

The Court concludes that IPPs have not met their burden to show that their proposed class is ascertainable.

### 2. Predominance

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual class members." Fed. R. Civ. P. 23(b)(3). Assessing predominance requires an examination of each element of a legal claim, "through the prism" of Rule 23(b). Marcus, 687 F.3d at 600. Plaintiffs must show, by a preponderance of the evidence, that each essential element of its claim can be proven with classwide, as opposed to individualized, evidence. Hydrogen Peroxide, 552 F.3d at 311–12. In assessing predominance, the Court must "formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." Id. at 311. The three relevant elements of an antitrust claim that must be capable of common proof for the class to be certified under Rule 23(b)(3) are: (1) violation of antitrust laws, (2) antitrust impact, and (3) measurable damages. Id., 552 F.3d at 311–12.

### a. Violation of Antitrust Laws

Faced with the Illinois Brick bar to damages recovery for Indirect Purchasers under federal antitrust laws, IPPs bring claims under the antitrust, consumer protection, and unjust enrichment laws of 11 states. Proving an antitrust violation may differ between these various laws, but this has not been focused on by the parties. Nevertheless, even if the same proof can be used to show a violation, variation among state laws raises other serious questions of predominance and case manageability. These issues are discussed, *infra*.

At least with respect to whether there has been an unlawful agreement in violation of federal antitrust laws (and by extension, state laws, to the degree they mirror federal law), common issues predominate. As this Court held in its summary judgment opinion, Plaintiffs have uncovered sufficient evidence from which a jury could conclude that Defendants agreed to fix prices of paper-backed gypsum wallboard, in violation of the federal antitrust laws. This evidence is likely admissible at trial, and can establish violation on a classwide basis. As a result, the remaining questions relevant to this motion are whether antitrust impact and measurable damages can be proven on a classwide basis.

### b. Antitrust Impact

Antitrust impact refers to injury – that is, each plaintiff must show that it suffered injury as a result of the defendants' unlawful behavior. Id. (citing Bogosian v. Gulf Oil Corp., 561 F.2d 434, 454 (3d Cir. 1977)). Though plaintiffs need not prove the element of antitrust impact at the class certification stage, they must "demonstrate that the element of antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members." Id.

### i. Daubert Motions

To show antitrust impact, IPPs rely primarily on the expert reports of Dr. Dwyer and Dr. Harris. In opposition, Defendants submitted the expert opinion of Dr. Johnson. All three experts filed voluminous economic reports, and were deposed. Defendants moved to preclude the opinion of both of IPPs' experts, under Daubert v. Merrell Dow Pharm. Inc., 509 U.S. 579 (1993), but IPPs did not challenge the admissibility of the opinion of Defendants' expert.

District Courts can exercise discretion when applying Daubert to a particular case. That is, the Circuit Court will not disrupt a District Court's decision to admit or exclude expert

evidence unless the decision "rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." In re TMI Litig., 193 F.3d 613, 666 (3d Cir. 1999).

The Court has no doubt as to Dr. Dwyer's or Dr. Harris's qualifications as expert economists. The Court further finds that their reports establish that they have acquainted themselves with the issues in this case, as well as the factual record; their reports are "reliable" and also "fit" to the issues and facts in this case. Thus, under the Daubert standards as interpreted by the Third Circuit, see In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717 (3d Cir. 1994); see also Dominguez v. Yahoo!, Inc., No. CV 13-1887, 2017 WL 390267, at *13 (E.D. Pa. Jan. 27, 2017) (Baylson, J.), the Defendants' Daubert motions are DENIED.

The Court finds that IPPs' experts have undertaken an inquiry into the subject matter of this case with expertise, and they have recognized the issues in the case and just because the court eventually disagrees with their conclusion does not mean that they have failed to meet the Daubert requirements.

This determination that the experts' reports will be considered on the class certification issue has no bearing on whether the reports establish that antitrust impact and damages can be proven on a classwide basis.

ii.   Economic Evidence

In the Court's recent decision certifying a class of direct purchasers of drywall, the Court undertook a lengthy analysis and review of the usefulness of economic and econometric evidence to prove antitrust impact. The Court incorporates by reference much of that analysis here.

