## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: DOMESTIC DRYWALL<br>ANTITRUST LITIGATION | |
| THIS DOCUMENT RELATES TO:<br><br>All Direct Purchaser Actions | MDL No. 2437<br>13-MD-2437 |

## <u>MEMORANDUM</u>

**Baylson, J.**                                                                                    **July 17, 2018**

As part of the class settlement for Direct Purchasers in these cases, Plaintiffs have appropriately filed a Motion for Award of Attorneys' Fees and Expenses. The Court has reviewed the supporting documents filed by Plaintiffs' counsel and the applicable legal precedents and files this Memorandum in support of the award.

As the first step in the outstanding success of Plaintiffs' counsel, this case started as a traditional price-fixing antitrust case. Counsel had located several direct purchasers of drywall, extensively used in construction and renovation work, as Plaintiffs on behalf of class of similarly situated direct purchasers. The initial Complaint in this Court was filed on December 20, 2012, and shortly thereafter a number of other Complaints were filed and the Judicial Panel on Multidistrict Litigation consolidated all of the cases in this Court. An initial pretrial conference and scheduling order set in motion the start of discovery, and the Court determined other relatively routine issues that commonly arise in complex litigation.

The course of this litigation can be succinctly summarized by cross-reference to the major decisions issued by the undersigned on various issues in the case, as a prelude to the award of attorneys' fees:

**A.    Major Opinions in Drywall**

1.    <u>Use of contention statements rather than answers to interrogatories</u>

On May 12, 2014, Defendants served interrogatories asking Plaintiffs to state "all acts and omissions that you contend each took in furtherance of the alleged conspiracy." <u>In re Domestic Drywall Antitrust Litig.</u>, 300 F.R.D. 228, 229 (E.D. Pa. 2014). Defendants then filed a motion to compel. The Court decided Defendants' request was not premature, but that "[r]ather than compel individual Plaintiffs to answer Defendants' interrogatories at this time, the Court will adopt a sequence of pretrial statements under which Plaintiffs' counsel will be required to set forth facts in their possession supporting their allegations … Defendants must reciprocate." <u>Id.</u> at 231. The contention statements filed by Plaintiffs were detailed, thorough and reflected a great deal of high-quality work in assembling and the results of the discovery which they had conducted on a highly professional basis.

2.    <u>Thompson Research Group, LLC's motion to quash</u>

On May 15, 2014, the Court granted in part and denied in part the motion to quash subpoena of a non-party analyst Thompson Research Group, LLC, which had allegedly served as a "conduit" for information regarding pricing among Defendants. <u>In re Domestic Drywall Antitrust Litig.</u>, 300 F.R.D. 234 (E.D. Pa. 2014). The Court allowed some discovery as to Thompson, but asked the parties to insure the confidentiality of Thompson Research Group's sources, limit the intrusion into Thompson's investigative files, and required Plaintiffs to pay for the costs of complying with the subpoena. <u>Id.</u> This third party discovery was appropriate and

indeed, in retrospect, necessary because one of the theories of liability of the Plaintiffs was that the Defendants had used these third party marketing research firms as "conduits" for providing information from one Defendant to another as to their pricing plans, pricing decisions, and other normally confidential competitive strategies. Although the conduit theory is not completely novel in antitrust litigation, the results of this third party discovery proved to be very important in the Plaintiffs' building a successful dossier of evidence on liability issues as well as damages.

3.  Denial of summary judgment as to all Defendants except CertainTeed

Following the direct and indirect purchaser settlements with USG and TIN, the remaining Defendants moved for summary judgment, with voluminous affidavits, deposition testimony and documents, asserting that there were no genuine issues of fact as to any alleged agreement to fix prices, and that the Court should conclude that the Plaintiffs had failed to gather sufficient evidence to warrant a jury trial. On February 18, 2016, the Court granted CertainTeed's motion for summary judgment, finding that "Plaintiffs' evidence as to Defendant CertainTeed is not sufficient to show that CertainTeed participated in the conspiracy," but denied summary judgment as to all other moving Defendants. In re Domestic Drywall Antitrust Litig., 163 F. Supp. 3d 175, 230–31 (E.D. Pa. 2016). The Plaintiffs' responsive briefs were outstanding in all respects, with thorough responses, excellent briefs, and persuasive citations – all of which warranted the Court to deny summary judgment except as to CertainTeed, as noted above.

4.  Appointment of independent expert on class issues

The Court decided not to appoint an independent expert on class action issues, but on June 16, 2017, it instead appointed a "technical advisor," Dr. Jeffrey Church of the University of Calgary, to assist the Court on limited econometric issues. (Letter, ECF 601.) Because both Plaintiffs and Defendants had retained highly skilled and knowledgeable expert economists on

the class action issue, the Court determined to retain its own expert as to some of the economic issues in this case. Although this independent technical adviser generally sided with the Defendants' view of the economic theories, the Court concluded that the Plaintiffs' evidence warranted certification of a class of Direct Purchasers, but did not warrant a class of Indirect Purchasers.

5.   Grant of Direct Purchaser Litigation Class

On August 23, 2017, the Court approved a litigation class of direct purchasers of drywall, finding that the requirements of Rule 23(a) and Rule 23(b)(3), as interpreted by the Third Circuit, had been met. In re: Domestic Drywall Antitrust Litig., 322 F.R.D. 188 (E.D. Pa. 2017).

6.   Denial of Indirect Purchaser Litigation Class

On August 24, 2017, the Court denied certification of a litigation class of indirect purchasers of drywall. In re Domestic Drywall Antitrust Litig., No. 13-MD-2437, 2017 WL 3700999 (E.D. Pa. Aug. 24, 2017). The Court found that although the indirect purchaser plaintiffs had satisfied the requirements of Rule 23(a), they had not met the Third Circuit's implied ascertainability requirement for Rule 23(b)(3) class actions, and had not shown that common issues predominated or that a class action was the superior method for adjudicating their claims, as was required under Rule 23(b)(3).

7.   Third Circuit Rulings

The Third Circuit rejected appeals under Rule 23(f), filed by Defendants as to the Court's grant of a Direct Purchaser class action, and filed by Plaintiffs as to the denial of class certification of Indirect Purchasers.

Also, previously, although the undersigned had certified the denial of Defendants' motions for summary judgment for interlocutory appeal under 28 U.S.C. § 1292(b), the Third Circuit rejected the interlocutory appeal.

**B.    Determining Attorneys' Fees in Class Action Common Fund Settlements: the Percentage-of-Recovery Method**

There are two methods of calculating attorneys' fees—the percentage-of-recovery method and the lodestar method. Under the percentage-of-recovery method, counsel will typically take a certain percentage of the plaintiffs' total recovery, with the understanding that the attorney is working on a contingent basis. The percentage-of-recovery method is favored in class action settlements involving a common fund, allowing the court to award attorneys' fees "in a manner that rewards counsel for success and penalizes it for failure." In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 821 (3d Cir. 1995). The theory underlying the use of the percentage-of-recovery method is that "the class would be unjustly enriched if it did not compensate the counsel responsible for generating the valuable fund bestowed on the class." Id. Therefore, counsel's compensation depends directly on the value created for the class.

Under the lodestar method, attorneys' fees are calculated by multiplying the hours worked by counsel by the average hourly rate. This method is often used in the context of fee-shifting statutes, or to reward counsel for undertaking socially beneficial litigation in cases where the expected recovery is small enough such that utilizing the percentage-of-recovery method would yield inadequate compensation for counsel. Id. Even though the lodestar method is not the primary method for calculating attorneys' fees in class action common fund settlements, "it is sensible for a court to use [this] second method of fee approval to cross check" the award calculated under the percentage-of-recovery method. Id. at 820. What is often referred to as the "lodestar cross-check" is performed by dividing the total recovery requested under the

percentage-of-recovery method by counsel's lodestar value, yielding a "lodestar multiplier." Thus, a lodestar multiplier of 2 would mean that under the percentage-of-recovery method, counsel would receive twice the amount of compensation that they would typically request for the same number of hours expended on the litigation.

