**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IN RE: DOMESTIC DRYWALL ANTITRUST LITIGATION** | **CIVIL ACTION** |
| **THIS DOCUMENT RELATES TO:** | **MDL No. 13-2437** |
| **Ashton Woods Holdings LLC, et al.,** <br>        **Plaintiffs,** <br><br>           **v.** <br><br> **USG Corp., et al.,** <br>        **Defendants** | **15-cv-1712** |

<u>**MEMORANDUM RE: PARTIAL SUMMARY JUDGMENT**</u>
<u>**ON UMBRELLA DAMAGES**</u>

**Baylson, J.**                                                    **October 3, 2019**

## I.    INTRODUCTION

In this multidistrict antitrust litigation ("MDL"), Plaintiffs—twelve homebuilders that purchased gypsum wallboard (drywall)—allege that Defendants—manufacturers and/or distributors of drywall—conspired to eliminate job quotes and fix prices during calendar years 2012 and 2013, causing Plaintiffs to pay artificially high prices.  Currently pending before the Court is the motion of remaining Defendants L&W, PABCO, and USG (collectively, "Defendants") for partial summary judgment on umbrella damages.  (ECF 292, Def.'s Mot. for Partial Summ. J.)  Defendants contend that Plaintiffs, as a matter of law, may not seek damages for drywall purchased from rival nonconspirators at prices that were inflated by Defendants' allegedly anticompetitive conduct.  The issue is whether, under California law, Plaintiffs can seek damages based on prices charged by drywall sellers that were not involved in the price-fixing

1

conspiracy, but whose prices were artificially high due to the alleged conspiratorial behavior of Defendants. After carefully considering the extensive briefing submitted by the parties and the positions advanced at oral argument on March 12, 2019, the Court **DENIES** Defendants' Motion.

## II.   FACTUAL BACKGROUND

The following is a fair account of the factual assertions—taken from both parties' recitations—that are relevant to Defendants' Motion for Partial Summary Judgment on Umbrella Damages.

### A.  Parties

Homebuilders that purchased drywall during 2012 and 2013 filed suit against domestic drywall manufacturers alleging a conspiracy to fix prices in contravention of federal and state antitrust laws and state consumer protection and unfair competition statutes (the "Homebuilder Action").[1]   The twelve Plaintiffs that remain in the Homebuilder Action are Ashton Woods Holdings, LLC ("Ashton Woods"); Beazer Homes Holdings Corp. ("Beazer Homes"); CalAtlantic Group, Inc. ("CalAtlantic"); D.R. Horton Los Angeles Holding Company, Inc. ("D.R. Horton"); Hovnanian Enterprises, Inc. ("Hovnanian"); KB Home; Meritage Homes Corporation ("Meritage Homes"); M/I Homes, Inc. ("M/I Homes"); Pulte Home Corporation ("Pulte Home"); The Drees Company ("Drees"); Toll Brothers, Inc. ("Toll Brothers"); and TRI Pointe Homes, Inc. ("TRI"). (Third Am. Compl.)  The original defendants in the Homebuilder Action consisted of United States Gypsum Company ("USG Co.") and United States Gypsum Corporation ("USG Corp.") (together, "USG"); USG Corp.'s wholly-owned subsidiary, L&W Supply Corporation ("L&W"); New NGC, Inc. ("National"); Lafarge North America, Inc. ("Lafarge"); Continental Building Products, Inc.

---

[1]  The second claim for relief prayed in the Third Amended Complaint, asserted by Ashton Woods and D.R. Horton, seeks damages under the Sherman Act for direct purchases from L&W.  (ECF 110, Third Am. Compl., ¶¶ 264-271.) The Court issued an order as to this claim on September 27, 2019.  (ECF 413.)  Because Plaintiffs only seek umbrella damages under state law, Count II is not affected by this opinion.

("Continental"); CertainTeed Gypsum, Inc. ("CertainTeed"); American Gypsum Company LLC ("American"); Tin, Inc. ("TIN"); and PABCO Building Products LLC ("PABCO"). (Id.) As a result of substantial motion practice and negotiation amongst the parties, only three Defendants remain: PABCO; USG; and L&W.[2]

**B. Nature of Plaintiffs' Damages Theory**

Plaintiffs seek damages based on the allegedly artificially inflated prices they paid for drywall. (Third Am. Compl. ¶ 249.) They seek to recover not only for inflated prices charged by conspiring Defendants, but also for prices charged by nonconspiring sellers.[3] Plaintiffs' theory is that Defendants' conspiracy to inflate prices created a price ceiling—an umbrella—that prompted the other market suppliers, even those uninvolved in the conspiracy, to similarly raise prices in order to maintain profitability. To illustrate, neither CertainTeed nor Georgia-Pacific are alleged to be part of the price-fixing conspiracy. Nonetheless, Plaintiffs that purchased from CertainTeed and Georgia-Pacific seek damages on the theory that because Defendants' allegedly conspiratorial conduct caused prices market-wide to be artificially high, they are liable for the injury suffered.

---

[2] The claims against CertainTeed and National were dismissed with prejudice by Plaintiffs voluntarily, (ECF 178; 331); and the claim against Continental was dismissed by the Court, (ECF 93.) The claims against American, Lafarge, and TIN have settled. (ECF 308, Pl.'s Opp. at 4 n.5.)

