## BONDURANT, MIXSON & ELMORE LLP

FRANK M. LOWREY IV

Direct Dial: (404) 881-4118
lowrey@bmelaw.com

July 12, 2023

**<u>Via Email to Chambers</u>**

The Honorable Michael M. Baylson
Judge, United States District Court, Eastern District of Pennsylvania

      Re: *Home Depot U.S.A., Inc. v. Lafarge North America, Inc.* (18-5305)

Dear Judge Baylson:

      Home Depot has brought its own case, featuring its own arguments "based on newly developed or preexisting evidence" as well as arguments why certain "prior rulings … should not be followed" in this case against Lafarge. *Home Depot USA, Inc. v. Lafarge N. Am., Inc.*, 59 F.4th 55, 64 (3d Cir. 2023). Home Depot offers new evidence, including testimony of Home Depot witnesses, that this conspiracy targeted Home Depot and that all suppliers—including USG— abruptly stopped competing for its business as of the January 2012 price increases. MSJ Resp. 6-10, 32-33, ECF No. 94; Revised Kneuper Initial Rpt. 40-41, 47-50, ECF No. 167-1.

      *Valspar*: Not one sentence in *Valspar* says that statements made to or passed through an intermediary cannot sustain an inference of conspiracy. The only piece of conduit evidence the *Valspar* majority discussed does not compare to National Gypsum (NG) and Lafarge's use of analysts to coordinate pricing with their competitors. *In re Domestic Drywall Antitrust Litig.*, 163 F.Supp.3d 175, 244-48 (E.D. Pa. 2016). And aside from conduit communications, the traditional conspiracy evidence sustains an inference of Lafarge's complicity. *Id.* at 246-47, 257; ECF No. 171 at 5-7. While Lafarge now urges the Court to decide otherwise based on other exhibits supposedly consistent with independent action, that is a classic fact issue for the jury.[1]

---

[1] *In re Urethane Antitrust Litig*, 2013 WL 6587972 (D. Kan. Dec. 16, 2013), which declined to treat jury findings in a class case as preclusive in a later opt-out suit, does not apply here. Home Depot does not contend that the Court's prior summary judgment ruling against Lafarge is preclusive, merely that it is correct.

The Honorable Michael M. Baylson
Page 2

*USG's participation*: Unlike in the Homebuilders case, the question here is not whether there is sufficient evidence to hold USG liable as a party, but whether the evidence admissible *against Lafarge* would allow a jury to infer that the conspiracy included USG. That is the most reasonable and likely construction of Lafarge's Steven DeMay's admission that there had been discussions among "all of the senior management at all of the manufacture[r]s" about adhering to the 2012 price increase. Ex. 1269. A jury could reasonably find that DeMay would not have said "all" (twice) if he meant all but USG, the industry's largest supplier.

Lafarge wrongly argues that, in Homebuilders, this Court held that DeMay did not really mean "all" and instead implicitly excluded USG. Tr. at 35 (ECF No. 175). Instead, the Court held that Ex. 1269 (and Ex. 1515) failed to defeat USG's summary judgment motion because USG "was cautious in its interactions with individuals at Thompson and Longbow, often withholding information" and, secondarily, that there was insufficient foundation to admit this document against USG under the co-conspirator hearsay exception. *In re Domestic Drywall Antitrust Litig.*, 2019 WL 3254090, *31 & n.9 (E.D. Pa. July 19, 2019). Those were the Court's *only* reasons for finding that Exs. 1269 and 1515 were "not applicable to our analysis of Gypsum." *Id.* at *31. But neither rationale negates the import of DeMay's acknowledgement, fully admissible against Lafarge, of prior discussions among "all" manufacturers about adhering to the upcoming price increase. Exhibit 1269's power as a Lafarge admission does not depend on what USG shared with analysts because there is no reason to assume (much less any evidence) that the discussions DeMay referenced had been passed through analysts.

Home Depot's interpretation of Ex. 1269 draws support from NG's admission of "verbal agreements for a large price increase in 2013." Ex. 1515. That is an independent indication— admissible against Lafarge as co-conspirator—that the suppliers engaged in the types of discussions to which DeMay admitted. As with Ex. 1269, Ex. 1515's import does not depend on

The Honorable Michael M. Baylson
Page 3

whether USG talked to analysts—again, there is no indication that the referenced "verbal agreements" were formed through analysts. Following the Third Circuit's opinion, this Court should consider Home Depot's account of this evidence de novo, whether it constitutes a new argument or simply a good reason why the prior USG ruling should not be followed here.

Other evidence shows that USG discussed eliminating job quotes with competing suppliers. After an April 2011 trade show attended by USG, American Gypsum's (AG) Keith Metcalf instructed his staff not to quote any jobs for 2012 because "[w]e may have a movement from all manufacturers to eliminate quotes." Ex. 1165. Like DeMay, Metcalf said "all manufacturers." And USG is the single most likely candidate to have talked to AG because USG had been internally considering eliminating job quotes, Ex. 766, but was concerned about "how we would get the 'industry' out of a 'competing for jobs' mentality." Ex. 1354.