Here, the debate between the expert economists, reflected with admirable advocacy in the briefs, about proving antitrust impact on a classwide basis, under <u>Hydrogen Peroxide</u> standards, is similar, but only to a limited degree, to the debate in the DPP memorandum recently filed. In the DPP case, the Court concluded that distinct facts of the drywall industry underlying the dueling econometric opinions, along with DPPs' regression study based on those facts, compared with Defendants' expert opinion which ignored many of those facts, warranted a conclusion that the common issues as to antitrust impact predominated, even if some econometric tests shed doubt.

However, the Court cannot make the same conclusions, or even inferences, as to the IPPs, because of the highly differentiated distribution, sale, and installation facts, surrounding drywall as it moves from the manufacturer to the end user. Thus the Court does not enter into, or reach conclusions about, the analysis of the econometrics as discussed in the very detailed expert opinions, except to conclude that the IPPs' experts, Dr. Harris and Dr. Dwyer, have ignored many complications documented by Defendants, and raised by the Court at oral argument, which require a conclusion that IPPs have not met their burden of proving that antitrust impact can be proven via classwide evidence.

In determining that a detailed econometric analysis is not necessary, the Court relies in part on its conclusions discussed elsewhere in this memorandum, that IPPs have also failed to satisfy their burden of proving the other requirements of Rule 23(b)(3) – that the class is not ascertainable, and that case management would be too difficult.

### iii. <u>Synopsis of Proposed Classwide Evidence</u>

Plaintiffs intend to show antitrust impact by showing (1) that all Direct Purchasers were impacted by the Defendants' price increase, and (2) that the Direct Purchasers passed the

overcharges onto their customers (IPPs). Defendants dispute that IPPs' method is capable of showing impact on a classwide basis.

1.  Step 1: All Direct Purchasers suffered impact

Plaintiffs intend to show that all direct purchasers suffered impact through: (i) documentary evidence that the price increase was implemented universally across the direct purchaser class, (ii) structural characteristics of the drywall industry that would ensure that the collusive increases would impact all direct purchasers, and (iii) Dr. Dwyer's merits report in which he conducted a regression to show that prices in the industry went up as a result of the conspiracy. IPP Mot. at 15-17.

Defendants argue that IPPs' expert, Dr. Dwyer, does not do a regression to compare what the conditions would have been absent the conspiracy, but assumes that any increase above 1% constitutes impact. Def. Br. at 24–25. IPPs argue that Dr. Dwyer did do a regression analysis in his merits report, and found an overcharge that would have applied to all direct purchasers. IPP Mot. at 17. Plaintiffs further object to Defendants' characterization of the law – they argue that at this stage, they need not actually show antitrust impact, but that they intend to offer common proof to show antitrust impact at trial. IPP Reply at 24.

2.  Step 2: Direct Purchasers passed on the overcharge, and the end users were impacted

Plaintiffs seek to establish that the overcharges were passed onto IPPs through deposition testimony, and also expert reports. IPPs argue that deposition testimony indicates that as a general rule, direct drywall purchasers like to pass on the costs to the end users. IPP Mot. 17–18. Dr. Harris discusses market characteristics and economic theory to show that economic theory would expect end users to be impacted as a result of the price increases. Id. at 19–23. Further, Dr. Dwyer conducted an econometric analysis to show pass through to end users. Id. at 23–30.

With respect to Dr. Dwyer's econometric analysis, Defendants argue that the methods he used to show pass through are inconsistent with one another – the same Plaintiff may be found to have experienced an overcharge when using one method, but not when using another. Defendants point out that there are a lot of different supply chains in the Drywall industry, so being able to assess pass through for all IPPs is difficult, and the IPPs have not presented a method that can do this. In response, IPPs go through each type of supply chain and argue that "common proof" can be used to show pass-through impact for each chain's end-user.

iv.  Analysis

IPPs fail to show that antitrust impact can be proven on a classwide basis. In arriving at this conclusion, the Court does not wrestle with every econometric disagreement discussed in the briefs and expert reports. Instead, the Court finds that there are sufficient criticisms advanced by Defendants and Dr. Johnson that IPPs, Dr. Dwyer, and Dr. Harris do not adequately respond to which prevent a finding that common issues predominate as to antitrust impact.