    1.    <u>Krell v. Prudential Ins. Co. of Am. (in Re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions), 148 F.3d 283 (3d Cir. 1998</u>)

        a.    Overview

In <u>Prudential</u>, the Third Circuit established three factors ("the <u>Prudential</u> factors") that courts will consider when determining whether the requested attorneys' fees are appropriate. They are:

    (1)  whether the entire value of benefits to the class is attributable to the efforts of class counsel;

    (2)  whether the percentage-of-recovery request reflects the fee that would result from private negotiations; and

    (3)  whether there are any particularly innovative terms in the settlement.

<u>In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions</u>, 148 F.3d 283, 338-40 (3d Cir. 1998).

These factors supplement the seven <u>Gunter</u> factors, discussed *infra*, in the balancing of whether a request for attorneys' fees is reasonable under the settlement agreement. Ultimately, the Third Circuit remanded the issue of attorneys' fees upon a finding that the district court inappropriately (1) failed to separate the value of the settlement created by administrative investigation from the value created by class counsel, and (2) gave weight to the contingency fee rates typical of smaller class actions or individual actions, but found that the district court's consideration of "innovative terms" of settlement was appropriate. <u>Id.</u>

b.      Procedural Posture and Factual Background

This case was before the Third Circuit as an appeal of the district court's approval of the settlement of a nationwide class action against Prudential Life Insurance Company, including the district court's creation of a bifurcated attorneys' fee award valued as high as $90 million in a nearly $2 billion settlement.

Beginning in 1994, lawsuits against Prudential Life Insurance Company alleging improper sales and marketing practices were filed across the United States. Id. at 290. In response to the growing number of lawsuits against Prudential, the New Jersey Insurance Commissioner assembled a task force to investigate the allegations and develop a remedial plan to compensate injured policyholders. Id. In 1996, the task force issued a remedial action plan creating two options—alternative dispute resolution or "no-fault" basic claim relief—across four types of claims. Id. at 291. While the task force was investigating, individual parties and classes continued to file actions against Prudential in both state and federal court. Id. at 292. Following the publication of the task force report, lead counsel in the underlying class action and Prudential entered into a settlement agreement in September of 1996. Id. at 294. The settlement agreement largely adopted the substance and structure of the task force remedial plan, but the district court found that the settlement made some enhancements. Id. at 296-97. Under the Stipulation of Settlement filed in October of 1996, lead counsel would request $90 million in attorneys' fees to be paid by Prudential. Id. at 329.

c.      The District Court's Analysis of Lead Counsel's Attorneys' Fees Request

The district court found the remedy structure analogous to a common fund, and thus determined that the percentage-of-recovery method was to apply. Id. An expert retained by lead counsel estimated that $863.7 million of the settlement agreement's value of $1.987 billion was

created by the task force plan, while the remaining $1.123 billion was created by class counsel. Id. The district court rejected the lead counsel's fee petition, instead creating a bifurcated fee award designed to provide between $45 million and $90 million to class counsel. Id. Notably, the district court recognized that the fee awards in cases where the recovery exceeded $100 million ranged between 4.1 and 17.92%; it also concluded that private parties would likely have negotiated a contingent fee of 10 to 15%. Id. at 331-332. The district court calculated that if the full $90 million in attorneys' fees were awarded, this would result in approximately 6.7% of the minimum recovery guaranteed by Prudential under the settlement agreement. Id. at 332. With a lodestar value of $17.7 million and expenses at just over $3 million, a $90 million fee would generate a lodestar multiplier of 5.1 at an average hourly rate at $1,148.70. Id.

> d.     The Third Circuit's Rejection of the District Court's Analysis and Remand on the Issue of Attorneys' Fees

In its analysis of the appropriateness of the attorneys' fees, the Third Circuit primarily took issue with the high value of attorneys' fees despite the presence of substantial government investigation. In remanding the issue of attorneys' fees back to the district court, the Third Circuit emphasized that "[i]t is not clear on the record before us that class counsel had so significant a role in the institution of the Task Force proceedings that the district court was justified in crediting counsel for all of the benefits created under the Task Force plan." Id. at 337.

Next, the Third Circuit focused on the district court's conclusion that a contingent fee of 10 to 15% would be privately negotiated in class actions of such a large size. "While such private fee arrangements might be appropriate in smaller class actions or litigation involving individual plaintiffs, we do not believe they provide much guidance in cases involving the aggregation of over 8 million plaintiffs and a potential recovery exceeding $1 billion," it noted. Id. at 340. The Third Circuit additionally took issue with the size of the lodestar multiplier of 5.1, stressing that

the district court did not "take care to explain how the application of a multiplier is justified by the facts of a particular case." Id.

Finally, though the Court found the above issues to be problematic in the district court's fee structure, it did consider the bifurcated fee award to be "an appropriate and innovative response to the structure of the settlement." Id. at 334.

     2.     Gunter v. Ridgewood Energy Corp., 223 F.3d 190 (3d Cir. 2000)

     a.     Overview

In Gunter v. Ridgewood Energy Corp., the Third Circuit adopted a discrete seven-factor test, listed in subsection d, *infra*, that courts use in determining the reasonableness of attorneys' fees in class action common fund settlements. Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n.1 (3d Cir. 2000). The Third Circuit also added a separate lodestar cross-check generating a "lodestar multiplier" that is used to gauge the difference between the class counsel's lodestar and the fee under the percentage-of-recovery method. Id. The Gunter factors are typically combined with the Prudential factors (discussed *supra*) in a court's analysis, resulting in a comprehensive ten-factor balancing test. Ultimately, the Third Circuit remanded the issue of attorneys' fees to the district court for a correct and clear articulation of its analysis in determining what amount of attorneys' fees ought to be awarded. Id. at 192, 196.

     b.     Procedural Posture and Factual Background

Gunter was before the Third Circuit on the plaintiffs' appeal of the district court's grant of attorneys' fees at only 18% of the $9.5 million settlement fund, instead of the 33 1/3% fee that the parties agreed to under the settlement agreement. 223 F.3d at 191. The underlying class action arose from a series of failed oil and gas investments, with the class alleging that the defendants fraudulently marketed and sold about $150 million of interests in partnerships

between 1986 and 1990. Id. at 192. The class action was brought under the Racketeer Influenced and Corrupt Organization Act and §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, as well as various state common law claims. Id. After discovery and pre-trial motion practice, including class certification and a round of summary judgment argument, the parties reached a settlement agreement in June of 1999. Id. at 193.

The terms of the settlement included a common fund of $9.5 million, which represented more than half of the total amount lost by class members to the fraudulent practices of the defendants. Id. In its submissions to the district court, class counsel requested reimbursement of $300,000 in costs as well as one third of the $9.5 million common fund (about $3.16 million). Id. Class counsel calculated the lodestar multiplier to be 1.1, and noted that none of the class members objected to the requested fee amount. Id. at 194.

c.     The District Court's Analysis of Class Counsel's Attorneys' Fees Request

In its brief analysis of class counsel's request for one-third of the common settlement fund, the district court decided to reduce the fee to 18% of the recovery. Gunter v. Ridgewood Energy Corp., No. CIV. 95-438 (WHW), 1999 WL 33266979, at *2 (D.N.J. Nov. 16, 1999), vacated, 223 F.3d 190 (3d Cir. 2000).  The factors considered by the district court included class counsel's submissions and statements regarding their efforts to settle the litigation, and the number of hours expended. *Id.* The district court ultimately held that "[t]he nature of this litigation, its resolution at this stage without the necessity of trial, the nature of the settlement, and its value, convince the court that it would place a reasonable burden on the class to award attorneys' fees of 18% of the Settlement Fund, or $1,700,000." Id. The district court denied class counsel's motion for reconsideration on the grounds that it was wary of the number of hours class counsel reported, stating "[t]he Court is of the opinion that these hours merely serve as a hindsight prop to the one-third percentage of plaintiffs' recovery sought by counsel as their fee." Gunter v.