[3] See, e.g., Def.'s Mot. for Partial Summ. J. Ex. 1, Ashton Woods Amount of Damages Contention Statement ¶ 9 ("Ashton Woods is able to pursue and recover under state law the overcharges for all of its drywall purchases regardless of the manufacturer of the drywall purchased.") (emphasis added); Def.'s Mot. for Partial Summ. J. Ex. 2, Beazer Homes Amount of Damages Contention Statement ¶ 9 (same); Def.'s Mot. for Partial Summ. J. Ex. 3, CalAtlantic Amount of Damages Contention Statement ¶ 9 (same); Def.'s Mot. for Partial Summ. J. Ex. 4, D.R. Horton Amount of Damages Contention Statement ¶ 9 (same); Def.'s Mot. for Partial Summ. J. Ex. 5, Drees Amount of Damages Contention Statement ¶ 9 (same); Def.'s Mot. for Partial Summ. J. Ex. 6, Hovnanian Amount of Damages Contention Statement ¶ 9 (same); Def.'s Mot. for Partial Summ. J. Ex. 7, KB Home Amount of Damages Contention Statement ¶ 9 (same); Def.'s Mot. for Partial Summ. J. Ex. 8, Meritage Homes Amount of Damages Contention Statement ¶ 9 (same); Def.'s Mot. for Partial Summ. J. Ex. 9, M/I Homes Amount of Damages Contention Statement ¶ 9 (same); Def.'s Mot. for Partial Summ. J. Ex. 10, Pulte Home Amount of Damages Contention Statement ¶ 9 (same); Def.'s Mot. for Partial Summ. J. Ex. 11, Toll Brothers Amount of Damages Contention Statement ¶ 9 (same); Def.'s Mot. for Partial Summ. J. Ex. 12, TRI Amount of Damages Contention Statement ¶ 9 (same).

### C. Overview of Distribution Scheme for Drywall

The process through which drywall manufactured by Defendants ultimately reached Plaintiffs is intricate and somewhat unusual, as the ultimate end-buyer homebuilder ordinarily did not know the identity of the manufacturer that produced the drywall used in the homes they constructed. The following is a brief description of the distribution chain, summarized in more detail in the subsections that follow.

Drywall manufacturers (both Defendants and nondefendant manufacturers) sold drywall to intermediary distributors. These intermediaries—the direct purchasers of drywall in the initial transaction with the manufacturer—either (a) resold the drywall directly to Plaintiffs or resold the drywall to a subcontractor who provided it to Plaintiffs ("Distributor Intermediaries") or (b) provided the drywall to Plaintiffs as part of an installation service ("Installer Intermediaries"). Regardless of the method by which the drywall was procured, Plaintiffs generally did not know the source of the drywall used in the homes they constructed. Although Plaintiffs did not typically mandate that drywall come from a certain manufacturer (absent participation in a specific manufacturer program such as the CertainTeed Building Solutions Program), in their distributor or subcontractor agreements, Plaintiffs required or strongly preferred that the drywall be produced domestically.

### D. Plaintiffs Have Shown Nonconspirator Drywall Manufacturers Followed the Allegedly Conspiratorial Price Increases Without Exception

Plaintiffs reference record evidence that, in their view, establishes CertainTeed and Georgia-Pacific raised prices directly in response to price decisions announced by the conspiring drywall manufacturers. Plaintiffs highlight various conversations and decisions amongst executives of the nonconspiring manufacturers—CertainTeed and Georgia-Pacific—demonstrating that their pricing decisions stemmed from the decisions of Defendants:

1. John K. Donaldson, President of **CertainTeed**, 2008–2012, declared that "[d]uring [his] tenure, [CertainTeed executives] did not perceive that CertainTeed Gypsum had the clout with customers to simply announce a list price increase and have it be accepted. Accordingly, while [CertainTeed] wished to pursue list price increases, [they] felt [their] best course was to match (or 'follow') price increases announced by the large manufacturers—USG and National Gypsum." (Pl.'s Statement of Undisputed Facts, Ex. 22 ¶ 37.) Mr. Donaldson also stated that "once a price increase had been announced by USG or National Gypsum, [CertainTeed's] decision to follow was generally a simple one." (Id. ¶ 38.) Thus, according to Mr. Donaldson, "[a]fter both USG and National Gypsum had issued announcements regarding new 2012 list prices (in addition to American), the decision for [Mr. Donaldson and Steve Hawkins, the Vice President of Sales of CertainTeed] about whether CertainTeed Gypsum should do something similar became an easy one." (Id. ¶ 49.)

2. Steve Hawkins, Vice President of Sales of **CertainTeed**, declared that "[w]hen it comes to the setting of list prices, CertainTeed has generally been what I would call a 'follower.' [CertainTeed] ha[s] waited until one or more of the large manufacturers—USG or National Gypsum—announce to their customers an increase, then [CertainTeed] ha[s] evaluated internally and unilaterally … what [their] response would be, and generally have decided to announce similar list price increases …, typically with the same effective date." (Pl.'s Statement of Undisputed Facts, Ex. 23 ¶ 15.) According to Mr. Hawkins, "[d]uring the period between January 2010 and September 2011, [CertainTeed] made eight price increase announcements, and in all but one [CertainTeed] made [their] price announcement after one of USG or National Gypsum had done so." (Id.) Mr. Hawkins explained that CertainTeed's pricing strategy was to "generally choose a percentage increase similar to what [USG or National Gypsum] … announced." (Id. ¶ 22.) Mr. Hawkins explained that after USG and National Gypsum announced price increases in 2012, he "saw no reason not to proceed with a CertainTeed announcement." (Id. ¶ 55.)

3. Dave Engelhardt, President of **CertainTeed** 2012–present, declared that "CertainTeed Gypsum followed price increases announced by other manufacturers, in particular one or both of the two large manufacturers, USG and National Gypsum ('National'). CertainTeed Gypsum followed this approach with respect to the 2012 price increase, electing not to announce anything until after both USG and National had done so. [After taking over as president of CertainTeed,] I did not change this approach and felt it was the correct approach for the interests of CertainTeed Gypsum." (Pl.'s Statement of Undisputed Facts, Ex. 24 ¶ 38.)

4. Keith Campbell, Vice President of Finance of **CertainTeed** 2000–2013, declared that "[b]ecause [CertainTeed] felt [the company] had limited ability to initiate list price increases, [CertainTeed] generally waited until one or both of the large manufacturers, USG and National Gypsum ('National'), announced list price increases to their customers before announcing anything … [CertainTeed]

generally then followed those announcements with [their] own." (Pl.'s Statement of Undisputed Facts, Ex. 25 ¶ 16.)