Moreover, AG and USG internal emails written the same day a few weeks before AG's September 2011 announcement are remarkably similar, as if the product of a common conversation. Exs. 1461, 1462. Next came Metcalf's September 6 call to L&W's Senior VP of Sales, who in turn immediately called his USG counterpart. Exs. 2146, 2187. By September 22, 2011, AG—a small manufacturer that had been waiting on "one or more of the big boys" to act (Ex. 2098)—felt comfortable being the first to raise price and eliminate job quotes.[2] The most plausible explanation is that it did so based on the assurance and agreement of fellow competitors and, as discussed above, USG is the most likely culprit. NG, another attendee at the April 2011 trade show, also knew USG's plans, writing *before* USG's announcement that it "[l]ooks like American beat USG to the punch." Ex. 1500. Thus, the cumulative evidence goes beyond USG's

---

[2] Dr. Kneuper's economic analysis of AG's heavy reliance on job quotes explains why it would have been irrational for AG to risk abandoning quotes absent assurance that industry-leader USG would do so. Revised Initial Kneuper Rpt. 36, ECF No. 167-1.

The Honorable Michael M. Baylson
Page 4

mere attendance at a trade show (like CertainTeed or the *Valspar* suppliers) and strongly signals

inter-supplier communications involving USG, AG, and others.[3]

 *Umbrella Damages*: The recoverability of umbrella damages under federal antitrust law

affects only this one case and so should be deferred to the Georgia court that will try this case.

MSJ Resp. at 94-96, ECF No. 94. Lafarge argues that Eleventh Circuit law (*In re Beef Industry*

*Antitrust Litig.*, 600 F.2d 1148, 1166 n.24 (5th Cir. 1979)) allowing umbrella damages was silently

overruled by footnote in *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1451 n.19 (11th Cir.

1991), because *Beef* applied a supposedly invalid "target-area" standing test. Yet well after 1991,

"[t]he Eleventh Circuit continues to apply the 'target area test.'"[4] Rather than accept Lafarge's

spin on Eleventh Circuit law, this Court should defer the issue to the courts of that circuit.[5]

 Moreover, Home Depot should recover umbrella damages under the Third Circuit

precedent discussed in Home Depot's summary judgment response at 79-94. In addition, this Court

identified *In re Modafinil Antitrust Litig.*, 837 F.3d 238 (3d Cir. 2016), which held that *Mid-West*

*Paper*'s rule against umbrella damages did not apply to cases alleging the foreclosure of market

competition. *Id.* at 264-66. Like Home Depot, *Modafinil* relied on Supreme Court standing law

that post-dates *Mid-West Paper*, reasoning that the misconduct had affected the entire market. *Id.*

While *Modafinil* did not have occasion to determine whether *Mid-West Paper* continues to govern

---

[3] Home Depot has offered new evidence and arguments regarding USG's use of L&W as a conduit to pass information to and from competitors, addressing shortcomings the Court identified in the Homebuilders' evidence. Second Suppl. Br. 14-17, ECF No. 167; MSJ Resp. 54, 61-69, ECF No. 94.

[4] *QSGI, Inc. v. IBM Glob. Fin.*, 2012 WL 13019046, at *3 (S.D. Fla. July 31, 2012); *see also Florida Seed Co. v. Monsanto*, 105 F.3d 1372, 1374 (11th Cir. 1997) (standing "predicated on the 'target area test'"); *Corey Airport Servs., Inc. v. City of Atlanta*, 2005 WL 8158629, at *14 (N.D. Ga. July 12, 2005), *aff'd*, 181 F. App'x 908 (11th Cir. 2006).

[5] To be clear, Lafarge's liability for its *co-conspirators'* overcharges has nothing to do with umbrella damages, which addresses liability for price elevations by "nonconspirator sellers." *In re Domestic Drywall Antitrust Litig.*, 2019 WL 4918675, at *6 (E.D. Pa. Oct. 3, 2019).

The Honorable Michael M. Baylson
Page 5

horizontal price-fixing cases, that same superseding caselaw would allow umbrella damages in that setting, too, at least where (as here) the evidence shows that the *entire* market raised prices above competitive levels when no one had previously been able to do so.

Finally, Lafarge urges that proving umbrella damages requires controlling for reasons (aside from the conspiracy) that a non-conspiring seller raised price. But that is what regression analysis does—control for non-conspiratorial factors explaining price. *See* Revised McClave Initial Rpt. 13, ECF No. 167-3 (showing USG and Georgia-Pacific's overcharges to Home Depot hovered near overcharges by other suppliers); MSJ Resp. 91-92, ECF No. 94. This analysis finds support in the direct evidence that Home Depot could not escape USG's price increases *because the other suppliers refused to bid against USG*. MSJ Resp. 98-102, ECF No. 94; Kneuper Daubert Resp. 17-30, ECF No. 95. Whatever USG or GP's *desire or motive* to raise Home Depot's prices, the fact remains that they were *unable* to do so in this same market until the 2012 and 2013 price increases by all suppliers.

*Post-Period Damages*: Contrary to Lafarge, ample evidence supports Home Depot's claim for post-period damages. Kneuper Daubert Resp. 35-40, ECF No. 95. First, Dr. Kneuper describes why, as a matter of economic theory, price-fixing conspiracies often change industry behavior in ways that continue to elevate prices. Then he applies that theory to the substantial evidence that the structural changes wrought by *this* conspiracy—the elimination of job quotes and shift to large, calendar-year price increases—continued into 2014-2015. Revised Initial Kneuper Rpt. 68, ECF No. 167-1; Revised Kneuper Rebuttal Rpt. 64-67, ECF No. 167-2. Second, Dr. McClave's regression shows that 2014-2015 prices continued to be elevated above the levels that competitive factors can explain. Revised McClave Initial Rpt. 9-12, ECF No. 167-3.

Respectfully submitted,

*Frank M. Lowrey IV*