1.  Overcharge to Direct Purchasers

The Court notes that there are potential issues with the manner in which IPPs propose to show that all direct purchasers were impacted by the conspiracy. Namely, Defendants criticize that neither of IPPs' experts conducts a regression analysis that is capable of showing individual impact for any of the direct purchasers. Further, Defendants point out that in Dr. Dwyer's class report, he does not do any regression that relates to the direct purchasers, but rather assumes impact if the direct purchaser experienced a 1% increase in price during the conspiracy period. These issues alone may be enough to defeat a finding of predominance. However, a lengthy analysis is not necessary, given the multitude of issues with showing that the direct purchasers passed through the overcharge to IPPs. Further, as the Court has previously held that DPPs had

presented classwide proof capable of establishing antitrust impact, we will assume for the purposes of this memorandum that this aspect of proving impact can be done via classwide evidence.

## 2. Pass-through to Indirect Purchasers

At the class certification stage, a putative indirect purchaser class must show that they can prove through common evidence that overcharges were eventually passed to them. In re Class 8 Transmission Indirect Purchaser Antitrust Litig., 679 F. App'x 135, 141 (3d Cir. 2017). IPPs have not met their burden to show pass-through here.

As discussed in Part IV.B.1, *supra*, IPPs vary widely in the manner in which they purchased drywall. These distribution channels are shown in a chart in Dr. Johnson's report. Johnson Report ¶ 21, Exh. 1. For example, the IPP putative class includes both a DIY customer who purchases a piece of drywall from Lowe's, and a commercial building owner who pays her contractor for drywall as part of a large installation job. The contractor may have purchased the drywall they used in the installation from any number of places, including a gypsum specialty dealer, a building material dealer, or a big box store. This complex distribution scheme tends to defeat a finding of predominance. Cf. Class 8 Transmission, 679 F. App'x at 140. IPPs' expert, Dr. Harris, ignores this evidence and opines, contrary to the record, that "[t]he distribution channel from manufacturer to end-user is short and easily identified." Harris Reply Report ¶ 6. The Court rejects this opinion as clearly contrary to the record and a vast oversimplification of the drywall market.

Under Hydrogen Peroxide, the District Court must forecast into a projected trial scenario. A trial of IPPs' claims would require several additional layers of evidence to show that the IPPs suffered antitrust impact as a result of a conspiracy to fix prices. Even assuming that the direct

purchaser trial has taken place, the DPPs have been successful, and the trial judge therefore applies collateral estoppel as to the finding of a conspiracy, the IPPs must then still prove themselves antitrust impact and damages. Dr. Dwyer presents a model showing pass through, but he admits that his model does not assess impact on end users, but rather it assesses impact on the customers of certain direct purchasers. Dwyer Class Report ¶¶ 39, 43. As Defendants point out, only three of the direct purchasers analyzed even sell to end-users. Def. Br. at 38. Dr. Dwyer's analysis therefore ignores a substantial portion of the complex distribution scheme, discussed above. This type of selective data presentation was fatal to the indirect purchasers in Class 8, and is similarly fatal to IPPs bid for certification here. See Class 8 Transmission, 679 F. App'x at 141.

Perhaps the best illustration of why the economics of drywall may not support a classwide impact analysis for the IPP class as its currently defined, relates to the very nature of home remodeling projects. Most contractors give a flat price for a specific remodeling job. Undoubtedly, the contractor wants to make a profit. And undoubtedly, if the cost of raw materials has increased over a period of time, the contractor is likely to want to "pass on" that increase to the consumer. However, if the contractor is anxious for the work, then the pass on would be less than if the contractor was very busy and didn't want to "discount" her prices. Nonetheless, the contractor, likely knowing that there are going to be competing bids for the same project, may not pass on an increase in the cost of raw materials, such as drywall, if the contractor knows that she can make a profit on labor or the profit margin she gets from using subcontractors and paying them a lesser amount than the consumer is being charged for that subcontracting work. These varying scenarios show the difficulty in not only parsing out how

much was actually paid for drywall in the contractor-remodel scenario, but how much of any alleged overcharge would have been passed on to the "end user."