Ridgewood Energy Corp., Civ. No. 95-438 (WHW), at 2-3 (D.N.J. Dec. 29, 1999). Noting that "[c]ounsel had their opportunity to provide full information to the Court upon their original submission. They did not. And, interestingly, they did not even attempt to do so by their motion for reconsideration." Id.

        d.        The Third Circuit's Remand of the Issue of Attorneys' Fees Based on Inadequate Reasoning on the Part of the District Court

After analyzing the district court's award of reduced attorneys' fees, the Third Circuit ultimately remanded the issue back to the district court, since "if the district court's fee-award opinion is so terse, vague, or conclusory that we have no basis to review it, we must vacate the fee-award order and remand for further proceedings." Gunter, 223 F.3d at 196. The Third Circuit then identified seven factors that courts ought to consider when determining the appropriateness of an attorneys' fee request in common fund class action settlements:

(1) the size of the fund created and the number of persons benefitted;

(2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel;

(3) the skill and efficiency of the attorneys involved;

(4) the complexity and duration of the litigation;

(5) the risk of nonpayment;

(6) the amount of time devoted to the case by plaintiffs' counsel; and

(7) the awards in similar cases.

Id. at 195 n.1. It also noted that in mega-fund cases, like those valued at over one billion dollars, courts may give these factors less weight. Id. Finally, the Third Circuit suggested that after a court's has analyzed the seven factors, it should perform a lodestar "cross-check," in which it

calculates the lodestar multiplier to determine whether the difference between counsel's lodestar and the fee request is reasonable under the circumstances of the case. Id.

In reviewing the district court's analysis of the factors, the Third Circuit found that, in the original fee award opinion as well as in the opinion denying class counsel's motion for reconsideration, the district court either failed to apply some of the seven factors it identified, or misapplied them. Id. at 201. The following analysis does not follow the order of the factors listed explicitly by the Third Circuit, 223 F.3d at 191 n.1.

> i.       *Third Circuit Review of the First Factor Analyzed by the District Court: The Complexity and Duration of the Litigation*

Regarding the first factor analyzed by the district court—the complexity and duration of the litigation—the Third Circuit found, unlike the district court, that the underlying litigation was both complex (involving federal securities law and a plethora of state claims), and that its four-and-a-half year duration weighed in favor of granting class counsel's fee request. Id. at 197.

> ii.      *Third Circuit Review of the Second Factor Analyzed by the District Court: The Existence of a Settlement Between the Parties*

The Third Circuit then addressed the second factor that the district court analyzed, and found that the district court inappropriately considered the existence of a settlement to warrant a reduction in the attorneys' fee award. Id. at 198. The Third Circuit held that "[p]rocuring a settlement, in and of itself, is never a factor that the district court should rely upon to reduce a fee award. To utilize such a factor would penalize efficient counsel, encourage costly litigation, and potentially discourage able lawyers from taking such cases." Id.

     *iii.*  *Third Circuit Review of the Third Factor Analyzed by the District Court: The Size of the Settlement and the Number of Persons Benefitted*

Turning to the next factor the district court analyzed—the size of the settlement and the number of persons benefitted—the Third Circuit found that the district court provided scant analysis of whether the attorneys' fee request was appropriate in light of the litigation in similar cases. <u>Id.</u>

     *iv.*  *Third Circuit Review of Two Factors Not Analyzed by the District Court: The Absence of Objections from Class Members, and the Risk of Non-Payment*

The Third Circuit next identified two factors that the district court failed to include altogether: the absence of objections from class members to class counsel's request for fees, and the risk of non-payment. <u>Id.</u> at 199. On the first issue, the Third Circuit did not make any explicit finding on the significance of the lack of objection to the requested fee amount. On the second issue, the Third Circuit noted "it seems that the risk of non-payment in this case was present both because the defendants were close to insolvency, and because other classes of plaintiffs in similar cases against the defendants had lost on similar legal theories." <u>Id.</u>

     *v.*  *Third Circuit Review of the District Court's Use of the Lodestar Cross-Check*

Finally, the Third Circuit found that the district court failed to adequately apply the lodestar cross-check, noting that "the District Court neither reduced its lodestar calculations to writing, nor gave Counsel a chance to justify their hours billed or their hourly rates." <u>Id.</u> While in its opinion denying the motion for reconsideration the district court stated that it had considered the lodestar value in arriving at its original fee award, the Third Circuit observed that any mention or discussion of either the lodestar value or multiplier was notably absent. <u>Id.</u> For all of these reasons—either a lack of analysis or improper analysis—the Third Circuit remanded the

issue of attorneys' fees back to the district court. Id. at 192, 196. No subsequent district court order or opinion could be found following the Third Circuit's remand.

3.     Welch & Forbes, Inc. v. Cendant Corp. (In re Cendant Corp. Prides Litig.), 243 F.3d 722 (3d Cir. 2001)

a.     Overview

This case presents an example of where a percentage-of-recovery award appeared to be reasonable on its face, but analysis under the Gunter factors and a lodestar cross-check demonstrated the award's unreasonableness. As in Gunter, the Third Circuit found the district court's analysis to be too cursory, and also determined that the district court had either failed to analyze or mis-analyzed several factors that it had outlined in Gunter. In re Cendant Corp. Prides Litig., 243 F.3d 722, 733, 735-36 (3d Cir. 2001). While a percentage-of-recovery figure of 5.7% appeared reasonable given the range suggested by other cases, the Third Circuit found that such a percentage was materially undermined by a projected lodestar multiplier between 7 and 10. Id. at 742. After reviewing the district court's analysis, the Third Circuit vacated the award of attorneys' fees and remanded the issue to the district court. Id. at 743.

b.     Procedural Posture and Factual Background

This case was before the Third Circuit on appeal of the district court's approval of a class settlement and award of attorneys' fees to lead counsel, and was ultimately remanded by the Third Circuit to the district court for proper analysis under the Gunter factors. Id. The underlying class action was filed on behalf of investors in the Cendant Corporation after it had disclosed some prior "accounting irregularities" in April of 1998. Id. at 725. On behalf of one of the classes of the consolidated class action (the "PRIDES class,") a law firm, Kirby, entered into a settlement agreement with Cendant in March of 1999 under which Cendant agreed to issue Rights to new PRIDES (a type of share); with 29,161,474 shares each valued at $11.71, the total

approximate value of the settlement agreement was $341,500,000. Id. Under the terms of the settlement agreement, Kirby would not ask for more than 10% of the $341,500,000 stated value, plus reasonable expenses. Id.

      c.      The District Court's Analysis of Kirby's Attorneys' Fees Request

In June of 1999, the district court approved the settlement, granted Kirby's expenses of $2,367,493, but found that for attorneys' fees, Kirby should receive 5.7% (instead of the 10% requested) of the settlement rights, totaling 1,650,680 rights valued at $19,329,463. Id. at 726. The district court's lodestar analysis found that approximately 5,600 hours were expended, and that senior partners charge an hourly rate of $495. In re Cendant Corp. Prides Litig., 51 F. Supp. 2d 537, 542 (D.N.J. 1999). Using this hourly rate, the district court calculated the lodestar multiplier to be 7. Cendant, 243 F.3d at 732. The $495 hourly rate of senior partners artificially lowered the lodestar multiplier, as inferior legal staff expended hours on the litigation. Id.

      d.      The Third Circuit Review of the District Court's Analysis and Remand on the Issues of Attorneys' Fees

The Third Circuit found the district court's analysis problematic for several reasons, not the least of which was the fact that "[a]s in Gunter, the District Court's fee opinion in this case was too cursory for us to 'have a sufficient basis to review for abuse of discretion.'" Id. at 733 (quoting Gunter, 223 F.3d at 196). The Third Circuit itemized a list of factors that the district court either failed to recognize or misjudged in its analysis of the adequacy of Kirby's attorneys' fee request:

> 1) the case was relatively simple in terms of proof, in that Cendant had conceded liability and no risks pertaining to liability or collection were pertinent;
>
> 2) the case was settled at a very early stage of the litigation, with an agreement being announced two months after Kirby filed for class certification and a proposed settlement being submitted to the District Court two months after that;

3) there was a minimal amount of motion practice in this case—before settlement, Kirby submitted only the Complaint and three motions, all on the same day;

4) discovery was virtually nonexistent—indeed the District Court did not mention any depositions taken or document review conducted by Kirby;

5) Kirby spent a relatively small amount of time on this case compared to the amount of time expended in most other large class actions."