5. Brent Paugh, President of Gypsum Division of **Georgia-Pacific**, declared that "the other wallboard manufacturers' announcements in the fall of 2011 and fall of 2012 concerning the elimination of job quotes and the holding of price for the full year helped contribute to the realization of wallboard price appreciation in January 2012 and January 2013, whereas previous price increase announcements by Georgia-Pacific or other manufacturers throughout 2010 and 2011 did not achieve any material price appreciation." (Pl.'s Statement of Undisputed Facts, Ex. 26 ¶ 9.)

Defendants dispute Plaintiffs' characterization of the rationale for the pricing decisions of CertainTeed and Georgia-Pacific, contending instead that the increase decisions were consistent with oligopolistic decisionmaking entirely unrelated to Defendants' actions. (ECF 312, Def.'s Resp. to Pl.'s Statement of Undisputed Facts at 9-18.)

**E. Record Evidence Demonstrates Plaintiffs Indirectly Purchased Drywall from Defendants**

Neither Plaintiffs nor Defendants dispute that the chain of distribution was indirect; that is, that there was at least one intermediary between Defendants' manufacture of drywall and Plaintiffs' eventual purchase.[4] Further, Plaintiffs ordinarily[5] did not know the identity of the manufacturer whose wallboard was ultimately used in the homes they constructed. Although Plaintiffs generally did not require that drywall used in their homes come from a particular manufacturer, they did insist or prefer that the drywall be sourced from the United States:

1. Michael Mancini, of **Meritage Homes**, confirmed that Meritage "doesn't track the manufacturer of the drywall it purchase[d]" other than to "specify that [drywall] shall be manufactured in North America." (Pl.'s Statement of Undisputed Facts, Ex. 27 Meritage Homes Dep. 132:1-5.)

---

[4] See, e.g., Pl.'s Statement of Undisputed Facts, Ex. 1 Expert Report of Daniel E. Ingberman ¶ 249 (referencing answers from CalAtlantic and Pulte Home depositions confirming that Plaintiffs rarely purchased wallboard directly); Pl.'s Statement of Undisputed Facts, Ex. 28 Beazer Homes Dep. 55:1-4 (confirming that the chain of distribution was "manufacturer, ProBuild, Eastern Applicators, [homebuilder]"); Pl.'s Statement of Undisputed Facts, Ex. 29 Drees Dep. 51:19-21 (Question: "Does Drees ever purchase drywall directly from the manufacturer?" Answer: "No.").
[5] According to deposition testimony, Plaintiffs knew the manufacturer that supplied the drywall to their subcontractor if the purchase was part of a special program, but for the majority of purchases the manufacturer's identity was unknown. See, e.g., Pl.'s Statement of Undisputed Facts, Ex. 28 Beazer Homes Dep. 66:21-23; Pl.'s Statement of Undisputed Facts, Ex. 29 Drees Dep. 53:15-25; Pl.'s Statement of Undisputed Facts, Ex. 35 Hovnanian Dep. 15:7-8.

2.  Joseph P. Starr, of **Beazer Homes**, verified that "Beazer [generally] doesn't know the manufacturer of the drywall that gets installed in its homes," but noted Beazer does "specif[y] that the drywall installed in its homes should be of U.S. manufacture." (Pl.'s Statement of Undisputed Facts, Ex. 28 Beazer Homes Dep. 67:13-16; 8-11.)

3.  David Edward Metz, of **Drees**, indicated that Drees "maintains no records of the drywall manufacturer that it purchased from distributors." (Pl.'s Statement of Undisputed Facts, Ex. 29 Drees Dep. 57:9-13.) The only requirement Drees has is that the drywall be "U.S. manufactured." (Id. 55:14.)

4.  Kevin Wilson, of **TRI**, stated that TRI did not require subcontractors to use a particular type of drywall, but explained that "[i]t's in [the contract between TRI Pointe Homes and the subcontractor] to only use domestically-produced drywall." (Pl.'s Statement of Undisputed Facts, Ex. 30 TRI Dep. 237:11-15.)

5.  Charles Chippero, of **Pulte Home**, stated that Pulte "specifically told [their distributors] to use domestically-produced wallboard." (Pl.'s Statement of Undisputed Facts, Ex. 31 Pulte Home Dep. 106:16-20.)

6.  Larry Sekely, of **M/I Homes**, explained that the only restriction M/I Homes placed on "the distributors that contractors source[d] their drywall from" was to specify that the drywall be "manufactured in the United States." (Pl.'s Statement of Undisputed Facts, Ex. 32 M/I Homes Dep. 119:9-13.)

7.  Robert Hodak, of **Toll Brothers**, confirmed that Toll Brothers "tr[ied] to specify nationally recognized, domestic manufacturers." (Pl.'s Statement of Undisputed Facts, Ex. 33 Toll Brothers Dep. 145:6-7.) However, Mr. Hodak acknowledged that Toll Brothers has "no way of knowing which precise manufacturer [the company] ultimately purchased from for a given project." (Id. 189:9-16.)

8.  Bradley Conlon, of **D.R. Horton**, confirmed that D.R. Horton does not know "the identity of the manufacturers of the drywall that its subcontractors install[ed] in its homes;" rather, "[t]he only identifying thing that [D.R. Horton] kn[e]w is that [it] ha[s] a policy to only buy United States domestic board." (Pl.'s Statement of Undisputed Facts, Ex. 34 D.R. Horton Dep. 665-10.)

9.  Doug Whitlock, of **Hovnanian**, stated that the company did not "specify the manufacturer for drywall" except to require that the drywall be domestically produced. (Pl.'s Statement of Undisputed Facts, Ex. 35 Hovnanian Dep. 15:7-8; 18-19.)