An indirect purchaser class that was limited to individuals who purchased drywall directly from the mass merchandisers (Home Depot, Lowe's and Menard's) would likely have been a closer case, at least for showing impact on a classwide basis. IPPs, by failing to limit the class to individual purchasers of drywall, have sunk themselves into an economic morass that cannot survive <u>Hydrogen Peroxide</u> analysis.

### c. Measurable Damages

Plaintiffs must also demonstrate that common issues predominate as to the element of "measurable damages." <u>Hydrogen Peroxide</u>, 552 F.3d 305, 311-12 (3d Cir. 2008) (citing <u>Newton v. Merrill Lynch</u>, 259 F.3d 154, 188 (3d Cir. 2001) ("In antitrust . . . actions, proof of injury (whether or not an injury occurred at all) must be distinguished from calculation of damages (which determines the actual value of the injury.)" Therefore, the Court must consider whether "there is a classwide method for proving damages, and if not, whether individual damage determinations will overwhelm the common questions on liability and impact." <u>Kleen Prods. LLC v. Int'l Paper Co.</u>, 831 F.3d 919, 929 (7th Cir. 2016).

### i. Parties' Arguments

Defendants argue that IPPs barely address their damages method in their class certification motion. Further, Defendants point to deposition testimony that neither of IPPs' experts have done a damages model analysis. IPPs respond that they have created a "straightforward" method of calculating damages, relying on the overcharge rate to direct purchasers as measured by Dr. Dwyer's merits report, and multiplying that by the total amount of home remodel business, and then adjusting for the pass-through rate to indirect purchasers.

ii. <u>Analysis</u>

Though it is true that individual damages calculations are not required at the class certification stage, the IPPs bear the burden to prove, by a preponderance of the evidence, that they will be able to come up with a workable damages model at trial. It is apparent from the deposition testimony and the briefing that IPPs have given little thought to this requirement. Though IPPs are correct that at this stage, they "are not required to prove damages by calculating specific damages figures for each member of the class," they nevertheless must show that a "reliable method is available to prove damages on a classwide basis." <u>In re Wellbutrin XL Antitrust Litig.</u>, 282 F.R.D. 126, 144 (E.D. Pa. 2011). Additionally, "[c]alculations need not be exact . . . but at the class certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation." <u>Comcast</u>, 133 S. Ct. at 1433 (citations and internal quotation omitted).

The model currently proposed by IPPs, seemingly as an afterthought, is riddled with assumptions that divorce the model from the facts and the theory of liability in IPPs' case. For example, IPPs' damages model assumes a 100% pass-through rate, which is something that they must prove. Further, the model intends to use aggregated figures of "repair and remodel" market segment, which is seemingly unrelated to their proof in this case. Under the Supreme Court's decision in <u>Comcast</u>, a damages model not reflecting the facts of the case or theory of liability is not permitted. Therefore, the Court holds that IPPs have not carried their burden as to classwide proof of measurable damages.

d. Variations in State Law

As mentioned above, IPPs bring claims under the laws of 11 different states, comprising three different claim types (state antitrust, consumer protection, and unjust enrichment), for a total of 22 state law claims. Under the Supreme Court's decision in <u>Phillips Petroleum Co. v. Shutts</u>, 472 U.S. 797 (1985), this Court would likely be required to apply the laws of each individual state which creates each particular cause of action. <u>Shutts</u>, 472 U.S. at 821. It is possible that this diverse application of laws could overwhelm a district court managing a nationwide class action, and therefore, at the class certification stage, it is important to consider how variations in state law may defeat predominance. <u>See</u> <u>Grandalski</u>, 767 F.3d at 184 ("class action movants must credibly demonstrate through an extensive analysis of state law variances that class certification does not present insuperable obstacles").

IPPs have not met their burden here to show that common issues predominate amongst their state law claims. Having largely failed to address this issue in their Motion, IPPs attempt to remedy this oversight in their Reply. However, IPPs' analysis of the State Laws in their Reply is overly-simple. For example, IPPs state that all antitrust laws require the same elements: antitrust violation, antitrust impact, and measurable damages. However, IPPs do not engage with any potential differences in state law as to those elements. That is, is an "antitrust violation" the same in every state? Indeed, it is already apparent to the Court that variations in state law could "swamp" common issues, due to its initial engagement with Defendants' pending Motion to Dismiss (ECF 504). This Motion is based on substantive state law that is not consistent among states. Many of these issues are complex, and require in-depth, state-specific analysis.