Id. at 735-36. In other words, the attorneys' fee amount requested by Kirby did not actually reflect the amount of work it expended on litigating the case. Because the high value of the settlement might have arguably come from the number of class members or the values of the PRIDES shares, the law firm might receive a windfall under the requested amount. These notions supported the Third Circuit's observation that "[i]n In re GMC Trucks, we observed that 'one court has noted that the fee awards have ranged from nineteen percent to forty-five percent of the settlement fund.' . . . These varying ranges confirm that a district court may not rely on a formulaic application of the appropriate range in awarding fees but must consider the relevant circumstances of the particular case." Id. at 736 (quoting 55 F.3d at 822) (internal citations omitted).

The Third Circuit noted that the district court failed to compare the requested attorneys' fee to those granted in similar cases. Id. The Third Circuit provided a chart listing class action common fund settlements, their value, and the percentage-of-recovery. Id. at 737. Looking at the cases listed in the chart, the Third Circuit noted that the attorneys' fees awards ranged from 2.8% to 36% of the total common settlement fund. Id. at 738. While the 5.7% fee awarded by the district court appeared to fall within this range, the Third Circuit again emphasized the fact that the work counsel performed was not deserving of an award of that size, writing "a brief review of the facts and posture of these other cases makes clear that, when examined through the seven-

factor lens of <u>Gunter</u>, the higher fees awarded in the other cases were far more justified than the high award in this case." <u>Id.</u> (italics added). Finally, the lodestar multiplier would likely fall between 7 and 10, a value the Third Circuit found inappropriately high. <u>Id.</u> at 742. The Third Circuit observed: "[i]n all the cases in which high percentages were applied to arrive at attorneys' fees, the courts explained the extensive amount of work that the attorneys had put into the case, and appropriately the lodestar multiplier in those cases never exceeded 2.99." <u>Id.</u> Thus, this case highlights the importance of the multiplier resulting from the lodestar cross-check, as even low percentage-of-recovery values may nevertheless leave law firms with windfall fee awards.

        4.      <u>In re AT&T Corp. Sec. Litig., 455 F.3d 160 (3d Cir. 2006)</u>

        a.      Overview

Where a district court granted the request for an attorneys' fee that was the product of a pre-arranged scale (not a traditional sliding scale where the percentage of recovery decreases as the settlement value increases), the Third Circuit found that because the attorneys' fee award conformed with the <u>Gunter</u> and <u>Prudential</u> factors, the district court did not abuse its discretion in granting the request. <u>In re AT&T Corp. Sec. Litig.</u>, 455 F.3d 160, 175 (3d Cir. 2006).

        b.      Procedural Posture and Factual Background

This case was before the Third Circuit from an appeal of three class members on the issue of attorneys' fees in a class action common fund settlement, specifically that they were excessive and did not employ a traditional sliding scale where the percentage of recovery for attorneys' fees decreases as the size of the settlement increases. <u>Id.</u> at 163.

Beginning in October of 2000, several plaintiffs filed federal securities fraud lawsuits under the Securities and Exchange Act of 1934, alleging that defendants made knowingly false

statements over the course of 7 months regarding anticipated performance for the year of 2000 to artificially inflate stock price. Id. at 162. After two years of discovery and two weeks of trial (beginning of October of 2004), the parties entered into a tentative settlement agreement in which AT&T agreed to a $100 million common settlement fund, with attorneys' fees set at 21.25%, or $21,500,000, and costs valued at $5,465,996.79. Id. at 163. The district court preliminarily approved the settlement agreement, and after notice was mailed to over one million potential class members, eight objections were received pertaining to the attorneys' fees arrangements. Id.

c.      The District Court's Analysis of the Request for Attorneys' Fees

In this securities case brought under the Private Securities Litigation Reform Act, the district court noted that in the Third Circuit, attorneys' fees requests are presumed reasonable unless the district court finds the fee to be clearly excessive on its face. Id. at 167 (citing Cendant, 264 F.3d at 220). The district court found that the sliding scale arrangement between the parties, which resulted in the 21.25% attorneys' fee, was reasonable and had not been shown to be unreasonable by the challengers.   Id. The district court concluded that the fee was also reasonable under the Gunter factors, specifically noting that the fee arrangements had been approved by each court-appointed lead plaintiff. Id. The district court subsequently found that a lodestar value of $16.6 million and a lodestar multiplier of 1.28 represented a "truly reasonable fee award." Id. at 169. The district court also approved reimbursement of costs. Id.

d.      The Third Circuit's Affirmance of the District Court's Approval of Attorneys' Fees

The Third Circuit affirmed the district court's grant of attorneys' fees, finding that "[t]he district court's analysis and discussion demonstrates it considered the fee award reasonableness factors relevant to the facts of the case[.]"  Id.  The first Gunter factor—the size of the settlement

and the number of persons benefitted—did not require any analysis, as the settlement was for $100 million and the class could potentially consist of over a million members. Id. at 169-70.

   i.   *The Second Gunter Factor: The Presence of Substantial Objections from Class Members on the Issue of Attorneys' Fees*

The Third Circuit found that with regard to the second <u>Gunter</u> factor, the presence of eight objections out of a potential class of one million members represented a "low level of objection," and thus the district court did not abuse its discretion by not considering these objections "substantial." <u>Id.</u> at 170.

   ii.   *The Third and Fourth Gunter Factors: The Skill and Efficiency of Counsel and the Complexity and Duration of Litigation*

The Third Circuit found that the third and fourth factors—the skill/efficiency of counsel and the complexity/duration of litigation—also weighed in favor of granting the fee award, as the litigation was long and even began trial, on complex securities law issues. <u>Id.</u>

   iii.   *The Fifth Gunter Factor: The Risk of Non-Payment*

There was only a slight risk of nonpayment under the fifth factor, but the Third Circuit found that the district court did not abuse its discretion in finding such a risk. <u>Id.</u> at 171.

   iv.   *The Sixth Gunter Factor: The Amount of Time Devoted by Class Counsel*

The lengthy litigation lent support to the sixth factor—the amount of time devoted by counsel, which was apparent from the number of pre-trial motions, the scope of discovery, and two weeks of trial. <u>Id.</u> Typically, a discussion of the number of hours devoted takes place under this factor, but such a figure is absent in this Third Circuit opinion.

   v.   *The Seventh Gunter Factor: Awards in Similar Cases*

With regard to the seventh factor—awards in similar cases—the district court did not abuse its discretion when it held that objectors had failed to present sufficient evidence to rebut a

presumption of reasonableness (under the PSLRA). <u>Id.</u> Thus, under the <u>Gunter</u> factors and the lodestar cross-check, the Third Circuit found that the circumstances weighed toward granting the requested attorneys' fees. <u>Id.</u> at 173.