10. Joseph Sabella, of **CalAtlantic**, verified that CalAtlantic required drywall be "U.S. made." (Pl.'s Statement of Undisputed Facts, Ex. 36 CalAtlantic Dep. 134:10.)

It is undisputed that the vast majority of drywall product used in the United States is produced by domestic manufacturers.  (Pl.'s Statement of Undisputed Facts ¶ 26; Def.'s Resp. to Pl.'s Statement of Undisputed Facts at 21.)  Therefore, according to Plaintiffs, the drywall they purchased was primarily, possibly exclusively, produced by United States manufacturers.  As a result, Plaintiffs assert that whether they purchased from conspirators or nonconspirators, they were charged inflated prices, because the anticompetitive agreement by defendants affected the price setting by all domestic manufacturers.

**F. Plaintiffs Have Shown Price Increases Were Passed on by Intermediary Purchasers**[6]

Evidence in the record establishes that Distributor Intermediaries—direct purchasers of drywall from defendants or other manufacturers that eventually sold to Plaintiffs—"passed on" the cost increases implemented by Defendants:

1. Ronald Pilla, President of Interiors Division of **Allied Building Products Corp.**—which purchased drywall from domestic manufacturers and resold it to contractors, homebuilders, and residential customers—declared that "Allied was forced to pass 100% of the manufacturer's [2012] price increases onto its customers."  (Pl.'s Statement of Undisputed Facts, Ex. 3 ¶ 7.)

2. Jeffrey S. Butts, Vice President of **KCG Inc.**—which purchased drywall exclusively from USG, National, American, PABCO, and Lafarge, and sold it to all Plaintiffs—declared that "it was necessary for KCG, Inc. to pass on to its customers [the price increases implemented by Defendants]."  (Pl.'s Statement of Undisputed Facts, Ex. 5 ¶ 6.)

3. William J. Umbach, Jr., Vice President of Gypsum for **ProBuild Corporation**—which supplied drywall to homebuilders and subcontractors—declared that "while the manufacturers desperately needed a price increase [in 2012], [ProBuild] could not afford to absorb any portion of it."  (Pl.'s Statement of Undisputed Facts, Ex. 6 ¶ 3.)

---

[6] A complete chart of the intermediate purchaser declarations concerning pass through of prices is attached as the Appendix to this Memorandum.

Additionally, the Installer Intermediaries—direct purchasers of drywall that provided drywall to Plaintiffs as part of their installation service—operated on a "cost-plus" basis, meaning that drywall pricing was a function of the cost for the physical material plus a percentage markup or a specific rate for installation.  (Pl.'s Statement of Undisputed Facts, Ex. 7 (Decl. of Colorworld Painting & Drywall Services) ¶ 5; Pl.'s Statement of Undisputed Facts, Ex. 8 (Decl. of Complete Interior Systems, Inc.) ¶ 5; Pl.'s Statement of Undisputed Facts, Ex. 9 (Decl. of Construction Applicators Metro LLC) ¶ 5; Pl.'s Statement of Undisputed Facts, Ex. 10 (Decl. of Paul Johnson Drywall) ¶ 5; Pl.'s Statement of Undisputed Facts, Ex. 11 (Decl. of Roadrunner Drywall Corp.) ¶ 5; Pl.'s Statement of Undisputed Facts, Ex. 12 (Decl. of Texan Drywall, Inc.) ¶ 5; Pl.'s Statement of Undisputed Facts, Ex. 13 (Decl. of Ultra-Wall Inc.) ¶ 5; Pl.'s Statement of Undisputed Facts, Ex. 14 (Decl. of Villarreal Drywall Inc.) ¶ 5; Pl.'s Statement of Undisputed Facts, Ex. 15 (Decl. of Votel Supply, Inc.) ¶ 5.)  Because the pricing by Installer Intermediaries that used a cost-plus structure was determined, in part, based on the cost of drywall itself, Plaintiffs that purchased from these companies likely bore some or all of the price increases caused by Defendants' conduct.

## III.  PROCEDURAL HISTORY

Because the Court has comprehensively documented the procedural history in this MDL in several previous opinions, only the procedural history that is relevant to Defendant's instant Motion will be discussed.

L&W, PABCO, and USG moved for partial summary judgment on umbrella damages on April 30, 2018.  (ECF 292.)  On June 8, 2018, Plaintiffs responded to the motion and included a separate statement of undisputed facts.  (ECF 308.)  Defendants replied in support of their motion for partial summary judgment on umbrella damages and addressed Plaintiffs' statement of undisputed facts on June 29, 2018.  (ECF 311; 312.)

In addition to filing a motion for partial summary judgment on umbrella damages, Defendants L&W, PABCO, and USG moved for summary judgment, (ECF 304); moved for summary judgment on choice of law, (ECF 316); and moved for partial summary judgment on unassigned claims, (ECF 318.) The Court held a hearing on these four motions—Defendants' motion for partial summary judgment on umbrella damages; motion for summary judgment; motion for summary judgment on choice of law; and motion for partial summary judgment on unassigned claims—on March 12, 2019. (ECF 378; 380.)

Following the hearing, the Court invited the parties to submit supplemental briefing on the applicability of the Supreme Court's decision in <u>Apple Inc. v. Pepper</u>, 139 S. Ct. 1514 (2019) to the pending motions. On June 3, 2019, both Plaintiffs and Defendants filed supplemental materials addressing the <u>Apple</u> holding as it relates to the motions presently before the Court. (ECF 385 (Defendants' brief); ECF 386 (Plaintiffs' brief).)

## IV.    STANDARD

Summary judgment is proper if the movant can establish "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is genuine—and will preclude a grant of summary judgment—if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). If a fact "might affect the outcome of the suit under the governing law," the factual dispute is material and will allow the nonmovant to survive summary judgment. <u>Id.</u> Only if "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party" is a grant of summary judgment appropriate. <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). At the summary judgment stage, the district court is obligated to "review the record as a whole and in the light most favorable to the

nonmovant, drawing reasonable inferences in its favor." <u>In re Chocolate Confectionary Antitrust Litig.</u>, 801 F.3d 383, 396 (3d Cir. 2015).