Plaintiffs have not carried their burden to prove by a preponderance of the evidence that common issues predominate among their various state law claims.

3. Superiority

In addition to predominance, plaintiffs seeking certification under Rule 23(b)(3) must show that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). This requirement is commonly referred to as "manageability." Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 164 (1974).

In determining whether plaintiffs have met their burden on superiority, courts consider "class members' interests in pursuing separate actions, the extent of any independent litigation already begun by class members, the desirability of concentrating the litigation in this forum, and the difficulties likely to be encountered in the management of a class action." In re Mushroom Direct Purchaser Antitrust Litig., 319 F.R.D. 158, 208 (E.D. Pa. 2016), reconsideration denied, No. 06-0620, 2017 WL 696983 (E.D. Pa. Feb. 22, 2017) (citing Fed. R. Civ. P. 23(b)(3)(A)–(D)).

As discussed in the predominance analysis above, the IPP class contains many different types of purchasers. These purchasers acquired drywall through a variety of different distribution schemes. Dealing with these differently-situated Plaintiffs in the same litigation could pose significant manageability issues. Indeed, by including within the class such a large variety of purchasers that will be difficult to notify and identify, Plaintiffs have created substantial management problems.

Furthermore, variation in state law creates additional management problems, raising questions about superiority. Under Shutts, this Court must apply the laws of each individual state. Shutts, 472 U.S. at 821. Managing the myriad statutes and state law quirks already apparent to the Court presents questions regarding the superiority of the nationwide class action to adjudicate this case. Is the superior method of adjudicating IPPs' 22 claims brought under the

laws of 11 states (none of which is Pennsylvania) a nationwide class action conducted in Philadelphia?  This is a significant question with which Plaintiffs have not engaged.  Compare Judge Pratter's decision In re Processed Egg Prod. Antitrust Litigation, 312 F.R.D. 124, 164 (E.D. Pa. 2015) in which she found that a chart and trial plan describing how state law claims could be grouped and managed at trial were insufficient to quell manageability concerns.  What Judge Pratter found insufficient is considerably more than Plaintiffs have presented here.

Plaintiffs have not proven by a preponderance of the evidence that class action is the superior method for adjudicating their claims.  This is an additional reason to deny certification.

## V.  Alternative Classes

### A.  Nationwide Injunctive Class

IPPs, in the alternative, seek to certify a Nationwide Injunctive Class under Rule 23(b)(2), defined as follows:

> All persons and entities who, from January 1, 2012 through present, as residents of the United States, indirectly purchased gypsum board manufactured by any of the Defendants, their subsidiaries, affiliates, or joint-venturers for end use and not for resale.

Via the Nationwide Injunctive Class, IPPs seek injunctive relief under Section 16 of the Clayton Act.  Plaintiffs seeking certification under Rule 23(b)(2) need not satisfy the Rule 23(b)(3) requirements of ascertainability, predominance, or superiority.  However, they must satisfy the Rule 23(a) prerequisites, along with the requirements in Rule 23(b)(2).

Though Rule 23(b)(2) does not require predominance, ascertainability, or superiority, it is well established that a class certified under this rule must be cohesive.  Barnes v. Am. Tobacco Co., 161 F.3d 127, 143 (3d Cir. 1998).  Here, Plaintiffs must show that "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole," with respect to:

"(1) actual or threatened injury 'from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur;' (2) causation; and (3) likelihood that the equitable relief will redress the injury."  In re OSB Antitrust Litig., No. 06-md-826, 2007 WL 2253425, *17 (E.D. Pa. Aug. 3, 2007) (internal citations omitted).

The cohesiveness requirement serves two purposes.  First, "unnamed members are bound . . . without the opportunity to withdraw," so "the court must ensure that significant individual issues do not pervade the entire action because it would be unjust to bind absent class members to a negative decision where the class representatives' claims present different individual issues than the claims of the absent members." Second, "the suit could become unmanageable and little value would be gained in proceeding as a class action . . . if significant individual issues were to arise consistently."  Barnes, 161 F.3d at 143 (internal citations and quotations omitted).