       *vi.    The Prudential Factors: Whether the Entire Value of the Settlement is Attributable to Class Counsel, Whether the Fee Reflects What Private Parties Would Have Negotiated, and Whether the Settlement Contained Innovative Terms*

Turning to the <u>Prudential</u> factors, the Third Circuit noted that there was no government investigation into the defendants' conduct, thus class counsel created the value of the settlement on their own. On the issue of privately negotiated contingency fees (the second *Prudential* factor), and in response to the appellants' contention that the percentage of recovery should not increase alongside the value of the settlement, the Third Circuit held that there is "no rule that a district court must apply a declining percentage reduction in every settlement involving a sizable fund." <u>Id.</u> at 174 (citing <u>Rite Aid Corp. Sec. Litig.</u>, 396 F.3d 294, 303 (3d Cir. 2005)) (internal quotation marks omitted). As there were no particularly innovative terms of the settlement, the final <u>Prudential</u> factor was not analyzed. Thus, the district court's approval of the requested attorneys' fees was affirmed by the Third Circuit.

     5.    <u>In re Diet Drugs Prod. Liab. Litig., 582 F.3d 524 (3d Cir. 2009)</u>

       a.    Overview

In a case where $567 million in attorneys' fees were requested from a settlement valued at $6.44 billion, the Third Circuit found that the district court did not abuse its discretion in granting the requested amount. Since "the lawyers involved were primarily concerned with obtaining relief for their clients and members of the class," the district court "correctly applied the method better designed to 'reward counsel for success and penalize it for failure.'" <u>In re Diet Drugs Prod. Liab. Litig.</u>, 582 F.3d 524, 541 (3d Cir. 2009) (citing <u>GMC</u>, 55 F.3d at 821).

b.  Procedural Posture and Factual Background

In this case, the appellants challenged the district court's findings on three of the Gunter/Prudential factors in its opinion granting attorneys' fees in the amount of 6.75% of a settlement totaling $6.44 billion—a fee award of roughly $567 million. Id. at 537. Specifically, appellants challenged the district court's findings on the following factors:

(1) the presence or absence of substantial objections,

(2) the risk of nonpayment, and

(3) the value of benefits attributable to the efforts of other groups.

Id. at 541. Ultimately, the Third Circuit affirmed the findings of the district court, upholding the award of attorneys' fees. Id. at 553.

Beginning in 1997, a wave of products liability actions arose after researchers discovered a correlation between some then-commonly prescribed appetite suppressants and a heart disorder known as valvular heart disease ("VHD"). Id. at 559. Scientific evidence of serious coronary side effects from the drugs prompted the FDA to issue a public health alert, and prompted the pharmaceutical company responsible for the development of the drugs, Wyeth, to withdraw the drugs from the market. Id. In November of 1999, Wyeth, the plaintiffs' management committee of the class action, and counsel from state court class actions executed a nationwide settlement. Id. at 530. The settlement included several options for eligible class members, which were ultimately valued at a total of $6.44 billion. Id. at 536. Class counsel from 72 different firms filed a joint petition for attorneys' fees in which they requested a total of approximately $567 million. Id. at 533. An auditor reported that the 72 firms had performed 354,431.49 hours of work on the litigation and found a lodestar value of $101,076,658.54. Id.

The District Court's Analysis of the Requested Attorneys' Fees

When presented with class counsel's request for $567 million in attorneys' fees, the district court made several findings. First, the plaintiffs' management committee faced significant risk at the beginning of the litigation that their work would ultimately be unsuccessful and uncompensated. Id. at 534. Second, that the discovery undertaken by the plaintiffs' management committee paved the way for the class settlement and individual settlements—in other words, the plaintiffs' management committee could rightly be considered to have created the entire value of the settlement benefitting the class. Id. Thirdly and lastly, that the plaintiffs' management committee conferred great benefits on all litigants and performed well. Id. Ultimately, in April of 2008, eleven years after the commencement of litigation against Wyeth, the district court awarded class counsel attorneys' fees in the amount of approximately $567 million. Id. at 536.

When applying the percentage-of-recovery method, the district court concluded that an award equaling 6.75% of the recoveries under the settlement agreement was appropriate. Id. at 536. The lodestar cross-check yielded a lodestar multiplier of 2.6; while it recognized that this might have been artificially low, the district court was confident that the actual multiplier would not be excessive. Id.

d.     The Third Circuit's Review and Affirmance of the District Court's Award of Attorneys' Fees

As to the first factor challenged—the presence or absence of substantial objections—the district court found it "remarkable" that there were fewer than thirty objections out of the approximately six million potential class members. Id. at 542 (citing In re Diet Drugs Prods. Liabl. Litig., 553 F. Supp. 2d 442, 473 (E.D. Pa. 2008) (internal quotation marks omitted). In response to appellants' argument that the district court inappropriately relied on the absence of

objections to the final joint fee petition, the Third Circuit stated that "[w]hatever weight the Court gave to this factor it gave based on the dearth of objections throughout the settlement and fee adjudication process, instead of focusing only on the objections to the final joint fee petitions." Id. This suggests that the scope of this factor takes into account the nature and volume of objections by class members throughout the litigation process, though arguably this is a fact-intensive inquiry.

As to the second factor challenged, the risk of nonpayment, the appellants argue that the district court erred as a matter of law when it considered the risk of nonpayment only at the beginning of litigation and not throughout the course of the action, as the risk of nonpayment dissipated after a settlement was reached. Id. at 543. However, the Third Circuit found that the district court indeed considered the risk of nonpayment throughout the action, specifically when it considered the risk of a "'second wave' of litigation" following the execution of the settlement agreement; the district court found that "[a]t the inception, and throughout this litigation, there was a substantial risk that the efforts of [Class Counsel] would not be successful." Id. (citing Diet Drugs, 553 F. Supp. 2d at 479).

As to the third factor challenged, the value of benefits attributable to others, the district court found that while class counsel was somewhat beholden to the researchers who linked the diet drugs to the illness, as well as to the FDA for its efforts to remove the drugs from the market, these entities had not performed the investigative legal work on which class counsel could then rely. Id. at 544. The appellants challenged the district court's finding as to this factor, pointing as well to the efforts of Texas lawyers in state litigation. Id. The Third Circuit upheld the reasoning of the district court on this factor, and noted that even if the efforts of the Texas state claim lawyers were undervalued, this alone is not grounds to vacate a fee award. "Our task

is to discern whether the Court's percentage-of-recovery analysis, when examined in its totality, supports the fee that it finally determined was appropriate," it held. Id. at 545. In Prudential, however, this factor was one of the overwhelming reasons (if not the primary reason) the Third Circuit vacated the fee award. However, this factor is one of degree; that is, the question is not whether there were efforts from outside groups, but rather whether class counsel relied on them to such an extent that it would not be appropriate to grant attorneys' fees based on the entire value of the settlement. The Third Circuit supported this notion when it stated that "the [District] Court determined that, whatever the Texas cases may have added, the recoveries arising from the MDL were due to the 'herculean efforts' of the [plaintiffs' management committee]—in developing the case against [the defendants], in negotiating an agreement that allowed [the defendants] to resolve the claims against it, and in amending the Settlement Agreement when it appeared to be in jeopardy." Id. at 544 (citing Diet Drugs, 553 F. Supp. 2d at 474).

6.      In re Ins. Brokerage Antitrust Litig., 579 F.3d 241 (3d Cir. 2009)

In this case, the Third Circuit upheld the district court's award of attorneys' fees totaling $29,950,000, where the attorneys' fees were to be paid separately from the settlement fund benefiting class members, which was valued at $100,000,000. In re Ins. Brokerage Antitrust Litig., 579 F.3d 241, 248 (3d Cir. 2009). Beginning in October of 2004, various state attorneys general and state insurance departments began investigating alleged bid-rigging and steering activities of insurance brokers and insurers in the property and casualty insurance industry, in violation of antitrust law; at the same time, private parties commenced class actions in federal courts throughout the country (which were consolidated in February of 2005 in the District of New Jersey). Id. One of the defendants, the Zurich Defendants, also subject to state-level investigations, entered into a Memorandum of Understanding ("MOU") with the class plaintiffs

in October of 2005, under which the Zurich Defendants would establish a settlement fund valued at $100,000,000. Id. at 250. Of the settlement fund, $29,900,000 would be earmarked to fund a separate settlement award. Id. at 252. The Zurich Defendants agreed to pay attorneys' fees up to $29,950,000, paid separately from the settlement fund. Id. at 253. After preliminary approval of the settlement, class counsel requested the distribution of the $29,950,000 as follows: $3,957,000 for litigation expenses, $150,000 for incentive awards for fifteen class representatives, and $25,803,000 for fees. Id.