It is the responsibility of the litigant seeking summary judgment to inform the district court of the basis for its motion and identify the portions of the record that demonstrate the absence of a genuine dispute of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). Where the burden of proof on a particular issue rests with the nonmoving party at trial, the moving party's initial burden can be met by simply "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." <u>Id.</u> at 325. Once the moving party has met its initial burden, the nonmoving party must set forth specific facts—through citation to affidavits, depositions, discovery documents, or other evidence—demonstrating the existence of a genuine triable dispute. Fed. R. Civ. P. 56(c).

## V.   DISCUSSION

The concept of umbrella damages refers to the phenomenon that when a group of conspirators sets the price of a product at an artificially high level, a price umbrella is created that spreads throughout the market. The umbrella effect occurs because nonconspirator sellers uninvolved in the anticompetitive conduct correspondingly raise prices. <u>See generally</u> Philip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application § 347 (4th ed. 2014). In the view of many courts, "the distinction between umbrella damages and other types of damages [is] legally and economically inconsequential." <u>In re Cathode Ray Tube Antitrust Litig.</u>, No. 07-5944, 2016 WL 6246736, at *4 (N.D. Cal. Oct. 26, 2016) ("<u>CRT</u>"); <u>see also id.</u> (collecting cases supporting proposition).

Defendants argue that umbrella damages are precluded as a matter of law for two reasons: (A) the Cartwright Act—California's antitrust statute—does not permit umbrella damages, and

even if the Cartwright Act does not expressly prohibit them, the harmonization doctrine weighs against adopting a construction of California state law that conflicts with federal law; and (B) Plaintiffs have not satisfied the antitrust standing requirement.[7]

### A. Availability of Umbrella Damages Under California State Law

#### 1. Parties' Contentions

Defendants first argue that umbrella damages are categorically unrecoverable under California statutory or judicial law. (Def.'s Mot. for Partial Summ. at 11.) Plaintiffs contend that the absence of positive California law on the availability of umbrella damages does not indicate such damages are disallowed. (Pl.'s Opp. at 17.)

Defendants also invoke the harmonization doctrine in support of their theory that, because California has not expressly permitted umbrella damages, the Court should not construe California law in a way that conflicts with well-settled federal law barring umbrella damages. (Def.'s Mot. for Partial Summ. J. at 12.) Plaintiffs argue that because the Cartwright Act is inherently broader than federal antitrust law, it is—at most—instructive on the proper construction of state law; it is not dispositive. (Pl.'s Opp. at 21.)

#### 2. Umbrella Damages Jurisprudence

In Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481 (1968), the Supreme Court held that a direct purchaser can recover for the entire extent of an overcharge, even if he subsequently passes on the illegal overcharge to buyers. See id. at 489 ("[T]he buyer is equally

---

[7] In their Motion, Defendants analyze the viability of umbrella damages under (a) federal law and (b) the law of the eighteen states, in addition to California, that Plaintiffs contend recognize the right of an indirect purchaser to sue for antitrust damages. (Def.'s Mot. for Partial Summ. J. at 4-15.) However, Plaintiffs do not seek umbrella damages under the Sherman Act, so Defendants' arguments on the unavailability of umbrella damages under federal law will not be addressed. (Pl.'s Opp. at 9.) Additionally, because the Court found that California's choice-of-law approach requires application of California state law to the state antitrust claims brought by Plaintiffs located in both repealer and nonrepealer states, the Court will not reach Defendants' arguments addressing umbrella damages under non-California law. (ECF 390; 400.)

entitled to damages [for injury based on anticompetitive conduct] if he raises the price for his own product."). In so holding, the Supreme Court rejected defendants' pass-on defense, which was based on the theory that the overcharged indirect purchasers that bought from the direct purchaser were the actual injured parties. See id. at 494 (noting that, although there might be situations where a pass-on defense is permitted, the general rule is that the direct purchaser is the injured party entitled to antitrust damages).

The Supreme Court again confronted the question raised in Hanover Shoe—whether a direct purchaser that suffered an overcharge but passed along that overcharge to a subsequent purchaser could recover—in Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977). This time, the issue surfaced in the context of a claim brought by an indirect purchaser that sought to use the direct purchaser's pass on as the basis for damages. Id. at 726. The Supreme Court—having rejected the defensive pass-on theory advanced in Hanover Shoe (i.e., foreclosing antitrust violators from defending against claims brought by direct purchasers based a pass-on theory)— also rejected plaintiffs' attempt to use pass on offensively. Id. at 730. Reasoning that permitting offensive, but not defensive, pass on would create a serious risk of duplicative liability for defendants, Illinois Brick reaffirmed the Hanover Shoe principle and extended it to bar indirect purchasers from seeking damages for antitrust violations under federal law. Id. at 736.

In the wake of Illinois Brick, some states—including California—statutorily repealed the holding, authorizing indirect, as well as direct, purchasers to recover for antitrust injuries under state law. See, e.g., CAL. BUS. & PROF. CODE § 16750(a) (allowing individuals injured by anticompetitive conduct to sue, "regardless of whether such injured person dealt directly or indirectly with the defendant"); see also Clayworth v. Pfizer, Inc., 233 P.3d 1066, 1082 (Cal. 2010) ("Passage of the Illinois Brick repealer statute was driven by the fear that indirect purchasers might

13

be stripped of their standing to sue under the Cartwright Act.").  However, even in states that have statutorily rejected <u>Illinois Brick</u>, linkage between state and federal antitrust law remains if the state has enacted a "harmonization" statute explicitly directing courts to consider federal law on antitrust issues.[8]