It is clear from the Third Circuit's articulation of the rule that similar concerns are present in a Rule 23(b)(2) cohesiveness inquiry as are present in a predominance inquiry.  Here, the "causation" element required to prevail under the Clayton Act is similar to the "impact" requirement for damages claims.  Therefore, the same issues that prevented certification there, in particular the differences in factual circumstances between class members, also prevent a finding of cohesiveness here.  The factual circumstances among indirect purchasers vary widely.  For some class members, causation would be very complicated to prove, and for others, it would be less complicated.  It would be unfair to saddle some indirect purchasers who may have an easier time proving causation than others with a binding negative judgment, without the opportunity to "opt out."

**B. Issue Classes**

IPPs make the additional alternative argument that if the Court does not certify the state damages or national classes, then the Court should certify one of two "issue classes": (1) a liability only class, and (2) a violation only class. Defendants object to certification of issue classes. Defendants characterize this alternative argument as "gerrymandering predominance," and cite Gates v. Rohm & Haas Co., 655. F.3d 255 (3d Cir 2011) for the proposition that issue classes should be disallowed.

In Gates, the Third Circuit approved of the district court's denial of certification of issue classes. The Third Circuit noted that there had been a split in authority as to what extent the availability of issue classes under Rule 23(c)(4) altered the predominance requirement. Compare Castano v. Am. Tobacco Co., 84 F.3d 734, 745 n. 21 (5th Cir.1996) (describing Rule 23(c)(4) as a "housekeeping rule" allowing common issues to be certified only when the cause of action meets the predominance requirement), with In re Nassau Cty. Strip Search Cases, 461 F.3d 219, 226 (2d Cir.2006) (allowing certification of issue classes even if common questions do not predominate for the cause of action as a whole). In noting this circuit split, the Third Circuit declined to take either side, and instructed that district courts should consider several factors when deciding whether to certify issue classes, including *inter alia* the efficiencies to be gained by granting partial certification in light of realistic procedural alternatives, the complexity of the case, the types of claims at issue, and fairness to the parties. See Gates, 655. F.3d at 273 (citing ALI's Principles of Aggregate Litigation).

Here, balancing the litany of factors listed by the ALI principles and approved of by Gates, the Court will deny certification of any issue classes. The only issue on which a class might arguably be certified is on the issue of whether there was an agreement to fix prices. The

Court finds that there is little to gain for IPPs if the Court were to certify this issue class, in light of the other procedural options available, as it would do little to advance IPPs' claims.

On a related note, the Court notes that procedurally, one could envision a possibility that if the Direct Purchasers case were to proceed to trial and prevail in proving that an agreement existed, then, assuming the Indirect Purchasers had re-filed their claims in various state courts, either as individuals or as representatives of a class under state law, Defendants would be collaterally estopped from disputing the existence of an agreement.

## VI.    Conclusion

Initially, the Court tends to agree with Plaintiffs' legal assertion that multiple liability is permissible.  However, this only advances the ball a few yards and does not get close to the goal line.  The Court rejects the proposed indirect purchaser class action.  IPPs have tried to characterize their class members as the DIY or DIFM purchaser.  IPPs contend that these class members keep records, and can easily determine the manufacturer of the drywall that is in their homes or businesses.  For the reasons previously stated, the Court disagrees.

As noted above, another problem with the proposed class definition is that Plaintiffs contend it should extend to include purchases "to the present time."  This creates numerous management problems.  The DPP class wisely limited the class period for Direct Purchasers to January 1, 2012 through January 31, 2013.  The Court does not understand why IPPs did not propose a similarly finite time period.  A class extending "to the present" interferes with a lot of commercial transactions, possibly extending through the date of any trial.  Plaintiffs have not thought this through very clearly, but that is their problem, not the Court's.

The Court will require that Plaintiffs consider their procedural options and file a detailed proposal as to how the Indirect Purchaser cases should proceed further either in this Court, as an

individual action, and/or in the state courts, whether the case should be dismissed without prejudice, or whether Plaintiffs intend to appeal under Rule 23(f).

Plaintiffs shall file their proposals within 14 days and Defendants may respond within 14 days thereafter.  A hearing may then be scheduled.

An appropriate order follows.

O:\13-MD-2437 - drywall\Memo re IPP Class Cert.docx