The district court found that while attorneys' fees are to be paid separately from the settlement fund, this case was nevertheless analogous to the typical class action common fund settlement, in which attorneys' fees were drawn from the fund under the percentage-of-recovery method. Id. at 280. Thus, the value of the settlement would be a combined $129,950,000. Id. The district court then proceeded to engage in an abbreviated Gunter analysis.

     7.    In re Linerboard Antitrust Litig., MDL No. 1261, 2004 WL 1221350 (E.D. Pa. June 2, 2004)

     a.    Overview

In this case, the district court found that, after analysis of the Gunter/Prudential factors, the requested attorneys' fees of 30% of a $202,572,489 settlement was reasonable. In re Linerboard Antitrust Litig., MDL No. 1261, 2004 WL 1221350, at *19 (E.D. Pa. June 2, 2004). The district court also approved reimbursement of litigation costs in the amount of $1,391,203.36. Id. The court found that where class counsel was particularly skilled and able to litigate the case with fewer hours expended, attorneys' fees should serve to reward such efficiency, and any downward adjustment would inappropriately punish counsel for skilled lawyering. Id. at *16.

b. Procedural Posture/Factual Background

This district court opinion addresses the request for attorneys' fees resulting from an antitrust action involving allegations that a number of US manufacturers of linerboard engaged in a continuing combination of conspiracy and unreasonable restraint of trade and commerce in violation of the Sherman Act. <u>Linerboard</u>, 2004 WL 1221350, at *1. Seven lawsuits were instituted after an administrative complaint was filed by the FTC against defendant Stone Container Corporation was resolved by a consent decree. <u>Id.</u> The lawsuits were consolidated in the Eastern District of Pennsylvania by the Judicial Panel on Multidistrict Litigation. <u>Id.</u> The total settlement amount among all the defendants totaled $202,572,489, with class counsel requesting 30% of the settlement value (approximately $60 million) plus reimbursement of $1,391,203.36 in litigation costs. <u>Id.</u> at *2.

c. The District Court's Finding that the Requested Fees are Reasonable

i. *The First Gunter Factor: The Size of the Fund Created and the Number of Persons Benefitted*

The district court found that this factor weighed in favor of approving the attorneys' fees request, on the ground that the size of the fund represented more than half of the claimed damages, and the class size of 80,000 was sufficiently large. <u>Id.</u> at *4-5. The plaintiffs had retained an economic expert that estimated that during the class period, the costs of boxes and sheets were 2.7% higher than they would have been absent the alleged conspiracy, representing a total of $478 million. <u>Id.</u> Thus, the settlements represented about 55% of the damages. <u>Id.</u> Furthermore, the class size of 80,000 companies weighed in favor of granting the request. <u>Id.</u> at *5.

26

ii.    *The Second Gunter Factor: The Presence or Absence of Substantial Objections by Members of the Class to the Fee Request*

The district court found that "in this case class members are represented by counsel. Further, the classes in this cases [sic] include many of the largest corporations in America . . . Based on the foregoing, the Court concludes that consideration of the of the second *Gunter* factor . . . supports granting the Fee Petition." *Id*.

iii.    *The Third Gunter Factor: the Skill and Efficiency of Counsel*

The district court found that this factor weighed in favor of granting the requested attorneys' fees, observing that "[t]hroughout every phase of the litigation petitioners managed a major discovery effort . . . In terms of document discovery alone, defendants produced more than 430 boxes of documents containing more than one (1) million pages of records." Id. at *10. The district court also observed that "most [of the] informal efforts at resolution [between class and defense counsel] have proved successful and the Court's involvement has only been required on a few occasions." Id. (internal citations omitted). This suggests that under this factor, courts may consider the ability for counsel to resolve issues cooperatively and independently.

iv. *The Fourth Gunter Factor: the Complexity and Duration of Litigation*

The district court noted that the litigation had been going on for six years, and that there was a high possibility that should the case proceed to trial, it could continue for several more years. Id. The district court also noted that there was previous authority for granting a similar fee award in a case where the settlement occurred much earlier in the litigation process, such as in In re Ikon Office Solutions Inc. Sec. Litig., 194 F.R.D. 166, 194 (E.D. Pa. 2000), where the court had awarded 30% of a $111 million settlement in attorneys' fees after one and a half years of litigation. Linerboard, 2004 WL 1221350, at *10.

*v.     The Fifth Gunter Factor: the Risk of Non-Payment*

The district court called attention to several important facts in this case pertaining to this factor. First, the district court noted that the FTC investigation into one of the defendants had been, according to one antitrust expert, "at the cutting edge of single firm antitrust liability." Id. at *11 (internal citations omitted) (internal quotation marks omitted). Because there had "never been a successfully litigated antitrust claim of a single firm attempt to conspire to raise prices or reduce out-put based solely, or even primarily, on market conduct by the defendant firm," the class faced significant risks of non-payment stemming from the uncertainty or the low success rate of this type of litigation. Id. (internal citations omitted) (internal quotation marks omitted).

Second, even though the district court found that the FTC had launched an investigation into one of the defendants, the district court adopted the view of the Second Circuit, which asked whether the defendants' liability was "prima facie established by the government's successful action." Id. (quoting City of Detroit v. Grinnell Corp., 495 F.2d 448, 455 (2d Cir. 1974), abrogated on other grounds by Goldberger v. Integrated Res., Inc., 209 F.3d 43 (2d Cir. 2000)). Here, the FTC did not successfully establish, prima facie, the defendant's liability. Linerboard, 2004 WL 1221350, at *11. The emphasis on this factor may also be considered to be an analysis under one of the Prudential factors, which analyzes the degree to which class counsel has relied on other entities to create the value of the settlement. In this case, the district court found that the FTC investigation had not played any significant role, and therefore class counsel could be considered to have created the entire value of the settlement. Id.

Finally, the defendants stated their intention to exploit several perceived weaknesses in the class' evidence of liability, such as the lack of direct evidence of a meeting among the defendants where the alleged conspiracy to violate antitrust laws would have taken place. This,

supplemented by the fact that there might have been other reasons for the increase of prices, made it much more difficult for the class to establish liability at trial. Id. at *12.

> vi.     *The Sixth Gunter Factor: the Amount of Time Devoted by Counsel*

Where counsel reported spending 51,268 hours on the litigation, the district court found it remarkable that "[f]ewer hours of attorney time were expended in this case than in comparable litigation. . . . This development should be rewarded when it reflects, as in this case, the efficiency of counsel in maximizing total recovery to the class by minimizing attorneys' fees expenses." Id. at *13. This weighed in favor toward granting the fee request.

> vii.     *The Seventh Gunter Factor: Awards in Similar Cases*

The district court found that this factor weighed in favor of granting the requested attorneys' fees, since "[m]any of the decisions cited by the Third Circuit involved settlements similar in size to the settlement in this litigation and the courts awarded fees in those cases comparable to the 30 percent fee requested by petitioners." Id. at *13 (citing Cendant, 243 F.3d at 737). The district court also took note of a then-recent Judicial Center study finding the median attorney fee awards in federal class actions to range between 27 and 30%. Id. at *14. The district court observed that "recent empirical data analyzing fee awards in securities cases indicates that regardless of size, fees average 32 percent of the settlement." Id. (internal citations omitted) (internal quotation marks omitted). The district court found these studies to be persuasive and that this factor weighed in favor of granting the requested fees.