Umbrella damages, the theory of damages that Plaintiffs assert here, were not at issue in either <u>Hanover Shoe</u> or <u>Illinois Brick</u>.  However, the Ninth Circuit applied the rationale of <u>Illinois Brick</u> to a claim for umbrella damages brought under federal law and found that "the limitations recognized in <u>Illinois Brick</u> bar umbrella claims in the context of the multi-tiered distribution chain alleged."  <u>In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.</u>, 691 F.2d 1335, 1340 (9th Cir. 1982) ("<u>Petroleum Products</u>").  The <u>Petroleum Products</u> court deliberately noted that it was "not decid[ing] … whether, in a situation involving a single level of distribution, a single class of direct purchasers from nonconspiring competitors of the defendants can assert claims for damages against price-fixing defendants under an umbrella theory."  <u>Id.</u>  Additionally, <u>Petroleum Products</u> involved claims for alleged antitrust violations brought under <u>federal</u> (as opposed to state) law.  <u>Id.</u> at 1337.

Two federal courts, each construing California <u>state</u> law, have recently considered the viability of an umbrella theory of damages in antitrust litigation on a motion for partial summary judgment.  Both decisions squarely confronted the issue the Court faces here—whether the Cartwright Act precludes umbrella damages as a matter of law—and have come to opposing conclusions.  <u>Compare</u> <u>Cty. of San Mateo v. CSL Ltd.</u>, No. 10-5686, 2014 WL 4100602, at *6 (N.D. Cal. Aug. 20, 2014) (denying partial summary judgment), <u>with</u> <u>In re TFT-LCD Antitrust Litig.</u>, No. 07-1827, 2012 WL 6708866, at *8 (N.D. Cal. Dec. 26, 2012) ("<u>TFT</u>") (granting partial

---

[8] Def.'s Mot. for Partial Summ. J. at 12-14 contains a comprehensive collection of the eleven out of nineteen repealer states that have enacted harmonization statutes.

summary judgment).  A third decision analyzed umbrella damages in connection with defendants' attempt to analogize the species of damages the plaintiffs were claiming (so-called "price-ladder" damages) to umbrella damages, which defendants contended were barred under Ninth Circuit interpretation of California antitrust law.  CRT, 2016 WL 6246736, at *8.

First, in TFT, the court assessed defendants' motion for partial summary judgment on umbrella damages claimed by indirect purchasers of panels that were bought from entities not involved in the litigation.  2012 WL 6708866, at *1-2.  The claim for umbrella damages arose under the law of five states, including California.  Id. at *6 n.8.  The TFT court ultimately declined to allow plaintiffs' umbrella theory and rested its holding on the rationale of the Ninth Circuit's Petroleum Products decision, which disallowed umbrella damages as "unacceptably speculative and complex" in contravention of the restrictions imposed by Illinois Brick.  Id. at *7.  TFT reasoned that the "absence of any state law authority endorsing umbrella damages claims" and "the particular facts of these cases, [namely the] multi-layered distribution chain" precluded plaintiffs' umbrella damages theory.  Id.

Next, in County of San Mateo, the reasoning of TFT was rejected and defendants' motion for partial summary judgment on umbrella damages was denied.  2014 WL 4100602, at *1.  The County of San Mateo court rejected defendants' argument that calculation of overcharge would be "unacceptably speculative," reasoning instead that damage calculations against both the conspiring rival defendants and the nonconspiring sellers involved a degree of speculation, but that indirect purchaser damages are nonetheless recoverable under California's Illinois Brick repealer statute.  Id. at *3.  County of San Mateo also found Petroleum Products inapposite, because California's repealer statute rejected "Illinois Brick's benchmark for speculation and complexity."  Id. at *5.

Most recently, in CRT, a district court in the Northern District of California assessed defendants' argument that the theory of damages on which plaintiffs were relying—so-called "price-ladder" damages—were prohibited because they were materially similar to umbrella damages which, in view of defendants, had been disallowed by the Ninth Circuit under California law. The CRT court roundly rejected this contention, concluding that "Ninth Circuit authority does not prohibit umbrella damages where plaintiffs are only one step removed from defendants in the distribution chain." 2016 WL 6246736, at *8. Because the court rejected defendants' contention that umbrella damages were categorically barred under California state law, it allowed plaintiffs' price-ladder theory to survive summary judgment. Id.

### 3. Application

The Cartwright Act does not bar umbrella damages as a matter of law, and thus partial summary judgment is improper. The absence of mandatory authority expressly authorizing such damages does not ipso facto mean they are prohibited. See, e.g., County of San Mateo, 2014 WL 4100602, at *4 ("The Court will not assume that umbrella damages are disallowed under California law, as under federal law, just because a California court has not addressed the issue."); see also In re Online DVD Rental Antitrust Litig., No. 09-2029, 2009 WL 4572070, at *4 (N.D. Cal. Dec. 1, 2009) (declining to hold that "umbrella liability [is unavailable] as a matter of law," though ultimately rejecting standing for umbrella damages on the facts of a motion to dismiss). Moreover, the Supreme Court of California has dictated that because "the Cartwright Act's primary concern is … the elimination of restraints of trade and impairments of the free market, [courts] can and should select the damages rule most consistent with that focus." Clayworth, 233 P.3d at 783. Applying this mandate indicates that Plaintiffs' theory of umbrella damages is not barred as a

matter of law, because rejecting umbrella damages at the summary judgment stage could disincentivize compliance with the Cartwright Act.