> viii.     *The Lodestar Cross-Check*

At an average mixed rate of $440, the lodestar value for 51,268 hours of work would be $22,557,920. Id. at *16. This would mean that under the requested 30% fee, the lodestar multiplier would be 2.66. Id. The district court found that since the Third Circuit has found the

appropriate lodestar multiplier ceiling to be either 3 (Cendant, 243 F.3d at 742), or 4 (Prudential, 148 F.3d at 341), a lodestar multiplier of 2.66 was within the appropriate range. Id. Furthermore, the district court took note of empirics suggesting that "during 2001-2003, the average multiplier approved in common fund class actions was 4.35 and during the 30 year period from 1973-2003, the average multiplier approved in common fund class actions was 3.89." Id.

ix.    *An Exception to the Traditional "Sliding Scale" Approach*

While most courts consider a sliding scale approach (where the percentage of recovery decreases as the settlement value increases) to be appropriate for awarding attorneys' fees, here the district court rejected that notion. The district court stated: "[o]ne might argue that a fee award of 20 percent of settlements in excess of $200 [sic] [million] is excessive given the absolute figure, approximately $60 million, that such an award produces. The Court rejects that thinking in this case because the highly favorable settlement was attributable to the petitioners' skill and it is inappropriate to penalize them for their success." Id. at *16.

8.    In re Flonase Antitrust Litig., 951 F. Supp. 2d 739 (E.D. Pa. 2013)

a.    Overview

In this case, the district court granted a request for attorneys' fees in the amount of one-third of the settlement fund—$50 million of $150 million—and reimbursement of expenses in the amount of $2,069,433. In re Flonase Antitrust Litig., 951 F. Supp. 2d 739, 746 (E.D. Pa. 2013). While class counsel also requested incentive awards of $85,000 and $75,000 for two of the class representatives, the district court reduced these awards to $50,000 and $40,000, respectively. Id. at 752.

b.    Procedural Posture and Factual Background

In this opinion, the district court was presented with a request for attorneys' fees in the

amount of one-third of the settlement value, reimbursement of costs, and incentive awards. The plaintiff class of 33 direct purchasers of Flonase, a brand-name nasal corticosteroid used to treat nasal inflammation caused by allergies, brought suit alleging that defendant SmithKline Beecham Corporation ("GSK") improperly delayed the entry of a generic version of the drug, resulting in overcharges to the class. Id. at 741. The complaint was filed in 2008; discovery began in late 2008 and continued through mid-2010. Id. The class was certified after a round of oral argument in November of 2010. Id. Two years later, in November of 2012, the parties reached a settlement agreement whereby GSK agreed to create a $150 million common settlement fund. Id. at 742. The settlement itself was preliminarily approved in January of 2013. Id. Class counsel was requesting $50 million for attorneys' fees, $2,069,433 in costs, and $85,000 and $75,000 in incentive awards to two class representatives.  Id. at 746.

      c.     The District Court's Gunter/Prudential Analysis

      *i.*     *The First Gunter Factor: the Size of the Fund and the Number of Beneficiaries*

The district court found that the $150 million settlement, distributed *pro rata* among the 33 class members, to be "sizable." Id. at 747. Even though the class size is small as compared to other antitrust litigation, the district court observed that the "immediate and certain payment" to class members weighed in favor of approving the fee. Id.

      *ii.*     *The Second Gunter Factor: the Presence of Substantial Objections by Class Members to the Requested Fees*

Succinctly, the district court found that "there are no objections by any class members to this settlement. This factor strongly supports approval of the requested fee." Id.

      *iii.*     *The Third Gunter Factor: The Skill and Efficiency of Counsel*

The district court found that this factor weighed in favor of granting the request for

attorneys' fees, stating that counsel "have extensive experience in plaintiff-side class action, with particular expertise in delayed generic entry cases. Indeed, counsel for both sides were knowledgeable, tenacious, and highly skillful. . . . [T]he $150 million settlement award represents a substantial amount and clearly demonstrates the value of class counsel's efforts." Id.

*iv.*      *The Fourth Gunter Factor: the Complexity and Duration of Litigation*

With regard to this factor, the district court noted that the action "involve[d] highly complex antitrust issues, FDA bioequivalence standards for suspension nasal spray products, pharmaceutical manufacturing and supply issues, and pharmaceutical regulatory issues, all of which were investigated and litigated for more than four years." Id. at 743. Furthermore, the parties settled after performing significant trial preparation, including "litigating *Daubert* challenges, identifying hundreds of trial exhibits, and briefing over a dozen motions in limine between them." Id.

*v.*      *The Fifth Gunter Factor: the Risk of Non-Payment*

The district court considered the risk of non-payment here "not negligible," as "success in this litigation was in no way guaranteed." Id. at 747-48. In addition, it was not enough to say that the plaintiff-class would likely have succeeded on the merits at establishing liability, as "there [was] no guarantee they would have recovered damages." Id. at 748. Of course, since most plaintiff-side counsel in class actions work on a contingency-basis, there was a risk of nonpayment in the event that the class was unsuccessful at trial. Id. All of these reasons supported granting the fee request.

*vi.*      *The Sixth Gunter Factor: the Time Devoted by Counsel to the Case*

According to the declaration of class counsel, more than 40,000 hours was spent in total on the litigation in this case. Id. The district court noted that "[t]he record of this litigation also

indicated that the time spent by Plaintiffs' counsel was necessary for the successful prosecution of this case, considering the complexity of the issues and the robust defense mounted by the defendants." <u>Id.</u> The district court found this factor to weigh in favor of granting the fee request.

       *vii.*       *The Seventh Gunter Factor: Awards in Similar Cases*

The district court noted that, at the time of the opinion in 2013, "in the last two-and-a-half years, courts in eight direct-purchaser antitrust actions approved one-third fees." <u>Id.</u> The district court looked more to the subject matter of the underlying litigation when comparing class action settlements than to the size.

       *viii.*     *The First Prudential Factor: the Value of Benefits Attributable to the Efforts of Class Relative to the Efforts of Other Groups*

In this case, there was no government investigation on which class counsel could rely to aid in its litigation efforts. <u>Id.</u> at 748-49. This factor weighed strongly in favor of granting the fee request.

       *ix.*      *The Second Prudential Factor: the Percentage that Would Have Been Negotiated*

While other district court opinions have cited to empirical data on the average contingency fee set between parties, the district court here chose to "not give great weight to this hypothetical exercise," thus leaving the factor neutral. <u>Id.</u> at 749 (quoting <u>Prudential</u>, 148 F.3d at 340) (internal quotation marks omitted).

       *x.*      *The Third Prudential Factor: Innovative Terms of Settlement*

The district court also found this factor to be neutral, as the settlement agreement was fairly standard. <u>Id.</u>

       *xi.*      *Lodestar Cross-Check*

The lodestar value, based on nearly 41,000 hours and rates between $120 and $795, was

calculated to be $16,750,000 at an average of $407 per hour. Id. at 750. The lodestar multiplier was determined to be 2.99, which the district court found to be "generally within the acceptable range." Id. at 751.

      d.      The District Court's Grant of Litigation Costs

With litigation costs reported at $2,069,433, the district court found that the expenses, which were primarily attributable to the payment of experts and document management, to be reasonable. Id. at 750.

      e.      The District Court's Grant of Incentive Awards

Interestingly, the district court adjusted the value of the incentive awards downward from what was requested. While counsel requested $85,000 and $75,000 awards for two of the class representatives, the district court lowered the values to $50,000 and $40,000, respectively. Id. at 751. The district court provided a rather cursory reason for the downward adjustment, stating "[t]hough incentive awards are appropriate in this case, the requested amounts are too large." Id. The district court went on to state that "an incentive award of $50,000 and $40,000 is within the range of payments awarded by courts within the Third Circuit in other direct purchaser antitrust litigation." Id. at 752.