Additionally, the Ninth Circuit's <u>Petroleum Products</u> decision, which held umbrella damages unavailable under federal law, is distinguishable because there the plaintiffs brought their claims solely under <u>federal</u> law. By contrast, here Plaintiffs' claim for umbrella damages is asserted under <u>state</u> law. The Court notes that there is no evidence in the record indicating Plaintiffs purchased drywall <u>directly</u> from Defendants.[9] Therefore, if the claims for umbrella damages were brought under federal law, then the decision on this Motion would be a simple one: because <u>Petroleum Products</u> largely barred umbrella damages under federal law and implied that the only scenario where they may be available is in the context of a single level of distribution, the lack of evidence establishing that Plaintiffs directly purchased drywall from any Defendant would have doomed their umbrella theory of damages. However, because Plaintiffs' umbrella damages claims are asserted under California's Cartwright Act, the <u>Petroleum Products</u> bar on claims for umbrella damages asserted under federal law (except claims for purchases made in a single level of distribution) is not determinative.

Finally, Defendants' harmonization theory does not persuade the Court. The issue that Defendants' harmonization argument raises is whether the Ninth Circuit's rejection of umbrella damages under the federal Sherman Act in <u>Petroleum Products</u> compels the conclusion that umbrella damages are similarly unavailable under California's Cartwright Act pursuant to the principle that courts should construe state antitrust law in harmony with federal antitrust law. For

---

[9] At most, the deposition testimony establishes that Plaintiffs purchased domestically manufactured drywall, because the drywall used in the homes constructed by Plaintiffs was procured by subcontractors that were contractually obligated to obtain drywall only from United States manufacturers. <u>See</u> Section II.E.

the reasons discussed below, the harmonization argument does not justify rejecting Plaintiffs' umbrella theory of damages.

In the first instance, California lacks a harmonization statute, a fact that Defendants impliedly concede. (Def.'s Mot. for Partial Summ. J. at 12.) Additionally, the Supreme Court of California has unambiguously held that "[i]nterpretations of federal antitrust law are at most instructive, not conclusive, when construing the Cartwright Act." Aryeh v. Canon Bus. Sols., Inc., 292 P.3d 871, 877 (Cal. 2013) (emphasis added); see also California v. ARC Am. Corp., 490 U.S. 93, 102 (1989) ("Congress intended the federal antitrust laws to supplement, not displace, state antitrust remedies."). Therefore, contrary to Defendants' argument that the lack of positive California law on the availability of umbrella damages justifies looking to federal decisional law, California's absence of a codified harmonization doctrine, coupled with the Supreme Court of California's express acknowledgement that federal law is not binding on interpretations of the Cartwright Act, indicates that this argument must be rejected.

In summary, because the Cartwright Act does not expressly prohibit umbrella damages (indeed, at least two federal courts interpreting the Act have concluded it does not, as a matter of law, bar plaintiffs from pursuing this theory), and because California judicial construction of the harmonization doctrine does not require application of the federal rule barring umbrella damages, Plaintiffs survive Defendants' Motion.

**B. Plaintiffs' Satisfaction of Antitrust Standing Requirement**

Second, Defendants contend that, even if umbrella damages are not categorically barred, Plaintiffs have not cleared the "[i]ndependent hurdle" of antitrust standing. (ECF 311, Def.'s Reply at 10.) Plaintiffs respond that California's repealer statute "expressly repudiated federal

antitrust authority as it relates to indirect purchasers' ability to collect all of their damages under state law." (Pl.'s Opp. at 21.)

Although courts in the Northern District of California have disagreed over the test that governs standing under the Cartwright Act, Plaintiffs do not dispute Defendants' application of the test set forth in <u>Associated General Contractors of California, Inc. v. California State Council of Carpenters</u>, 459 U.S. 519 (1983) ("<u>AGC</u>"). Under that test, five factors govern whether an antitrust claim is cognizable: (1) the nature of the injury suffered by the plaintiff; (2) the directness or indirectness of the injury; (3) the speculative nature of the harm; (4) the risk of multiple recovery; and (5) the complexity of apportioning damages. <u>Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California</u>, 190 F.3d 1051, 1054 (9th Cir. 1999). Defendants contend that factors (1), (2), and (3) favor granting partial summary judgment on umbrella damages. (Def.'s Reply at 14.) However, on balance, application of the five <u>AGC</u> factors indicates Plaintiffs may be able to satisfy the antitrust standing requirement at trial, thereby precluding summary judgment.

An antitrust injury that will support standing under the first factor of the <u>AGC</u> test is one that is "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." <u>American Ad Management</u>, 190 F.3d at 1055. Defendants dispute the notion that antitrust laws are designed to allow recovery for umbrella damages; they argue that there is no statutory indication that recovery is available for purchases made from entities not involved in the alleged price-fixing conspiracy. (Def.'s Reply at 15.)

The first <u>AGC</u> factor favors Plaintiffs, because there are credible allegations of unlawful conduct that caused Plaintiffs to suffer injury of the type the antitrust laws were designed to prevent—that is, financial injury caused by conspiracy-induced artificially inflated prices. Plaintiffs have pointed to specific facts in the record supporting the existence of a conspiracy to

inflate drywall prices.[10]  Moreover, the purpose of the antitrust laws is to protect "competition, not competitors." Brown Shoe Co. v. United States, 370 U.S. 294, 344 (1962).  Although courts have varied on whether they permit plaintiffs to proceed on an umbrella damages theory, the judicial landscape does not reveal "general hostility" towards umbrella damages, as Defendants claim. (Def.'s Reply at 15.)  Rather, the differing views of courts on the question of the viability of umbrella damages reflect the highly nuanced, fact-specific nature of rigorous analysis of antitrust damages.  See Online DVD, 2009 WL 4572070, at *4 (highlighting that "the Supreme Court has … noted that antitrust standing is to be determined based upon a case by case analysis of the facts, in light of AGC").