**C.     Summary of Conclusions**

Considering the outstanding conduct of Plaintiffs' counsel throughout this litigation, as reflected in the opinions cited above, and the Third Circuit precedents on award of attorneys' fees, the Court now turns to counsel's performance in this case and in the context of the factors in Gunter and the other cases cited above (not necessarily in order of importance).

1.       Plaintiffs' counsel are experienced antitrust lawyers who have been working in this field of law for many years and have brought with them a sophisticated and highly professional approach to gathering persuasive evidence on the topic of price-fixing.

2.       The briefs filed by Plaintiffs' counsel were consistently of high quality.

3.       Plaintiffs' counsel were up against highly skilled defense counsel, who represented the Defendants in this case with vigor and substantive briefing to try to persuade this Court that Plaintiffs did not have a case, and should not be allowed to represent a class of direct purchasers.   The Court considered the defense arguments carefully and considerably, but generally sided with the Plaintiffs because of the outstanding work of Plaintiffs' counsel as presented in this petition for approval of fees.

4.       There was no government case or investigation, on which Plaintiffs could build their own case.   Few cases with no government action, or investigation, result in class settlements as large as this one.

5.       The Plaintiffs' conduct in discovery, particularly the use of digital searching methods, yielded a number of incriminating documents, which together with deposition testimony and other evidence, persuaded the Court that Defendants' motions for summary judgments should be denied and that a class of direct purchasers should be certified.

6.       The use of the conduit theory in pursuing third-party research/marketing firms in this industry was very innovative and important in gathering evidence.

7.       The performance of Plaintiffs' counsel on the class action issues was imaginative, bringing forth great quantity of persuasive evidence that common issues predominated and that the Plaintiffs' case had merit.

8.     These cases also attracted a number of very large homebuilders, who had filed their own Complaint in the Northern District of California, which was consolidated with these class actions.  The Court believes that the Plaintiffs in those cases have benefitted greatly from the work done by the class plaintiffs who have filed this motion for attorneys' fee.  The class attorneys are obviously not entitled to any compensation from the individual plaintiffs, but as a "reality check," the Court believes that the homebuilder plaintiffs have benefitted from the work of the class plaintiffs.

9.     Number of persons benefitted – the Direct Purchasers of drywall constitute a very large class of both entities involved in distribution and resale of drywall such as major so-called "big box" retailers:  Home Depot, Lowe's, e.g., and also Homebuilders (12 large homebuilders, as noted above, have their own litigation pending).

10.    Skill and efficiency of the attorneys – although the Court has commented on this above, it bears repeating that the result attained is directly attributable to having highly skilled and experienced lawyers represent the class in these cases.  The Court has had personal (and pleasant) experiences with many of the lawyers in this case, representing both Plaintiffs and Defendants, for many years, including during my extensive practice on antitrust litigation while in private practice, and is personally knowledgeable of the high degree of their competence.

11.    Antitrust litigation is complex and challenging.  This is particularly true for Plaintiffs' counsel in a case where there has been no government investigation.

12.    Duration of the litigation – this case was filed in 2013 and although approximately years may seem like a long time for a case to be pending, it is not that long when compared to other antitrust cases brought as class actions.

13.     Class action status – although much has been written of some abuses in the bringing of class actions, in the Court's view, the substantial results warrant a conclusion that in an antitrust price-fixing case, class actions have resulted in multi-billion dollars in damages, that have been paid out by defendants who were either convicted of price-fixing in criminal cases, found liable in civil cases, or as in this case, agreed to settle.  Thus, as far as antitrust price-fixing cases are concerned, Rule 23 has been not only generous to the attorneys who bring these cases, but much more so to individuals who have paid higher prices for various goods, over many decades, and would not have collected anything but for the efforts of plaintiffs' class action counsel.

14.     Innovative Terms in the Settlement Agreement – the Court is not aware of any innovative terms in this settlement agreement.  However, class counsel have had extensive experience in other class settlements in antitrust cases and bring that experience to this case.  Also, the Court is assured that the settlement process will be moving forward, including the distribution of the settlement funds to class members, will be handled efficiently and expertly.

15.     The Amount of Costs – although the expenses involved are considerable, the costs involved in securing the facts, largely through detailed electronic discovery strategies, which inherently involve consultants and expertise, and through the experts retained on both the class action and liability aspects of the case.  In addition, the Court finds that the expenses that will be incurred in the distribution of the funds are reasonable and that class counsel will be using firms with expertise in this area and will supervise them carefully.

Although the above discussion covers most of the <u>Gunter</u> issues, the Court will review them for sake of completeness:

1.	The size of the fund created and the number of the class are both large and reflect outstanding work by counsel.

2.	There are no objections to this settlement.  The only opt-outs are the homebuilders who have filed their own separate case which is still pending on pretrial matters in this Court but will be remanded to the Northern District of California after the completion of pretrial proceedings.

3.	As noted above extensively, the class counsel exhibited skill and efficiency at all times.

4.	This case is obviously a complex price-fixing case which had large volumes of discovery and legal briefing on many issues.

5.	The risk of non-payment is unknown but quite possible that some of the Defendants who were adversely affected by the recent recession may have been at risk of filing for bankruptcy.

6.	Although Plaintiffs' counsel spent many hours working on this case, the Court finds that the amount of time was warranted and if Plaintiffs' counsel had not worked as many hours as they did, this case may have resulted in summary judgment being granted for all Defendants, or Plaintiffs being unable to proceed to trial.

7.	Awards in similar cases support the award in this case.  A cross-check of the percentage awarded with the multiplier, based on total hours multiplied by hourly rates, shows the total fee requested and awarded is not excessive.

8.	Under many precedents, the general rubric in this geographical area is that a 1/3 attorneys' fee is often the standard in contingent fee cases in "routine" personal injury and product liability cases, plus reimbursement to counsel for expenses.

**CONCLUSION**

As the above discussion shows, very few precedents have awarded this percentage amount in antitrust and securities cases. The Court finds the total hours claimed is accurate and reasonable. The lodestar $38,058,631.50 is also reasonable because the rates claimed are well within the range of rates charged by counsel in this district in complex cases. The Court finds the hours and rates to have been presented in an accurate and credible manner.

The Court follows Judge Brody's decision in <u>In re Flonase Antitrust Litig.</u>, 951 F. Supp. 2d 739 (E.D. Pa. 2013), which has many similar features to this case.

In considering all of the factors above, the Court has decided to award the requested one-third of the $190,059,056 Combined Settlement Fund as attorneys' fees, in the amount of $63,353,019. A significant factor in awarding the full one-third requested is the delay in payment. Class counsel have labored for approximately six years, including pre-suit investigation, without any payment.

Class counsel will also be awarded expenses in the amount of $2,925,629, and the funds in the opt-out fee and expense account of $610,236. The Court will award incentive awards to the four named Plaintiffs in the amount of $50,000 each as in line with other cases. The Court will not award accrued interest.

A cross-check with the lodestar confirms that this award of attorneys' fees is reasonable. Dividing the net amount of attorneys' fees, $63,353,019, by the lodestar, $38,058,631.50, yields a lodestar multiplier of 1.66, which is reasonable and lower than in some of the cases described above.

Applying a reasonable multiplier of the lodestar, for judicial factors such as contingency, delay and payment risk, etc., the Court finds there is a reasonable correlation between an award of fees of one-third of the Combined Settlement Fund plus costs.

**BY THE COURT:**


**/s/ Michael M. Baylson**

_____

**MICHAEL M. BAYLSON**
**United States District Court Judge**



O:\13-MD-2437 - drywall\13md2437 Memorandum DPP Action re Atty Fees.docx