The second AGC factor also favors Plaintiffs, because the "chain of causation between [Plaintiff's] injury and the alleged restraint in the market [for drywall]" is sufficiently direct. American Ad Management, 190 F.3d at 1058.  Plaintiffs' explanation of the causal chain between Defendants' alleged price conspiracy and the artificially high drywall prices charged to Plaintiffs is as follows: Defendants conspired to raise prices during the conspiracy period and executed on those plans; nonconspiracy manufacturers, such as CertainTeed and Georgia-Pacific, also increased prices in response to the price announcements by Defendants, resulting in higher prices industry-wide; the Distributor and Installer Intermediaries that purchased directly from the manufacturers and resold to Plaintiffs passed on the higher increases caused by the conspiracy. (Pl.'s Statement of Undisputed Facts ¶¶ B.7–25.)  The close connection asserted here is distinguishable from causation in cases where this factor favored defendants.  See, e.g., Antoine L. Garabet, M.D., Inc. v. Autonomous Techs. Corp., 116 F. Supp. 2d 1159, 1170 (C.D. Cal. 2000) (finding that second AGC factor weighed against plaintiffs because there were "other purchasers

---

[10] The Court summarized the substance of the allegations related to the anticompetitive conduct in California in the Memorandum re Motion for Summary Judgment (Choice of Law), ECF 390, at 10-17.

who … purchased from [d]efendants <u>directly</u>, whose damages would be more demonstrable, and for whom the causal chain would be unbroken").

The third <u>AGC</u> factor does not clearly weigh against finding that Plaintiffs have standing. Antitrust standing may be speculative under this factor if the injury is indirect and the alleged effects of the injury "may have been produced by independent factors." <u>AGC</u>, 459 U.S. at 542. The degree of speculation implicated by Plaintiffs' theory of umbrella damages does not, as a matter of law, allow the Court to deny antitrust standing at this stage of the litigation—a motion for partial summary judgment. First, Plaintiffs' have presented facts showing that the injury flows directly from the conspiracy to inflate prices and eliminate job quotes. Second, although Defendants point out various ways in which the umbrella damages calculation could be complicated due to the particularities of this case, complexity is not a reason to grant summary judgment. <u>See, e.g.</u>, <u>Forsyth v. Humana, Inc.</u>, 114 F.3d 1467, 1478 (9th Cir. 1997) ("Complex antitrust cases … invariably involve complicated questions of causation and damages."), <u>rev'd on other grounds</u>, <u>Lacey v. Maricopa Cty.</u>, 693 F.3d 896 (9th Cir. 2012).

Finally, although neither party analyzes the applicability of the fourth or fifth <u>AGC</u> factors, there is no indication that either of these factors strongly favor Defendants. As to the fourth <u>AGC</u> factor, unlike in <u>Garabet</u> where the court found that the availability of two superior plaintiff classes heightened the danger of duplicative recovery, Defendants have not identified any superior plaintiffs who might seek to recover and implicate the possibility of duplicitous obligations. <u>Garabet</u>, 116 F. Supp. at 1170. Additionally, the lengthy procedural history of this MDL decreases the risk that another purchaser will pursue a duplicate claim and subject Defendants to repetitive recovery. As to the fifth <u>AGC</u> factor, the task of apportioning damages is not rendered unacceptably complicated just because Plaintiffs seek umbrella damages.

In short, Defendants' contention that umbrella damages are unavailable under California's Cartwright Act as a matter of law is rejected because it is not required by the text nor is it supported by judicial interpretations of the Act. Additionally, notwithstanding Defendants' arguments to the contrary, proper application of the AGC factors indicates that Plaintiffs have standing. Accordingly, partial summary judgment on umbrella damages is inappropriate at this time. However, if the evidence adduced at trial fails to prove Plaintiffs' umbrella damages theory, Defendants may renew their challenge on a motion for directed verdict.

## VI.  CONCLUSION

For the foregoing reasons, Defendants' Motion for Partial Summary Judgment on Umbrella Damages is **DENIED**.

An appropriate order follows.

O:\CIVIL 15\15-1712 ashton woods v. usg\15cv1712 Memorandum re Partial Summary Judgment on Umbrella Damages.docx

## APPENDIX

| | Chart of Intermediate Purchaser Declarations re: Pass Through of Prices | | | |
|---|---|---|---|---|
| **Exhibit #** | **Intermediate Purchaser** | **Purchased From** | **Supplied To** | **Citation re: Pass Through** |
| 3 | Allied Building Products Corp. | "[A]ll of the major drywall manufacturers in the United States." | "Homebuilders" | ¶ 7 |
| 5 | KCG, Inc. | USG, National, American, PABCO, Lafarge | Ashton Woods, Beazer Homes, CalAtlantic, D.R. Horton, Hovnanian, KB Home, Meritage, M/I Homes, Pulte, Drees Company, Toll Brothers, Tri Pointe Homes | ¶ 6 |
| 4, 6 | ProBuild | USG, National, CertainTeed, Georgia-Pacific, Lafarge, American, PABCO | "[A]ll of the homebuilding plaintiffs or their subcontractors." | Ex. 6 ¶ 3 |
| 7 | Colorworld Painting & Drywall Services | USG, National, American, PABCO, Lafarge | TRI Pointe Group | ¶ 5 |
| 8 | Complete Interior Systems, Inc. | USG, National, Lafarge | Toll Brothers, Inc. | ¶ 5 |
| 9 | Construction Applicators Metro LLC | USG, National, American, PABCO, Lafarge | Hovnanian | ¶ 5 |
| 10 | Paul Johnson Drywall | USG, National, American, PABCO, Lafarge | Meritage Homes | ¶ 5 |
| 11 | Roadrunner Drywall Corp. | USG, National, PABCO | Hovnanian | ¶ 5 |
| 12 | Texan Drywall, Inc. | USG, National, American, PABCO, Lafarge | D.R. Horton | ¶ 5 |
| 13 | Ultra-Wall Incorporated | USG, National, American, PABCO, Lafarge | TRI Pointe Group | ¶ 5 |
| 14 | Villarreal Drywall inc. | USG, National, American, PABCO, Lafarge | Meritage Homes | ¶ 5 |
| 15 | Votel Supply Inc. (formerly Ken Builders Supply Inc.) | USG, National, American, PABCO, Lafarge | Drees Company | ¶ 5 |